UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PERPETUAL ASHARE

                Plaintiff,

     -against-                       Civil Action No. _____

SONTAG & HYMAN, P.C.,
MARC H. HYMAN,
EAST HARLEM MEC PARCEL C L.P.,              **COMPLAINT AND DEMAND FOR**
EAST HARLEM MEC PARCEL C HOUSING     **JURY TRIAL**
FUND DEVELOPMENT CORPORATION,
METRO 125, INC and
RICHMAN PROPERTY SERVICES, INC.

                Defendants.
-----------------------------------------------------------x

       Plaintiff Perpetual Ashare, by her attorneys at Manhattan Legal Services and The Law

Firm of Ahmad Keshavarz, bring suit against the debt collection law firm, Sontag & Hyman, P.C

("S&H") and a principal at the firm, Marc H. Hyman ("Hyman") (collectively "Attorney

Defendants) for violations of the Fair Debt Collection Practices Act, GBL § 349, Judiciary Law

§ 487 and for negligence and gross negligence; and against the owners of the property, East

Harlem Mec Parcel C,  L.P., ("LP") and East Harlem MEC Parcel C Housing Development Fund

Corporation ("HDFC"), and their property management companies, Richman Property Services

Inc. ("Richman") and Metro 125, Inc ("Metro 125") (collectively the "Landlord Defendants") for

systematically suing dozens of tenants, including Plaintiff, for rent that cannot be lawfully

collected because of the refusal of the Landlord Defendants to obtain a Certificate of Occupancy

for the building.

## SUMMARY OF CLAIMS[1]

1.      Plaintiff Perpetual Ashare is a single working mother, supporting her two children in the rent-stabilized apartment they have called home since 2012. Defendants East Harlem Mec Parcel C L.P. ("LP"), East Harlem MEC Parcel C Housing Development Fund Corporation ("HDFC"), own Ms. Ashare's building, which is managed by Defendants Richman Property Services ("Richman"), and Metro 125, Inc, ("Metro 125") (collectively "Landlord Defendants"). Landlord Defendants are responsible for ensuring that Ms. Ashare's building is safe, habitable, and in compliance with all applicable laws, codes and regulations governing multiple dwellings.

2.      Neglecting this basic responsibility, Landlord Defendants failed to obtain a new Certificate of Occupancy for the building in 2015 after rehabilitation they sought and authorized rendered their original Certificate of Occupancy invalid. Certificates of Occupancy are so central to New York City's regulatory oversight of building habitability that a landlord who fails to obtain one is specifically, immediately and completely barred from collecting any rent monies for that building through any means, including by commencing a summary proceeding. To date, Landlord Defendants have still not obtained a new Certificate of Occupancy for the building. Thus, for nearly ten years, they have been barred from taking any actions to collect rent. However, in shameless contempt of this statutory bar to rent collection, over the past decade Landlord Defendants have continued to relentlessly and illegally hound tenants in 2293 3rd Ave., New York, New York 10035 ("the Subject Building"), including Ms. Ashare, for rent. Specifically, Attorney Defendants and Landlord Defendants have unlawfully collected a decade of rental payments from Ms. Ashare. She now seeks these payments as damages, within the confines of the statutes of limitations.

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

Last saved: 4/4/2025 6:00 PM

3.      On or about June 11, 2024, the law firm Sontag & Hyman ("S&H"), under the signature of attorney and senior partner Marc H. Hyman ("Hyman") (collectively "Attorney Defendants") on behalf of Landlord Defendants, commenced a nonpayment eviction proceeding against Ms. Ashare seeking possession of her apartment and $1,381.34 in rent arrears that were statutorily uncollectable. At the time, the Attorney Defendants knew or should have known there was no legal basis for the proceeding. In fact, in March 2024, Attorney Defendants were specifically informed by the New York State Appellate Term in a collection law suit against another tenant of the building that their clients, the Landlord Defendants, were barred from collecting rent due to the fact that the Subject Building lacked a valid Certificate of Occupancy. Nevertheless, Attorney Defendants duped and pressured Ms. Ashare into making multiple rent payments that were statutorily uncollectable before she obtained counsel. Attorney Defendants then refused to discontinue the eviction lawsuit even after Ms. Ashare's counsel notified them that the rent was statutorily uncollectable. In fact, in the last ten years, Landlord Defendants have hired Attorney Defendants to file dozens of nonpayment evictions against tenants in the building for statutorily uncollectable rent, including several against Ms. Ashare.

4.      Defendants' statutorily prohibited collection efforts caused Ms. Ashare incredible stress, fear, anguish, and exhaustion. Defendants denied Ms. Ashare protections guaranteed by a statutory scheme specifically intended to shield her from any and all rental collection efforts until her landlord obtained a valid Certificate of Occupancy for the building. Instead, Ms. Ashare suffered for months under the specter of eviction and homelessness. Ms. Ashare lost hours of sleep to the paralyzing fear of displacement, agonizing over her children's future should they lose their home. Pressured by Defendants' threat of a nonpayment eviction case, she drained her checking account nearly to the point of overdraw to make several rental payments she did not

owe, which left her teetering on the brink of food insecurity. Her joy in hobbies and time with friends or family evaporated under the relentless, crushing pressure of navigating court appearances and eviction paperwork entirely alone. She became a shadow of her former self, perpetually exhausted and sleep-deprived, often breaking into tears, and thinking of little else besides saving her family from homelessness. Ultimately, Defendants traumatized Ms. Ashare, threatening her housing and financial stability and causing her enormous anguish and fear for months on end in an attempt to recoup a rental debt that, due to Defendant Landlords' own failure to obtain a valid Certificate of Occupancy, the Defendants were plainly statutorily barred from collecting.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(d), and 28 U.S.C. § 1331.

6.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Ms. Ashare's N.Y. General Business Law § 349, and N.Y. Jud. Law § 487 state law claims, because they share a common nucleus of operative facts with the federal claim and are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

7.      Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

8.      Venue in this district is proper under 28 USC § 1391(b) because the unlawful conduct complained of herein occurred within the Southern District of New York and Defendants transact business in the Southern District of New York.

## PARTIES

9.      Plaintiff Perpetual Ashare (hereinafter "Ms. Ashare") is an individual currently residing in New York County, New York.

10.      Ms. Ashare is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a(3) as she was alleged to owe rent.

11.      Defendant Sontag & Hyman, P.C. ("S&H") is a New York professional services corporation registered at the New York Department of State with a principal executive office address of 165 Roslyn Road, 1st Floor, Roslyn Heights, New York, NY 11577.

12.      Defendant Sontag & Hyman, is a landlord-tenant law firm that regularly files non-payment proceedings in Landlord Tenant Court ("LT Court") seeking alleged past-due rent against residential tenants and possession of the property. **Exhibit A** (S&H Website)[2]. S&H files thousands of nonpayment petitions in New York Courts and sends thousands of debt collection letters seeking rent. S&H identifies itself as a debt collector on notices they send to tenants when seeking rent arrears on behalf of their landlord clients. For these and other reasons, S&H is "debt collector" as defined by 15 U.S.C. § 1692a(6).

13.      Defendant Marc H. Hyman ("Hyman") is, per the website of S&H, "a senior and co-founding member of the firm" and "co-supervises all aspects of the firm's landlord/tenant litigation." **Exhibit B** (S&H Website, Marc Hyman Profile). Hyman signed the Non-Payment Petition against Ms. Ashare that forms the basis for this Complaint. Indeed, the names of Hyman and co-partner Bruce Sontag are pre-printed in the signature lines of the non-payment petitions S&H file in LT-Court. Hyman's signature is on hundreds of the nonpayment petitions filed by S&H. A search on New York State Courts Electronic Filing ("NYSCEF") shows approximately 1,241 Landlord Tenant Nonpayment cases filed just since July 11, 2024 in which Marc Hyman is listed as the attorney. A sampling of those cases shows the Hyman cases are filed for his firm

---

[2] All Exhibits are incorporated into the complaint by reference in their entirety.

S&H. Therefore, Hyman is a "debt collector" as defined by 15 U.S.C. § 1692a(6), and is jointly and severally liable for the acts of S&H.

14.     Defendants S&H and Hyman are collectively the "Attorney Defendants."

15.     Defendant East Harlem Mec Parcel C, L.P. ("LP") is a domestic limited partnership registered at the New York Department of State with a listed service address at 122 East 42nd Street, 18th Floor, New York, NY 10168.

16.     LP is the petitioner in the non-payment petitions against Ms. Ashare and dozens of other tenants of the building at 2293 3rd Ave., New York, NY 10035 over the last 10 years – despite the fact that LP has been statutorily prohibited from suing for rent because the building has had no valid Certificate of Occupancy for nearly 10 years.

17.     Defendant East Harlem MEC Parcel C Housing Development Fund Corporation ("HDFC") is a domestic not-for-profit corporation duly authorized and qualified to do business in the State of New York. Defendant HDFC is the co-declarant on the Condo Declaration of the Subject Building.

18.     Defendant Richman Property Services Inc. ("Richman") is a corporation, or corporate cluster, organized and existing under the laws of Connecticut, duly authorized and qualified to do business in the State of New York. Richman regularly conducts business in the Southern District of New York, and this suit arises from its business and conduct in this judicial district.

19.      Defendant Metro 125 LLC ("Metro 125"), a part of the "Richman Group of Companies" corporate cluster, is a domestic limited liability corporation registered at the New York Department of State with a listed service address at 118 West 125th Street New York, New York 10027.

Last saved: 4/4/2025 6:00 PM

20.     Upon information and belief, Metro 125 LLC works in conjunction with Defendant Richman to manage the Subject Building, charge and collect rent. Employees of Richman additionally sign Ms. Ashare's leases on behalf of "Owner." Consequently, Richman and Metro 125 are jointly and severally liable for LP unlawfully seeking and unlawfully obtaining rent from Ms. Ashare.

21.     LP, HDFC, Richman and Metro 125 are collectively the "Landlord Defendants."

## FACTS

### Ms. Ashare's Tenancy

22.     Plaintiff Ms. Ashare is a single mother and the tenant-of-record of 2293 3rd Avenue Apartment #806 New York, NY 10035 (hereinafter, "Subject Unit").

23.     She has resided in this rent-stabilized apartment since 2012 alongside her two children, ages 21 and 18. Ms. Ashare is a Certified Nursing Assistant and works the night-shift.

24.     The Subject Unit is subject to Rent Stabilization Law, the federal Low Income Housing Tax Credit Program, and the HOME Investments Partnerships Program.

### Ownership And Management of Subject Building By Landlord Defendants

25.     According to ownership records filed with the Automated City Register Information System ("ACRIS"), Defendants LP and HDFC are co-declarants on the Condo Declaration for 2293 3rd Avenue, New York, NY 10035 (hereinafter, "Subject Building"). *See* **Exhibit C** (Condo Declaration)**.** Further, according to Housing Preservation and Development (hereinafter, "HPD") records, the Subject Building is owned by Defendant LP, with the corporate address listed as 777 West Putnam Ave Greenwich, CT 06830.  Defendant LP is also the plaintiff in the many nonpayment eviction cases filed against Ms. Ashare, and identifies itself as the "landlord" of the Subject Building in the Petition of the most recent nonpayment proceeding.

Last saved: 4/4/2025 6:00 PM

**Exhibit D** (Non-Payment Notice of Petition and Petition Against Ashare).

26.    However, while Defendants LP and HDFC own the Subject Building, the day-to-day operations of the Subject Building are, upon information and belief, managed entirely by a cluster of associated and intertwined corporate entities, which includes Defendant Richman and Defendant Metro 125.

27.    Indeed, upon information and belief, Defendant LP seems to function as an empty corporate ownership vehicle, without any independent staff, contact information, or decision-making authority, set up and run by various members of the Richman corporate cluster. Defendant LP is a limited Partnership, and Defendant Richman is a "co-managing member" of that partnership. **Exhibit C** (Condo Declaration). Further, Defendant LP is listed as "having an office at c/o The Richman Group, 340 Pemberwick Road, Greenwich, Connecticut 06831." *Id.* Defendant LP also lists 340 Pemberwick Road, Greenwich, Connecticut 06831 as its address on Ms. Ashare's 2020 lease. **Exhibit E** (Ashare Leases — 2020, 2022, 2024).

28.    Instead, it is Defendant Richman and Defendant Metro 125 who fundamentally operate, manage and run the Subject Building. Defendant Richman is listed on HPD record as the Managing Agent for the Subject Building, with Karlene Johnson-Clarke named specifically as the agent of record.

29.    Richman also staffs an office from which LP's day-to-day affairs are managed, including the collection of unlawful rent. Richman has a website portal to collect the unlawful rent from Ms. Ashare and other tenants. **Exhibit F** (Richman Payment Portal Notice).

30.    Defendants Richman and Metro 125 are indistinguishable to Ms. Ashare. When Ms. Ashare went into the Management Office in February of 2024, she spoke with Karlene Johnson-Clarke, who printed a rental breakdown for her that listed "East Harlem MEC Parcel C,

LP" as "DBA Metro 125" at the top left corner. **Exhibit G** (DBA Metro 125 Rental Breakdown Print Out).

31.    Ms. Johnson-Clarke is employed as a senior property manager by Defendant Richman, whose logo appears at the top of her business card. Her email address is listed as "ClarkeK@richmanmgt.com." Below her name, the card says "The Balton, Metro, Douglass," which are, upon information and belief, three separate buildings entangled in, or owned by, the Richman corporate cluster. **Exhibit H** (Karlene Johnson-Clarke Business Card).

32.    Until January 2024, Ms. Ashare paid rent directly to Defendant Metro 125. All of her money order rent payments listed "Metro 125" in the Pay-to line.

33.    Starting in January 2024, Ms. Ashare paid rent online using an application called "Rente Café portal," run, upon information and belief, by Defendant Richman. **Exhibit F** (Richman Payment Portal Notice).

34.    Even the website "Metro125.com," which promises "affordable New York Living" on its homepage, lists "BY RICHMAN PROPERTY SERVICES INC" under the logo in the upper left-hand corner, and a copyright to Richman Property Services at the bottom.

35.    Further, while Defendant LP is listed as the Owner/Agent on Ms. Ashare's 2020 and 2024 Rent Stabilized Leases, it is Karlene Johnson Clarke, a Richman employee, who actually executed the lease by signing on the line for "Owner's Signature." Additionally, on Ms. Ashare's 2020 Rent Stabilized lease, the Owner/Agent is listed not as Defendant LP but merely as "Metro," with an address of 777 West Putnam Ave Greenwich, CT 06830. **Exhibit E** (Ashare Leases).

36.    Richman takes affirmative steps to collect (uncollectable) rent from Ms. Ashare each month, including by providing ledgers on "The Richman Group of Companies" letterhead.

**Exhibit I** (July 26, 2024 Ledger).

37. As recently as February of this year, Ms. Ashare received an Annual Recertification Notice listing the "Metro 125 Team" as the entity to whom she must submit her annual documents verifying her income and eligibility for the unit. *See* **Exhibit W** (Annual Recertification Initial Notice). That notice is signed by "The Metro 125 Team," and the second page is printed with Defendant Metro 125's logo.

38. Additionally, in April, an Assistant Property Manager named Gregory Sherril sent Ms. Ashare an e-mail regarding recertification paperwork for her unit. *See* **Exhibit X** (Annual Recertification email). That email lists Mr. Sherril as employed by, in part, "Metro 125," yet lists his email address as <u>sherrilg@richmanmgt.com</u>. Further, the website address for Defendant Richman appears at the bottom of the email below Mr. Sherril's signature line.

39. Ultimately, Defendant Metro 125 and Richman seemed to Ms. Ashare to operate interchangeably as agents of Defendant LP, collecting rent, processing her annual recertifications, managing her building, and making decisions about what rental debt, if any, she owed.

40. Consequently, upon information and belief, Landlord Defendants Richman and Metro 125 were fully responsible for charging and collecting rent from Ms. Ashare on behalf of Defendant LP.

## Defendants Could Not Lawfully Collect Rent From Ms. Ashare Because the Building Has No Certificate of Occupancy

41. The Subject Building has lacked a valid Certificate of Occupancy for nearly ten years, since June 4, 2015, when the last temporary Certificate of Occupancy expired. **Exhibit J** (Expired Temporary Certificate of Occupancy). No new Certificate of Occupancy has since been issued.

Last saved: 4/4/2025 6:00 PM

42.     Without a valid Certificate of Occupancy, rent may not be lawfully collected from the tenant, nor may it be sought in a special proceeding. *See Chazon, LLC v. Maugenest*, 19 N.Y.3d 410, 416, 971 N.E.2d 852 (2012) (citing to, *inter alia*, N.Y. Mult. Dwell. Law § 302(1)).

43.     Notably, on March 25, 2024, the Appellate Term, First Department affirmed the dismissal of a nonpayment proceeding filed against Ms. Ashare's neighbor, holding that "[b]ecause the building lacks a valid certificate of occupancy, landlord is precluded from seeking to recover rent..." *E. Harlem MEC Parcel C, L.P. v. Smalls*, 82 Misc. 3d 127(A), 205 N.Y.S.3d 841 (N.Y. App. Term. 2024) (hereinafter, "*Smalls*") (citing to MDL §§ 301, 302(1)(a),(b)). Crucially, S&H represented Defendant LP in the proceeding, including at the Appellate Term. *Id.*

44.     Incredibly, two months later, Defendants would sue Ms. Ashare for rent in the very same building.

### **Unlawful Collection Efforts by Defendants Against Ms. Ashare**

*Defendants' Unlawful, Deceptive Rent Demands Pressure and Dupe Ms. Ashare to Pay Defendants Rent to Which They Had No Lawful Right*

45.     Attorney Defendants mailed Ms. Ashare, on behalf of Landlord Defendants, a collection letter dated January 18, 2024 making certain disclosures required be the FDCPA pursuant to 15 U.S.C. § 1692g.  *See* **Exhibit K** (January 18 1692g Notice).[3]  S&H alleged in the Notice that Ms. Ashare owed Defendant LP $3,369.76 for "rent arrears" and stated they were retained to collect that amount. *Id*.  The header of the Notice listed the name and address of S&H and was sent via certified mail in an envelope disclosing the name and return address of S&H. *Id*.

---

[3] Because Exhibit K is dated more than one year from the date of the filing of this Complaint, it does not form a basis of this suit.

Last saved: 4/4/2025 6:00 PM

46.     Later, Attorney Defendants mailed to Ms. Ashare a Five Day Rent Demand ("Five Day Rent Demand") dated April 10, 2024, which, upon information and belief, they had also generated. *See* **Exhibit L** (Five Day Rent Demand and Envelope). The Five Day Rent Demand contended that more than five days passed since Ms. Ashare's rent was due, and that she owed a total of $3,617.44, itemized as $854.76 balance from February 2024, and $1,381.34 for April 2024 and again for March 2024. The letter represented to Ms. Ashare that she was "in default of your lease agreement".

47.     Ms. Ashare recognized the Five Day Rent Demand as the type of collection letter sent as an immediate precursor to the filing of a non-payment eviction proceeding. She had received letters similar to Exhibit L, also from Defendant S&H, immediately prior to the commencement of seven prior non-payment eviction proceedings filed against her in the past. Additionally, she recognized Defendant S&H as the firm that had attempted to evict her several times in the past. Thus, in reading that she was "in default of her lease agreement," Ms. Ashare believed that her landlord was again going to take her to court to attempt to evict her.

48.     The Five Day Rent Demand was mailed and generated by Attorney Defendants, though the top and the bottom of the letter state that it is from "East Harlem Mec Parcel C, LP." Notably, the address underneath the name of the LP is actually the address for the Richman management office to which Ms. Ashare goes when she makes in-person payments, "311 West 127th St., New York, New York 10027." Moreover, the letter was sent via certified mail in an envelope bearing the name of S&H and the firm's address in Roslyn Heights, NY. When S&H filed the nonpayment case, they uploaded to NYSCEF a copy of the Five Day Rent Demand stamped with the same certified mail tracking number that was listed on the envelope. *See* **Exhibit M** (As-filed Five Day Rent Demand with Tracking Number).

49.     Notably, and unbeknownst to Ms. Ashare at the time, five of these prior non-payment proceedings brought since 2015 unlawfully sought (and obtained) rent from Ms. Ashare when the Attorney Defendants and Landlord Defendants were prohibited from doing so given the refusal of the Landlord Defendants to obtain a Certificate of Occupancy.[4]

50.     In response to receiving the Five Day Rent Demand, Ms. Ashare was terrified that she and her children would be evicted and end up on the street. Consequently, Ms. Ashare picked up overtime shifts and worked hard to gather at least the February 2024 Balance of $854.76 and March 2024 amount of $1,381.34 as indicated on the Five Day Rent Demand.

51.     Due to complications with the payment portal, Ms. Ashare decided to pay in person. So, on April 18, 2024, she paid for the bus fare and rode the bus from her apartment to the office of Richman Property Services, Inc., 311 West 127th Street New York, NY 10027, where she would usually pay rent. There, Ms. Ashare spoke with Karlene Johnson-Clarke, who input Ms. Ashare's debit card information into the portal in order to make a payment of $2,245.10 towards the alleged rental debt. *See* **Exhibit I** (July 26, 2024 Ledger). Ms. Ashare then paid again for the bus fare and rode the bus back home.

52.     At or around the same time, Ms. Ashare received from Defendants a letter dated April 11, 2024 titled "Thirty Day Demand Notice" demanding payment of $3,617.44 for rent, itemized as $854.76 balance from February 2024, and $1,381.34 for April 2024 and again for March 2024. *See* **Exhibit N** (Thirty Day Rent Demand); *see also* **Exhibit O** (Affidavit of Service

---

[4] Within the last 10 years, the LP has (unlawfully) filed non-payment proceedings against Ms. Ashare in the following index numbers: LT-300890-24/HA, LT-301030-22/HA, LT-251192-19/HA, LT-251372-19/HA, LT-251876-16/HA, LT-250006-16/HA. The Attorney Defendants brought many if not all of these unlawful non-payment proceedings for the Landlord Defendants. The Attorney Defendants are liable as for damages the amounts of money they induced Ms. Ashare to pay in connection with these unlawful non-payment proceedings within the last 3 years under GBL 349 and for negligence and gross negligence' and for 6 years under Judiciary Law 487. Similarly, the Landlord Defendants are liable to Ms. Ashare for the rent they sought or received from Ms. Ashure within the last 3 years under GBL 349 and for negligence and gross negligence. Prior to 2015, non-payment proceeding with the LP as the petitioner were brought against Ms. Ashure in LT-251826-14/HA and LT-250023-13/HA.

of Thirty Day Rent Demand). This was precisely the same amount and calculation as in the Five

Day Rent Demand dated the day before, April 10, 2024. *See* **Exhibit L** (Five Day Rent

Demand). The Thirty Day Rent Demand demanded that Ms. Ashare pay $3,617.44 or vacate the

premises within 30 days. *See* **Exhibit N** (Thirty Day Rent Demand). Unlike the Five Day Rent

Demand, the Thirty Day Rent Demand does not have a header listing the name and address of

the letter's source, although the lower right side of the notice states the name of Defendant LP.

Ms. Ashare's recollection is that the Thirty Day Rent Demand was mailed in an envelope with

S&H's name and return address, indicating that the letter was actually sent from, and upon

information and belief, generated by S&H. Upon receiving the envelope, Ms. Ashare

immediately recognized Defendant S&H as the firm that had attempted to evict her several times

in the past, and further had sent similar notices in connection with prior eviction cases. In

addition, the Thirty Day Rent Demand states "This firm" has been "retained" to collect the rental

arrears, suggesting the letter is from a law firm retained by the landlord. Further, the lower left

side states "OUR FILE NO. 444061/07303," which is the same file number as listed on the first

page of the Notice of Petition: "Our file No. 444061". *See* **Exhibit D** (Notice of Petition and

Petition).

     53.    Because the Thirty Day Rent Demand indicating that she owed a debt, and

because she wanted to avoid court, Ms. Ashare paid another bus fare and rode to the Richman

Property Services, Inc. offices on June 5, 2024 to make another payment. With the help of

Karlene Johnson-Clarke again, she paid $2,800 toward the alleged debt. *See* **Exhibit I** (July 26,

2024 Ledger).

     54.    After making this $2,800 payment, Ms. Ashare only had $80 left in her bank

account, on which she and her children had to survive until her next paycheck came nearly a

week later.

55.    In sum, Defendants' unlawful, deceptive rent demands pressured and duped Ms.

Ashare to pay rent to which they had no lawful right, which is an actual monetary injury.

***Defendants Deceptively, Unlawfully, and Unconscionably Dragged Ms. Ashare to Court***

56.    Then, around June 11, 2024, Attorney Defendants, on behalf of Landlord

Defendants, commenced an eviction proceeding for nonpayment against Ms. Ashare under the

caption *East Harlem Mec Parcel C v Perpetual Ashare et al,* LT-300890-24/NY, seeking to

collect $1,381.34 in alleged rental arrears, for April 2024. *See* **Exhibit D** (Petition). At the time

the Petition was filed, Landlord Defendants knew or should have known that there was no valid

Certificate of Occupancy for the Subject Building and that they were precluded from recovering

any rent for the Subject Building as a matter of law.

57.    Ms. Ashare received the Petition on or about June 24, 2024. The Petition arrived

in an envelope from Attorney Defendants, and listed Defendant LP as the Petitioner and

Attorney Defendants as the Attorney for Petitioner. The Petition was additionally verified upon

information and belief by Defendant Marc Hyman, an employee of Attorney Defendants. It also

appended the Five Day Rent Demand, as well as the Thirty Day Rent Demand.

58.    The Petition stated that Ms. Ashare needed to file an "Answer," which she had

filed in previous cases at the Harlem Community Justice Center located at 170 E 121st St, New

York, NY 10035.

59.    On July 2, 2024, Ms. Ashare went to the Harlem Community Justice Center

where she was connected with a woman from New York City's Human Resources

Administration ("HRA") who helped her submit an application for a One-Shot Deal, a loan

provided by HRA for tenants facing eviction.

60.     Ms. Ashare also submitted her Answer *pro se* at the Harlem Community Justice Center, and received her first court date, July 29, 2024, scheduled to take place at Housing Court at 111 Centre Street New York, NY 10013. **Exhibit P** (Pro Se Answer).

61.     The following day, July 3, 2024, Ms. Ashare arrived home in the morning after her night shift and called HRA to complete her One-Shot Deal interview. She was on hold for over two hours, and only briefly spoke with an HRA worker before they put her back on hold. She was so exhausted and overwhelmed that she could not wait on the phone any longer and hung up.

62.     The morning of July 29, 2024, Ms. Ashare paid the subway fare and rode downtown to Housing Court.

63.     After Ms. Ashare checked in on her case, she was connected with the Office of Civil Justice ("OCJ"), who found that she was eligible for free legal services. She then was connected with Manhattan Legal Services (hereinafter, "MLS"), who gathered information about her case in court and informed her that they would call her back to let her know whether they could represent her. She paid the subway fare again and rode the train home.

64.     On August 9, 2024, MLS called Ms. Ashare and informed her that they were able to provide her with legal representation. They filed a Notice of Appearance the same day.

65.     On November 20, 2024, MLS filed an amended Answer in the nonpayment case, which listed as the Second Defense and First Counterclaim the fact that there was no valid Certificate of Occupancy for the Subject Building, and as such that the landlord could not collect rent. **Exhibit Q** (Amended Answer).

66.     On November 21, 2024, MLS mailed, via Federal Express, a Demand Letter to Attorney Defendants. Attn: Michael Giammarusco 165 Roslyn Road, 1st Floor Roslyn Heights,

NY 11577. The letter arrived on November 22, 2024 and was signed for by "J. EAN". The letter

stated, in relevant part, that Ms. Ashare did not owe any rent because there was no valid

Certificate of Occupancy, and demanded that Attorney Defendants discontinue the nonpayment

proceeding against Ms. Ashare immediately. **Exhibit R** (MLS Demand Letter).

67.    Then, on November 26, 2024, MLS emailed attorney Michael Giammarusco at

Giammarusco@sontag-hyman.com providing a copy of the MLS Demand Letter and requesting

that the firm discontinue the proceeding in advance of the December 3, 2024 court appearance.

MLS received no reply, and so on December 2, 2024, they followed up via email. **Exhibit S**

(November 26 and December 2, 2024 Email).

68.    On December 3, 2024, the parties appeared in court. MLS again asked Attorney

Defendants to discontinue the case considering their client was statutorily prohibited from

collecting rent without a valid Certificate of Occupancy. Attorney Defendants were unwilling to

do so and hence the proceeding was adjourned to January 13, 2025. **Exhibit T** (December 3,

2024 Stipulation).

69.    On December 17, 2024, MLS filed a summary judgment motion seeking

dismissal with prejudice as the building lacked a valid Certificate of Occupancy. Attorney

Defendants did not file opposition to MLS's motion. **Exhibit U** (Summary Judgment Motion).

70.    On January 13, 2025, the parties appeared in court and Attorney Defendants

agreed to discontinue the proceeding without prejudice. **Exhibit V** (Stipulation of

Discontinuance).

### Ms. Ashare's Damages

71.    The Attorney Defendants and Landlord Defendants are liable to Ms. Ashare for

all rent payments they induced or received from her during the 10-year period for which they

17

were collecting rent with no lawful right given the law regarding Certificates of Occupancy. Given the statute of limitations for Plaintiff's claims in this suit, these damages are sought against the Attorney Defendants for up to six years prior to the filing of this Complaint (the statute of limitations is 6 years for Judiciary Law § 487, 3 years for GBL § 349 and for negligence and gross negligence, and one year for the FDCPA); and against the Landlord Defendants for up to 3 years prior to the filing of this Complaint under GBL § 349 and for negligence and gross negligence. As previously noted, the Attorney Defendants have filed multiple non-payment proceedings against Ms. Ashare for the last 10 years with no lawful right to do so.

72.     From early April 2024, when Ms. Ashare first received the Five Day Rent Demand and the Thirty Day Rent Demand, until the case was discontinued on January 13, 2025, Ms. Ashare was extremely distressed about the debt her landlord claimed she owed.

73.     When Ms. Ashare first received the Five Day Rent Demand dated April 10, 2024 (Exhibit L) her heart immediately sank. She was so overcome by fear and helplessness that she began to cry. Throughout this period, Ms. Ashare experienced a constant sensation of fear, helplessness, and dread. She was convinced that she and her children would become homeless, and she fixated on that terrifying possibility.

74.     Ms. Ashare was particularly afraid that an eviction would harm and destabilize her children. Ms. Ashare worked hard to provide her children with a reliable home life, which allowed them to excel academically. She was terrified that losing their home would seriously inhibit their ability to focus at a critical juncture, as one child was finishing college, while the other was finishing high school and applying for college. Thinking about her children becoming homeless brought her acute pain, anguish, and stress.

75.     Further, Ms. Ashare felt shame and embarrassment even just at the thought of her children or family members learning about the eviction, and so she worked hard to conceal this information from them. She worried that her family would be ashamed of her if they learned about the eviction case, and further that her children themselves would become stressed and thus unable to focus on their studies.

76.     Ms. Ashare was duped and pressured into making payments for rent for which Defendants had no lawful right to by the unlawful threats to sue by way of the Five Day Rent Demand (Exhibit L) and the Thirty Day Rent Demand (Exhibit N).

77.     Additionally, Ms. Ashare suffered from severe sleeping problems as a result of the nonpayment case. While Ms. Ashare would normally sleep in the morning after her night shift, during the pendency of the case, she was frequently unable to sleep, and would lie awake ruminating on how to pay the debt her landlord alleged she owed. Ms. Ashare was so afraid of these debt collection efforts and the threat of homelessness that she began picking up overtime shifts at work, which were physically demanding and cut into the little time she had to rest. During this time, her colleagues often commented that she looked very exhausted.

78.     Furthermore, while Ms. Ashare used to enjoy watching movies on her free time, she could no longer focus as she was so preoccupied with the alleged debt.

79.     Ms. Ashare also began experiencing headaches from the stress and lack of sleep, as well as periodic body aches in her knees, shoulders, and arms. Since the case was discontinued, her aches have disappeared.

80.     Additionally, Ms. Ashare's appetite decreased during the last year, as she was often too stressed to eat. While she would normally eat three meals a day, she began eating just one meal a day during the course of the case.

19

81.     During the pendency of the case, strangers with whom Ms. Ashare interacted frequently noted how stressed and despondent she seemed. For example, when Ms. Ashare applied for the One-Shot Deal with HRA, Ms. Ashare was so visibly upset and exhausted that the HRA worker had to continually comfort her. Additionally, the morning of Ms. Ashare's first court appearance, a stranger—who saw her pacing up and down the hallway—told her that she looked extremely pale and "like a zombie".

**<u>Attorney Defendants' Deceptive Acts and Lack of Meaningful Review</u>**

82.     Pursuant to the FDCPA, an attorney signing a demand for debt collection is responsible for exercising professional judgment concerning the validity of a debt prior to engaging in the debt collection.

83.     Pursuant to New York State Law, when an attorney signs a pleading, the attorney is certifying he or she determined that the claim is not frivolous after a reasonable investigation. 22 N.Y.C.R.R. § 130-1.1a.

84.     Upon information and belief, a meaningful and reasonable investigation by Attorney Defendants would have consisted of reviewing their client's *prima facie* case before filing, including reviewing whether the Landlord Defendants were legally permitted to collect rent for the building, and reviewing any of Attorney Defendants' prior litigation involving the Subject Building.

85.     Attorney Defendants failed to conduct even the most cursory meaningful review or reasonable investigation prior to signing and filing the debt collection complaint against Ms. Ashare.

86.     Upon information and belief, Attorney Defendants not only failed to review whether or not there was a valid Certificate of Occupancy for the building permitting Landlord

20

Defendants to collect the alleged rent, they also ignored their own litigation history in the building, included a controlling decision from the Appellate Term on this issue.

87.    Alternatively, the Attorney Defendants knew there was no valid Certificate of Occupancy and knew there was no lawful basis to demand rent but nevertheless filed suit to collect the same.

88.    Indeed, mere weeks before filing against Ms. Ashare, on March 25th, 2024, the Appellate Term, First Department issued a ruling against Attorney Defendants in a separate case, *East Harlem Mec Parcel C, L.P., v. Reggie Smalls*, finding Landlord Defendants were statutorily barred from collecting rent in the Subject Building due to the lack of a valid Certificate of Occupancy. *Smalls, supra.*

89.    The Appellate Term clearly and conclusively informed Attorney Defendants in that decision that Landlord Defendants was entirely precluded from seeking to recover rent due to the subject' buildings lack of a valid Certificate of Occupancy.

90.    This ruling came after Defendant  Hyman and Attorney Michael Giammarusco, both employed by Attorney Defendants, had litigated this issue for months, including appealing an earlier identical ruling from a New York County Housing Court Judge. In fact, Defendant Hyman filed and argued the appeal at the Appellate Term.

91.    Defendant Hyman and Attorney Giammarusco both consented to the electronic record on NYSCEF in the *Smalls* case, and so both received automatic e-mail service of the Appellate Term's *Smalls* decision on April 9th when it was processed by the court system.

92.    Upon information and belief, Attorney Defendants utterly ignored this controlling Appellate Term ruling, and continued trying to extract statutorily uncollectable rent from tenants, including Ms. Ashare, in the same building on behalf Landlord Defendants.

21

93.     In fact, in the months that followed the *Smalls* decision, Attorney Defendants sued not only Ms. Ashare, but also her neighbor Shakedria Mathis for statutorily uncollectible rent.

94.     Upon information and belief, even a cursory review of Ms. Ashare's most basic information, namely her address, would have revealed that she lived in the same building at issue in the *Smalls* decision.

95.     Indeed, upon information and belief, only two weeks after the *Smalls* decision was issued and a mere day after the ruling was uploaded to NYSCEF, Attorney Defendants contradicted the decision entirely by sending Ms. Ashare the Five Day Rent Demand, dated April 10, 2024, attempting to collect statutorily uncollectable rent.

96.     Just a few weeks later, upon information and belief, Attorney Defendants prepared and sent the Thirty Day Rent Demand, attempting to collect more rent and threatening to sue Ms. Ashare if she did not pay.

97.     Finally, Attorney Defendants formally sued Ms. Ashare for alleged rent owed in early June, two short months after the Appellate Term specifically told Attorney Defendants that Landlord Defendants were legally barred from collecting rent in that building and commencing nonpayment proceedings accordingly.

98.     Notably, Defendant Hyman—the same who filed and argued the *Smalls* decision at the Appellate Term—verified the nonpayment Petition against Ms. Ashare.

99.     Upon information and belief, Attorney Defendants' complete disregard for both the directives of the Appellate Term in the *Smalls* decision and the mandates of the controlling statute evince a clear intention to deceive Ms. Ashare and/or the court as to the legal validity of the alleged rental debt.

100.     By signing and verifying the complaint, Attorney Defendants knowingly made a

false representation to Ms. Ashare and the court that they engaged in a meaningful review and made a reasonable inquiry into the complaint.

## **Defendants' Pattern and Practice**

101.    Even beyond the especially egregious circumstances of disregarding the *Smalls* decision, upon information and belief, Attorney Defendants also have a widespread pattern and practice of engaging in debt collection without meaningful review.

102.    Upon information and belief, and according to S&H's website, the firm only has four attorneys.

103.    Yet, according to NYSCEF records, in the year of 2024, Attorney Defendants filed approximately one thousand nonpayment eviction cases in local Housing Court.

104.    The high volume of nonpayment cases filed by Attorney Defendants itself strongly suggests that not only did Attorney Defendants fail to make the requisite meaningful review prior to drafting, signing, and filing the complaint against Ms. Ashare, but that Attorney Defendant have a broad pattern and practice of filing collection complaints without requisite review.

105.    Indeed, since the rent became legally uncollectible in 2015, Attorney Defendants have brought dozens of nonpayment cases in the Subject Building on behalf of Landlord Defendants, all of which, upon information and belief, are deceptive and improper.

106.    NYSCEF records show that in those ten years, Landlord Defendants filed 127 nonpayment proceedings against tenants living in the Subject Building, seeking rent that is statutorily uncollectable. Six of those cases were against Ms. Ashare herself.

107.     Of these 127 summary eviction proceedings for nonpayment, Attorney Defendants represented Landlord Defendant in 82 of those proceedings, including all six of the

cases brought against Ms. Ashare.

108.    Further, according to NYSCEF records, 45 of these 127 nonpayment proceedings resulted in a monetary and possessory judgment issued against the tenants.

109.    Of those 45 cases, Attorney Defendants represented Landlord Defendants in 24 of the nonpayment proceedings leading to a Judgment.

110.    The systemic deceptive collection practices of Landlord Defendants and Attorney Defendants have, upon information and belief, affected dozens of similarly situated consumers living in the Subject Building.

**FIRST CAUSE OF ACTION**
Violation of the FDCPA, 15 U.S.C. § 1692, et seq.
(Against Attorney Defendants)

111.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

112.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692; *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

113.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have

been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

114.    The Attorney Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation, the Attorney Defendants materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; making false representations of the character, amount, or legal status of any debt; making false representations of any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt; making a false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false representation or deceptive means; using unfair or unconscionable means; and the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

115.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

116.    Plaintiff seeks recovery for actual damages, statutory damages of up to $1,000, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. L. § 349 *et seq*.
### (Against All Defendants)

117.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

118.    Defendants violated N.Y. Gen. Bus. Law § 349 *et seq*. by using deceptive acts and practices in the conduct of their businesses.

119.    These acts were done by Defendants systematically, and, as such, have had a broad impact on consumers at large.

120.    Defendants committed the above-described acts willfully and/or knowingly.

121.    Defendants' deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

122.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

123.    As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm, including emotional distress and costs.

124.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

125.    Plaintiff is entitled to preliminary and permanent injunctive relief barring Defendants from engaging in such deceptive acts and practices, and to recover actual, statutory, and treble damages, together with costs and attorney's fees.

## THIRD CAUSE OF ACTION
### Violation of N.Y. Judiciary Law § 487
### (Against Attorney Defendants)

26

126.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

127.    Attorney Defendants engaged in egregious conduct which violated N.Y. Jud. Law § 487 by, inter alia, filing a court action to recover a debt from Ms. Ashare despite clear evidence that Ms. Ashare did not owe the putative debt, including a controlling Appellate Term decision concerning the same building and owner, also litigated by Attorney Defendants which held that rent was uncollectible in the Subject Building. Smalls, supra. This conduct further included Attorney Defendants' refusal to discontinue the subject proceeding after several requests by Ms. Ashare, through MLS.

128.    Upon information and belief, based on the large volume of cases filed by Attorney Defendants, they engage in a broad practice of filing court cases without making a meaningful review or reasonable investigation into the facts of each case.

129.    By signing the complaint, Attorney Defendants made a false representation that it had engaged in a reasonable investigation to ensure that the action was not frivolous and a meaningful review to ensure its cause of action was meritorious.

130.    Attorney Defendants' conduct was deceitful and calculated to delay the civil court action for its own benefit, including its failure to discontinue the Housing Court Eviction for several months after being notified that the subject premises had no valid Certificate of Occupancy.

131.    Attorney Defendants' acts of deceit and/or collusion and legal delinquency violated N.Y. Judiciary Law.

132.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil

prosecution, wrongful litigation, and abuse of process.

133.    The deceitful conduct of Attorney Defendants caused actual damages to Plaintiff, including emotional distress.

134.    Attorney Defendants are liable to Plaintiff for treble damages pursuant to N.Y. Judiciary Law § 487.

### FOURTH AND FIFTH CAUSES OF ACTION
Negligence and Gross Negligence
(Against all Defendants)

135.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

136.    Defendants, who owed Plaintiff a duty of reasonable care, failed to exercise even slight care or diligence, amounting to gross negligence, or, at least, to negligence, by, *inter alia,* seeking and receiving payment of rent to which they had no legal right.

137.    As a result of Defendants' actions, Plaintiff was injured.

138.    Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general. Defendants are liable to Plaintiff for actual and punitive damages. To the degree Plaintiff alleges intentional misconduct by Defendants, she, in the alternative, alleges them as claims for negligence.

139.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court award the following relief:

Last saved: 4/4/2025 6:00 PM

(a) Declaratory judgment that Defendants' actions violate 15 U.S.C. §§ 1692e, and 1692f;

(b) Actual Damages;

(c) Statutory damages;

(d) Treble damages;

(e) Punitive damages;

(f) Costs and reasonable attorney's fees to Plaintiff; and

(g) Such other and further relief as may be just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
       April 4, 2025

               Respectfully submitted,

               Manhattan Legal Services
               2090 Adam Clayton Powell Jr Blvd, 5th Floor
               New York, NY 10027

               */s/ Cecilia MacArthur*
               _____
               Cecilia MacArthur, of Counsel

               */s/ Mary "Molly" Rockett*
               _____
               Mary "Molly" Rockett, of Counsel

Dated: Brooklyn, New York
       April 4, 2025

               The Law Office Ahmad Keshavarz

                    */s/ Ahmad Keshavarz*
             By: _____
                   Ahmad Keshavarz