# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PERPETUAL ASHARE

                       Plaintiff,

       -against-

SONTAG & HYMAN, P.C.,
MARC H. HYMAN,
EAST HARLEM MEC PARCEL C L.P.,
EAST HARLEM MEC PARCEL C HOUSING
FUND DEVELOPMENT CORPORATION,
METRO 125, INC and
RICHMAN PROPERTY SERVICES, INC.

                      Defendants.
-------------------------------------------------------------x

Civil Action No. _____

**COMPLAINT AND DEMAND FOR
JURY TRIAL**

      Plaintiff Perpetual Ashare, by her attorneys at Manhattan Legal Services and The Law

Firm of Ahmad Keshavarz, bring suit against the debt collection law firm, Sontag & Hyman, P.C

("S&H") and a principal at the firm, Marc H. Hyman ("Hyman") (collectively "Attorney

Defendants) for violations of the Fair Debt Collection Practices Act, GBL § 349, Judiciary Law

§ 487 and for negligence and gross negligence; and against the owners of the property, East

Harlem Mec Parcel C,  L.P., ("LP") and East Harlem MEC Parcel C Housing Development Fund

Corporation ("HDFC"), and their property management companies, Richman Property Services

Inc. ("Richman") and Metro 125, Inc ("Metro 125") (collectively the "Landlord Defendants") for

systematically suing dozens of tenants, including Plaintiff, for rent that cannot be lawfully

collected because of the refusal of the Landlord Defendants to obtain a Certificate of Occupancy

for the building.

# SUMMARY OF CLAIMS[1]

1.      Plaintiff Perpetual Ashare is a single working mother, supporting her two children in the rent-stabilized apartment they have called home since 2012. Defendants East Harlem Mec Parcel C L.P. ("LP"), East Harlem MEC Parcel C Housing Development Fund Corporation ("HDFC"), own Ms. Ashare's building, which is managed by Defendants Richman Property Services ("Richman"), and Metro 125, Inc, ("Metro 125") (collectively "Landlord Defendants"). Landlord Defendants are responsible for ensuring that Ms. Ashare's building is safe, habitable, and in compliance with all applicable laws, codes and regulations governing multiple dwellings.

2.      Neglecting this basic responsibility, Landlord Defendants failed to obtain a new Certificate of Occupancy for the building in 2015 after rehabilitation they sought and authorized rendered their original Certificate of Occupancy invalid. Certificates of Occupancy are so central to New York City's regulatory oversight of building habitability that a landlord who fails to obtain one is specifically, immediately and completely barred from collecting any rent monies for that building through any means, including by commencing a summary proceeding. To date, Landlord Defendants have still not obtained a new Certificate of Occupancy for the building. Thus, for nearly ten years, they have been barred from taking any actions to collect rent. However, in shameless contempt of this statutory bar to rent collection, over the past decade Landlord Defendants have continued to relentlessly and illegally hound tenants in 2293 3rd Ave., New York, New York 10035 ("the Subject Building"), including Ms. Ashare, for rent. Specifically, Attorney Defendants and Landlord Defendants have unlawfully collected a decade of rental payments from Ms. Ashare. She now seeks these payments as damages, within the confines of the statutes of limitations.

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

2

3.     On or about June 11, 2024, the law firm Sontag & Hyman ("S&H"), under the signature of attorney and senior partner Marc H. Hyman ("Hyman") (collectively "Attorney Defendants") on behalf of Landlord Defendants, commenced a nonpayment eviction proceeding against Ms. Ashare seeking possession of her apartment and $1,381.34 in rent arrears that were statutorily uncollectable. At the time, the Attorney Defendants knew or should have known there was no legal basis for the proceeding. In fact, in March 2024, Attorney Defendants were specifically informed by the New York State Appellate Term in a collection law suit against another tenant of the building that their clients, the Landlord Defendants, were barred from collecting rent due to the fact that the Subject Building lacked a valid Certificate of Occupancy. Nevertheless, Attorney Defendants duped and pressured Ms. Ashare into making multiple rent payments that were statutorily uncollectable before she obtained counsel. Attorney Defendants then refused to discontinue the eviction lawsuit even after Ms. Ashare's counsel notified them that the rent was statutorily uncollectable. In fact, in the last ten years, Landlord Defendants have hired Attorney Defendants to file dozens of nonpayment evictions against tenants in the building for statutorily uncollectable rent, including several against Ms. Ashare.

4.     Defendants' statutorily prohibited collection efforts caused Ms. Ashare incredible stress, fear, anguish, and exhaustion. Defendants denied Ms. Ashare protections guaranteed by a statutory scheme specifically intended to shield her from any and all rental collection efforts until her landlord obtained a valid Certificate of Occupancy for the building. Instead, Ms. Ashare suffered for months under the specter of eviction and homelessness. Ms. Ashare lost hours of sleep to the paralyzing fear of displacement, agonizing over her children's future should they lose their home. Pressured by Defendants' threat of a nonpayment eviction case, she drained her checking account nearly to the point of overdraw to make several rental payments she did not

owe, which left her teetering on the brink of food insecurity. Her joy in hobbies and time with friends or family evaporated under the relentless, crushing pressure of navigating court appearances and eviction paperwork entirely alone. She became a shadow of her former self, perpetually exhausted and sleep-deprived, often breaking into tears, and thinking of little else besides saving her family from homelessness. Ultimately, Defendants traumatized Ms. Ashare, threatening her housing and financial stability and causing her enormous anguish and fear for months on end in an attempt to recoup a rental debt that, due to Defendant Landlords' own failure to obtain a valid Certificate of Occupancy, the Defendants were plainly statutorily barred from collecting.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(d), and 28 U.S.C. § 1331.

6.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Ms. Ashare's N.Y. General Business Law § 349, and N.Y. Jud. Law § 487 state law claims, because they share a common nucleus of operative facts with the federal claim and are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

7.     Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

8.     Venue in this district is proper under 28 USC § 1391(b) because the unlawful conduct complained of herein occurred within the Southern District of New York and Defendants transact business in the Southern District of New York.

## PARTIES

9.      Plaintiff Perpetual Ashare (hereinafter "Ms. Ashare") is an individual currently residing in New York County, New York.

10.     Ms. Ashare is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a(3) as she was alleged to owe rent.

11.     Defendant Sontag & Hyman, P.C. ("S&H") is a New York professional services corporation registered at the New York Department of State with a principal executive office address of 165 Roslyn Road, 1st Floor, Roslyn Heights, New York, NY 11577.

12.     Defendant Sontag & Hyman, is a landlord-tenant law firm that regularly files non-payment proceedings in Landlord Tenant Court ("LT Court") seeking alleged past-due rent against residential tenants and possession of the property. **Exhibit A** (S&H Website)[2]. S&H files thousands of nonpayment petitions in New York Courts and sends thousands of debt collection letters seeking rent. S&H identifies itself as a debt collector on notices they send to tenants when seeking rent arrears on behalf of their landlord clients. For these and other reasons, S&H is "debt collector" as defined by 15 U.S.C. § 1692a(6).

13.     Defendant Marc H. Hyman ("Hyman") is, per the website of S&H, "a senior and co-founding member of the firm" and "co-supervises all aspects of the firm's landlord/tenant litigation." **Exhibit B** (S&H Website, Marc Hyman Profile). Hyman signed the Non-Payment Petition against Ms. Ashare that forms the basis for this Complaint. Indeed, the names of Hyman and co-partner Bruce Sontag are pre-printed in the signature lines of the non-payment petitions S&H file in LT-Court. Hyman's signature is on hundreds of the nonpayment petitions filed by S&H. A search on New York State Courts Electronic Filing ("NYSCEF") shows approximately 1,241 Landlord Tenant Nonpayment cases filed just since July 11, 2024 in which Marc Hyman is listed as the attorney. A sampling of those cases shows the Hyman cases are filed for his firm

---

[2] All Exhibits are incorporated into the complaint by reference in their entirety.

S&H. Therefore, Hyman is a "debt collector" as defined by 15 U.S.C. § 1692a(6), and is jointly and severally liable for the acts of S&H.

14. Defendants S&H and Hyman are collectively the "Attorney Defendants."

15. Defendant East Harlem Mec Parcel C, L.P. ("LP") is a domestic limited partnership registered at the New York Department of State with a listed service address at 122 East 42nd Street, 18th Floor, New York, NY 10168.

16. LP is the petitioner in the non-payment petitions against Ms. Ashare and dozens of other tenants of the building at 2293 3rd Ave., New York, NY 10035 over the last 10 years – despite the fact that LP has been statutorily prohibited from suing for rent because the building has had no valid Certificate of Occupancy for nearly 10 years.

17. Defendant East Harlem MEC Parcel C Housing Development Fund Corporation ("HDFC") is a domestic not-for-profit corporation duly authorized and qualified to do business in the State of New York. Defendant HDFC is the co-declarant on the Condo Declaration of the Subject Building.

18. Defendant Richman Property Services Inc. ("Richman") is a corporation, or corporate cluster, organized and existing under the laws of Connecticut, duly authorized and qualified to do business in the State of New York. Richman regularly conducts business in the Southern District of New York, and this suit arises from its business and conduct in this judicial district.

19. Defendant Metro 125 LLC ("Metro 125"), a part of the "Richman Group of Companies" corporate cluster, is a domestic limited liability corporation registered at the New York Department of State with a listed service address at 118 West 125th Street New York, New York 10027.

20.     Upon information and belief, Metro 125 LLC works in conjunction with Defendant Richman to manage the Subject Building, charge and collect rent. Employees of Richman additionally sign Ms. Ashare's leases on behalf of "Owner." Consequently, Richman and Metro 125 are jointly and severally liable for LP unlawfully seeking and unlawfully obtaining rent from Ms. Ashare.

21.     LP, HDFC, Richman and Metro 125 are collectively the "Landlord Defendants."

## FACTS

### Ms. Ashare's Tenancy

22.     Plaintiff Ms. Ashare is a single mother and the tenant-of-record of 2293 3rd Avenue Apartment #806 New York, NY 10035 (hereinafter, "Subject Unit").

23.     She has resided in this rent-stabilized apartment since 2012 alongside her two children, ages 21 and 18. Ms. Ashare is a Certified Nursing Assistant and works the night-shift.

24.     The Subject Unit is subject to Rent Stabilization Law, the federal Low Income Housing Tax Credit Program, and the HOME Investments Partnerships Program.

### Ownership And Management of Subject Building By Landlord Defendants

25.     According to ownership records filed with the Automated City Register Information System ("ACRIS"), Defendants LP and HDFC are co-declarants on the Condo Declaration for 2293 3rd Avenue, New York, NY 10035 (hereinafter, "Subject Building"). *See* **Exhibit C** (Condo Declaration)**.** Further, according to Housing Preservation and Development (hereinafter, "HPD") records, the Subject Building is owned by Defendant LP, with the corporate address listed as 777 West Putnam Ave Greenwich, CT 06830.  Defendant LP is also the plaintiff in the many nonpayment eviction cases filed against Ms. Ashare, and identifies itself as the "landlord" of the Subject Building in the Petition of the most recent nonpayment proceeding.

7

**Exhibit D** (Non-Payment Notice of Petition and Petition Against Ashare).

26.    However, while Defendants LP and HDFC own the Subject Building, the day-to-day operations of the Subject Building are, upon information and belief, managed entirely by a cluster of associated and intertwined corporate entities, which includes Defendant Richman and Defendant Metro 125.

27.    Indeed, upon information and belief, Defendant LP seems to function as an empty corporate ownership vehicle, without any independent staff, contact information, or decision-making authority, set up and run by various members of the Richman corporate cluster. Defendant LP is a limited Partnership, and Defendant Richman is a "co-managing member" of that partnership. **Exhibit C** (Condo Declaration). Further, Defendant LP is listed as "having an office at c/o The Richman Group, 340 Pemberwick Road, Greenwich, Connecticut 06831." *Id.* Defendant LP also lists 340 Pemberwick Road, Greenwich, Connecticut 06831 as its address on Ms. Ashare's 2020 lease. **Exhibit E** (Ashare Leases — 2020, 2022, 2024).

28.    Instead, it is Defendant Richman and Defendant Metro 125 who fundamentally operate, manage and run the Subject Building. Defendant Richman is listed on HPD record as the Managing Agent for the Subject Building, with Karlene Johnson-Clarke named specifically as the agent of record.

29.    Richman also staffs an office from which LP's day-to-day affairs are managed, including the collection of unlawful rent. Richman has a website portal to collect the unlawful rent from Ms. Ashare and other tenants. **Exhibit F** (Richman Payment Portal Notice).

30.    Defendants Richman and Metro 125 are indistinguishable to Ms. Ashare. When Ms. Ashare went into the Management Office in February of 2024, she spoke with Karlene Johnson-Clarke, who printed a rental breakdown for her that listed "East Harlem MEC Parcel C,

LP" as "DBA Metro 125" at the top left corner. **Exhibit G** (DBA Metro 125 Rental Breakdown Print Out).

31.     Ms. Johnson-Clarke is employed as a senior property manager by Defendant Richman, whose logo appears at the top of her business card. Her email address is listed as "ClarkeK@richmanmgt.com." Below her name, the card says "The Balton, Metro, Douglass," which are, upon information and belief, three separate buildings entangled in, or owned by, the Richman corporate cluster. **Exhibit H** (Karlene Johnson-Clarke Business Card).

32.     Until January 2024, Ms. Ashare paid rent directly to Defendant Metro 125. All of her money order rent payments listed "Metro 125" in the Pay-to line.

33.     Starting in January 2024, Ms. Ashare paid rent online using an application called "Rente Café portal," run, upon information and belief, by Defendant Richman. **Exhibit F** (Richman Payment Portal Notice).

34.     Even the website "Metro125.com," which promises "affordable New York Living" on its homepage, lists "BY RICHMAN PROPERTY SERVICES INC" under the logo in the upper left-hand corner, and a copyright to Richman Property Services at the bottom.

35.     Further, while Defendant LP is listed as the Owner/Agent on Ms. Ashare's 2020 and 2024 Rent Stabilized Leases, it is Karlene Johnson Clarke, a Richman employee, who actually executed the lease by signing on the line for "Owner's Signature." Additionally, on Ms. Ashare's 2020 Rent Stabilized lease, the Owner/Agent is listed not as Defendant LP but merely as "Metro," with an address of 777 West Putnam Ave Greenwich, CT 06830. **Exhibit E** (Ashare Leases).

36.     Richman takes affirmative steps to collect (uncollectable) rent from Ms. Ashare each month, including by providing ledgers on "The Richman Group of Companies" letterhead.

**Exhibit I** (July 26, 2024 Ledger).

37.     As recently as February of this year, Ms. Ashare received an Annual Recertification Notice listing the "Metro 125 Team" as the entity to whom she must submit her annual documents verifying her income and eligibility for the unit. *See* **Exhibit W** (Annual Recertification Initial Notice). That notice is signed by "The Metro 125 Team," and the second page is printed with Defendant Metro 125's logo.

38.     Additionally, in April, an Assistant Property Manager named Gregory Sherril sent Ms. Ashare an e-mail regarding recertification paperwork for her unit. *See* **Exhibit X** (Annual Recertification email). That email lists Mr. Sherril as employed by, in part, "Metro 125," yet lists his email address as sherrilg@richmanmgt.com. Further, the website address for Defendant Richman appears at the bottom of the email below Mr. Sherril's signature line.

39.     Ultimately, Defendant Metro 125 and Richman seemed to Ms. Ashare to operate interchangeably as agents of Defendant LP, collecting rent, processing her annual recertifications, managing her building, and making decisions about what rental debt, if any, she owed.

40.     Consequently, upon information and belief, Landlord Defendants Richman and Metro 125 were fully responsible for charging and collecting rent from Ms. Ashare on behalf of Defendant LP.

**Defendants Could Not Lawfully Collect Rent From Ms. Ashare Because the Building Has No Certificate of Occupancy**

41.     The Subject Building has lacked a valid Certificate of Occupancy for nearly ten years, since June 4, 2015, when the last temporary Certificate of Occupancy expired. **Exhibit J** (Expired Temporary Certificate of Occupancy). No new Certificate of Occupancy has since been issued.

10

42. Without a valid Certificate of Occupancy, rent may not be lawfully collected from the tenant, nor may it be sought in a special proceeding. *See Chazon, LLC v. Maugenest*, 19 N.Y.3d 410, 416, 971 N.E.2d 852 (2012) (citing to, *inter alia*, N.Y. Mult. Dwell. Law § 302(1)).

43. Notably, on March 25, 2024, the Appellate Term, First Department affirmed the dismissal of a nonpayment proceeding filed against Ms. Ashare's neighbor, holding that "[b]ecause the building lacks a valid certificate of occupancy, landlord is precluded from seeking to recover rent..." *E. Harlem MEC Parcel C, L.P. v. Smalls*, 82 Misc. 3d 127(A), 205 N.Y.S.3d 841 (N.Y. App. Term. 2024) (hereinafter, "*Smalls*") (citing to MDL §§ 301, 302(1)(a),(b)). Crucially, S&H represented Defendant LP in the proceeding, including at the Appellate Term. *Id.*

44. Incredibly, two months later, Defendants would sue Ms. Ashare for rent in the very same building.

### Unlawful Collection Efforts by Defendants Against Ms. Ashare

*Defendants' Unlawful, Deceptive Rent Demands Pressure and Dupe Ms. Ashare to Pay Defendants Rent to Which They Had No Lawful Right*

45. Attorney Defendants mailed Ms. Ashare, on behalf of Landlord Defendants, a collection letter dated January 18, 2024 making certain disclosures required be the FDCPA pursuant to 15 U.S.C. § 1692g. *See* **Exhibit K** (January 18 1692g Notice).[3] S&H alleged in the Notice that Ms. Ashare owed Defendant LP $3,369.76 for "rent arrears" and stated they were retained to collect that amount. *Id.* The header of the Notice listed the name and address of S&H and was sent via certified mail in an envelope disclosing the name and return address of S&H. *Id.*

---

[3] Because Exhibit K is dated more than one year from the date of the filing of this Complaint, it does not form a basis of this suit.

Last saved: 4/4/2025 6:00 PM

46.     Later, Attorney Defendants mailed to Ms. Ashare a Five Day Rent Demand ("Five Day Rent Demand") dated April 10, 2024, which, upon information and belief, they had also generated. *See* **Exhibit L** (Five Day Rent Demand and Envelope). The Five Day Rent Demand contended that more than five days passed since Ms. Ashare's rent was due, and that she owed a total of $3,617.44, itemized as $854.76 balance from February 2024, and $1,381.34 for April 2024 and again for March 2024. The letter represented to Ms. Ashare that she was "in default of your lease agreement".

47.     Ms. Ashare recognized the Five Day Rent Demand as the type of collection letter sent as an immediate precursor to the filing of a non-payment eviction proceeding. She had received letters similar to Exhibit L, also from Defendant S&H, immediately prior to the commencement of seven prior non-payment eviction proceedings filed against her in the past. Additionally, she recognized Defendant S&H as the firm that had attempted to evict her several times in the past. Thus, in reading that she was "in default of her lease agreement," Ms. Ashare believed that her landlord was again going to take her to court to attempt to evict her.

48.     The Five Day Rent Demand was mailed and generated by Attorney Defendants, though the top and the bottom of the letter state that it is from "East Harlem Mec Parcel C, LP." Notably, the address underneath the name of the LP is actually the address for the Richman management office to which Ms. Ashare goes when she makes in-person payments, "311 West 127th St., New York, New York 10027." Moreover, the letter was sent via certified mail in an envelope bearing the name of S&H and the firm's address in Roslyn Heights, NY. When S&H filed the nonpayment case, they uploaded to NYSCEF a copy of the Five Day Rent Demand stamped with the same certified mail tracking number that was listed on the envelope. *See* **Exhibit M** (As-filed Five Day Rent Demand with Tracking Number).

49.     Notably, and unbeknownst to Ms. Ashare at the time, five of these prior non-payment proceedings brought since 2015 unlawfully sought (and obtained) rent from Ms. Ashare when the Attorney Defendants and Landlord Defendants were prohibited from doing so given the refusal of the Landlord Defendants to obtain a Certificate of Occupancy.[4]

50.     In response to receiving the Five Day Rent Demand, Ms. Ashare was terrified that she and her children would be evicted and end up on the street. Consequently, Ms. Ashare picked up overtime shifts and worked hard to gather at least the February 2024 Balance of $854.76 and March 2024 amount of $1,381.34 as indicated on the Five Day Rent Demand.

51.     Due to complications with the payment portal, Ms. Ashare decided to pay in person. So, on April 18, 2024, she paid for the bus fare and rode the bus from her apartment to the office of Richman Property Services, Inc., 311 West 127th Street New York, NY 10027, where she would usually pay rent. There, Ms. Ashare spoke with Karlene Johnson-Clarke, who input Ms. Ashare's debit card information into the portal in order to make a payment of $2,245.10 towards the alleged rental debt. *See* **Exhibit I** (July 26, 2024 Ledger). Ms. Ashare then paid again for the bus fare and rode the bus back home.

52.     At or around the same time, Ms. Ashare received from Defendants a letter dated April 11, 2024 titled "Thirty Day Demand Notice" demanding payment of $3,617.44 for rent, itemized as $854.76 balance from February 2024, and $1,381.34 for April 2024 and again for March 2024. *See* **Exhibit N** (Thirty Day Rent Demand); *see also* **Exhibit O** (Affidavit of Service

---

[4] Within the last 10 years, the LP has (unlawfully) filed non-payment proceedings against Ms. Ashare in the following index numbers: LT-300890-24/HA, LT-301030-22/HA, LT-251192-19/HA, LT-251372-19/HA, LT-251876-16/HA, LT-250006-16/HA. The Attorney Defendants brought many if not all of these unlawful non-payment proceedings for the Landlord Defendants.  The Attorney Defendants are liable as for damages the amounts of money they induced Ms. Ashare to pay in connection with these unlawful non-payment proceedings within the last 3 years under GBL 349 and for negligence and gross negligence' and for 6 years under Judiciary Law 487. Similarly, the Landlord Defendants are liable to Ms. Ashare for the rent they sought or received from Ms. Ashure within the last 3 years under GBL 349 and for negligence and gross negligence.  Prior to 2015, non-payment proceeding with the LP as the petitioner were brought against Ms. Ashure in LT-251826-14/HA and LT-250023-13/HA.

Last saved: 4/4/2025 6:00 PM

of Thirty Day Rent Demand). This was precisely the same amount and calculation as in the Five

Day Rent Demand dated the day before, April 10, 2024. *See* **Exhibit L** (Five Day Rent

Demand). The Thirty Day Rent Demand demanded that Ms. Ashare pay $3,617.44 or vacate the

premises within 30 days. *See* **Exhibit N** (Thirty Day Rent Demand). Unlike the Five Day Rent

Demand, the Thirty Day Rent Demand does not have a header listing the name and address of

the letter's source, although the lower right side of the notice states the name of Defendant LP.

Ms. Ashare's recollection is that the Thirty Day Rent Demand was mailed in an envelope with

S&H's name and return address, indicating that the letter was actually sent from, and upon

information and belief, generated by S&H. Upon receiving the envelope, Ms. Ashare

immediately recognized Defendant S&H as the firm that had attempted to evict her several times

in the past, and further had sent similar notices in connection with prior eviction cases. In

addition, the Thirty Day Rent Demand states "This firm" has been "retained" to collect the rental

arrears, suggesting the letter is from a law firm retained by the landlord. Further, the lower left

side states "OUR FILE NO. 444061/07303," which is the same file number as listed on the first

page of the Notice of Petition: "Our file No. 444061". *See* **Exhibit D** (Notice of Petition and

Petition).

  53. Because the Thirty Day Rent Demand indicating that she owed a debt, and

because she wanted to avoid court, Ms. Ashare paid another bus fare and rode to the Richman

Property Services, Inc. offices on June 5, 2024 to make another payment. With the help of

Karlene Johnson-Clarke again, she paid $2,800 toward the alleged debt. *See* **Exhibit I** (July 26,

2024 Ledger).

  54. After making this $2,800 payment, Ms. Ashare only had $80 left in her bank

account, on which she and her children had to survive until her next paycheck came nearly a

week later.

55.     In sum, Defendants' unlawful, deceptive rent demands pressured and duped Ms. Ashare to pay rent to which they had no lawful right, which is an actual monetary injury.

### *Defendants Deceptively, Unlawfully, and Unconscionably Dragged Ms. Ashare to Court*

56.     Then, around June 11, 2024, Attorney Defendants, on behalf of Landlord Defendants, commenced an eviction proceeding for nonpayment against Ms. Ashare under the caption *East Harlem Mec Parcel C v Perpetual Ashare et al,* LT-300890-24/NY, seeking to collect $1,381.34 in alleged rental arrears, for April 2024. *See* **Exhibit D** (Petition). At the time the Petition was filed, Landlord Defendants knew or should have known that there was no valid Certificate of Occupancy for the Subject Building and that they were precluded from recovering any rent for the Subject Building as a matter of law.

57.     Ms. Ashare received the Petition on or about June 24, 2024. The Petition arrived in an envelope from Attorney Defendants, and listed Defendant LP as the Petitioner and Attorney Defendants as the Attorney for Petitioner. The Petition was additionally verified upon information and belief by Defendant Marc Hyman, an employee of Attorney Defendants. It also appended the Five Day Rent Demand, as well as the Thirty Day Rent Demand.

58.     The Petition stated that Ms. Ashare needed to file an "Answer," which she had filed in previous cases at the Harlem Community Justice Center located at 170 E 121st St, New York, NY 10035.

59.     On July 2, 2024, Ms. Ashare went to the Harlem Community Justice Center where she was connected with a woman from New York City's Human Resources Administration ("HRA") who helped her submit an application for a One-Shot Deal, a loan provided by HRA for tenants facing eviction.

<div align="center">15</div>

60.     Ms. Ashare also submitted her Answer *pro se* at the Harlem Community Justice Center, and received her first court date, July 29, 2024, scheduled to take place at Housing Court at 111 Centre Street New York, NY 10013. **Exhibit P** (Pro Se Answer).

61.     The following day, July 3, 2024, Ms. Ashare arrived home in the morning after her night shift and called HRA to complete her One-Shot Deal interview. She was on hold for over two hours, and only briefly spoke with an HRA worker before they put her back on hold. She was so exhausted and overwhelmed that she could not wait on the phone any longer and hung up.

62.     The morning of July 29, 2024, Ms. Ashare paid the subway fare and rode downtown to Housing Court.

63.     After Ms. Ashare checked in on her case, she was connected with the Office of Civil Justice ("OCJ"), who found that she was eligible for free legal services. She then was connected with Manhattan Legal Services (hereinafter, "MLS"), who gathered information about her case in court and informed her that they would call her back to let her know whether they could represent her. She paid the subway fare again and rode the train home.

64.     On August 9, 2024, MLS called Ms. Ashare and informed her that they were able to provide her with legal representation. They filed a Notice of Appearance the same day.

65.     On November 20, 2024, MLS filed an amended Answer in the nonpayment case, which listed as the Second Defense and First Counterclaim the fact that there was no valid Certificate of Occupancy for the Subject Building, and as such that the landlord could not collect rent. **Exhibit Q** (Amended Answer).

66.     On November 21, 2024, MLS mailed, via Federal Express, a Demand Letter to Attorney Defendants. Attn: Michael Giammarusco 165 Roslyn Road, 1st Floor Roslyn Heights,

NY 11577. The letter arrived on November 22, 2024 and was signed for by "J. EAN". The letter

stated, in relevant part, that Ms. Ashare did not owe any rent because there was no valid

Certificate of Occupancy, and demanded that Attorney Defendants discontinue the nonpayment

proceeding against Ms. Ashare immediately. **Exhibit R** (MLS Demand Letter).

67.     Then, on November 26, 2024, MLS emailed attorney Michael Giammarusco at

Giammarusco@sontag-hyman.com providing a copy of the MLS Demand Letter and requesting

that the firm discontinue the proceeding in advance of the December 3, 2024 court appearance.

MLS received no reply, and so on December 2, 2024, they followed up via email. **Exhibit S**

(November 26 and December 2, 2024 Email).

68.     On December 3, 2024, the parties appeared in court. MLS again asked Attorney

Defendants to discontinue the case considering their client was statutorily prohibited from

collecting rent without a valid Certificate of Occupancy. Attorney Defendants were unwilling to

do so and hence the proceeding was adjourned to January 13, 2025. **Exhibit T** (December 3,

2024 Stipulation).

69.     On December 17, 2024, MLS filed a summary judgment motion seeking

dismissal with prejudice as the building lacked a valid Certificate of Occupancy. Attorney

Defendants did not file opposition to MLS's motion. **Exhibit U** (Summary Judgment Motion).

70.     On January 13, 2025, the parties appeared in court and Attorney Defendants

agreed to discontinue the proceeding without prejudice. **Exhibit V** (Stipulation of

Discontinuance).

## **Ms. Ashare's Damages**

71.     The Attorney Defendants and Landlord Defendants are liable to Ms. Ashare for

all rent payments they induced or received from her during the 10-year period for which they

were collecting rent with no lawful right given the law regarding Certificates of Occupancy. Given the statute of limitations for Plaintiff's claims in this suit, these damages are sought against the Attorney Defendants for up to six years prior to the filing of this Complaint (the statute of limitations is 6 years for Judiciary Law § 487, 3 years for GBL § 349 and for negligence and gross negligence, and one year for the FDCPA); and against the Landlord Defendants for up to 3 years prior to the filing of this Complaint under GBL § 349 and for negligence and gross negligence. As previously noted, the Attorney Defendants have filed multiple non-payment proceedings against Ms. Ashare for the last 10 years with no lawful right to do so.

72.      From early April 2024, when Ms. Ashare first received the Five Day Rent Demand and the Thirty Day Rent Demand, until the case was discontinued on January 13, 2025, Ms. Ashare was extremely distressed about the debt her landlord claimed she owed.

73.      When Ms. Ashare first received the Five Day Rent Demand dated April 10, 2024 (Exhibit L) her heart immediately sank. She was so overcome by fear and helplessness that she began to cry. Throughout this period, Ms. Ashare experienced a constant sensation of fear, helplessness, and dread. She was convinced that she and her children would become homeless, and she fixated on that terrifying possibility.

74.      Ms. Ashare was particularly afraid that an eviction would harm and destabilize her children. Ms. Ashare worked hard to provide her children with a reliable home life, which allowed them to excel academically. She was terrified that losing their home would seriously inhibit their ability to focus at a critical juncture, as one child was finishing college, while the other was finishing high school and applying for college. Thinking about her children becoming homeless brought her acute pain, anguish, and stress.

75.     Further, Ms. Ashare felt shame and embarrassment even just at the thought of her children or family members learning about the eviction, and so she worked hard to conceal this information from them. She worried that her family would be ashamed of her if they learned about the eviction case, and further that her children themselves would become stressed and thus unable to focus on their studies.

76.     Ms. Ashare was duped and pressured into making payments for rent for which Defendants had no lawful right to by the unlawful threats to sue by way of the Five Day Rent Demand (Exhibit L) and the Thirty Day Rent Demand (Exhibit N).

77.     Additionally, Ms. Ashare suffered from severe sleeping problems as a result of the nonpayment case. While Ms. Ashare would normally sleep in the morning after her night shift, during the pendency of the case, she was frequently unable to sleep, and would lie awake ruminating on how to pay the debt her landlord alleged she owed. Ms. Ashare was so afraid of these debt collection efforts and the threat of homelessness that she began picking up overtime shifts at work, which were physically demanding and cut into the little time she had to rest. During this time, her colleagues often commented that she looked very exhausted.

78.     Furthermore, while Ms. Ashare used to enjoy watching movies on her free time, she could no longer focus as she was so preoccupied with the alleged debt.

79.     Ms. Ashare also began experiencing headaches from the stress and lack of sleep, as well as periodic body aches in her knees, shoulders, and arms. Since the case was discontinued, her aches have disappeared.

80.     Additionally, Ms. Ashare's appetite decreased during the last year, as she was often too stressed to eat. While she would normally eat three meals a day, she began eating just one meal a day during the course of the case.

81.     During the pendency of the case, strangers with whom Ms. Ashare interacted frequently noted how stressed and despondent she seemed. For example, when Ms. Ashare applied for the One-Shot Deal with HRA, Ms. Ashare was so visibly upset and exhausted that the HRA worker had to continually comfort her. Additionally, the morning of Ms. Ashare's first court appearance, a stranger—who saw her pacing up and down the hallway—told her that she looked extremely pale and "like a zombie".

**Attorney Defendants' Deceptive Acts and Lack of Meaningful Review**

82.     Pursuant to the FDCPA, an attorney signing a demand for debt collection is responsible for exercising professional judgment concerning the validity of a debt prior to engaging in the debt collection.

83.     Pursuant to New York State Law, when an attorney signs a pleading, the attorney is certifying he or she determined that the claim is not frivolous after a reasonable investigation. 22 N.Y.C.R.R. § 130-1.1a.

84.     Upon information and belief, a meaningful and reasonable investigation by Attorney Defendants would have consisted of reviewing their client's *prima facie* case before filing, including reviewing whether the Landlord Defendants were legally permitted to collect rent for the building, and reviewing any of Attorney Defendants' prior litigation involving the Subject Building.

85.     Attorney Defendants failed to conduct even the most cursory meaningful review or reasonable investigation prior to signing and filing the debt collection complaint against Ms. Ashare.

86.     Upon information and belief, Attorney Defendants not only failed to review whether or not there was a valid Certificate of Occupancy for the building permitting Landlord

20

Defendants to collect the alleged rent, they also ignored their own litigation history in the building, included a controlling decision from the Appellate Term on this issue.

87.     Alternatively, the Attorney Defendants knew there was no valid Certificate of Occupancy and knew there was no lawful basis to demand rent but nevertheless filed suit to collect the same.

88.     Indeed, mere weeks before filing against Ms. Ashare, on March 25th, 2024, the Appellate Term, First Department issued a ruling against Attorney Defendants in a separate case, *East Harlem Mec Parcel C, L.P., v. Reggie Smalls*, finding Landlord Defendants were statutorily barred from collecting rent in the Subject Building due to the lack of a valid Certificate of Occupancy. *Smalls, supra.*

89.     The Appellate Term clearly and conclusively informed Attorney Defendants in that decision that Landlord Defendants was entirely precluded from seeking to recover rent due to the subject' buildings lack of a valid Certificate of Occupancy.

90.     This ruling came after Defendant  Hyman and Attorney Michael Giammarusco, both employed by Attorney Defendants, had litigated this issue for months, including appealing an earlier identical ruling from a New York County Housing Court Judge. In fact, Defendant Hyman filed and argued the appeal at the Appellate Term.

91.     Defendant Hyman and Attorney Giammarusco both consented to the electronic record on NYSCEF in the *Smalls* case, and so both received automatic e-mail service of the Appellate Term's *Smalls* decision on April 9th when it was processed by the court system.

92.     Upon information and belief, Attorney Defendants utterly ignored this controlling Appellate Term ruling, and continued trying to extract statutorily uncollectable rent from tenants, including Ms. Ashare, in the same building on behalf Landlord Defendants.

93.     In fact, in the months that followed the *Smalls* decision, Attorney Defendants sued not only Ms. Ashare, but also her neighbor Shakedria Mathis for statutorily uncollectible rent.

94.     Upon information and belief, even a cursory review of Ms. Ashare's most basic information, namely her address, would have revealed that she lived in the same building at issue in the *Smalls* decision.

95.     Indeed, upon information and belief, only two weeks after the *Smalls* decision was issued and a mere day after the ruling was uploaded to NYSCEF, Attorney Defendants contradicted the decision entirely by sending Ms. Ashare the Five Day Rent Demand, dated April 10, 2024, attempting to collect statutorily uncollectable rent.

96.     Just a few weeks later, upon information and belief, Attorney Defendants prepared and sent the Thirty Day Rent Demand, attempting to collect more rent and threatening to sue Ms. Ashare if she did not pay.

97.     Finally, Attorney Defendants formally sued Ms. Ashare for alleged rent owed in early June, two short months after the Appellate Term specifically told Attorney Defendants that Landlord Defendants were legally barred from collecting rent in that building and commencing nonpayment proceedings accordingly.

98.     Notably, Defendant Hyman—the same who filed and argued the *Smalls* decision at the Appellate Term—verified the nonpayment Petition against Ms. Ashare.

99.     Upon information and belief, Attorney Defendants' complete disregard for both the directives of the Appellate Term in the *Smalls* decision and the mandates of the controlling statute evince a clear intention to deceive Ms. Ashare and/or the court as to the legal validity of the alleged rental debt.

100.     By signing and verifying the complaint, Attorney Defendants knowingly made a

22

false representation to Ms. Ashare and the court that they engaged in a meaningful review and made a reasonable inquiry into the complaint.

**Defendants' Pattern and Practice**

101.    Even beyond the especially egregious circumstances of disregarding the *Smalls* decision, upon information and belief, Attorney Defendants also have a widespread pattern and practice of engaging in debt collection without meaningful review.

102.    Upon information and belief, and according to S&H's website, the firm only has four attorneys.

103.    Yet, according to NYSCEF records, in the year of 2024, Attorney Defendants filed approximately one thousand nonpayment eviction cases in local Housing Court.

104.    The high volume of nonpayment cases filed by Attorney Defendants itself strongly suggests that not only did Attorney Defendants fail to make the requisite meaningful review prior to drafting, signing, and filing the complaint against Ms. Ashare, but that Attorney Defendant have a broad pattern and practice of filing collection complaints without requisite review.

105.    Indeed, since the rent became legally uncollectible in 2015, Attorney Defendants have brought dozens of nonpayment cases in the Subject Building on behalf of Landlord Defendants, all of which, upon information and belief, are deceptive and improper.

106.    NYSCEF records show that in those ten years, Landlord Defendants filed 127 nonpayment proceedings against tenants living in the Subject Building, seeking rent that is statutorily uncollectable. Six of those cases were against Ms. Ashare herself.

107.     Of these 127 summary eviction proceedings for nonpayment, Attorney Defendants represented Landlord Defendant in 82 of those proceedings, including all six of the

cases brought against Ms. Ashare.

108.    Further, according to NYSCEF records, 45 of these 127 nonpayment proceedings resulted in a monetary and possessory judgment issued against the tenants.

109.    Of those 45 cases, Attorney Defendants represented Landlord Defendants in 24 of the nonpayment proceedings leading to a Judgment.

110.    The systemic deceptive collection practices of Landlord Defendants and Attorney Defendants have, upon information and belief, affected dozens of similarly situated consumers living in the Subject Building.

### FIRST CAUSE OF ACTION
Violation of the FDCPA, 15 U.S.C. § 1692, et seq.
(Against Attorney Defendants)

111.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

112.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692; *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

113.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have

been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

114.    The Attorney Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, the Attorney Defendants materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; making false representations of the character, amount, or legal status of any debt; making false representations of any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt; making a false representation or implication that any individual is an attorney or that any communication is from an attorney;  threatening to take and actually taking an action prohibited by law; using any false representation or deceptive means; using unfair or unconscionable means; and the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

115.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

116.    Plaintiff seeks recovery for actual damages, statutory damages of up to $1,000, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
Violation of N.Y. Gen. Bus. L. § 349 *et seq*.
(Against All Defendants)

117.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

118.    Defendants violated N.Y. Gen. Bus. Law § 349 *et seq*. by using deceptive acts and practices in the conduct of their businesses.

119.    These acts were done by Defendants systematically, and, as such, have had a broad impact on consumers at large.

120.    Defendants committed the above-described acts willfully and/or knowingly.

121.    Defendants' deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

122.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

123.    As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm, including emotional distress and costs.

124.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

125.    Plaintiff is entitled to preliminary and permanent injunctive relief barring Defendants from engaging in such deceptive acts and practices, and to recover actual, statutory, and treble damages, together with costs and attorney's fees.

## THIRD CAUSE OF ACTION
Violation of N.Y. Judiciary Law § 487
(Against Attorney Defendants)

26

126.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

127.     Attorney Defendants engaged in egregious conduct which violated N.Y. Jud. Law § 487 by, inter alia, filing a court action to recover a debt from Ms. Ashare despite clear evidence that Ms. Ashare did not owe the putative debt, including a controlling Appellate Term decision concerning the same building and owner, also litigated by Attorney Defendants which held that rent was uncollectible in the Subject Building. Smalls, supra. This conduct further included Attorney Defendants' refusal to discontinue the subject proceeding after several requests by Ms. Ashare, through MLS.

128.     Upon information and belief, based on the large volume of cases filed by Attorney Defendants, they engage in a broad practice of filing court cases without making a meaningful review or reasonable investigation into the facts of each case.

129.     By signing the complaint, Attorney Defendants made a false representation that it had engaged in a reasonable investigation to ensure that the action was not frivolous and a meaningful review to ensure its cause of action was meritorious.

130.     Attorney Defendants' conduct was deceitful and calculated to delay the civil court action for its own benefit, including its failure to discontinue the Housing Court Eviction for several months after being notified that the subject premises had no valid Certificate of Occupancy.

131.     Attorney Defendants' acts of deceit and/or collusion and legal delinquency violated N.Y. Judiciary Law.

132.     Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil

27

prosecution, wrongful litigation, and abuse of process.

133.    The deceitful conduct of Attorney Defendants caused actual damages to Plaintiff, including emotional distress.

134.    Attorney Defendants are liable to Plaintiff for treble damages pursuant to N.Y. Judiciary Law § 487.

<div align="center">

**FOURTH AND FIFTH CAUSES OF ACTION**
Negligence and Gross Negligence
(Against all Defendants)

</div>

135.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

136.    Defendants, who owed Plaintiff a duty of reasonable care, failed to exercise even slight care or diligence, amounting to gross negligence, or, at least, to negligence, by, *inter alia*, seeking and receiving payment of rent to which they had no legal right.

137.    As a result of Defendants' actions, Plaintiff was injured.

138.    Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general. Defendants are liable to Plaintiff for actual and punitive damages. To the degree Plaintiff alleges intentional misconduct by Defendants, she, in the alternative, alleges them as claims for negligence.

139.    Ms. Ashare's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

<div align="center">

**PRAYER FOR RELIEF**

</div>

**WHEREFORE,** Plaintiff prays that the Court award the following relief:

<div align="center">28</div>

(a) Declaratory judgment that Defendants' actions violate 15 U.S.C. §§ 1692e, and

1692f;

(b) Actual Damages;

(c) Statutory damages;

(d) Treble damages;

(e) Punitive damages;

(f) Costs and reasonable attorney's fees to Plaintiff; and

(g) Such other and further relief as may be just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
        April 4, 2025

Respectfully submitted,

Manhattan Legal Services
2090 Adam Clayton Powell Jr Blvd, 5th Floor
New York, NY 10027

*/s/ Cecilia MacArthur*
_____
Cecilia MacArthur, of Counsel

*/s/ Mary "Molly" Rockett*
_____
Mary "Molly" Rockett, of Counsel

Dated: Brooklyn, New York
        April 4, 2025

The Law Office Ahmad Keshavarz

*/s/ Ahmad Keshavarz*
By: _____
        Ahmad Keshavarz

29



SONTAG & HYMAN, P.C. ATTORNEYS AT LAW is recognized as a leading authority in the area of Landlord/Tenant law in New York, Bronx, Kings, Queens, Staten Island, Nassau, Suffolk, Yonkers and Westchester Counties.

The Senior Partners and Associates have over thirty years of experience handling all facets of landlord/tenant litigation specializing in non-payment of rent, holdover and HP proceedings.

We also handle negotiating and drafting of commercial and residential leases, real estate closings (both commercial and residential), administrative law proceedings, Supreme Court litigation, and Appellate work. We have direct contact with the staff at HPD and HCR formerly know as DHCR.

The firm also represents many cooperatives both private and regulated governed by HPD and HCR.

We have represented Hospital Housing for over 25 years and are fully versed in how to handle these cases while still recognizing the importance of keeping an ongoing relationship between the hospital and employee.

The attorneys have the proven ability to obtain a positive outcome on behalf of our clients. It is our firm's philosophy that clients are entitled to representation by the most qualified and highly skilled attorneys who have the capacity to handle our clients' litigation needs expeditiously, with precision and personalized attention.

 MENU

Marc H. Hyman is a senior and co-founding member of the firm, which was formed in 1992. Marc co-supervises all aspects of the firm's landlord/tenant litigation, including representation of commercial and residential owners and management companies, cooperatives and condominiums, in New York, Bronx, Queens, Kings, Westchester , Nassau and Suffolk Counties. He also served on the subcommittee of the Committee on the Judiciary of the Association of the Bar of the City of New York as a representative of the Housing Court Committee.

Marc is known for having prosecuted many successful residential and commercial non payment and holdover proceedings in the Civil Court as well as ejectment actions in the Supreme Court. In recent years, the scope of litigation has included tenant buy-outs and evictions related thereto. Marc earned his JD from Hofstra University School of Law in 1988 and his BS from the University of Maryland in 1985. He is admitted to the New York State Bar and the United States District Court - Eastern and Southern Districts.

## Contact Marc H. Hyman

Name*

Email*

Telephone*

Message

I am human

hCaptcha
Privacy - Terms

SEND

+
−

Sontag & Hyman                                    ×

165 Roslyn Road, 1st Floor, Roslyn
Heights, NY  11577

Leaflet | © OpenStreetMap

To Top  ^

Website Maintenance and Hosting by Joomla Connections, LLC



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2012052400755001001E4F30

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 69 |
|---|---|---|

Document ID: 2012052400755001   Document Date: 01-25-2012   Transaction Date: 05-24-2012
Document Type: CORRECTION AGREEMENT
Document Page Count: 67

| PRESENTER: | RETURN TO: |
|---|---|
| NATIONAL REAL ESTATE SERVICES INC - PICK-UP | UBS 780 SHORE & APPLEMENT P |
| SOPHIA | 969 BROADWAY |
| 222-01 COMMODAILT ROAD - AC1-725 | NEW YORK NY - 090 |
| WHITE PLAINS NY - 10276 | |
| 914-376-1972 | |
| xxx.xx.000.com | |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1327 46 | Entire Lot | | 2291 FREDERICK |
| | Property Type: APARTMENT BUILDING | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 1790 1001 | Entire Lot | | 2291 FREDERICK DO |
| | Property Type: COMMERCIAL CONDOMINIUM | | | |

Additional Properties on Continuation Page

**CROSS REFERENCE DATA**

CRFN_____ or Document ID_____ or Year____ Reel__ Page___ or File Number_____

**PARTIES**

PARTY 1:
EAST HARLEM MEC PARCEL C CONDOMINIUM
2521 FREDERICK DO
NEW YORK NY 10459

| FEES AND TAXES | | | |
|---|---|---|---|
| Mortgage: | | Filing Fee: | |
| Mortgage Amount: | $ 0.00 | | 0.00 |
| Taxable Mortgage Amount: | $ 0.00 | NYC Real Property Transfer Tax | |
| Exemption: | | | 0.00 |
| TAXES: County (Basic): | $ 0.00 | NYS Real Estate Transfer Tax | |
| City (Additional): | $ 0.00 | | 0.00 |
| Spec (Additional): | $ 0.00 | |
| TASF: | $ 0.00 | **RECORDED AND FILED IN THE OFFICE** |
| MTA: | $ 0.00 | **OF THE CITY REGISTER OF THE** |
| NYCTA: | $ 0.00 | **CITY OF NEW YORK** |
| Additional MRT: | $ 0.00 | Recorded/Filed          2012-01-0087 |
| TOTAL: | $ 0.00 | City Register File No.(CRFN): |
| Recording Fee: | $ 175.00 | 20120020156 |
| Affidavit Fee: | $ 0.00 | |

City Register Official Signature



CONDOMINIUM NO. 2327

## STATE OF NEW YORK
## OFFICE OF THE ATTORNEY GENERAL

### ERIC T. SCHNEIDERMAN
Attorney General

Writer's Direct Info:
(212) 416-6096
Erica.Buckley@ag.ny.gov

January 11, 2012

Christine A. Coletta, Esq.
Hirschen Singer & Epstein LLP
902 Broadway
New York, NY 10010

Re:    East Harlem MEC Parcel C Condominium
       2293 Third Avenue, New York, NY
       File No. NA11-0228
       (Part 23-2-Unit Subdivision)

Dear Ms. Coletta:

The Department of Law has reviewed your application submitted on December 5, 2011 concerning a transaction involving the above-referenced premises.

On the basis of the facts and circumstances stated in your letter and supporting documentation, the Department of Law has determined that it will not take any enforcement action because the described transaction occurs without filing or registration pursuant to Section 352-e and Section 359-e of the General Business Law. We understand that it is your opinion as counsel that the transaction is not subject to those registration and filing requirements.

This position is based solely on the limited information supplied and representations made in your letter and supporting documentation. Any different set of facts or circumstances might result in the Department of Law taking a different position. In addition, this letter expresses the Department of Law's position on enforcement action which could arise from this transaction only, occurring without filing or registration, and does not purport to express any legal conclusion on any subsequent transaction or offering. Any material misstatement or omission of a material fact in the application may render such treatment void *ab initio* and may subject you to enforcement action.

The issuance of this letter shall not be construed to be a waiver of, or limitation on, the Attorney General's authority to take enforcement action for violations of Article 23-A of the General Business Law and other applicable provisions of law.

Very truly yours,

Erica F. Buckley

Erica F. Buckley
Chief of Review

EAST HARLEM MEC PARCEL C L.P., a limited partnership organized and existing under the laws of the State of New York, having an office at c/o The Richman Group, 340 Pemberwick Road, Greenwich, Connecticut 06831 (the "Partnership") and EAST HARLEM MEC PARCEL C HOUSING DEVELOPMENT FUND CORPORATION, a not-for-profit corporation organized and existing under the laws of the State of New York, having an office at 174 East 104th Street, New York, New York 10029 (the "HDFC" and, together with the Partnership, the "Declarant"), do hereby declare:

1.      Submission of Property.  The Declarant hereby submits the land more particularly described on Schedule A attached hereto and made a part hereof, together with the building and improvements thereon erected (the "Building") beneficial and equitable interest of which are owned by the Partnership, with the record title being held by the HDFC as nominee for the Partnership (the land and Building being hereinafter collectively called the "Property") to the provisions of Article 9-B of the Real Property Law of the State of New York (the "Condominium Act") and does hereby establish a regime for condominium ownership of the Property as more particularly set forth herein and in the By-Laws.

2.      Location of Land.  The Land on which the Building is situated (the "Land") is located at 2293 Third Avenue, New York, New York.

3.      Building.  Schedule B attached hereto and made a part hereof contains a description of the Building, including the number of stories, the number of Units and the principal materials of which the Building is constructed.

4.      Name of Condominium.  This Condominium shall be known as the EAST HARLEM MEC PARCEL C CONDOMINIUM (the "Condominium").

5.      By-Laws.  Attached to this Declaration and made a part hereof are the By-Laws of the Condominium (the "By-Laws"), which By-Laws set forth detailed provisions governing the operation, use and occupancy of the Condominium. Any reference herein to the By-Laws shall mean the By-Laws annexed hereto as Schedule D, as the same may be amended from time to time as provided therein.  Any reference herein to the "Rules and Regulations" shall mean the Rules and Regulations annexed to the By-Laws as the same may be amended from time to time as provided therein.

6.      Units.  The Condominium shall initially consist of two (2) units which are hereinafter sometimes referred to individually as "Unit 1" and "Unit 2," respectively, and collectively, as the "Units."  (The owner of the Units is sometimes referred to herein as a "Unit Owner.") Unit 1 shall be comprised of approximately 5,600 square feet of ground floor retail space, and related areas as more specifically defined in Paragraph 7(a) hereof.  Unit 2 shall consist of approximately 58,036 square feet of residential space on floors cellar through eight, which space shall contain 49 residential apartment units and an outdoor space, each as depicted in Floor Plans (as defined below) and related areas as more specifically defined in Paragraph 7(b) hereof.  The location of Unit 1 and Unit 2 in the Building created by this Declaration is shown on the floor plans of the Building certified by Cooper Carry Architects, and filed in the office of the City Register, New York County, simultaneously with the recording of this Declaration (the "Floor Plans").  Schedule C annexed hereto and made a part hereof, sets forth with respect to each Unit in the Building, its Unit designation, tax lot number, location, and

approximate size, and the Common Elements, all as more particularly shown on the Floor Plans. Each Unit shall also include an undivided percentage of ownership in the Common Elements of the Condominium (the "Common Interest") which shall be deemed appurtenant to such Unit, in the amount set forth on Schedule C. The Common Interest shall always be deemed conveyed or encumbered with any conveyance or encumbrance of a Unit. The Common Interest is not severable from the Unit and may not be conveyed or encumbered other than together with a conveyance or encumbrance of the Unit.

7.    Description and Dimensions of Units.

(a)    Unit 1. Unit 1 consists of those areas of the Building designated as such on the Floor Plans and not otherwise specifically designated in this Declaration as part of Unit 2 or a portion of the Common Elements. The dimensions of Unit 1 consist of the area measured (i) horizontally from the exterior surface of the glass windows or building facade to the centerline of the metal studs or to the centerline of the blockwork of any interior walls and partitions separating Unit 1 from Unit 2, or separating Unit 1 from any Common Element; and (ii) vertically between the top of the concrete plank of its lower most floor and the bottom of the concrete plank of its uppermost ceiling. Unit 1 includes:

(i)    The interior walls, partitions, doors, floor coverings and underlayments and finished ceilings and ceiling systems within Unit 1.

(ii)    All heating, ventilating, air conditioning, sprinkler systems, mechanical and electrical equipment, including all related wires, conduits, pipes, ducts, valves, switches, controls, meters, and similar components which exclusively serve Unit 1.

(iii)    All mechanical rooms located within the area defined as Unit 1 on the Floor Plans, unless such mechanical rooms are specifically designated as Common Elements.

(iv)    Canopies, doors, entrances, skylights, windows, window frames, casements and mullions which exclusively serve Unit 1.

(v)    All other facilities in the Building which exclusively serve or benefit, or are necessary for the existence, maintenance, operation or safety of Unit 1, unless specifically described as a part of Unit 2 or a Common Element.

Unit 1 shall not include any of the Common Elements located therein or any piping, wiring, ductwork, machinery or other materials and equipment used exclusively by Unit 2.

(b)    Unit 2. Unit 2 consists of those areas of the Building designated as such on the Floor Plans and not otherwise specifically designated in this Declaration as part of Unit 1 or a portion of the Common Elements. The dimensions of Unit 2 consist of the area measured (i) horizontally from the exterior surface of the glass windows or building facade to the centerline of the metal studs or to the centerline of the blockwork of any interior walls and partitions separating Unit 2 from Unit 1, or separating Unit 2 from any Common Element; and (ii) vertically between the bottom of the concrete plank of its lower most floor and the top of the concrete blank of its uppermost ceiling. Unit 2 includes:

(i) The interior walls, partitions, doors, floor coverings and underlayments and finished ceilings and ceiling systems within Unit 2.

(ii) All heating, ventilating, air conditioning, sprinkler systems, mechanical and electrical equipment, including all related wires, conduits, pipes, valves, switches, controls, and similar components which exclusively serve Unit 2.

(iii) All mechanical rooms located within the area defined as Unit 2 on the Floor Plans, unless such mechanical rooms are specifically designated as Common Elements.

(iv) Elevators which serve Unit 2, including their respective shafts, pits, appurtenances and controls.

(v) All stairs, landings and corridors which serve Unit 2.

(vi) Canopies, doors, entrances, windows, window frames, casements and mullions which exclusively serve Unit 2.

(vii) The outdoor space in the rear of the Building.

(viii) All other facilities in the Building which serve or benefit, or are necessary for the existence, maintenance, operation or safety of Unit 2, unless specifically described as a part of Unit 1 or a Common Element.

Unit 2 shall not include any of the Common Elements located therein or any piping, wiring, ductwork, machinery or other materials and equipment used exclusively by Unit 1.

8.    Use of Units.

(a) Subject to the provisions of this Declaration and the By-Laws, Unit 1 may be used for any lawful purpose, provided that such use (i) is then permitted by a validly existing certificate of occupancy and (ii) is permitted under applicable zoning laws, codes, rules, or regulations. The Unit 1 owner and its tenants, occupants, employees and invitees must use, occupy and maintain (or cause to be used, occupied and maintained) said Unit 1, during the period of said owner's ownership, in a manner that will not detract from the character or appearance of the Condominium and will not materially adversely affect Unit 2. Without limiting the generality of the foregoing, Unit 1 may be used as a retail space and other uses necessary or desirable for commercial or retail business operations.

(b) Subject to the provisions of this Declaration and the By-Laws, Unit 2 shall be used for any lawful purpose, provided that such use (i) is then permitted by a validly existing certificate of occupancy and (ii) is permitted under applicable zoning laws, codes, rules and regulations. Without limiting the generality of the foregoing, Unit 2 may be used as residential apartment units and ancillary uses. The Unit 2 owner and its tenants, occupants, employees and invitees must use, occupy and maintain (or cause to be used, occupied and maintained) said Unit 2, during the period of said owner's ownership, in a manner that will not detract from the character or appearance of the Condominium and will not materially adversely affect Unit 1.

- 4 -

9.    Common Elements.

(a)    <u>Definition Of Common Elements Generally</u>.  The Common Elements of the Condominium (the "Common Elements") consist of the entire Property including the Land and all parts of the Building and improvements thereon, other than the Units as well as all personal property and fixtures existing in, on, or under the Property or elsewhere, either currently or hereafter existing, for the common use of all the Units or by all Unit Owners or which is necessary for, or convenient to, the existence, maintenance, management, operation or safety of the Property as a whole.  The Common Elements are not subject to partition nor are they severable from the Units.

(b)    <u>Use of Common Elements Generally</u>.  Subject to the provisions of this Declaration and the By-Laws, as any of the same may be amended from time to time in accordance with the respective terms thereof, each Unit Owner, its tenants, licensees, invitees, agents and employees, may use the Common Elements, for the purpose for which such Common Elements are intended, without hindering or encroaching upon the lawful rights of any other Unit Owner.

(c)    <u>Schedule Of Common Elements</u>.  The Common Elements include, without limitation, the following:

(i)    The Land and all other areas of the Property and all apparatus, systems, equipment and installations now or hereafter existing in the Building or on the Property not part of any Unit, for the common use of all Units or by all Unit Owners or necessary or convenient for the existence, maintenance or safety of the Property as a whole;

(ii)    All foundations, footings, columns, girders, beams and supports, but excluding those which are specifically designated elsewhere in this Declaration or on the Floor Plans as otherwise;

(iii)    A portion of the roof, as designated on the Floor Plans;

(iv)    The areas identified on the Floor Plans as Common Elements;

(v)    All central and appurtenant installations for services such as electricity, telephone, television, gas, sewer, waste, hot and cold water and sprinkler system (including all pipes, ducts, wires, chutes, cables and conduits used in connection with any such service whether located in Common Elements or in Units), which serve or benefit all Unit Owners or other Common Elements;

(vi)    All other facilities of the Building (including but not limited to shafts, pipes, wires, ducts, vents, cables, conduits and lines) which serve or benefit, or are necessary or convenient for the existence, maintenance, operation or safety of, all Units or all Unit Owners and are not a part of any of the Units.

(d)    <u>Maintenance of Common Elements</u>.  The cost of maintenance, repair and replacement of the Common Elements will be borne by the each Unit Owner in accordance with their percentage interests established in Schedule C. Notwithstanding the foregoing, in the event that painting, decorating, maintenance, repair or replacement of any Common

Element shall be necessitated by the negligence, misuse, or neglect of a Unit Owner, the expense thereof will be the obligation of such Unit Owner.

(e) No Partition. The Common Elements are not subject to partition nor are they severable from the Units.

10. Determination of Percentages in Common Elements. The percentage of interest in the Common Elements appurtenant to each Unit is shown on Schedule C and was determined pursuant to Section 339i(1)(ii) of the Condominium Act and is based upon the approximate proportion that the floor area of the Unit on the date hereof bears to the aggregate floor area of all of the Units, but such proportion reflects the substantially exclusive advantages enjoyed by one or more, but not all of the Units in a part or parts of the Common Elements. The aggregate Common Interest of all Units is and shall always be 100%.

11. Encroachments. Subject to the terms of any mortgages recorded against the Building, any portion of the Common Elements now encroaches upon any Unit, or if any Unit now encroaches upon any other Unit or upon any portion of the Common Elements, or if any such encroachment shall occur hereafter as a result of settling or shifting of the Building, or by reason of the repair or restoration by the Board of Managers after a casualty or condemnation of any Unit or the Common Elements or the repair or restoration by a Unit Owner of a Unit after a casualty or condemnation, a valid easement shall exist for the encroachment and for the maintenance thereof so long as the Building stands.

12. Easements.

(a) The Board of Managers shall have a right upon reasonable notice at reasonable times of access to each Unit to inspect the same and to maintain, repair or replace the Common Elements contained therein or elsewhere in the Building.

(b) The Board of Managers shall have a right of access to each Unit, to cure or remedy any physical condition or any building code violation noted or issued by a governmental agency which condition or violation poses a serious and imminent danger or hazard to the safety of the Building as a whole or occupants thereof or would prevent the legal occupancy of the Building as a whole (but not to cure or remedy a condition or violation which affects only the Unit in which such condition or violation exists) or any other Unit, subject to the rights of residential tenants under their leases.

(c) Each Unit Owner shall have an easement in common with all other Unit Owners, and shall be subject to a like reciprocal easement, for ingress and egress through all Units, to the extent such is necessitated by an emergency.

(d) Each Unit Owner shall have an easement in common with all other Unit Owners, and each Unit shall be subject to a like reciprocal easement upon reasonable notice at reasonable times to operate, maintain, supplement, repair, alter, rebuild, restore and replace any electrical, mechanical, plumbing, heating, ventilation or air conditioning equipment or systems (including any related, wire, pipes, conduits, ducts, controls, relays and similar appurtenances) that constitute part of such Unit (collectively the "Unit Equipment"), provided that the exercise thereof does not result in any additional encroachment upon any Unit or

Common Element beyond the encroachment for such Unit Equipment existing on the date hereof or as specifically reserved on the Floor Plans. After the date hereof, each Unit Owner shall have an easement in common with all other Unit Owners and each Unit shall be subject to a like reciprocal easement in, over, under, through or upon any other Unit or any Common Elements upon reasonable notice at reasonable times to relocate or install additional Unit Equipment, subject to the prior written consent of the Unit Owner of the servient Unit (if the proposed encroachment is with respect to a Unit) or the Board of Managers (if the proposed encroachment is with respect to the Common Elements). Any consent required hereunder shall not be unreasonably withheld or delayed, provided that all information (including plans and specifications) of the proposed relocation or installation is furnished to the consenting Unit Owner or the Board of Managers, as the case may be.

(e)     In connection with any change in a Unit pursuant to Article 21 hereof, each Unit Owner shall have an easement to utilize, affix to, anchor in, or penetrate the exterior walls of the Building from the Unit side thereof to the unexposed interior surface of the brick, provided that no such use shall impair the structural integrity of the Building or any portion thereof.

(f)     Each Unit shall have an easement of support and of necessity and shall be subject to an easement of support and necessity in favor of all other Units and the Common Elements.

(g)     Each Unit Owner shall have an easement, with the consent of the Board of Managers (such consent not to be unreasonably withheld) as hereinafter provided, to erect, maintain, repair and replace, from time to time, subject to the requirements of applicable laws, ordinances, rules and regulations, one or more signs, banners, awnings or canopies (collectively "Displays") on the exterior of the Building and sidewalks adjacent thereto (i) for the purpose of identifying a prospective occupant of all or any portion of such Unit, and/or (ii) in connection with the operation of the Unit. Each Unit Owner shall be obligated to maintain any Display erected by it in good condition or repair at all times, or to remove such Display and restore the condition of any Common Elements affected by the installation or removal thereof.

(h)     The Board of Managers shall have the right to grant to any public utility such additional electric, gas, steam or other utility easements or consent to relocate any existing utility easements upon any portion of the Common Elements which the Board of Managers shall deem necessary or desirable for the proper operation and maintenance of the Building. Any utility company and its employees and agents shall have the right of access to any Unit or the Common Elements in furtherance of such easement, provided such right of access shall be exercised in such a manner as to not unreasonably interfere with the normal conduct of business of the tenants and occupants of any Unit.

(i)     The exercise of any easement granted in this Article 12 shall be on condition that (i) the exercise thereof shall be in a manner that will not unreasonably interfere with the normal conduct of business of the Unit Owner of the servient Unit, its tenants or the occupants thereof, (ii) entry shall be permitted on not less than three (3) days' prior notice, except that no notice will be necessary in the case of an emergency, provided that all reasonable efforts will be made to provide advance notice and, if advance notice cannot be

given, notice will be given as soon thereafter as practicable, and (iii) the beneficiary of any easement shall have the responsibility of repairing any damage resulting from the exercise of its right to use or maintain the same.

(j)     In connection with the exercise of any easement hereinabove expressly granted, each Unit Owner and their agents, contractors and employees, shall have such additional easements for ingress, egress and access generally, including for storage of materials, in, on, over, under and through the Common Elements or any Unit, as are reasonably necessary for the practical exercise of the foregoing rights, but subject to all of the limitations otherwise applicable to the exercise of easements generally.

13.     Acquisition of Units by Board of Managers.  In the event the Board of Managers shall acquire ownership of a Unit, together with the appurtenant interest in the Common Elements, from any Unit Owner at a foreclosure or other judicial sale, or otherwise pursuant to Section 8 of Article VI of the By-Laws, title to any such Unit, together with the appurtenant Common Interest, shall be held by the Board of Managers, or its designee, on behalf of all Unit Owners.

14.     Person to Receive Service.  Service of process on the Unit Owners in any action with relation to the Common Elements shall be made upon the person holding the office of the President (or in his absence, on any member of the Board of Managers), from time to time c/o the Board of Managers of East Harlem MEC Parcel C Condominium, c/o The Richman Group, 340 Pemberwick Road, Greenwich, Connecticut 06831, or such other address as the President of the Condominium may determine.  In addition, the Secretary of State of the State of New York is hereby designated as agent of the Condominium and the Board of Managers upon whom process against the Condominium and/or the Board of Managers shall be made by personally delivering to and leaving with him or her or his or her deputy, or with any person authorized by the Secretary of State to receive such service, at the office of the Department of State in the City of Albany, duplicate copies of such process together with the statutory fee.  The Secretary of State of the State of New York shall mail a copy of any process against it served upon the Secretary of State to: East Harlem MEC Parcel C Condominium, c/o The Richman Group, 340 Pemberwick Road, Greenwich, Connecticut 06831, or as otherwise set forth in writing to the Secretary of State.

15.     Units Subject to Declaration, By-Laws and Rules and Regulations.  All present and future owners of Units (and their tenants) shall be subject to and shall comply with the provisions of this Declaration, the By-Laws and the Rules and Regulations, as they may be amended from time to time and any recorded encumbrances to which they are now or hereafter subordinate.  The acceptance of a deed, lease or conveyance shall constitute an agreement that the provisions of this Declaration, the By-Laws and the Rules and Regulations, as they may be amended from time to time, are accepted and ratified by such owner or its tenants, as the case may be, and all of such provisions of this Declaration, the By-Laws and the Rules and Regulations, as they may be amended from time to time, shall be deemed and taken to be covenants running with the land and shall bind any person having at any time any interest or estate in such Unit, as though such provisions were recited and stipulated at length in each and every deed of conveyance thereof.

16.     Amendment of Declaration.

(a)    The provisions of this Declaration may not be amended without written agreement of all Unit Owners.

(b)    No amendment to this Declaration shall be effective until recorded in the Office of the City Register, New York County.

(c)    Notwithstanding any other provision of this Declaration, no action of partition or division of the Common Elements shall be brought nor shall Condominium ownership of the Property be terminated where such partition, division or termination will result in a violation of the then existing local zoning or building laws or codes.

17.    Common Charges.  All sums assessed by the Board of Managers, but unpaid, together with interest thereon at the maximum rate permitted by law, shall constitute a lien on the Unit prior to all other liens except tax or assessment liens on the Unit by the taxing subdivision of a governmental authority.  Such lien may be foreclosed by the Condominium when Common Charges are past due in accordance with the laws of the State of New York in like manner as a mortgage on real property or by any other proceedings permitted by applicable law.  In any such foreclosure, the Condominium shall also have a right to recover all costs and expenses incurred, including reasonable attorneys' fees.  Every Unit Owner shall pay the Common Charges assessed against its Unit when due and no Unit Owner may exempt itself or the Unit from liability for the payment of Common Charges assessed against it or the Unit by waiver of the use of any of the Common Elements or by abandonment of the Unit.

18.    Incurrence of Debt.  The Board of Managers may not incur any debt.

19.    Liability Of Grantee For Unpaid Common Charges.  Subject to the last two sentences of this Article 19, any grantee or transferee of a unit ("Grantee") shall be jointly and severally liable with the transferor/Unit Owner for any unpaid Common Charges assessed against the Unit through the time of the grant or conveyance, without prejudice to the Grantee's right to recover from the transferor/Unit Owner the amounts paid by the Grantee therefor.   The Grantee shall be entitled to a statement from the Board of Managers setting forth the amount of Common Charges assessed and unpaid against its Unit as provided under Article VI, Section 6 of the By-Laws.  The Grantee shall not be liable for any unpaid Common Charges assessed prior to the date of the transfer or conveyance in excess of the amount set forth in such statement.

20.    Termination of Condominium.  The Condominium shall continue and shall not be subject to an action for partition until (i) terminated following a condemnation or taking by eminent domain of the Property pursuant to the By-Laws, or (ii) such time as withdrawal of the Property from the provisions of the Condominium Act is authorized by a unanimous vote of all Unit Owners.  In the event said termination is authorized as aforesaid, the Property shall be subject to an action for partition by any Unit Owner or as if owned in common, in which event the net proceeds of the sale of the Property shall be divided among all Unit Owners in proportion to their respective Common Interests, provided, however, that no payment shall be made to a Unit Owner until there has first been paid out of its share of such net proceeds all liens on the Unit, in the order of priority of such liens.

21.     <u>Changes in Units</u>.  Subject to the applicable provisions of the Declaration and By-Laws (including Section 17 of Article VI of the By-Laws), and except to the extent prohibited by law, each Unit Owner, at its sole cost and expense, shall have the right with respect to any Unit owned by such Unit Owner, without prior notice and without the vote or consent of the Board of Managers, or the other Unit Owner, to (i) make alterations, additions, improvements or repairs, ordinary or extraordinary, of any type or nature whatsoever, in, to and upon the Unit, (ii) change the layout or configuration of any areas within the Unit, provided, however, that in each instance the Unit Owner shall comply with all laws, ordinances and regulations of all governmental authorities having jurisdiction, and any and all structural changes shall not (x) adversely or materially affect the structural integrity of the Building or any of its supporting beams, columns, floor slabs, foundations or elevator systems, or (y) affect the Common Elements of any other Unit.  At the request of the Unit Owner, the Board of Managers will execute any application or other document required to be filed with any governmental agency having or asserting jurisdiction in connection with any addition, alteration, improvement or repair of a Unit, at which time the requesting Unit Owner shall indemnify and hold the Board of Managers and other Unit Owner harmless from any expense or liability by virtue of the execution of the application or such other documents.

22.     <u>Invalidity</u>.  The invalidity of any provision of this Declaration or the By-Laws shall not be deemed to impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration and By-Laws and, in such event, all of the other provisions of this Declaration and By-Laws shall continue in full force and effect as if such invalid provision had never been included herein.

23.     <u>Waiver</u>.  No provision contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

24.     <u>Captions</u>.  The captions herein are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Declaration nor the intent of any provision hereof.

25.     <u>Gender</u>.  The use of the masculine gender in this Declaration shall be deemed to refer to the feminine or neuter gender and the use of the singular shall be deemed to refer to the plural, and vice versa, whenever the context so requires.

26.     <u>Exculpation</u>.  Neither Declarant nor any director, officer, employee, agent, consultant, or affiliate of Declarant shall have any personal liability of any nature whatsoever to any Unit Owner or any other party by reason of this Declaration, the By-Laws, or any Rules and Regulations (as defined in the By-Laws) in connection with the establishment of this Condominium.

27.     <u>Defined Terms</u>.  Capitalized terms used in this Declaration and not otherwise defined herein shall have the meaning ascribed to them in the By-Laws.

28.     <u>Jurisdiction</u>.  Each Unit Owner does hereby submit to the jurisdiction and venue of the courts of the County and State of New York for the resolution of any dispute which may arise

ACKNOWLEDGMENTS

STATE OF ~~NEW YORK~~ Connecticut )
)  ss.:
COUNTY OF ~~New York~~ Fairfield )

On this 26 day of January 2012, before me, the undersigned, a Notary Public in and for said State, personally appeared Kristin Miller, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
          Notary Public

ANN H. McGUIRE
NOTARY PUBLIC
MY COMMISSION EXPIRES
JANUARY 31, 2013

SEAL

STATE OF NEW YORK )
)  ss.:
COUNTY OF New York )

On this 27th day of January, 2012, before me, the undersigned, a Notary Public in and for said State, personally appeared LEB. Bloc 7 _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
          Notary Public

PATRICIA GRAHAM
Notary Public - State of New York
NO. 01GR6004034
Qualified in New York County
My Commission Expires 12-19-14

SEAL

STATE OF NEW YORK )
)  ss.:
COUNTY OF New York )

On this 25 day of January 2012, before me, the undersigned, a Notary Public in and for said State, personally appeared Walter M. Polan personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
          Notary Public

- 13 -

SAMUEL GONZALEZ
Notary Public, State of New York
No. 01GO6225810
Qualified in Westchester County
Commission Expires: July 26, 2014



[page content too faded and blurred to read reliably]





| | | | |
|---|---|---|---|
| Section 9. | Majority of Unit Owners | | 7 |
| Section 10. | Quorum | | 7 |
| Section 11. | Majority Vote | | 8 |
| Section 12. | Action Without Meeting | | 8 |
| **ARTICLE V** | OFFICERS | | 8 |
| Section 1. | Designation | | 8 |
| Section 2. | Designation of Officers | | 8 |
| Section 3. | Removal of Officers | | 8 |
| Section 4. | President | | 8 |
| Section 5. | Vice President | | 8 |
| Section 6. | Treasurer | | 8 |
| Section 7. | Secretary | | 9 |
| Section 8. | Agreements, Contracts, Deeds, Checks, etc | | 9 |
| Section 9. | Compensation of Officers | | 9 |
| **ARTICLE VI** | OPERATION OF THE CONDOMINIUM | | 9 |
| Section 1. | Determination of Common Expenses and Fixing of Common Charges | | 9 |
| Section 2. | Insurance | | 10 |
| Section 3. | Repair or Reconstruction After Fire or Other Casualty | | 12 |
| Section 4. | Payment of Common Charges | | 18 |
| Section 5. | Default in Payment of Common Charges | | 19 |
| Section 6. | Statement of Common Charges | | 19 |
| Section 7. | Collection of Common Charges and Assessments | | 19 |
| Section 8. | Foreclosure of Lien for Common Charges and Assessments | | 20 |
| Section 9. | Maintenance and Repairs | | 21 |
| Section 10. | Right of Access | | 22 |
| Section 11. | Violations of Maintenance Obligations | | 22 |
| Section 12. | Abatement and Enjoinment of Violations by Unit Owners | | 23 |
| Section 13. | Restaurant/Food Service Uses | | 23 |
| Section 14. | Use of Units | | 24 |
| Section 15. | Licenses and Permits | | 25 |
| Section 16. | Additions, Alterations or Improvements by Board of Managers | | 25 |
| Section 17. | Additions, Alterations or Improvements by Unit Owners | | 25 |

# CONDOMINIUM BY-LAWS

of

# EAST HARLEM MEC PARCEL C CONDOMINIUM

## ARTICLE I
## Definitions

Section 1.     Definitions.  Capitalized terms used in these By-Laws and not otherwise defined herein shall have the meanings ascribed thereto in the Declaration of Condominium to which these By-Laws are attached.  The Condominium consists of two (2) Units, Unit 1 and Unit 2.  As used herein, the term "Unit" or "Units" shall be deemed to refer to any or all of the Units which may exist from time to time.  The term "Unit 1 Section" shall refer to Unit 1.  The term "Unit 2 Section" shall refer to Unit 2.

(a)     "Certifying Professional" shall mean an architect or similarly qualified professional who is experienced in assessing and allocating construction and/or rehabilitation costs arising out of damage, destruction, or a taking of one or more Units or the Common Elements;

## ARTICLE II
## Plan of Unit Ownership

Section 1.     Purpose.   The purpose of these By-Laws is to set forth the rules and procedures which shall govern the operation and conduct of East Harlem MEC Parcel C Condominium.

Section 2.     Applicability of By-Laws.    The provisions of these By-Laws are applicable to the use and occupancy of all portions of the Property (i.e., the Units and Common Elements) as well as all easements, rights and appurtenances thereto, and all other property, personal or otherwise, intended for use in connection therewith.

Section 3.     Application.  All present and future owners, lessees and mortgagees (fee or leasehold) of Units and their respective employees, agents, tenants, licensees or invitees and any other persons who may use the facilities of the Condominium or enter upon the Property are subject to these By-Laws, the Declaration and the Rules and Regulations attached hereto as Exhibit A (the "Condominium Documents"), each as may be amended from time in time in accordance with their respective terms.   The acceptance of a deed of conveyance, or the succeeding to title to a Unit (by operation of law or otherwise) shall constitute an agreement that these Condominium Documents, as they may be amended from time to time, are assumed, accepted, ratified, and will be complied with.

1

Section 4.    Office.  The office of the Condominium and of the Board of Managers shall be located at the Property or at such other location within the City of New York as may from time to time be designated by notice to all Unit Owners by the Board of Managers.

## ARTICLE III
## Board of Managers

Section 1.    Section Designation, Number and Qualification.    The affairs of the Condominium shall be governed by a board of managers (the "Board of Managers").  The Board of Managers shall consist of three (3) persons.  The Owner of Unit 1 shall be entitled to designate one (1) member of the Board.  The Owner of Unit 2 shall be entitled to designate two (2) members of the Board (one of who shall be designated by the Owner of Unit 2 to be the Chairman of the Board).

Section 2.    Powers and Duties of the Board of Managers.  The Board of Managers shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except those that may not be delegated to the Board of Managers by the Unit Owners by law or by the Declaration or by these By-Laws.  All determinations however, which (i) affect only Unit 1 and do not "adversely affect" Unit 2 or the use of Unit 2 for its permitted purposes, shall be made by the Unit 1 Owner, and (ii) affect only Unit 2 and do not "adversely affect" Unit 1 or the use of Unit 1 for its permitted purposes, may be made by the Unit 2 Owner.  All other determinations with respect to administration of the affairs of the Condominium shall be made by the Board of Managers.  Both the Unit 1 Owner and the Unit 2 Owner shall have a duty to notify each other in writing each time a determination is made by one of them that might reasonably be expected to have a material impact on Unit 1, if the determination is by the Unit 2 Owner, or on Unit 2, if the determination is by the Unit 1 Owner.  Any dispute as to whether a determination made by one Unit Owner "adversely affects" another Unit Owner or said Unit Owner's Unit, shall be a dispute which shall be settled by arbitration in accordance with Article XIII herein (an "Arbitrable Dispute").  Subject to the foregoing, the powers and duties of the Board of Managers shall include, but shall not be limited to the following:

(a)    Operation, care, upkeep, maintenance, replacement, repair and cleaning of the Common Elements;

(b)    Making additions, alterations and improvements to the Common Elements, subject to the provisions of Article VI, Section 16;

(c)    Determination of Common Charges required to pay Common Expenses of the Condominium;

(d)    Collection of the Common Charges and other assessments from Unit Owners, and expenditure of same to pay Common Expenses, as set forth in Section 1 of Article VI, herein;

(e)    Adoption and amendment of rules and regulations covering operation and use of the Common Elements as herein permitted;

2

(f)     Acquiring in the name of the Board of Managers, or its designee, corporate or otherwise, on behalf of all Unit Owners, rights and interests in personal property for use in connection with the ownership and operation of the Common Elements, subject to the provisions of Article VI, Section 16;

(g)     Obtaining insurance, pursuant to the provisions of Article VI, Section 2 hereof;

(h)     Making repairs to and/or restoration of the Common Elements after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings or as may be required by law, subject to the provisions of Article VI, Sections 3 and 16 and Article VIII and otherwise, in accordance with any other applicable provisions of the Declaration and By-Laws;

(i)     Adjusting and settling claims under insurance policies obtained pursuant to Article VI, Section 2, and executing and delivering releases upon settlement of such claims on behalf of all Unit Owners, provided that such adjustment or settlement must be approved by 100 percent of the Unit Owners;

(j)     Executing, acknowledging and delivering (i) any declaration or other instrument affecting the Property which the Board of Managers deems appropriate or necessary to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, Landmarks Preservation commission, or any other public authority, applicable to the maintenance, demolition, construction, alteration, repair or restoration of the Property, or (ii) subject to the provisions of the Declaration and By-Laws and the approval rights of any mortgagee, any consent, covenant, restriction, easement or declaration affecting the Property which the Board of Managers deems necessary or appropriate;

(k)     Preparing, executing and recording, on behalf of all Unit Owners, as their attorney-in-fact, a restatement of the Declaration and/or these By-Laws whenever the Board of Managers deems it advisable to consolidate and restate all amendments, modifications, additions and deletions theretofore made to the Declaration and/or these By-Laws;

(l)     Executing, acknowledging and delivering any document or other instrument necessary to commence, pursue, compromise or settle certiorari proceedings to obtain reduced real estate tax assessments with respect to Units for the benefit and on behalf of each Unit Owner who has given appropriate written authorization, provided that each such Unit Owner indemnifies the Board of Managers and the Condominium from and against all claims, costs and expenses (including, without limitation, reasonable attorney's fees and disbursements) resulting from such proceedings;[1]

(m)     Taking such actions as may be necessary or desirable to enforce the provisions of the Declaration, By-Laws and Rules and Regulations and defend on behalf of the Condominium, any actions commenced against the Condominium, provided that the

---

[1]     Each Unit Owner may commence certiorari proceedings on its own behalf, so long as it provides thirty (30) days notice to the other Unit Owner in advance of the commencement of such action.

3

commencement of legal proceedings must be approved by 100% of the Unit Owners except for L&T actions and insurance proceedings not affecting the other unit owners;

(n)    Settling any claim or lawsuit by or against the Condominium, provided that any such settlement is approved by 100% of the Unit Owners; and

(o)    Entering into service or supply contracts to effect any of the foregoing, provided, that if any such contract is with any person or entity related to any Unit Owner (or the directors, officers, employees or affiliates thereof), the terms of such contract, when taken as a whole, are not less advantageous to the Condominium than those which would be obtained for similar services or products between unrelated parties in New York City.

The Board of Managers may not lease or license any portion of the Common Elements.

Section 3.    <u>Managing Agent and Manager</u>.  The Board of Managers may not employ for the Condominium a managing agent and/or a manager unless approved by 100% of the Unit Owners.

Section 4.    <u>Election and Term of Office</u>.  Each member of the Board of Managers shall hold office for a three-year term or until his successor shall have been designated as provided in Section 1 of Article III hereof.

Section 5.    <u>Removal of Members of the Board of Managers</u>.  At any regular or special meeting of Unit Owners, any one or more of the members of the Board of Managers may be removed with or without cause by the Unit Owner having designated such member.  A replacement shall be promptly designated by the applicable Unit Owner.

Section 6.    <u>Vacancies</u>.  In the event that a member of the Board of Managers designated by the Owner of Unit 1 or the Owner of Unit 2 dies, becomes incompetent, resigns or is otherwise unable to serve, the Unit Owner having designated such member shall, immediately and in no event later than 10 days after notification by the Board that there is a vacancy, designate a successor.

Section 7.    <u>Regular Meetings</u>.  Regular meetings of the Board of Managers may be held at such time and place as shall be determined from time to time by a majority of the members of the Board, but at least one such meeting shall be held during each fiscal year. Notice of regular meetings of the Board of Managers shall be given to each member of the Board of Managers by the Chairman of the Board, by mail, facsimile or by hand, at least five (5) business days prior to the day named for such meeting.  Such notice shall state the time of the meeting and a location in the borough of New York.

Section 8.    <u>Special Meetings</u>.  Special meetings of the Board of Managers may be called by any member of the Board of Managers upon at least five (5) business days' notice to each member of the Board of Managers in like manner and on like notice as for Regular Meetings.

Section 9.    <u>Waiver of Notice</u>.  Any member of the Board of Managers may at any time waive notice of any meeting of the Board of Managers in writing, and such waiver shall be

4

deemed equivalent to the giving of such notice. Attendance by a member of the Board of Managers at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. Any one or more members of the Board of Managers or any committee thereof may participate in a meeting of the Board or committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting. If all the members of the Board of Managers are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

Section 10.     Quorums.     Except as otherwise required in these By-Laws, all determinations and actions of the Board of Managers shall be made at a meeting of the Board at which a quorum is present. At all meetings, the presence of two (2) members of the Board of Managers shall be required to constitute a quorum.

Section 11.     Action.  Each member of the Board of Managers shall be entitled to cast one (1) vote each in any vote held by the Board. Except as otherwise expressly required by the Declaration or By-Laws, the majority vote of the members present at a meeting at which a quorum is present shall constitute the decision of the Board of Managers. Any action required or permitted to be taken by the Board of Managers may be taken without a meeting if all members of the Board consent in writing to the adoption of a resolution authorizing such action and the writing or writings are filed with the minutes of the proceedings of the Board.

Section 12.     Fidelity Bonds.  The Board of Managers may obtain adequate fidelity bonds for all members of the Board of Managers, officers and employees of the Condominium and the managing agent handling or responsible for Condominium funds. The premiums on such bonds shall constitute a Common Expense.

Section 13.     Compensation.  No member of the Board of Managers shall receive any compensation from the Condominium for acting as such.

Section 14.     Liability of the Board of Managers.  The members and officers of the Board of Managers shall not be liable to the Unit Owners for any mistake of judgment or negligence, except for their own individual willful misconduct, gross negligence, or bad faith. To the fullest extent allowed by law, the Unit Owners shall indemnify and hold harmless each of the members and officers of the Board of Managers against all liability to others arising from their acts as, or by reason of the fact that such person was, a member or officer of the Board of Managers. It is intended that the members and officers of the Board of Managers shall have no personal liability with respect to any contract made by them on behalf of the Condominium within the scope of their authority. It is also intended that the liability of any Unit Owner arising out of any contract made by the Board of Managers or out of the aforesaid indemnity in favor of the members and officers of the Board of Managers shall be limited to such proportion of the total liability thereunder as such Unit Owner's interest in the Common Elements bears to the interests of all Unit Owners in the Common Elements. Every agreement made by the Board of Managers or by the managing agent on behalf of the Condominium shall provide that the members and officers of the Board of Managers, or the managing agent, as the case may be, are acting only as agents for the Unit Owners and shall have no personal liability thereunder (except as Unit Owners), and that any liability of a Unit Owner thereunder shall be limited to such

5

proportion of the total liability thereunder as his interest in the Common Elements bears to the interests of all Unit Owners in the Common Elements. Except as might otherwise be limited by applicable law, the Board may purchase and maintain insurance against liability arising under the indemnification obligations contained in this Section 14 and for such additional related risks as the Board shall deem appropriate.

## ARTICLE IV
## Unit Owners

Section 1.    Annual Meetings.   Immediately after the recording of the Declaration, a meeting of Unit Owners shall be held at which time the Unit Owners shall designate or elect, as provided in Section 1 of Article III, members to the Board of Managers and may transact such other business as may properly come before such meeting. Thereafter, an annual meeting shall be held within approximately three (3) weeks of the anniversary of the first annual meeting on such day as all Unit Owners shall agree.

Section 2.    Place of Meetings.   Meetings of the Unit Owners shall be held at the principal office of the Condominium or at such other suitable place in the Borough of New York convenient to the Unit Owners and as may be designated by the Board of Managers.

Section 3.    Special Meetings.   It shall be the duty of the President to call a special meeting of the Unit Owners if so directed by resolution of the Board of Managers, or upon a petition signed and presented to the Secretary by any Unit Owner. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No business shall be transacted at a special meeting except as stated in the notice.

Section 4.    Notice of Meetings.   It shall be the duty of the Secretary to mail, via certified mail, return receipt requested, or by FedEx or other reputable overnight carrier, a notice of each annual or special meeting of the Unit Owners at least five (5), but not more than forty (40) days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each Unit Owner of record, at the Property or at such other address as such Unit Owner shall have designated by notice in writing to the Secretary. If the purpose of any meeting shall be to act upon a proposed amendment to the Declaration or to these By-Laws, the notice of meeting shall contain the text of the proposed amendment and shall be mailed at least thirty (30) days prior to such meeting to each Unit Owner and each mortgagee. The mailing of a notice of meeting in the manner provided in this Section shall be considered service of notice.

Section 5.    Adjournment of Meetings.   If any meeting of Unit Owners cannot be held because a quorum is not present either in person or by proxy, a majority of the Unit Owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than three (3) business days from the time the original meeting was called.

Section 6.    Order of Business.   The order of business at all meetings of the Unit Owners shall be as follows:

(a)    Call to order.

(b)    Roll call.

6

(c)    Proof of notice of meeting.

(d)    Reading of minutes of preceding meeting.

(e)    Reports of officers.

(f)    Report of Board of Managers.

(g)    Election of members of the Board of Managers (when required).

(h)    Unfinished business.

(i)    New business.

Section 7.    <u>Title to Units</u>.  Title to Units may be taken in the name of an individual or in the names of two or more persons, as tenants-in-common or as joint tenants or as tenants by the entirety, or in the name of a corporation, limited liability company or partnership, or in the name of a fiduciary.

Section 8.    <u>Voting</u>.

(a)    The total number of votes of all Unit Owners shall be two.  Accordingly, as of the date hereof, the owner of Unit 1 may cast 1 vote and the owner of Unit 2 may cast 1 vote.

(b)    Each Unit Owner shall be entitled to designate an individual to act as proxy on its behalf who shall be entitled to cast the votes appurtenant to such Unit at all meetings of Unit Owners.  The designation of any such proxy shall be made in writing to the Secretary, and shall be binding upon such Unit Owner until revoked in writing by notice given to the Secretary or in person by the Unit Owner at a meeting of the Unit Owners.

Section 9.    <u>Majority of Unit Owners</u>.  As used in these By-Laws "majority of Unit Owners" shall mean those Unit Owners having more than 51% of the total votes of all Unit Owners entitled to vote on such matter.  To the extent that there are two Unit Owners, both must concur for a majority.

Section 10.    <u>Quorum</u>.  Except as otherwise provided in these By-Laws, the presence in person or by proxy of all of Unit Owners shall constitute a quorum at all meetings of Unit Owners.

Section 11.    <u>Majority Vote</u>.  Except where a higher percentage vote is required by the Declaration, these By-Laws or by law the vote of a majority of Unit Owners at a meeting at which a quorum shall be present shall be binding upon all Unit Owners for all purposes.

Section 12.    <u>Action Without Meeting</u>.  Any action required or permitted to be taken by the Unit Owners may be taken without a meeting if all of Unit Owners consent in writing to the adoption of a resolution authorizing such action and the writing or writings are filed with the records of the Condominium.

## ARTICLE V
### Officers

Section 1.    Designation.  The principal officers of the Condominium shall be the President, Vice President, Secretary, and Treasurer.  Only the President and Vice President must be members of the Board of Managers.  An individual may hold more than one office at the same time provided, however, that the offices of President and Secretary must be held by different individuals.

Section 2.    Designation of Officers.  The President, Secretary and Treasurer shall be designated by the Unit 2 Owner and the Vice President shall be designated by the Unit 1 Owner. The officers shall be designated at the organization meeting of each new Board of Managers and shall hold office at the pleasure of the Applicable Unit Owner.

Section 3.    Removal of Officers.  Any officer may be removed, either with or without cause by the Unit Owner who appointed such officer.  Any officer may resign at any time by giving notice in writing to the Board of Managers.  Unless stated otherwise in the letter of resignation, the resignation shall be effective immediately.  If an officer shall be removed or resign or die or is otherwise incapacitated, his successor shall be designated by the applicable Unit Owner.

Section 4.    President.  The President shall be the chief executive officer of the Condominium.  He shall preside at all meetings of the Unit Owners and Board of Managers. Subject to the provisions of these By-Laws, he shall have all of the general powers and duties which are incident to the office of president of a corporation organized under the Business Corporation Law of the State of New York.

Section 5.    Vice President.  The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act.  If neither the President nor the Vice President is able to act, the Board of Managers shall appoint some other member of the Board of Managers to act in the place of the President on an interim basis.  The Vice President shall also perform such other duties as shall from time to time be imposed upon him by the Board of Managers or by the President.

Section 6.    Treasurer.  The Treasurer of the Condominium shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data.  He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Managers or the Managing Agent in such depositories as may from time to time be designated by the Board of Managers, and he shall perform, in general, all the duties incident to the office of treasurer of a corporation organized under the Business Corporation Law of the State of New York.  Notwithstanding anything to the contrary contained herein or in the Declaration, the Board of Managers shall have the right to engage accountants, bookkeepers and other appropriate professionals to perform one or more of the tasks described as the Treasurer's responsibilities in this section.  In the event such professional is engaged, it shall be the Treasurer's responsibility to oversee and examine the work performed by the professional, to ensure accuracy, timeliness and complete performance.

Section 7.    <u>Secretary</u>.  The Secretary shall keep the minutes of all meetings of the Unit Owners and of the Board of Managers; he shall have charge of such books and papers as the Board of Managers may direct; and he shall, in general, perform all the duties incident to the office of secretary of a corporation organized under the Business Corporation Law of the State of New York.

Section 8.    <u>Agreements, Contracts, Deeds, Checks, etc.</u>  All agreements, contracts, deeds, leases and checks in excess of $1,000 of the Condominium shall be executed by two officers.

Section 9.    <u>Compensation of Officers</u>.  No officer shall receive compensation from the Condominium for acting as such.

## ARTICLE VI
## Operation of the Condominium

Section 1.    <u>Determination of Common Expenses and Fixing of Common Charges</u>.

(a)    (1)    The Board of Managers shall from time to time, and at least annually, prepare a budget to meet the Common Expenses of the Condominium and determine the overall amount of Common Charges payable by the Unit Owners to meet the Common Expenses of the Condominium.  The Board, upon unanimous vote of all Board members, however, shall have the right to determine Common Charges for a particular item of expense on a different basis than Common Interest.  Specifically, upon unanimous vote of all Board members, the Board may compute Common Charges for a particular item of expense based on the estimated amount by which the particular expense item benefits or is used by the Unit or the Unit Owner, provided the allocation is fairly attributable to the Unit and reasonable under the circumstances.

(2)    The Board of Managers shall advise the Unit Owners promptly, in writing, of the amount of Common Charges payable by each of them, as determined by the Board of Managers, and shall furnish copies of each budget on which such Common Charges are based to the Unit Owners, at least ten (10) days prior to the adoption thereof.  That portion of the Common Charges which is allocated by the Board of Managers to principal payments on indebtedness or for capital improvements shall be treated upon the books of the Condominium as capital contributions.

(b)    The Common Expenses shall include, among other things, the cost of insurance premiums on all policies of insurance required to be or which have been obtained by the Board of Managers pursuant to the provisions of these By-Laws.  The Common Expenses may also include an amount to cover any deficit in the Common Charges collected for any prior year.  Common Expenses shall also include other items stated in the Declaration or these By-Laws to be Common Expenses.

(c)    Real estate taxes and other taxes and assessments on the Property until the Units are separately assessed shall be paid by the Board of Managers as a Common Expense.

9

(d)     Assessments other than and in addition to Common Charges may be levied against Unit Owners.  These charges shall be paid by Unit Owners in the same manner as provided in these By-Laws for Common Charges ("Special Assessments").  Failure to pay any such assessments shall be treated in the same manner as failure to pay Common Charges.

Section 2.     Insurance.

(a)     The Board of Managers and the Unit Owners shall be required to obtain and maintain as a Common Expense of the Condominium the following insurance for the Property:

(1)     "All risk" real property coverage on each Unit (including all installations and other property therein, except for trade fixtures and moveable personal property) and the Common Elements for an amount equal to one hundred percent (100%) of the replacement cost thereof, coverage for loss of business income by the Units Owners for one hundred percent (100%) of the annual exposure, coverage for loss of common charges for one hundred percent (100%) of the annual exposure, and personal property coverage for one hundred percent (100%) of the replacement costs.

(2)     Comprehensive boiler and machinery insurance on a blanket basis covering any Building equipment, machinery and apparatus (i.e., boilers, heating apparatus, fired and unfired pressure vessels, air conditioning equipment, miscellaneous electrical apparatus and their appurtenant equipment) with the same limits as the real property coverage pursuant to Section 2(a)(1).

(b)     For the insurance policies required pursuant to Section 2(a) of this Article, the Unit 1 Owner, the Unit 2 Owner and the Board of Managers shall be a named insured as their interests may appear.

(c)     All insurance proceeds with respect to any loss shall be payable to the Board of Managers.

(1)     The insurance policies required pursuant to Section 2(a) of this Article shall contain waivers of subrogation against Unit Owners and the Board of Managers.

(2)     The insurance policies required pursuant to Section 2(a) of this Article shall provide, by endorsement or otherwise, that (i) the acts or omissions of any insured party or their agents, employees or representatives shall not invalidate the policy as against any other insured party or otherwise adversely affect the rights of any other insured party under any such policy to collect the full amount of the policy to the extent required to rebuild its portion of the Building, and (ii) the insurance shall not be invalidated should any of the insureds under the policy waive any or all rights of recovery against any party for loss occurring to the property insured under the policy.

(3)     No policy of casualty insurance under Section 2(a) of this Article for damage against property shall contain a co-insurance clause.

   (d) The Board of Managers and the Unit Owners shall obtain and maintain as a Common Expense of the Condominium the following insurance:

     (1) Commercial general liability insurance covering claims for personal and bodily injury or property damage occurring in, on, under, within, upon or about the Common Elements or the Owners' Units or as a result of operations thereon (including contractual liability covering obligations created by the Condominium Documents) in an amount of not less than $1,000,000 per occurrence and not less than $10,000,000, in the aggregate including any excess or umbrella liability coverage.

     (2) For the insurance policies required pursuant to this Section 2(d), the Unit 1 Owner, the Unit 2 Owner and the Board of Managers shall be a named insured.

   (e) Nothing contained hereby shall be deemed to preclude any Unit Owner from maintaining insurance, without any requirement to name the other Unit Owner. However, neither Unit Owner shall carry any additional casualty insurance for damage against property (i) unless each policy contains a waiver of subrogation against the other Unit Owners, their tenants and the Board of Managers, or (ii) if the effect of such additional casualty insurance for damage against property is to affect adversely or otherwise diminish the liability of or coverage available from the carriers issuing the insurance obtained by the parties pursuant to the provisions of Section 2(a) of this Article.

   (f) (1) Required insurance policies shall be in such form and shall be issued by financially responsible insurance companies licensed to do business in the State of New York as are reasonably acceptable to the Unit Owners and the Board of Managers and in accordance with the requirements of any mortgagee(s).

     (2) Required insurance policies shall provide for a minimum of thirty (30) days' prior written notice of the cancellation, nonrenewal or modification thereof to the Unit Owners and the Board of Managers.

     (3) Neither a Unit Owner nor the Board of Managers shall willfully or knowingly violate or suffer or permit the violation of the terms of any policy of insurance required hereunder, or do or permit or suffer anything to be done, or keep anything in any portion of the Building which could result in termination of any such policies, could adversely affect the right of recovery under any such policies, or would result in reputable and independent insurance companies refusing to insure the Building and or the Units or Common Elements in the amounts required hereunder at the regular rates.

     (4) Insurance specified in Sections 2(a) and 2(d) of this Article shall be reviewed by the Board of Managers periodically at the request of any Unit Owner, but no review will be required more often than annually (unless there is a substantial change in the Building or operations conducted in the Building), to determine if such limits, deductible amounts and types of insurance are reasonable and prudent. However, the Board of Managers shall not amend or waive any of the insurance requirements set forth in this Section 2(a) or 2(d) without the consent of, in all instances, 100 percent of the Unit Owners.

(g)     Evidence of renewal policies, in binder or certificate form, shall be delivered by each Unit Owner to the Board of Managers not less than thirty (30) days prior to the expiration dates of any expiring policies, together with proof that the premiums for at least the first year of the term of such policies (or installment payments then required to have been paid on account of such premiums) shall have been paid.

(h)     Provided that such a waiver does not invalidate the respective policy or policies or diminish or impair the insured's ability to collect under such policy or policies or unreasonably increase the premiums for such policy or policies unless the party to be benefited by such waiver pays such increase, and without limiting any release or waiver of liability or recovery required or contained elsewhere in the Condominium Documents, each Unit Owner waives all claims for recovery from the other Unit Owner and the Board of Managers, and the Board of Managers waives all claims for recovery from the Unit Owners, for any loss or damage to any of its property insured (or required hereunder to be insured) under valid and collectible insurance policies to the extent of any recovery collectible (or which would have been collectible had such insurance required hereunder been obtained) under such insurance policies.

(i)     The Board of Managers shall also be required to obtain and maintain to the extent obtainable and/or to the extent required by law as a Common Expense of the Condominium workers' compensation insurance and New York State Disability Insurance.

(j)     The Board of Managers shall also be required to obtain and maintain as a Common Expense of the Condominium directors and officers insurance covering all members and officers of the Board of Managers.

(k)     If a Unit Owner fails to procure and maintain the insurance required under this Section 2, the Board of Managers may, but shall not be obligated to, procure such insurance on behalf of the Unit Owner and shall cause the cost of such premium to be charged to the Unit Owner as a special assessment.  Failure to pay such assessment shall be treated in the same manner as failure to pay Common Charges.

Section 3.     Repair or Reconstruction After Fire or Other Casualty.

(a)     (1)     Subject to any applicable mortgage provisions, if any portion of the Building is damaged by fire or other casualty and if such damage (i) occurs within and affects only Unit 1, or (ii) occurs within and affects only Unit 2, then any such damage shall be promptly repaired and restored by the Owner of the Unit in which the damage occurred (the "Damaged Owner") with due diligence and in as timely a manner as is practicable under the circumstances. Such Damaged Owner shall obtain all required permits and shall adjust the claim with the insurance company (subject to any approval rights of any mortgagee(s) of the Unit). The Damaged Owner shall be entitled to any insurance proceeds held by the Board of Managers by reason of such damage, for application to the cost and expense of the repair and restoration of any such damage, as provided in these By-Laws.  The Damaged Owner shall be responsible for any costs to repair or restore the damage in excess of the insurance proceeds, and shall be entitled to receive any excess proceeds, subject to the rights, if any, of any mortgagee of the Unit respecting such excess proceeds.  If the cost of repair and restoration is projected to cost more than $200,000, the Damaged Owner shall submit plans and specifications, a construction

12

schedule, copies of permits and contracts, and any other documents reasonably required by the Board of Managers, to the Board of Managers. If the cost of repair and restoration is projected to cost more than $1,000,000, the Damaged Owner shall also be required to submit a payment and performance bond. This requirement may be waived with the consent of both the Owner of Unit 1 and the Owner of Unit 2.

(2)     If the cost of repair and restoration to be performed pursuant to this Section is less than $500,000 (or such lesser amount as determined by 100% of the Unit Owners), the Damaged Owner shall be entitled to receive the total insurance proceeds for application to the cost of repair or restoration, subject to compliance with the provisions of Article IX, Section 7(c) below and this Section 3(a) and any applicable mortgage provisions.

(b)     If any portion of the Building is damaged by fire or other casualty and if such damage occurs (i) within Unit 1 only and does not affect Unit 2 or the Common Elements, other than to an immaterial degree, or (ii) such damage occurs within Unit 2 only and does not affect Unit 1 or the Common Elements, other than to an immaterial degree, then the provisions contained in Section 3(a) above shall apply; provided, however, that the Damaged Owner shall (i) notify the other Owner and/or the Board of Managers, as applicable (the "Minimally Damaged Party") of the nature and extent of the damage and (ii) obtain the Minimally Damaged Party's prior consent to the contractor to be used, which consent shall not be unreasonably withheld. If the Damaged Owner delivers to the Minimally Damaged Party evidence reasonably satisfactory to the Minimally Damaged Party that the Minimally Damaged Party has the benefit of reasonably adequate warranties and guaranties provided by the contractor, then so long as the Damaged Owner has complied with the provisions of this Section 3(b), the Damaged Owner shall not be liable to the Minimally Damaged Party for any defect in the work performed by the contractor repairing the damage.

(c)     (1)     Subject to Sections 3(g) and 3(j) of this Article, if the Building is damaged by fire or other casualty and the provisions of Sections 3(a) and 3(b) do not apply, the Board of Managers shall, with due diligence and in as timely a manner as practicable under the circumstances, cause the damage to be repaired and the Building to be restored and the repair and restoration of the damage ("Restoration Work") shall be the responsibility of the Board of Managers pursuant to the provisions of this Section 3(c).

(2)     The Board of Managers shall adjust the claim with the insurance company providing the insurance under Article VI, Section 2(a), shall obtain all required permits (copies of which shall be given to each Owner and to the mortgagees), subject, however, to the prior approval by any mortgagee of the adjustment of any claim greater than $200,000, which approval shall not be unreasonably withheld. If the cost of repair is $200,000 or less, the Board may and shall form and complete the repair and restoration promptly, without the consent of any Unit Owner or mortgagee.

(3)     The Board of Managers shall supervise the construction work with respect to the Building. The repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable and shall be performed on behalf of the Unit Owners by a general contractor or a construction manager selected by the Board of Managers. If the overall cost of the repair and restoration is greater than $200,000, then (i) the Board of

Managers shall prepare a construction schedule and (ii) the general contractor or construction manager (and in the case of a construction manager, any trade contractors performing work for the benefit of both Owners with a contract price in excess of $50,000) shall be selected by the Board of Managers and approved by the Unit Owners and the mortgagees, which approval shall not be unreasonably withheld.  The construction manager or general contractor will coordinate the Board's restoration work with the Unit Owner's restoration work, as necessary, so the work and scheduling may proceed expeditiously and efficiently.  All such coordination work shall be performed in accordance with good construction practices, without priority or preferences for particular Units or Unit Owners.  The cost of the construction manager or general contractor shall be a Common Expense.

(4)     The plans and specifications for such repair and restoration shall be prepared by an architect engaged by the Board of Managers and shall provide for the restoration of the damaged portion of the Building as close as commercially practicable to the condition that existed prior to the damage or destruction, except to the extent any changes in law require otherwise or unless the Unit Owners agree otherwise subject to the reasonable approval of the mortgagees.  The Board of Managers shall cause the architect to furnish to each of the Unit Owners and the mortgagees a set of the plans and specifications (and shop drawings upon request) which it has prepared or caused to be prepared.  If, in connection with any restoration or repair hereunder, only one Unit Owner desires to make any material change in the Common Elements, the consent of the other Unit Owner shall be required.  Each mortgagee shall receive copies of all change orders and shall have the right to reasonably approve any material changes to the Building which affect the Unit securing the lien of its mortgage.

(5)     Unless the Board of Managers determines otherwise, the general contractor or the construction manager, as the case may be, shall work under the supervision of the Architect.

(d)     (1)     If the cost and expense of performing any repair and restoration of the Building pursuant to Section 3(a) (including cases where the provisions of Section 3(a) apply by operation of the provisions of Section 3(b)) of this Article shall exceed the amount of any available insurance proceeds for the restoration of the Building, the excess cost and expense (or the entire amount of such cost and expense, if there are no insurance proceeds) shall be paid by the Damaged Owner.  The Damaged Owner shall also pay any deductible amount.

(2)     If the cost and expense of performing any repair and restoration which is undertaken pursuant to this Section 3(c) shall exceed the amount of available insurance proceeds, the excess cost and expense (or the entire amount of such cost and expense, if there are no insurance proceeds) shall be borne by the Unit Owners in proportion to the Architect Allocation Ratio (as defined below).  Notwithstanding the foregoing, (i) to the extent the additional costs result from changes requested by a Unit Owner or the acts or omissions by Unit Owner, such Unit Owner shall be solely responsible for payment of the additional costs, and (ii) if a Unit Owner fails to carry any insurance required under Section 2(a), such Unit Owner shall be responsible for the payment of any restoration costs that would have been paid from the proceeds of such insurance.  The Unit Owners shall share, subject to the terms of the immediately preceding sentence, any cost overruns resulting from Unavoidable Delays based on the Architect Allocation Ratio.  The term "Architect Allocation Ratio" shall have the following

14

meaning: the ratio of (A) the relative cost of the restoration to be performed under Section 3(c) of this Article of the damage suffered by each Unit Owner to (B) initially, the estimate of the total cost of such repair or restoration (the "Estimate") and, as and if the costs change during the course of the Restoration Work, the actual total costs. The Certifying Professional shall reasonably determine the Architect Allocation Ratio and shall notify the Unit Owners of such ratio and the method by which the same was calculated, which notice shall include a complete schedule of costs and a reasonably detailed breakdown thereof by area and type of damage. Either Unit Owner shall have the right for thirty (30) days from the date of receipt of the aforementioned notice from the Certifying Professional to dispute the Architect Allocation Ratio by giving notice to the others (including the Certifying Professional), which notice shall include, with reasonable detail, the basis for the dispute and the proposed alternate allocation ratio and the method by which the same is calculated. Each Unit Owner shall share in paying the deductible in accordance with the Architect Allocation Ratio. Any dispute relating to the Architect Allocation Ratio shall be subject to Arbitration in accordance with these By-Laws.

        (e)    (1)    Within sixty (60) days after any damage requiring any repair or restoration under either Section 3(a), 3(b) or Section 3(c) of this Article, the Certifying Professional shall be selected by the Board of Managers where Section 3(c) applies, and the Damaged Owner (where Section 3(a) or 3(b) applies) and the selecting party shall cause the Certifying Professional to prepare a reasonably detailed statement (the "CP Statement") setting forth (i) a description of the damaged areas of the Building, and (ii) the Estimate, and shall deliver a copy of such Estimate to each Owner and to the Board of Managers.

        (2)    If the insurance proceeds available for any repair or restoration required under Section 3(a), 3(b) or Section 3(c) (based upon the adjustment of the insurance claims in respect of the damage giving rise thereto) are less than the amount of the Estimate (and provided that with respect to Section 3(a) or 3(b), the Estimate exceeds $200,000), then within ten (10) days of such deficiency becoming known, (x) if pursuant to Section 3(a) or 3(b), the Damaged Owner shall deposit with the Board of Managers the deficiency, or (y) if pursuant to Section 3(c), the Owners shall deposit with the Board of Managers their respective shares of such deficiency as determined in accordance with the Architect Allocation Ratio. Furthermore, if the Certifying Professional determines that a deficiency exists, then, and in such case, the Damaged Owner (if pursuant to Section 3(a) or 3(b)) shall deposit with the Board of Managers, or the Owners (if pursuant to Section 3(c)) shall each deposit with the Board of Managers within ten (10) days after receipt of the statement of the deficiency from the Certifying Professional, the deficiency (if pursuant to Section 3(a) or 3(b)) or their respective shares of the deficiency in accordance with the Architect Allocation Ratio (if pursuant to Section 3(c)). If a Unit Owner fails to contribute its deficiency as determined above and such failure continues for a period of ten (10) days after the Unit Owner is given notice of such failure, the other Unit Owner (who shall be a Creditor Owner) may, but shall not be obligated to, pay the share of the defaulting Owner (who shall be a Defaulting Owner). In addition, the Board of Managers shall have the right, but shall not be obligated to pay the share of the Defaulting Owner. Any payments made by the Board of Managers pursuant to the foregoing shall be deemed a special assessment made by the Board of Managers against the Defaulting Owner, and failure of the Defaulting Owner to pay such special assessment shall be treated in the same manner as failure to pay Common Charges.

(f)     Upon completion of the repair and restoration and full payment therefor, any unadvanced portion of the amounts on deposit with the Board of Managers for such purpose shall be distributed as follows:

(1)     With respect to any repairs or restoration performed pursuant to the provisions of Section 3(a) or 3(b), the balance held by the Board of Managers, together with any letter of credit or other security held by the Board of Managers, shall be paid and/or delivered to the Damaged Owner, subject to the provisions of Article IX, Section 7(e).

(2)     With respect to any repairs or restoration pursuant to Section 3(c), the balance on deposit with the Board of Managers shall be retained by the Board of Managers.

(3)     If the Board of Managers is holding any letter of credit or other security, the Board of Managers will draw upon or otherwise liquidate these items unless the party depositing these items substitutes cash in an amount equal to the amount secured by these deposits.  If a Unit Owner's or the Board of Managers' share of excess proceeds is equal to the amount secured by deposits made by the Unit Owner or the Board of Managers, as applicable, the return of the deposited items shall be a credit against the excess proceeds to which it is entitled.

(g)     (1)     Subject to the provisions of this Section 3(j) below, each Unit Owner shall be obligated to repair and restore its Unit, and the Board of Managers shall be obligated to restore the Common Elements, regardless of whether or not any insurance proceeds are available.  Furthermore, each Unit Owner shall reasonably cooperate with the other Unit Owner and the Board of Managers, and the Board of Managers shall reasonably cooperate with the Unit Owners in connection with any repairs or restoration to the Building.

(2)     If, however, one Unit Owner defaults in the full, faithful and punctual performance of any obligation under this Section 3 (including, without limitation, adjusting any loss, preparing plans and specifications, selecting contractors, negotiating and executing contracts, and performing construction), then the other Unit Owner or the Board of Managers, shall have, in addition to all other remedies it may have hereunder or at law or in equity, upon the expiration of at least ten (10) days' prior notice of such default, the right, but not the obligation, if the Defaulting Owner has not commenced the good faith cure of such default within said ten (10) day period, (i) to make any decisions required in connection with the performance of such obligation on behalf of the Defaulting Owner, (ii) to actually perform the obligation on behalf of the Defaulting Owner, and (iii) in accordance with the applicable provisions of Article IX, Section 10, to use the Defaulting Owner's insurance proceeds in connection with the performance of any such obligation.  If any Unit Owner defaults in the performance of its obligations under this Section 3, as aforesaid, the other Owner and the Board of Managers, are each hereby irrevocably appointed attorney-in-fact of the Defaulting Owner (such power of attorney being coupled with an interest) to take any and all steps necessary on behalf of Defaulting Owner to perform the Defaulting Owner's obligations as provided herein. Any and all expenses incurred by the Board of Managers pursuant to the foregoing shall be deemed a special assessment against the Defaulting Owner, and failure of the Defaulting Owner to pay such special assessment shall be treated in the same manner as failure to pay Common Charges.  To the extent one Unit Owner incurs expenses for the obligations of the Defaulting

16

Owner pursuant to this Section, the Unit Owner incurring such expenses shall be a creditor Owner with respect to all funds expended on behalf of the Defaulting Owner, and the Defaulting Owner shall owe such monies to the creditor Owner.

(3)     If the Board of Managers defaults in the full, faithful and punctual performance of any obligation under this Section 3 (including, without limitation, adjusting any loss, preparing plans and specifications, selecting contractors, negotiating or executing contracts and performing construction, the Unit Owners shall have, in addition to any other rights and remedies, the right, acting together jointly, to perform all obligations of the Board of Managers, and the Unit Owners shall be deemed to have a joint and several power of attorney from the Board of Managers to act on its behalf to perform the Board of Manager's obligations set forth herein.

(h)     For purposes of this Section 3, architects' and engineers' fees, attorneys' fees, consultants' fees, the fees of the Certifying Professional, title insurance premiums and other similar costs and expenses relating to repair or restoration shall be included in the costs and expenses of any such repair or restoration.

(i)     When and if the Board of Managers is authorized or otherwise required to proceed with repair and reconstruction pursuant to this Section 3(c) above, it shall arrange for and commence such work promptly and shall diligently prosecute same to completion in accordance with these By-Laws.  In anticipation of receipt of insurance proceeds, the Board of Managers may levy and assess as a Special Assessment, prior to receipt of such proceeds, the amount anticipated to be necessary to repair or reconstruct the Property.  Upon receipt of the proceeds, the Board of Managers will reimburse Unit Owners any amounts they paid as Special Assessments as will not be needed to pay the cost of repair and restoration.  Any cost of such repair and restoration in excess of the insurance proceeds shall constitute a Common Expense and the Board of Managers may assess all the Unit Owners for such deficit as part of their Common Charges.

(j)     If as the result of fire or other casualty, at least 75% of the Property, based on floor area, is destroyed or substantially damaged, a special meeting of the Unit Owners shall be called in accordance with these By-Laws at which meeting the Unit Owners shall be asked to decide if the Building should be repaired or reconstructed.  The Building shall be repaired and reconstructed unless pursuant to the vote held at that meeting, Unit Owners unanimously and affirmatively determine not to repair or restore the Building.  If Unit Owners representing 100% in number of Units and in Common Interest affirmatively determine not to repair or restore the Building, then, and in such event, the Building will not be repaired and the Property, or such portion of the Property as shall remain, shall be subject to an action for partition at the suit of any Unit Owner or lienor as if owned in common, in accordance with the provisions of the Condominium Act.  The net proceeds of sale, together with the net proceeds of insurance policies maintained by the Board for coverage of the Common Elements, shall be divided by the Board of Managers among and paid to the Unit Owners in proportion to their respective percentage interests in the Common Elements, after first paying out of the share of each Unit Owner the amount of any unpaid liens on said Owner's Unit, in the order of the priority of such liens.

Section 4.     Payment of Common Charges.  (a) Unit Owners shall be obligated to pay Common Charges and other assessments at such time or times as the Board of Managers shall determine.

(a)     Dissatisfaction with the quantity or quality of maintenance or services furnished to the Property shall not be grounds for withholding or failure to pay Common Charges or any other assessments.  Likewise, no Unit Owner shall deem itself or be deemed by the Board of Managers to be exempt from the obligation to pay Common Charges or other assessments for any reason, including, without limitation, waiver of use or enjoyment of the Common Elements, abandonment of Unit Owner's Unit, or by claiming the quantity or quality of services are not worthy of such payment or are not as were expected by such Owner at the time of acquisition of the Unit or at any other time.

(b)     No Unit Owner shall be liable for the payment of Common Charges or other assessments assessed against such Owner's Unit from and after the date of sale, transfer or other conveyance of the Unit made by such Unit Owner in accordance with the Declaration and these By-Laws, and applicable to the period subsequent to the sale, transfer or other conveyance.

(c)     The grantee of a Unit shall be jointly and severally liable with grantor for unpaid Common Charges and other assessments assessed against such Unit and due up to the date of conveyance, without prejudice to the grantee's right to recover from the grantor any amounts paid by the grantee therefor.  Accordingly, a party acquiring title through an arm's-length transaction or as a gift or donation, a mortgagee or other party acquiring title to a Unit through foreclosure or by deed in lieu of foreclosure, a creditor of a Unit Owner acquiring title to a Unit through a sale or other proceeding arising out of the bankruptcy of a Unit Owner, or any other grantee whatsoever, shall be liable for the payment of Common Charges and other assessments assessed against that Unit prior to that party's acquisition of the Unit.  Accordingly, a Unit shall, upon transfer, always be subject to a lien for unpaid Common Charges that were assessed against the Unit and due and payable prior to the transfer, subject to § 339-z of the Real Property Law.

(d)     A party acquiring a Unit through a foreclosure or by deed in lieu of foreclosure, through a Unit Owner's bankruptcy or liquidation, through purchase, gift or donation, or through any other means, shall be liable for all Common Charges and assessments assessed against the Unit for the period on and after, and due from and after, the date of that party's acquisition of title to the Unit.

(e)     If a petition in bankruptcy is filed by or against a Unit Owner, or if a trustee, receiver or similar official is appointed to administer a Unit Owner's assets, the Unit Owner, trustee, receiver or other official shall remain obligated to pay, and the Unit shall continue to be subject to, Common Charges and assessments for the entire duration of any bankruptcy or other reorganization proceeding.

Section 5.     Default in Payment of Common Charges.

(a)     If any Common Charge or other assessment imposed by the Board of Managers, or any installment thereof, is not paid by the due date, then such payment shall be

deemed delinquent and the Unit Owner shall be in default under these By-Laws for such nonpayment.

      (b)    The Board of Managers may impose a late charge in the amount the Board deems reasonable, provided such late charges are uniformly applied, with respect to Common Charges or other assessments not paid within 10 days after the due date.

      (c)    In addition to late charges, if the Common Charge or assessment (or installment thereof with respect to any assessment payable in installments) is not paid within thirty (30) days after the due date, then (i) such Common Charge or assessment shall bear interest from the due date in the amount of 2% over the prime rate then announced by The Chase Manhattan Bank (or its successor, if applicable), but in no event more than the highest legal rate, (ii) the Board may accelerate the remaining installments of any assessment payable in installments, and (iii) the Board may bring legal action against the delinquent Unit Owner, foreclose the lien on such Unit granted under these By-Laws and/or the Condominium Act, or otherwise seek to recover the amounts due to the Condominium. The expenses, including, without limitation, attorneys' fees and disbursements, incurred by the Board in any proceeding brought to collect such unpaid Common Charges or assessments, shall be added to the amount of such delinquent Common Charge, assessment or installment thereof, together with late charges and interest.

      (d)    Any amounts collected on account of past due Common Charges or other assessments, through foreclosure or otherwise, shall be applied in the following order: attorneys' fees and disbursements, other costs of collection, interest, late charges and Common Charges or assessments, beginning with the Common Charge or assessment due for the longest period.

      Section 6.    <u>Statement of Common Charges</u>.  Upon the written request of a Unit Owner or mortgagee with respect to the Unit owned by such Owner or upon which such mortgagee holds a mortgage, or upon the written request of a prospective purchaser, mortgagee or title insurer of such Unit, the Board of Managers, acting through the Managing Agent, if any, shall promptly furnish a certificate in writing setting forth with respect to such Unit as of the date of such certificate: (i) whether or not the Common Charges due have been paid; (ii) the amount of such Common Charges, including interest and costs, if any, due and payable; and (iii) whether any other amounts or charges are owing to the Condominium. A reasonable charge, as determined by the Board of Managers as and when applicable, may be made for the issuance of this certificate. Any such certificate, when duly issued as herein provided, shall be conclusive and binding with regard to any matter therein stated as between the Board of Managers and any bona fide purchaser or lessee of, or lender on, or title insurer of, the Unit with respect to which the request was made.

      Section 7.    <u>Collection of Common Charges and Assessments</u>.

      (a)    The Board of Managers shall take prompt action to collect any Common Charge and/or other assessment previously imposed by the Board of Managers which remains unpaid for more than thirty (30) days from the due date for payment thereof.

(b)    All sums assessed as Common Charges by the Board of Managers, as well as any other assessments made by the Board of Managers, but unpaid, together with late charges as may be established by the Board of Managers, interest thereon at such rate as may be fixed by the Board of Managers, and reasonable attorneys' fees and other costs and expenses incurred in efforts to collect such past due Common Charges and/or other assessments, shall be the personal obligation of the Unit Owner.  Such sums shall constitute a lien upon the Unit prior to all other liens except (i) any lien for past due and unpaid real estate taxes, and (ii) any lien for sums unpaid on a first mortgage of record against that Unit.

Section 8.    Foreclosure of Lien for Common Charges and Assessments.

(a)    Any lien for past due Common Charges and/or other assessments may be foreclosed by the Board of Managers in accordance with the laws of the State of New York, in like manner as a mortgage on real property, and the Board of Managers shall also have the right to recover all costs incurred in foreclosing on such lien, including, without limitation, reasonable attorneys' fees and disbursements, as set forth in these By-Laws.

(b)    Notwithstanding anything to the contrary in these By-Laws or in the Declaration, once an action to foreclose a lien for Common Charges or other assessments is commenced pursuant to this Section 8, if the representative(s) of the Owner of the Unit being foreclosed has (have) not previously resigned from the Board of Managers, each such individual's membership on the Board of Managers shall be deemed terminated.

(c)    In the event the proceeds of any foreclosure sale for non-payment of Common Charges or other assessments are not sufficient to pay such unpaid Common Charges, assessments and related expenses, the Board of Managers shall commence an action for the deficiency (if not yet commenced) against the Unit Owner who had failed to pay the Common Charges or other assessments.  Following suit for a deficiency judgment, if the amounts collected are insufficient to pay outstanding costs, the remaining balance may be charged to all Unit Owners as a Common Expense.

(d)    In any action brought by the Board of Managers to foreclose a lien on a Unit because of unpaid Common Charges or other assessments, the Unit Owner shall be required to pay a reasonable rental for the use of said Unit Owner's Unit, and the plaintiff in such foreclosure action shall be entitled to the appointment of a receiver to collect the same.

(e)    The Board of Managers, acting on behalf of all Unit Owners, shall have power to purchase such Unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same.

(f)    A suit to recover a money judgment for unpaid Common Charges shall be maintainable without foreclosing, filing or waiving the lien securing the same, and foreclosure may be maintained despite the pendency of a suit to recover a money judgment.

Section 9.    Maintenance and Repairs.

(a)    All maintenance of and repairs to any Unit, whether ordinary or extraordinary, but not including any maintenance of or repairs to any Common Elements

contained within a Unit, shall be made by and at the expense of the Owner of such Unit.  Each Unit Owner shall be responsible for all damage to any and all other Units and/or to Common Elements that occur as a result of its failure to perform such maintenance and repairs.

(b)     All painting, decorating, maintenance (including the removal of trash, debris, snow and ice), repairs and replacements, whether structural or nonstructural, ordinary or extraordinary to the Common Elements shall be made by the Board of Managers and shall be paid by the Unit Owners in proportion to their respective percentage interests in the Common Elements.  In the event of an emergency situation ("Emergency Situation"), each Unit Owner shall have the right to take immediate action to remedy the condition and shall be entitled to reimbursement of the reasonable costs of such repair or maintenance from the other Unit Owner, unless the emergency maintenance or repair was necessitated by the negligence, misuse or neglect of a Unit Owner, in which case the provisions of Section 9(c) below shall apply.

(c)     The cost of any repair or replacement necessitated by the negligence, misuse or neglect of a Unit Owner shall be charged to such Unit Owner and to the extent unpaid, shall constitute a Common Charge assessed against such Unit Owner.  Except in case of an emergency (for which all reasonable efforts will be made to provide advance notice, or, if advance notice cannot be given, notice shall be given as soon thereafter as practicable), the offending Unit Owner shall be given notice of the repair or replacement which has been necessitated by its negligence, misuse or neglect and a reasonable opportunity to effect the repair or replacement at its cost, in a manner to be determined in the reasonable discretion of (i) the Board of Managers, in the case of damage to the Common Elements, or (ii) the Unit Owner(s) in the case of a damaged Unit(s) or Limited Common Element serving or benefiting such unit owner.

(d)     The interior and exterior surfaces of all exterior windows are to be cleaned and replaced by and at the expense of the Unit Owner in whose Unit such windows are located, subject to compliance with all laws, regulations and applicable provisions of the Declaration and By-Laws.

(e)     Unit Owners and the Board of Managers shall, in connection with alteration, maintenance and repair of their respective interests at the Property, comply with the Rules and Regulations and schedule their construction and/or maintenance and/or repair work such that no party or its agents or employees unreasonably interferes with the work being done by any other party, its agents or employees at the Property.

(f)     With respect to Unit Owners' obligations generally, in connection with their responsibilities pursuant to applicable law, and/or their rights and/or responsibilities under the Condominium Documents, Unit Owners shall have the right to erect and maintain scaffolding, sidewalk bridges or other equipment or facility required by law, regulation, code or ordinance when the Unit Owner is performing such required or permitted construction work, even though such scaffolding, sidewalk bridge or other equipment or facility may encroach on another Unit or on the Common Elements; provided that the erection and maintenance of such scaffolding, sidewalk bridge or other equipment or facility shall be done in a manner to reasonably eliminate or minimize interference with another Unit or the Common Elements.  Neither Unit Owner shall be liable to the other Unit Owner or the Board of Managers, or to any

21

tenant or licensee of a Unit Owner for any damages (including, without limitation, interference with business operations) incurred in connection with the foregoing, except for damages caused by the negligence of the Unit Owner or the Unit Owner's agents or employees. In no event, however, may scaffolding be installed in a manner or location that will prevent reasonable access to a Unit (other than to a Unit owned by the Owner erecting same).

Section 10.   Right of Access.  By acceptance of a deed to a Unit, a Unit Owner shall be deemed to have granted a right of access to said Unit Owner's Unit to the Board of Managers and/or any other person authorized by the Board of Managers or by these By-Laws as described below, for the purpose of making inspections or for the purpose of correcting any condition originating in said Unit Owner's Unit and threatening another Unit or a General Common Element, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other Common Elements in said Unit Owner's Unit or elsewhere in the Building, or to correct any condition which violates the provisions of any mortgage covering another Unit, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the Unit Owner, and further provided that such right shall be exercised in compliance with all applicable laws and in such a manner as will not unreasonably interfere with the use of the Unit for which it was intended.  No prior notice shall be required in the event that the Board of Managers shall determine that action is immediately necessary for the preservation or safety of the Building or for the safety of the residents or Unit Owners of the Condominium or other persons, or required to avoid the suspension of any necessary service to the Condominium.  In case of emergency, such right of entry shall be immediate, whether or not a Unit Owner is present.

Section 11.   Violations of Maintenance Obligations.

(a)   In the event any Unit Owner, after receipt of at least five (5) days prior written notice from the Board of Managers (or the other Unit Owners if the Board of Managers refuses to enforce this provision), fails or neglects in any way to perform any obligations with respect to the painting, decorating, maintenance, repair or replacement of said Unit Owner's Unit as provided in Article VI, Section 9 or of any Common Element for which such Unit Owner is responsible under the Declaration or these By-Laws, the Board of Managers (or other Unit Owner, as the case may be) may perform or cause to be performed such painting, decorating, maintenance, repair or replacement unless such Unit Owner, within five days after receiving notice of such default, cures such default, or in the case of a default not reasonably susceptible to cure within such period, commences and thereafter prosecutes to completion, with due diligence, the curing of such default.  All sums expended and all costs and expenses incurred in connection with the making of any such painting, decorating, maintenance, repair or replacement in such Unit Owner's Unit, together with interest thereon at the rate of 2% per month (but in no event in excess of the maximum rate permitted by law), shall be immediately payable by such Unit Owner to the Board of Managers (or the other Unit Owner as the case may be) and shall, for all purposes hereunder, constitute Common Charges payable by such Unit Owner.

(b)   In addition to the foregoing, if any Unit Owner fails or neglects in any way to perform or cause to be performed any obligation with respect to the maintenance, repair or replacement of any part of said Unit Owner's Unit (hereinafter the "recalcitrant Unit Owner"), and if the recalcitrant Unit Owner's failure to so perform materially and adversely affects the

value or use of another Unit, or the safe and efficient operation of a Unit, then in addition to such rights as the non-recalcitrant Unit Owner shall have against the recalcitrant Unit Owner for the failure of the recalicitrant Unit Owner to repair and restore its Unit under Article VI, Section 9 of these By-Laws, if the Owner of the adversely affected Unit petitions the Board of Managers in writing to take specified actions to enforce the recalcitrant Unit Owner's obligation, the Board of Managers shall be obligated to and shall promptly take such specified actions (and if the Board of Managers fails to take such action, the effected Unit Owner may repair or restore the Unit, each at the recalcitrant Unit Owner's expense), provided that such specified actions are reasonable, necessary and do not materially or adversely affect the value or use of any other Unit in the Condominium, the safe or efficient operation of any other Unit in the Condominium, or the normal conduct of business of any other Unit in the Condominium or its tenants or other occupants, and the Board of Managers provides at least 48 hours prior notice to the recalcitrant Unit Owner before commencing such actions. Notwithstanding the foregoing, no notice shall be required in case of an Emergency Situation. The costs incurred in taking such action shall be charged in accordance with Article VI, Section 9(b) and/or 9(c) of these By-Laws.

Section 12.    <u>Abatement and Enjoinment of Violations by Unit Owners</u>. The material violation of the Rules and Regulations, or the breach of any By-Law contained herein, or the breach of any provision of the Declaration, shall give the Board of Managers the right, in addition to and supplementing any other rights set forth in these By-Laws, upon reasonable advance notice to the Unit Owner notifying the Unit Owner of the violation and advising that the Board of Managers intends to take action to remedy or cure the default or violation, (i) to enter the Unit in which, or as to which, such violation or breach exists and to abate and remove, at the expense of the defaulting Unit Owner, any structure, thing or condition that may exist in the Unit contrary to the intent and meaning of the provisions of the Declaration, By-Laws or Rules and Regulations, as applicable (provided, however, that no prior notice shall be required in the event that the Board of Managers shall determine that action is immediately necessary for the preservation or safety of the Property or for the safety of the residents of the Condominium or other persons or required to avoid the suspension of any essential service to the Condominium), and the Board of Managers shall not thereby be deemed guilty of trespass, and (ii) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

Section 13.    <u>Restaurant/Food Service Uses</u>. Any portion of a Unit used for storage, preparation, service or consumption of food or beverages is to be exterminated against infestation by vermin, roaches or rodents regularly and in addition, whenever there shall be evidence of any infestation. If any Unit Owner shall use any portion of the Unit as a dining room, whether for consumption within or without the Unit, said Unit Owner shall cause all refuse and rubbish in the Unit to be stored in sealed, watertight, metal containers having rubber wheels and bumpers fashioned so as to prevent damage to the Unit and the Building, and to be removed daily from the Unit and the Building, and shall not suffer or permit said Unit Owner's employees or any persons making deliveries to or from the Unit or removing refuse and rubbish therefrom, to leave any food, refuse and rubbish containers or other matter standing upon the streets or sidewalks adjacent to the Building. If the Unit Owner shall fail to comply with the foregoing provisions of this paragraph, the Board of Managers (or the Other Unit owner if the Board of Manager's refuses to enforce this provision), in addition to all other remedies provided in the Declaration and By-Laws, may remove any food, refuse and rubbish containers and other

matter so left standing at the Unit Owner's expense, without any liability on the part of the Board of Managers therefor and/or modify these by-laws and prohibit any food service uses within the Condominium.

Section 14.   Use of Units.  (a) No Unit or any portion of the Property shall be used in violation of the Declaration.  No Unit or any portion of the Property shall be used in a manner which shall violate any law, zoning ordinance, rules or regulations of any governmental body having jurisdiction thereof or any order or requirement of the New York Board of Fire Underwriters (or successor or other organization of similar function).  Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof and relating to (i) the Common Elements shall be complied with by and at the sole expense of the Board of Managers, and (ii) a Unit shall be complied with by and at the sole expense of the Unit Owner thereof.

(a)   Any Unit Owner may (and if necessary, in the name of, but without expense to, the Board) contest, by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to its Unit, of any laws, orders and requirements of public authorities (and the Board shall reasonably cooperate with such Unit Owner in such proceedings) provided that (i) such Unit Owner shall defend, indemnify and hold harmless the Board against liability, loss or damage which the Board shall suffer by reason of such contest (and any noncompliance in connection therewith), including reasonable attorneys' fees and other expenses incurred by the Board; and (ii) such Unit Owner shall keep the Board advised as to the status of such proceedings.  A Unit Owner who shall be contesting the validity or enforcement of any laws, orders and requirements of public authorities or the applicability thereof to its Unit as set forth above, need not comply therewith during the period of such contest or challenge, provided that (i) noncompliance is not a crime or punishable by fine or imprisonment; (ii) no part of the Building shall be subject to being condemned or vacated by reason of noncompliance or otherwise by reason of such contest; (iii) such noncompliance shall not subject the Land and/or Building or both or any other Unit to a lien or sale or materially adversely affect the use or operation of any other Unit; (iv) such Unit Owner shall first deliver to the Board a security bond issued by a surety company reasonably satisfactory to the Board, indemnifying and protecting the Board against any loss or injury by reason of such noncompliance or other security reasonably satisfactory to the Board; (v) such Unit Owner shall promptly and diligently prosecute such contest to completion; (vi) such noncompliance shall not cause the cancellation of any of the insurance policies purchased by a Unit Owner or the Board pursuant to Article VI, Section 2 hereof, or increase the premiums to be paid under such insurance policies unless such Unit Owner promptly reimburses the Board for such increased amount of premium; and (vii) such Unit Owner shall provide for reasonably adequate reserves against liability, loss or damage if the challenged law, order or requirement of public authorities is imposed against the Unit.

(b)   No Unit Owner shall do or permit to be done any act or thing in or upon the Unit or Common Elements of the Condominium which will invalidate or be in conflict with any insurance policies covering the Condominium and fixtures and property therein, and shall not do, or permit anything to be done in or upon the Unit, or bring or keep anything therein, except as now or hereafter permitted by the New York City Fire Department, New York Board of Fire Underwriters, New York Fire Insurance Rating Organization or other similar authority having jurisdiction.  To the extent that any particular use of a Unit or portion thereof shall cause

24

the rate of insurance to be higher than otherwise, the owner of such Unit shall pay any such additional premium as a Special Assessment.

Section 15.    Licenses and Permits.  If any governmental license or permit shall be required for the proper and lawful conduct of business in a Unit, and if failure to secure such license or permit would in any way adversely affect any other Unit Owner, tenant or other occupant or the Board of Managers, such Unit Owner shall duly procure and thereafter maintain such license or permit and submit the same to inspection by the Board of Managers.  Thereafter, the occupancy of the affected space shall at all times comply with the terms and conditions of each such license or permit.

Section 16.    Additions, Alterations or Improvements by Board of Managers.  The Board of Managers shall not authorize or approve (i) an expenditure for any project which it is anticipated will cost more than $100,000 to complete, or (ii) the expenditure of more than $100,000 in any one fiscal year for all additions, alterations or improvements to the Common Elements of a capital nature, unless at a meeting duly held in accordance with these By-Laws, the Board of Managers unanimously resolves to make such addition, alterations or improvements.  Except as provided above any additions, alterations or improvements of a capital nature to the Common Elements may be made by the Board of Managers by majority vote, without approval of the Unit Owners, and the cost thereof shall constitute a Common Expense.  Additions, alterations or improvements that cost less than $1,000 to complete and are less than $2,000 in any fiscal year, may be made by the Board of Managers and the cost thereof shall be a Common Expense.  Before undertaking any work pursuant to this Section, the Board of Managers may require the consent in writing of any Unit Owner whose rights, in the Board of Manager's sole judgment, may be prejudiced by the addition, alteration or improvement.

Section 17.    Additions, Alterations or Improvements by Unit Owners.

(a)    Subject to the applicable provisions of the Declaration and By-Laws, including but not limited to Section 21 of the Declaration and this Section 17 of the By-Laws, each Unit Owner shall have the right, without the consent of the Board of Managers (provided Section 17(h) is complied with) or other Unit Owners, to (i) make alterations, additions or improvements, interior and exterior, ordinary and extraordinary, in, to and upon their respective Units; and (ii) change the layout or configuration of any areas within the Unit.

(b)    In connection with any addition, alteration or improvement undertaken by or on behalf of a Unit Owner pursuant to subparagraph (a) of this Section 17, the Unit Owner shall:

(1)    comply with all laws, ordinances, rules and regulations of all governmental authorities having jurisdiction and the requirements of applicable insurance policies and the New York Board of Fire Underwriters (or successor);

(2)    provide thirty (30) days prior notice to the Board of Managers;

(3)    hold the Board of Managers and the other Unit Owner harmless from any liability, cost or expense arising therefrom;

25

(4)    procure or cause to be procured, appropriate insurance, in form and limits reasonably acceptable to the Board of Managers, to insure against damage to other Units and the Common Elements and general liability arising out of such work;

(5)    comply with all applicable provisions of this Declaration and the By-Laws and Rules and Regulations;

(6)    perform or cause such work to be performed in a manner and at times so as to not unreasonably interfere with the use and occupancy of other Units; and

(7)    remove or cause to be discharged of record within ninety (90) days of the filing thereof, any mechanic's liens.

(c)    Notwithstanding any provisions of subparagraph (a) of this Section 17 to the contrary, no Unit Owner may, without the prior written consent of the Board of Managers make any addition, alteration or improvement to any portion of the Property which:

(1)    affects the structure of the Building, or any portion thereof;

(2)    affects any fire, life, or safety system which is shared by the other Unit; or

(3)    affects the Common Elements or any other Unit.

(d)    The Board shall be obligated to act on a Unit Owner's request for approval for an addition, alteration or improvement in or to a Unit within thirty (30) days after the Board's receipt from the Unit Owner of information and material in sufficient detail for the Board to thoroughly evaluate the request.  In connection with any such request for approval, the Unit Owner shall be expected to submit, at a minimum, plans and specifications prepared by an architect licensed in New York State.  The Board shall have the right to impose such additional reasonable requirements as it deems appropriate.

(e)    The cost of any proposed alteration or improvement of a Unit (including but not limited to the cost incurred by the Board to engage architects, lawyers and other professionals to review the plans and specifications for the proposed construction work and, if applicable, the proposed amendment to the Declaration) shall be borne by the Owner of the Unit being altered or improved.

(f)    Any alteration or improvement of a Unit shall be performed in compliance with all laws, codes, ordinances and regulations, and the provisions of these By-Laws governing alterations generally.

(g)    Prior to and as a condition of granting consent to the making of any structural, mechanical, electrical or plumbing alteration, repair, addition or improvement to a Unit or to any Common Element, the Board may require the Unit Owner to execute an agreement in the form required by the Board, setting forth the terms and conditions under which the proposed work is to be done, including, without limitation, the name and address of the contractor and the days and hours during which the work is to be done.

(h)     Unit Owners proposing alteration work shall have the obligation to submit the name and address of their contractor(s), together with a telephone number and contact person for each contractor who will be working in the Unit, in writing to the Board of Managers at least five (5) business days before the work is scheduled to begin.  All electrical and plumbing work in a Unit must be performed by licensed contractors.  Further, all contractors must carry liability insurance coverage in such minimum amounts as the Board shall from time to time establish. Proof of license and insurance coverage must be submitted to the Board of Managers at the time the contractor's name is given to the Board.  A contractor's liability insurance policy must be in full force and effect at the time the work is performed and must be issued by a reputable insurance company licensed to do business in New York, and reasonably acceptable to the Board of Managers.  The contractor shall deliver a certificate of insurance, satisfactory to the Board of Managers of the Condominium, naming the Board of Managers of the Condominium and the other Unit Owner as additional insureds.  The determination as to whether an application is complete shall be in the sole discretion of the Board.

(i)     Any application by a Unit Owner to any department of or governmental agency of the City of New York or to any other governmental authority for permits or certificates necessary to make an addition, alteration or improvement in or to any Unit shall be executed by the Board of Managers, if required by the agency or authority, provided, however, that the Board of Managers shall not incur any liability on the part of the Board of Managers or any member of the Board to any contractor, subcontractor, materialman, architect or engineer on account of such installation, addition, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom.  The Unit Owner shall indemnify the Board of Managers and the other Unit Owner in writing for any loss, damage or liability the Board or the other Unit Owner may incur, resulting in any way from execution of any such documents.  The cost of obtaining any such permits or certificates, as well as the cost of professional fees, if any, incurred by the Board of Managers in evaluating the proposed construction plans, shall be borne by the Owner of the Unit in which the addition, alteration or improvement is to be made.

The Common Elements shall be used only for their intended purposes.  Subject to the provisions of Section 17, no Unit Owner shall make any addition, alteration, improvement or change in or to any General Common Element without the prior written consent of the Board of Managers.

Section 18.     Water Charges and Sewer Rents.  Unit Owner 2 shall be responsible for arranging for water service for the Property directly with the City of New York.  Unit Owner 1 shall reimburse Unit Owner 2 for its proportionate share of water usage, together with all related sewer rents arising therefrom, on an equitable basis reasonably negotiated between the Unit Owners promptly after the bills for same shall have been rendered.

Section 19.     Gas and Electricity.  Each Unit Owner shall be responsible for arranging for gas (other than for heat and hot water) and electric service and paying the cost thereof directly to Consolidated Edison or other utility company providing such service.  Electricity for the Common Elements shall be on the meter for Unit 2 and the Board of Managers shall reimburse Unit Owner 2 for the cost of electricity used in connection with the Common Elements, and such cost will be a Common Expense.   For gas service for heat and hot water,

Unit Owner 2 shall pay [_____]% of such costs and Unit Owner 1 shall pay [_____]% of such costs.

Section 20.    <u>Boiler and Burner Maintenance</u>.  The cost to maintain and repair the boiler and other components of the heat and hot water system will be a Common Expense paid by the Board of Managers.

Section 21.    <u>Removal of Garbage and Refuse</u>.  Each Unit Owner shall arrange for garbage removal from their Unit.  Each Unit Owner will be fully responsible for the cost of such garbage removal for their respective Unit.

Section 22.    <u>Noise and Vibration</u>.  No Unit Owner shall cause or permit any contractor, agent, employee or tenant to create unreasonable noise or vibration.

Section 23.    <u>Sidewalks</u>.  It shall be the obligation of the Board of Managers to clean the sidewalks surrounding the Building and to remove the snow therefrom.  The Board of Managers shall be solely and fully responsible for the cost of repairing and replacing the sidewalks, and such cost will be a Common Expense.

Section 24.    <u>Common Ownership</u>. It is initially contemplated that the same entity will own the beneficial and equitable interest in both Unit 1 and Unit 2. At any time that one entity owns the beneficial and equitable interest in both Units, the Board of Managers may assign the rights, duties and obligations of the Board of Managers to the Unit Owner.

<div align="center">

**ARTICLE VII**
**<u>Mortgages</u>**

</div>

Section 1.    <u>Mortgage of Units</u>.  Each Unit Owner shall have the right to mortgage its Unit without restriction provided that (i) the other Unit Owner consents to such mortgage, such consent not to be unreasonably withheld, (ii) the Board of Managers is notified in writing of the making of the mortgage and receives a conformed copy of the mortgage and note, and (iii) the Unit Owner making such mortgage first pays all assessments and General Common Charges, as the case may be, previously assessed by the Board of Managers against the Unit, and satisfies all unpaid liens against the Unit, except for the lien of a permitted mortgage.

<div align="center">

**ARTICLE VIII**
**<u>Condemnation</u>**

</div>

Section 1.    <u>Takings in General</u>.    (a) If a Unit Owner or the Board of Managers receives notice that all or any part of the Property has been or is to be taken through the exercise of the power of eminent domain under applicable law (a "Taking"), such Owner or the Board of Managers shall so notify the other Owner, the Board of Managers and all mortgagees, as applicable.

(a)    Except for the foregoing requirement, the provisions of this Article VIII (as well as Article IX) shall only apply to Takings if and so long as such Taking qualifies as a Condominium Taking as defined herein.  No provision of Articles VIII and IX shall apply to a Taking which is not a Condominium Taking (and, accordingly, any proceeding or award in

<div align="center">

28

</div>

respect thereof shall be prosecuted and settled by, and the Award shall be paid to the affected Owner or the Board of Managers, as applicable, subject only to the rights, if any, granted by such Owner to its mortgagee(s)).

     (b)    A Condominium Taking is a Taking except for the Takings specified in Section 1(d) below.

     (c)    A Unit 1 Taking which is not in any way a Unit 2 Taking or a Common Element Taking and in which the Unit 2 Owner and the Board of Managers are not named (or required to be named) as a party to the condemnation proceeding is not a Condominium Taking. A Unit 2 Taking which is not in any way a Unit 1 Taking or a Common Element Taking and in which the Unit 1 Owner and the Board of Managers are not named (or required to be named) as a party to the condemnation proceeding is not a Condominium Taking.

     (d)    Notwithstanding that a Taking does not initially qualify or ceases to qualify as a Condominium Taking, if such Taking is not of Substantially All of the Property, then any restoration, reconstruction, or alteration in connection with such Taking shall nevertheless be subject to the provisions of Article VI in the same manner as if there were damage or destruction arising from casualty, to the extent otherwise applicable to such restoration, reconstruction or alteration (except that any deficiency shall be determined in accordance with Article VIII, Sections 4(c) and (d) below).

     (e)    The following terms shall have the following meanings:

     (1)    "Award" or "Awards": Any or all of the Unit 1 Award, the Unit 2 Award or the Common Element Award, as applicable.

     (2)    "Combined Award": The aggregate Award(s), including, without limitation, consequential damages for any constructive taking, payable in connection with damages attributable to a Unit 1 Taking and/or a Unit 2 Taking and/or a Common Element Taking which is a Condominium Taking, and, in the case of a Condominium Taking of less than Substantially All of the Property, such award shall include any award (or portion thereof) payable on the basis of restoration or other work necessitated by, or arising out of, such taking or condemnation, but shall not include any separate claim by either Owner or by the tenants of Unit 2 or by the Board of Managers for personal property, trade fixtures or money or relocation costs.

     (3)    "Common Element Award": The aggregate Award(s) payable in connection with and attributable to a Common Element Taking which is a Condominium Taking, including, without limitation, consequential damages for any constructive taking, and in the case of a Condominium Taking of less than Substantially All of the Property, such award shall include any award (or portion thereof) payable on the basis of restoration or other work necessitated by, or arising out of, such taking or condemnation, but shall not include any separate claim for the Board of Managers' personal property, trade fixtures, and moving or relocation costs.

     (4)    "Common Element Taking": The Taking of all or any part of the Common Elements.

(5)    "Date of Taking":  With respect to a Condominium Taking, the earlier of (1) the date on which actual possession of the Property, or any part thereof, as the case may be, is acquired pursuant to applicable law in connection with the Condominium Taking, or (2) the date on which fee title to the Units, the Common Elements or any part thereof, as the case may be, has vested in any lawful power or authority pursuant to the provision of applicable law in connection with the Condominium Taking.

(6)    "Net Award" or "Net Awards":  Any one of or all of the Net Unit 1 Award, Net Unit 2 Award or the Net Common Element Award, as applicable.

(7)    "Net Unit 1 Award":  The Unit 1 Award less all reasonable fees and expenses incurred by the Unit 1 Owner and any mortgagee of Unit 1 and by the Board of Managers, if applicable, in collecting the Unit 1 Award or the initial Combined Award, as applicable.

(8)    "Net Unit 2 Award":  The Unit 2 Award less all reasonable fees and expenses incurred by the Unit 2 Owner and any mortgagee of Unit 2 and by the Board of Managers, if applicable, in collecting the Unit 2 Award or the initial Combined Award, as applicable.

(9)    "Net Common Element Award":  The Common Element Award less all reasonable fees and expenses incurred by the Board of Managers, Unit Owners and any mortgagee of a Unit in collecting the Common Element Award.

(10)    "Unit 1 Award":  The aggregate Award(s) payable in connection with and attributable to a Unit 1 Taking which is a Condominium Taking, including, without limitation, consequential damages for any constructive taking, and in the case of a Condominium Taking of less than Substantially All of the Property, such award shall include any award (or portion thereof) payable on the basis of restoration or other work necessitated by, or arising out of, such taking or condemnation, but shall not include any separate claim for the Unit 1 Owner's personal property or trade fixtures.

(11)    "Unit 1 Taking":  The Taking of the whole or any portion of Unit 1.

(12)    "Unit 2 Award":  The aggregate Award(s) payable in connection with and attributable to a Unit 2 Taking which is a Condominium Taking, including, without limitation, consequential damages for any constructive taking, and in the case of a Condominium Taking of less than Substantially All of the Property, such award shall include any award (or portion thereof) payable on the basis of restoration or other work necessitated by, or arising out of, such taking or condemnation, but shall not include any separate claim for the Unit 2 Owner's (or its tenants') personal property, trade fixtures, and money or relocation costs for itself or for any of its tenants.

(13)    "Unit 2 Taking":  The Taking of the whole or any portion of Unit 2.

(14)   "Section 3 Condominium Taking":   A Condominium Taking qualifying under Article VIII, Section 3(a), (b), or (c).

(15)   "Substantially All of either Unit 1 or Unit 2": Such portion of either (but not both) Unit 1 or Unit 2, as the case may be, as, when so taken, would leave a balance of Unit 1, or Unit 2, as the case may be, due to either the area so taken or the location of the part or parts so taken in relation to the part or parts of Unit 1 or Unit 2, as the case may be, not so taken, such that Unit 1 or Unit 2, as the case may be, would not, under economic conditions, zoning laws and building regulations then existing constitute a Unit capable of producing a fair and reasonable net annual income from any use permitted hereunder with respect to Unit 1 or Unit 2, as the case may be.

(16)   "Substantially All of the Property":   Such portion of the Property as, when so taken, would leave a balance of the Property that, due either to the area so taken or the location of the part or parts so taken in relation to the part or parts not so taken, would not, under economic conditions, zoning laws and building regulations then existing, readily accommodate a new or reconstructed building or buildings of a type and size generally similar to the Building existing at the Date of Taking and capable of producing a fair and reasonable net annual income with respect to both of Unit 1 and Unit 2.

Section 2.    Awards.  (a) In the event of a Condominium Taking, the Awards shall be determined and disbursed, and any repair and restoration of the Building shall be performed, in accordance with the requirements of this Article VIII.  The Unit 1 Owner, the Board of Managers and any mortgagees of Unit 1 shall have the right to participate in the prosecution of the claims for the Unit 1 Award and/or the Combined Award.  The Unit 2 Owner, the Board of Managers and the mortgagees of Unit 2 shall have the right to participate in the prosecution of the claims for the Unit 2 Award and/or the Combined Award.  All parties shall cooperate with one another to maximize the amount of their respective Awards and in any event, in connection with a Combined Award. (Nothing herein shall limit the right of either Owner to make a separate claim for that Owner's personal property, trade fixtures and moving or relocation costs, or limit the tenants of Unit 2 from making a separate claim for their personal property, moving and relocation costs).  If the court is prepared to allocate a separate Unit 1 Award, a separate Unit 2 Award and a separate Common Element Award, then each Owner, together with its respective mortgagees, and the Board of Managers, where applicable, may compromise or settle its Award. However, if the court does not allocate a separate Unit 1 Award, a separate Unit 2 Award and a separate Common Element Award, but instead awards only a Combined Award, then no Owner (nor mortgagee), nor the Board of Managers, may compromise or settle the Combined Award without the consent of all the others.  Upon a determination of the Combined Award, then the Board of Managers, the Unit 1 Owner, the Unit 2 Owner and the mortgagees of Unit 1 and Unit 2, shall endeavor in good faith to allocate and divide the Combined Award into a Unit 1 Award and a Unit 2 Award, and if applicable, a Common Element Award.  If the parties cannot agree, then such allocation and division shall be an Arbitrable Dispute.  Upon such allocation and division of the Combined Award, whether by agreement of the parties or by Arbitration, such allocated award shall then be the Unit 1 Award and Unit 2 Award, and if applicable, the Common Element Award, for all purposes hereunder.

Section 3.    Section 3 Condominium Takings.

31

(a)     In the event of (1) a Condominium Taking of Substantially All of the Property, or (2) a temporary Condominium Taking of (i) all of the Building, or (ii) part of both Unit 1 and Unit 2, or (3) a Condominium Taking which is both a Unit 1 Taking and a Unit 2 Taking, but by which Substantially All of either Unit 1 or Unit 2 is taken (but the Condominium Taking is thus not of Substantially All of the Property), or (4) a Condominium Taking that is both a Unit 1 Taking and a Unit 2 Taking, but in which it is determined that no Restoration Work is required in either Unit that affects the Common Elements, then the provisions of Paragraphs (b) and (c) immediately below shall apply. If there is any dispute as to whether the Condominium Taking qualifies as a Section 3 Condominium Taking, the same shall constitute an Arbitrable Dispute.

(b)     If, in connection with any Article VIII Section 3 Condominium Taking described in Paragraph (a) above, a separate Unit 1 Award and Unit 2 Award (and/or a separate Common Element Award as applicable), is awarded by the court, then upon such separate court awards, such Taking shall no longer be a Condominium Taking (and, accordingly, the provisions of Article VIII, Section 1(b) shall apply).  However, if there is a dispute as to whether such Condominium Taking qualifies as a Section 3 Condominium Taking, then any Awards received shall be paid over to and held by the Board of Managers, in trust, until such dispute is resolved, and if it is determined to be a Taking which qualifies as a Section 3 Condominium Taking, then the Board of Managers shall release all Awards in accordance with Paragraph (c) below, and upon such release, such Taking no longer constitutes a Condominium Taking (and, accordingly, the provisions of Article VIII, Section 1(b) shall apply).  If, in connection with any Section 3 Condominium Taking, a Combined Award is awarded, it shall be paid over to the Board of Managers and held in trust until any disputes are resolved and until the allocation is made as provided in Article VIII, Section 2 above, at which time the Board of Managers shall release all Awards in accordance with Paragraph (c) below and upon such release the Taking shall no longer constitute a Condominium Taking (and, accordingly, the provisions of Section 1(b) shall apply).  If the Condominium Taking is determined upon resolution of any dispute to not be a Section 3 Condominium Taking, then the provisions of Section 4 shall apply.

(c)     When the Award is released under Paragraph (b) above, the Unit 1 Award, net of a proportionate share of the expenses due the Board of Managers, shall be paid to the Unit 1 Owner, the Unit 2 Award, net of a proportionate share of the expenses due the Board of Managers, shall be paid to the Unit 2 Owner, and if applicable, the Common Element Award, net of a proportionate share of the expenses due the Board of Managers, shall be paid to the Board of Managers.  However, to the extent the Board of Managers has received a notice pursuant to Article XI, Section 4 with respect to Unit 1 and/or Unit 2, the portion of the Unit 1 Award otherwise payable to the Unit 1 Owner shall be paid to the mortgagee of that Unit, and the portion of the Unit 2 Award otherwise payable to the Unit 2 Owner shall be paid to the mortgagee of that Unit, as applicable.

Section 4.     <u>Condominium Takings other than Section 3 Condominium Takings.</u>

(a)     In the event of a Condominium Taking other than a Section 3 Condominium Taking, if the court awards a separate Unit 1 Award, Unit 2 Award and/or Common Element Award, then the Awards shall promptly be paid to the Board of Managers and the Board of Managers shall hold the same separately, in trust, and disburse the same in

accordance with this Section and Article IX. Upon receipt of a Combined Award, the payees shall also pay the same over to the Board of Managers which shall hold and invest the same in trust and shall not disburse any proceeds thereof until the Combined Award is allocated as provided in Section 2 above. After receipt of the separate Awards or after the Combined Award is allocated and divided into a Unit 1 Award, Unit 2 Award and Common Element Award, if applicable, the Board of Managers shall pay its expenses and then, prior to any other disbursements, shall promptly pay (i) out of the Unit 1 Award, to the Unit 1 Owner and its mortgagees, their respective reasonable fees and expenses, (ii) out of the Unit 2 Award, to the Unit 2 Owner and its mortgagees, their respective reasonable fees and expenses and (iii) out of the Common Element Award, to the Board of Managers, its reasonable fees and expenses. The Net Award for each portion of the Property shall be held and disbursed in accordance with this Section 4 and Article IX. The expenses of the Board of Managers shall be paid out of the Awards based on the ratio of each Owner's Award or the Common Elements Award, as applicable, to the sum of the Awards.

(b)  In connection with any Condominium Taking to which this Section 4 applies, the Board of Managers and the Unit Owners shall cooperate to repair and restore the remainder of the Building (such repair and restoration being referred to herein as a "Condemnation Restoration") in accordance with the applicable provisions of Article VI, Section 3(c) (except that (i) any deficiency shall be determined in accordance with Article VIII, Sections 4(c) and (d) below and (ii) all decisions to be made by the Owners in Article VI, Section 3(c) shall be made by the Owners when applied to this Section 4). The plans and specifications shall provide for repair and restoration of the remainder of the Building to form an architectural and functional whole with such changes in the Building as shall be required by reason of the Taking.

(c)  As soon as reasonably practical after a Condominium Taking governed by this Section 4, (i) a Certifying Professional shall be selected by the Board of Managers, (ii) the Certifying Professional shall prepare a reasonably detailed statement setting forth (a) a description of the condemned areas of the Building, and (b) an estimate of the total costs of such repair or restoration, and shall deliver a copy of such estimate to each Owner and the Board of Managers (the "Estimate") and (iii) the Certifying Professional shall determine and certify to the initial Architect Condemnation Ratio (as defined below). Each Owner and the Board of Managers shall be responsible for its share of the costs of restoration (including costs resulting from "Unavoidable Delays") based on the Architect Condemnation Ratio. If the cost and expense to either Owner or the Board of Managers of performing its share of any repair and restoration pursuant to this Section 4 shall exceed the amount of its Net Award, the excess cost and expense shall be borne by such Owner or the Board of Managers as provided in Section 4(d) below. The term "Architect Condemnation Ratio" shall have the following meaning: the ratio reasonably determined by the Certifying Professional comparing (A) the relative cost of the restoration to be performed under this Section 4 as a result of the taking suffered by an Owner or the Board of Managers to (B) initially, the Estimate, and, as and if the costs change during the course of the Restoration Work, the actual total costs. Notwithstanding the foregoing, (1) to the extent the additional costs incurred by an Owner or the Board of Managers result from the acts or omissions of the other Owner or the Board of Managers, as applicable, or optional changes requested by the other Owner, or the Board of Managers, as applicable, such Owner or the Board of Managers, as applicable, performing the acts or omissions or requesting the changes shall be solely responsible for payment of the additional costs (which costs will be factored into an

33

adjusted Architect Condemnation Ratio), and (2) if an Owner or the Board of Managers fails to carry any insurance required under Article VI, Section 2 hereof, the Owner or the Board of Managers, as applicable, shall be responsible for the payment of any restoration costs that would have been paid from the proceeds of such insurance. Any dispute relating to the Architect Condemnation Ratio shall be deemed an Arbitrable Dispute.

(d)     If with respect to either Owner or the Board of Managers, the portion of the Estimate allocated to such Owner or the Board of Managers based on the Architect Condemnation Ratio, or if the actual amount incurred in performing the repair or restoration for such Owner or the Board of Managers (based on the Architect Condemnation Ratio) exceeds the amount of such party's Net Award, if any, or if the Certifying Professional determines, in accordance with Article IX, Section 9, that a deficiency exists with respect to such Owner or the Board of Managers, such Owner or the Board of Managers, as applicable, shall deposit with the Board of Managers, within ten (10) days after receipt of the statement of the deficiency from the Certifying Professional, or the other Owner or the Board of Managers, its deficiency as so determined in accordance with Article IX, Section 9. If an Owner or the Board of Managers fails to contribute its deficiency, and such failure continues for a period of ten (10) days after the Owner or the Board of Managers is given notice of such failure, then the other Owner (who shall be a Creditor Owner) may, but shall not be obligated to, pay the share of the defaulting Owner (who shall be a Defaulting Owner) or to pay the share of the Board of Managers, as applicable. In addition, the Board of Managers shall have the right, but shall not be obligated, to pay the share of the Defaulting Owner. Any payments made by the Board of Managers pursuant to the foregoing shall be deemed a special assessment made by the Board of Managers against the Defaulting Owner, and failure of the Defaulting Owner to pay such special assessment shall be treated in the same manner as failure to pay Common Charges.

(e)     At such time as there is (i) either (a) an executed fixed price or guaranteed maximum price construction contract for all the Restoration Work or (b) both an executed construction management agreement and signed trade contracts for not less than sixty percent (60%) of the Restoration Work and (c) payment and performance bonds covering (x) the construction contracts under a fixed price or guaranteed maximum price construction contract or (y) all trade contracts in excess of $1,000,000, and (ii) the Certifying Professional certifies as to the foregoing and that with respect to an Owner, the Net Award of such Owner then held by the Board of Managers is more than 120% of the estimated cost of such Owner's share of remaining Restoration Work allocable to such Owner based on such contracts and the Estimate as it may have been adjusted and the Architect Condemnation Ratio (any amount above 120%, the "Surplus Net Award"), then with respect to such Owner's Net Award, the Board of Managers upon notice from an Owner accompanied by the foregoing certifications (which notice shall be sent to the other Owner, the Board of Managers and the mortgagees), shall disburse said Owner's Surplus Net Award in accordance with the disbursement provisions for excess Net Awards in Article VIII, Section 4(h) below (it being understood that any disbursement under Section 4(h) below which is authorized by this Section 4(e) shall be in addition to, and not in lieu of, any subsequent distribution under Section 4(h) which shall occur upon the completion of the Condemnation Restoration and the full payment of the costs thereof).

(f)     If an Owner is required to deposit a deficiency under Section 4(d) above, and fails to do so (thus becoming the Defaulting Owner) and if the other Owner (the Creditor

Owner) has no deficiency applicable to it, but elects not to deposit the deficiency of the Defaulting Owner, then the (i) Creditor Owner or (ii) the mortgagee of the Creditor Owner (any such party, the "Notifying Party") may send a notice to the Defaulting Owner and its mortgagees specifying (a) that the notice is being sent under this Section 4(f) and (b) demanding that the deficiency be deposited within sixty (60) days so that Restoration Work can proceed. If such deficiency is not so deposited (by anyone) within such sixty (60) day period, then, upon fifteen (15) days' prior notice to the Defaulting Owner and all of its mortgagees, the Notifying Party may at any time thereafter request that the Board of Managers pay to it the Creditor Owner's Net Award then held by the Board of Managers in accordance with Section 4(h) below, and thus terminating the Creditor Owner's obligation to rebuild its portion of the Building. The Board of Managers shall continue to hold the Net Award of the Defaulting Owner pending final resolution of any claims by the Creditor Owner for failure to deposit the deficiency and thus enabling the restoration to proceed. Upon such final resolution, the amount owing to the Creditor Owner shall be paid first out of the Defaulting Owner's Net Award, and the balance, if any, shall be paid to the Defaulting Owner in accordance with applicable provisions of this Section 4(h). Nothing herein shall be deemed to limit the amount of the Creditor Owner's claims to the Defaulting Owner's Net Award.

(g)     (1)     Subject to the provisions of Section 5, each Owner shall be obligated to repair and restore its Unit, and the Board of Managers shall be obligated to repair and restore the Common Elements, regardless of whether or not its Net Award is sufficient. Furthermore each Owner shall cooperate with the other Owner and the Board of Managers, and the Board of Managers shall cooperate with each Unit Owner, in connection with any repairs or restoration to the Building.

(2)     If, however, one Owner defaults in the full, faithful and punctual performance of any obligation under this Article VIII or Article IX (including, without limitation, preparing plans and specifications, selecting contractors, negotiating and executing contracts, and performing construction and submitting requisitions to the Board of Managers), then the other Owner or the Board of Managers shall have, in addition to all other remedies it may have hereunder or at law or in equity, upon the expiration of at least ten (10) days' prior notice of such default, the right, but not the obligation, if the Defaulting Owner has not commenced the good faith cure of such default within said ten (10) day period, to make any decisions required in connection with the performance of such obligation on behalf of the Defaulting Owner, to actually perform the obligation on behalf of the Defaulting Owner, and in accordance with the applicable provisions of Article IX, Section 10, to use the Defaulting Owner's Net Award in connection with the performance of any such obligation. If any Owner defaults in the performance of its obligations under this Section 4, as aforesaid, the other Owner and the Board of Managers are each hereby irrevocably appointed attorney-in-fact of the Defaulting Owner (such power of attorney being coupled with an interest) to take any and all steps necessary on behalf of Defaulting Owner to perform the Defaulting Owner's obligations as provided herein. Any and all expenses incurred by the Board of Managers pursuant to the foregoing shall be deemed a special assessment against the Defaulting Owner, and failure of the Defaulting Owner to pay such special assessment shall be treated in the same manner as failure to pay Common Charges.

(3)     If the Board of Managers defaults in the full, faithful and punctual performance of its obligations under this Section 4 (including, without limitation, adjusting any loss, preparing plans and specifications, selecting contractors, negotiating or executing contracts, and performing construction), the Unit Owners shall have, in addition to any other rights and remedies, the right, acting together jointly, to perform all obligations of the Board of Managers, and the Unit Owners shall be deemed to have a joint and several power of attorney from the Board of Managers to act on its behalf to perform the Board of Managers' obligations set forth herein.

(h)     If pursuant to this Section 4, there is any excess of the Net Award or Net Awards over an Owner's share or the Board of Managers' share of the costs of Condemnation Restoration, the excess Net Award, if any, shall be paid to such Owner or the Board of Managers, as applicable, after the condemnation restoration is completed.

(i)     For purposes of this Section 4, architects' and engineers' fees, attorneys' fees, consultants' fees, the fees of the Certifying Professional, title insurance premiums and other similar costs and expenses relating to repair or restoration shall be included in the costs and expenses of any such repair or restoration and be paid by the Board of Managers out of the Net Award(s).   Such costs shall be borne by the Owners in accordance with the Architect Condemnation Ratio.

Section 5.     Partition Action in Lieu of Continuation of Condominium.   If any condemnation or eminent domain proceeding results in the taking of Substantially All of the Property, and Unit Owners representing at least 80% in Common Interest voting at a duly called meeting of the Unit Owners promptly resolve not to continue the Condominium, then the Property or so much thereof as shall remain, shall be subject to an action for partition at the suit of any Unit Owner or lienor as if owned in common in which event the net proceeds of sale arising out of the partition action, together with the net proceeds of the award from the condemnation or eminent domain proceeding shall be considered one fund and shall be divided by the Board of Managers among all the Unit Owners in proportion to their respective percentage interests in the Common Elements, provided, however, that no payment shall be made to a Unit Owner until there has first been paid off out of such Owner's share all liens on such Owner's Unit, in the order of priority of such liens.

## ARTICLE IX
### Records

Section 1.     Records and Audits.  The Board of Managers shall keep or shall cause the managing agent to keep detailed records of the actions of the Board of Managers, minutes of the meetings of the Board of Managers, minutes of the meetings of the Unit Owners, and financial records and books of account of the condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each Unit which, among other things, shall contain the amount of each assessment of General Common Charges against such Unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.  An annual report of the receipts and expenditures of the Condominium audited by an independent certified public accountant, shall be rendered by the Board of Managers to all Unit Owners, promptly after the end of each fiscal year.  The cost of such report shall be paid by the Board of Managers as a

Common Expense.  Records of the Board of Managers shall be kept at its offices at the Property. Each Unit Owner, and its representatives or employees and each mortgagee of a Unit shall be permitted to examine the books of account of the Condominium at reasonable times, on business days.  All of the books and records held by the Board of Managers shall be made available to all Unit Owners.

## ARTICLE X
## Miscellaneous

Section 1.    Notices.  All notices hereunder shall be sent by registered or certified mail or by FedEx or other reputable overnight carrier to the office of the Board of Managers or to such other address as the Board of Managers may hereafter designate from time to time, by notice in writing to both Owners and to all mortgagees of Units.  All notices to a Unit Owner shall be sent by registered or certified mail or by FedEx or other reputable overnight carrier to their respective addresses, as designated by them from time to time, in writing, to the Board of Managers, except that notices of an annual meeting pursuant to Article IV, Section 1 may be sent by regular mail.  All notices to mortgagees of Units shall be sent by registered or certified mail or by FedEx or other reputable overnight carrier to their respective addresses, as designated by them from time to time, in writing, to the Board of Managers.  All notices shall be deemed to have been given five (5) days after mailing, except notices of change of address which shall be deemed to have been given when received.

Section 2.    Consents.    Any time either Owner or the Board of Managers, as applicable, gives any consent or approval requested to be given hereunder, the other Owner or the Board of Managers, as applicable, shall have the right to rely on such consent or approval and to presume that the party giving such consent or approval is authorized to give it and has obtained any and all approvals it may be required to obtain in connection with such consent or approval.  Notwithstanding anything contained herein to the contrary, any time the consent of or other action by a mortgagee is required pursuant to the Condominium Documents (other than a consent to an amendment to the Condominium Documents which shall require the consent of all mortgagees), if there is more than one mortgagee with respect to any Unit, then as to such Unit, such consent or action shall only be required from the mortgagee holding a first mortgage lien of record secured by the Unit, or any other mortgagee designated from time to time (and until de-designated) by such first mortgagee to give consent in place of the holder of the first mortgagee. However, a Unit Owner may at any time agree that there may be more than one designated mortgagee with respect to said Owner's Unit which shall have the right to grant consents or take other action pursuant hereto.  Any designation made pursuant to this Section 2 shall be effective within ten (10) days after notice thereof is given to the Board of Managers and/or the Unit Owner(s) and the Board of Managers.  Notwithstanding the foregoing, all mortgagees shall be entitled to receive all notices hereunder to be given to a mortgagee (unless the mortgagee stipulates that it does not require such notice).  In all cases where the consent of a mortgagee is required, such consent may not be unreasonably withheld or delayed.

Section 3.    Invalidity.  The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

Section 4.     Captions.     The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of these By-Laws, or the intent of any provision thereof.

Section 5.     Gender.     The use of the masculine gender in these By-Laws shall be deemed to be the feminine or neuter gender and the use of the singular shall be deemed to be the plural, whenever the context so requires or admits.

Section 6.     Waiver.     No restriction, condition, obligation, or provision contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches thereof which may occur.

Section 7.     No Severance of Ownership.     No Unit Owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his Unit without including therein the appurtenant Common Interest, it being the intention hereof to prevent any severance of such combined ownership.  Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including all such interests, shall be deemed and taken to include the interest or interests so omitted, even though the latter shall not be expressly mentioned or described therein.  No part of the appurtenant Common Interest of any Unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the Unit to which such interests are appurtenant.

Section 8.     Waiver of Right of Partition.     In the event that a Unit shall be acquired by the Board of Managers, or its designee, on behalf of all Unit Owners as tenants-in-common, all such Unit Owners shall be deemed to have waived all rights of partition with respect to such Unit.

Section 9.     Payment of Assessments.     No Unit Owner shall be permitted to convey, sell or lease its Unit unless and until all unpaid General Common Charges and assessments theretofore assessed by the Board of Managers against its Unit shall have been paid in full and until it shall have satisfied (by payment or bond) all unpaid liens against such Unit.  The foregoing shall not affect the validity of any mortgage.

## ARTICLE XI
## Amendments to By-Laws

Section 1.     Amendments to By-Laws.     The provisions of these By-Laws may not be amended without written agreement of all Unit Owners at a meeting of the Unit Owners duly held in accordance with these By-Laws.

## ARTICLE XII
## Conflicts

Section 1.     Conflicts.     These By-Laws are set forth to comply with the requirements of Article 9-B of the Real Property Law of the State of New York.  In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

## ARTICLE XIII
### Arbitration

Section 1.  Applicability.  Arbitration (hereinafter "Arbitration"), shall be available in those cases where the Declaration or these By-Laws require that the applicable party not unreasonably withhold or delay its consent, approval, determination, authorization or acceptance, or that the applicable party act in a reasonable manner, or that the applicable party exercise or refrain, in its reasonable discretion, from exercising any right granted to it in these By-Laws or the Declaration, or where as a matter of law, the party may not unreasonably withhold or delay its consent.  Arbitration shall also be applicable in all other instances pursuant to these By-Laws or the Declaration where a dispute is an Arbitrable Dispute or may or must be resolved through Arbitration.

Section 2.  Appointment of Arbitrators.

(a)  In any circumstance for which Arbitration is required or permitted under the Declaration or these By-Laws, the party desiring Arbitration shall, within 15 business days of the event giving rise to the right to Arbitration, give written notice to such effect to the other party.  Such notice also shall state the name and address of the arbitrator said party has appointed on its behalf, and shall state the issue to be arbitrated.  Within five (5) business days after such notice is given, the other party by written notice to the original party, shall provide the name and address of a second person which said party shall have appointed on its behalf.  If within five (5) business days following notice of the appointment of the second of said arbitrators, said two arbitrators shall be unable to resolve the issue, the two arbitrators shall, no later than five (5) business days after the end of their initial 5-day determination period, appoint by instrument in writing, a third person, as an impartial arbitrator, who shall proceed with the two arbitrators first appointed to determine the matter.

(b)  If after notice of the appointment of the first arbitrator is given, the second arbitrator shall not have been appointed as aforesaid, then the party originating the Arbitration may apply for the appointment of an arbitrator in the manner hereinafter provided for the appointment of a third arbitrator in the case where the two arbitrators chosen hereunder are unable to agree upon such appointment.

(c)  If the two (2) initially-appointed arbitrators shall be unable to agree within five (5) business days following the appointment of the latter of said arbitrators upon the matter in dispute and, in the event of the foregoing circumstances, if they shall fail to agree on an arbitrator to serve as the third arbitrator as aforesaid, then either party may apply to the American Arbitration Association ("AAA") or any successor organization (or if such organizations shall fail, refuse or be unable to act, to a court of competent jurisdiction in the State of New York) for the designation of such arbitrator.

(d)  If any arbitrator appointed by either of the parties, by the AAA (or any successor organization), or court, or by the other two (2) arbitrators, shall die, become disqualified or incapacitated, or shall (for reasons beyond his or her control) fail to act, before such matter shall have been determined, a substitute arbitrator shall promptly be appointed by the person or persons' who appointed the arbitrator who shall have died, become disqualified or

incapacitated or who shall have failed to act, and if a substitute arbitrator is not so named within three (3) business days after such death, disqualification, incapacity or failure to act, such substitute arbitrator shall be appointed by application to the AAA, as described above.

Section 3.    Qualification of Arbitrators.  Each arbitrator shall be a person who shall have had at least ten (10) years' continuous experience in the County of New York in a calling connected with the matter of the dispute (e.g., in the management or operation of mixed-use (i.e., residential and commercial) buildings in Manhattan, or in construction and/or architectural or engineering endeavors, etc.), shall be associated with a firm engaged in such business and shall not be a sole practitioner, and when required by law or regulation pertaining to practice of the profession or trade, shall be licensed to practice in New York.  Any third arbitrator appointed in accordance with this Article XIV shall be impartial and shall not then be employed or controlled by, controlling or under common control with any member of the Board of Managers, any Unit Owner, any Managing Agent, or any affiliates of the foregoing.

Section 4.    Procedures.

(a)    Arbitration shall be conducted, to the extent consistent with the Declaration and these By-Laws, in accordance with the then prevailing Arbitration Rules for expedited procedures of the AAA, other than rules relating to the appointment of arbitrators, and such other procedures as are agreed to by the parties.  All parties shall have the right to appear and be represented by counsel before the appointed arbitrators and to submit such data and memoranda in support of their respective positions in the matter in dispute as they may deem necessary or appropriate in the circumstances.

(b)    Following presentation and submission of all such data, memoranda and similar material by all parties to the Arbitration in support of their positions, the arbitrators shall be obligated to render a determination within the time period set forth in this Article XIV for the rendering of decisions.  The arbitrators' determination shall in all instances be in writing and shall not be rendered verbally.

(c)    In the event a third arbitrator is appointed as described above, the arbitrators shall be instructed to render a decision within ten (10) business days of the third arbitrator's appointment.  In all Arbitrations, the written decision of any two arbitrators in accordance with the foregoing, shall be final and binding upon the parties to the Arbitration and judgment may be entered thereon in any court of competent jurisdiction.  In rendering their decision, the arbitrators shall have no power to modify any of the provisions of the Declaration or these By-Laws, and the jurisdiction of the arbitrators is limited accordingly, it being specifically understood that in no event shall the arbitrators have the authority to award damages.

Section 5.    Costs and Expenses.  In any Arbitration the losing party shall pay the fees and disbursements of the arbitrators and all other costs associated with the Arbitration, including the legal fees and disbursements, and out-of-pocket expenses of the other parties involved in the Arbitration, unless the Declaration or these By-Laws provides otherwise with respect to specific items of dispute.

# EXHIBIT A

## RULES AND REGULATIONS

      1.    The sidewalks and entrances to the Property shall not be obstructed or used for any other purpose than ingress to and egress from the Units.

      2.    Intentionally omitted.

      3.    Intentionally omitted.

      4.    No Unit Owner, tenant or other occupant or any of their agents, servants, employees, licensees or visitors shall at any time bring into or keep in his Unit any inflammable, combustible or explosive fluid, material, chemical or substance, except as shall be necessary and appropriate for the permitted uses of such Unit.

      5.    No Unit Owner, tenant or other occupant shall permit anything to be done or kept in its Unit or in the Common Elements which will result in the cancellation of insurance on the Building or which would be in violation of any laws and requirements of public authorities.  No waste shall be committed in the Common Elements.

      6.    No Unit Owner shall suffer or permit a Unit or any part thereof to be used in any manner or anything be done therein or anything to be brought into or kept therein which, in the reasonable judgment of the Board of Managers, in any way shall impair or interfere with any of the Common Elements or servicing of the Common Elements or impair or interfere with the use of the Common Elements by, or occasion discomfort, inconvenience or annoyance to a Unit Owner, tenant or other occupant of the Building.

      7.    No Unit Owner shall discharge or permit to be discharged any materials into waste lines, vents or flues of the Building which might reasonably be anticipated to cause damage thereto.

      8.    All data processing, other business machines and equipment and all other mechanical equipment or any other equipment installed and used by a Unit Owner, tenant or other occupant in its Unit shall not exceed the permissible floor load for said Unit and shall be so equipped, installed and maintained by such Unit Owner, tenant or other occupant as to prevent the transmission of noise, vibration or electrical or other interference from such Unit to any other area of the Building.  No Unit Owner, tenant or other occupant shall move any safe, heavy machinery, or heavy equipment into or out of the Building without employing persons licensed as master riggers, if such licenses are required under the circumstances by applicable laws, or requirements of public authorities or insurance bodies.

      9.    Unit Owners will not clean, nor require, permit, suffer or allow any windows to be cleaned from the outside in violation of Section 202 of the Labor Law or of the rules of the Board of Standards and Appeals or of any other board or body having or asserting jurisdiction.

Case 1:25-cv-02834-GHW-RFP Document 114 Filed 04/06/25 Page 104 of 235

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF **NEW YORK** HOUSING PART

---------------------------------------------------------------X

**EAST HARLEM MEC PARCEL C, L.P.**

Petitioner/Landlord,

-against-

**PERPETUAL ASHARE**
**"JOHN DOE"-OCCUPANT(S)**
**"JANE DOE"-OCCUPANT(S)**

Respondent(s)/Tenant(s),

**2293 3RD AVENUE   APT# 806**
**NEW YORK, NY**                    **10035**

Respondent(s)/ Undertenant(s),

"John Doe" and/or "Jane Doe": *Names of the Undertenants being*
*fictitious and unknown to Petitioner. The persons intended are*
*whoever is in possession of the premises described herein.*

---------------------------------------------------------------X

**IMPORTANT TO TENANT:**

If you are dependent upon a
person in the military service
of the United States or the
State of New York, advise the
Clerk immediately, in order to
protect your rights.

Index No. LT-

**Notice of Petition**
**Nonpayment    DWELLING**

Petitioner's Business Address:
**EAST HARLEM MEC PARCEL C, L.P.**

**311 WEST 127TH STREET**
**NEW YORK, NEW YORK**
**10027**

Our file No. **444061**

**Your Landlord is suing you for nonpayment of rent.**

1. Your Landlord has started an eviction nonpayment case against you for rent the Landlord claims
you owe. The Landlord's reasons are given in the attached Petition.

2. Your Landlord is asking this Court for:
*a possessory and a money judgment for $  **1,381.34** plus interest from **February    2024**
 and reasonable attorney fees for this proceeding.
*permission to evict you from your premises if you do not pay the money judgment.

3. You have a right to a trial, but first you must Answer the Petition by going to the Landlord-
Tenant Clerk's Office at: **111 CENTRE STREET 2ND FL    NEW YORK, NY 10013**

You must do this within **10** days after the date these papers were given to you or a person
who lives or works in your premises or were posted at your premises at:
**2293 3RD AVENUE NEW YORK, NY 10035   APT# 806**

*Warning!* If you don't answer the Petition within **10** days, a judgment may be entered
against you. If that happens, the Landlord will have the right to evict you.

4. Your Answer should say the legal reasons that you don't owe all or part of the rent. The legal
reasons are called defenses. You can also say any claims you have against the Landlord. You will
have to prove your defenses and claims in court. To Answer the Petition you must either:
* Go to the Landlord-Tenant Clerk's Office and tell the Clerk your Answer, or  *  Give the
Landlord-Tenant Clerk your Answer in writing (Form No. Civ-LT-91a).
Information to help you Answer the Petition (Form No. Civ-LT-92) is available at the Landlord-
Tenant's clerk's office or online at www.nycourts.gov/housingnyc
*Important!* If you don't tell the Clerk about a defense in your Answer you might not be able to
talk about it later in this case or any other case.

5. When you Answer the Petition, you will get a date to come back to Court **3** to **8** days later. You have a right to postpone that date for **14** days but you have to come to the courthouse to ask for a postponement. If you pay all the rent due before your court date, the case will be dismissed.

6. If your name is not on this Notice but you live in the premises listed above, you have a right to come to Court and Answer the Petition.

7. Available Resources: * **Legal Help:** Under New York City Law, you may be able to get a free lawyer to represent you in this case. The court does not give you a lawyer. Call (718) 557-1379 or go to nyccourts.gov/nyc-freelawyer or LawHelpNY at www.lawhelpny.org for information about getting free legal help. If you have money to hire a lawyer, you can contact the New York City Bar Legal Referral Service at 212-626-7373.

• **Language Help:** If you don't speak English well or are deaf or hard of hearing, you have a right to a free court interpreter. Tell the Court Clerk you need an interpreter, or call 646-386-5670. To read a translation of this Notice in another language visit: www.nycourts.gov/housingnyc  For information on evictions:

> **646 386-5750:** Informations concernant les expulsions • বেদখলের তথ্য • 迫迁相关信息 迫遷相關資訊 • Информация о выселении • معلومات بشأن حالات الطرد • بے دخلیوں کی معلومات • Enfòmasyon Konsènan Degèpisman • Información sobre desalojos

• **ADA Help:** If you need special accommodations to use the court because of a disability, tell a Court Clerk or ADA contact person listed at: http://www.nycourts.gov/COURTS/nyc/housing/services.shtml#ada or call 646-386-5300 or 711 (TTY).

• **Financial Help:** If you owe the rent and don't have the money, contact HRA's Infoline at (718) 557-1399 for more information about getting help to pay the rent.

• **Help at the Courthouse:** There is a Help Center in the courthouse where you can speak to a Court Attorney or Volunteer Lawyer.

• **Online Help:** Visit the Housing Court's website at: www.nycourts.gov/housingnyc (also available in Spanish and Chinese) or visit LawHelpNY at www.lawhelpny.org

> **Postponements and Rent Deposits:** In court, you can ask to postpone your case. You have the right to postpone the case for at least **14** days. If your case is not finished in **60** days or you ask to postpone the case again, the court can order you to deposit money in court or make a rent payment to the landlord. If you don't do this, your case may go to trial right away. RPAPL Sec. 745.
> **After Judgment.** If the court orders a judgment against you after a trial, the court may give you time to pay the judgment and not be evicted. After that time is up, you will get a Notice of Eviction from a Marshal giving you at least **14** days to pay all the rent due or move. If you don't pay or move, you will be evicted by the Marshal. RPAPL Sec. 749 (2).

Attorney for Petitioner:
**SONTAG & HYMAN, P.C.**
**165 ROSLYN ROAD FL 1**
**ROSLYN HEIGHTS, NY      11577**
**516-621-0600**
  **6/11/24**
**courtdate@sontag-hyman.com**

**ALIA RAZZAQ**

Clerk of the Court of the City of New York

Case 2:25-cv-02838-GW-RHP Document 68-14 Filed 06/06/25 Page 106 of 235

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF **NEW YORK** HOUSING PART                      Index No. LT-

-----------------------------------------------------------------------------X
**EAST HARLEM MEC PARCEL C, L.P.**

                                                    Petitioner/Landlord,

                                                              **Petition Non-Payment**

        -against-
**PERPETUAL ASHARE**
**"JOHN DOE"-OCCUPANT(S)**
**"JANE DOE"-OCCUPANT(S)**

                                        Respondent(s)/Tenant(s),

**2293 3RD AVENUE**              Address        Amount Claimed:  **$1,381.34**
**NEW YORK, NY**
**APT# 806          10035**

-----------------------------------------------------------------------------X
THE PETITION OF  **EAST HARLEM MEC PARCEL C, L.P.**     respectfully shows that, upon

information and belief:

1.    Petitioner is the Landlord of the subject premises.
      **1A. Notice was sent to tenant(s) pursuant to RPL 235-e(d)**

2.    Respondent(s)/Tenant(s) **PERPETUAL ASHARE**          **"JOHN DOE"-OCCUPANT(S)**
                              **"JANE DOE"-OCCUPANT(S)**

      is/are the Tenant(s) in possession of said premises pursuant to a **WRITTEN** rental agreement
      **MADE HERETOFORE** wherein respondent promised to pay to Landlord as rent
      $ **1,381.34** each month in advance on the 1st day of each month.
      Respondent(s)/Occupant(s) is/are the undertenant(s) of the aforesaid Respondent/Tenant(s).

3.    Respondent(s) is/are now in possession of said premises. Said premises are the
      residence of the Tenant(s) herein.

4.    The premises from which removal is sought were rented for **DWELLING** purposes and
      are described as follows:
      ALL ROOMS, **APT# 806**      in building known as
      **2293 3RD AVENUE NEW YORK, NY 10035**
      situated within the territorial jurisdiction of the Civil Court of the City of New York,
      County of  **NEW YORK**

5.    Pursuant to said agreement there was due from Respondent/Tenant(s), the sum of  **$1,381.34**
      rent and additional rent as follows:
      + Reasonable legal fees        **APR24**      **$1381.34**

Case 25-02233-cgm   Doc 114   Filed 07/07/25   Page 107 of 235

6. THE APT. IS SUBJECT TO RENT STABILIZATION LAW, IS REGISTERED WITH DHCR, THE RENT DOES NOT EXCEED THE LEGAL REGULATED RENT, & IS ALSO SUBJECT TO THE FEDERAL LOW INCOME HOUSING TAX CREDIT PROGRAM (26 US 42 & 26 CFR 1.42 -5) & THE HOME INVESTMENTS PARTNERSHIPS PROGRAM CREATED PURSUANT TO TITLE II OF THE CRANSTON-GONZALEZ NATL. AFFORDABLE HOUSING ACT OF 1990 & THE REGULATIONS AT 24 CFR 92. THUS, THE APT. IS EXEMPT FROM THE GOOD CAUSE EVICTION LAW OF RPL 6-A PER RPL 214 (5)&(6). THE RPL 231-C NOTICE IS APPENDED & ITS CONTENTS INCORPORATED HEREIN.

7. Said rent/maintenance has been demanded **BY A    THIRTY DAY WRITTEN NOTICE** from the tenant(s) since same became due.

8. Respondents have defaulted in the payments thereof and continue in possession of the premises without permission after said default.

9. The premises are   a multiple dwelling and pursuant to the Housing Maintenance Code Article 41 there is a currently effective registration statement on file with the Office of Code Enforcement in which the owner has designated the managing agent named below, a natural person over 21 years of age, to be in control of and responsible for the maintenance and operation of the dwelling. Multiple Dwelling No. **143472**
   Agent:   **NANNEY PENA**

         **2293 THIRD AVENUE NEW YORK, NY 10035**

   WHEREFORE, Petitioner requests a final judgment against Respondent(s) for the rent demanded herein, awarding possession of the premises to the Petitioner/Landlord, and directing the issuance of a Warrant to remove Respondent(s) from possession of the premises together with the costs, disbursements and reasonable legal fees in this proceeding. Dated: **6/11/24**
   **EAST HARLEM MEC PARCEL C, L.P.**


**STATE OF NEW YORK, COUNTY OF NASSAU**

The undersigned affirms under penalty of perjury that he is one of the attorneys for the petitioner; that he has read the foregoing Petition and knows the contents  thereof; that the same are true to his own knowledge except as to the matter stated to be upon information and belief; and as to those matters he believes them to be true. The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows:  statements and/or records provided by Petitioner, its agents and/or employees and contained in the file in the attorney's office. This verification is made pursuant to the provisions of RPAPL 741.

Attorney for Petitioner:
**SONTAG & HYMAN, P.C.**
**165 ROSLYN ROAD FL 1**
**ROSLYN HEIGHTS, NY        11577**
**516-621-0600**
 **6/11/24**
**courtdate@sontag-hyman.com**

**B. SONTAG / M.H.HYMAN**

EAST HARLEM MEC PARCEL C, L.P
311 WEST 127TH STREET
NEW YORK, NEW YORK 10027

April 10, 2024

Via Certified Mail

PERPETUAL ASHARE
2293 3RD AVENUE  APT 806
NEW YORK, NY 10035

Dear Tenant:

Please be advised that pursuant to your lease agreement, your rent was due
on the 1st of the month. More than five (5) days have passed since your
rent was due. The following is due and owing:

FBB24/BAD    $864.76    MAR24    $1,181.31    APR24    $1,301.13

Total:    $3,617.64

Accordingly, you are in default of your lease agreement. This notice is
given pursuant to RPL Section 235-e (d).

EAST HARLEM MEC PARCEL C, L.P.

We are attempting to collect a debt and any information obtained will be
used for that purpose.

3 of 21

NYSCEF DOC. NO. 1                    RECEIVED NYSCEF: 06/11/2024

THIRTY DAY DEMAND NOTICE

April 11, 2024

To: PERPETUAL ASHARE
"JOHN DOE"-OCCUPANT(S)
"JANE DOE"-OCCUPANT(S)
2293 3RD AVENUE                    APT 806
NEW YORK, NY                       10035

TAKE NOTICE, that you are justly indebted to the undersigned Landlord of
the above described premises in that you owe the sum of        $3,617.44
for the rent of said premises from  **February 1, 2024  TO**     **April 30,  2024**
Which you are required to pay on or before the expiration of   THIRTY  days
from the day of service of this Notice, or surrender the possession of said
premises to the undersigned Landlord, in default of which the undersigned
Landlord will commence summary proceedings under the Statute to recover the
possession thereof.

Prior to this demand, a rent default letter was sent by certified mail
pursuant to RPL 235-e(D).

FEB24/BAL    854.76      MAR24      1,381.34      APR24       1,381.34

Landlord: EAST HARLEM MEC PARCEL C, L.P.

This firm has been retained to collect a debt consisting of the above
referenced rent arrears as indicated above. Any information obtained will be
used for that purpose. Although you are requested to pay the said debt or
surrender the possession of the said premises to the undersigned Landlord
within   THIRTY days from the day of service of this notice, you still have
the right to dispute this debt, or any portion thereof, within thirty
days after your receipt of this notice, and to make a written request,
within thirty days after your receipt of this notice, for more information
about the debt.

OUR FILE NO. 444061/07303
    PS 01

Case 2:25-cv-02683-RGW-WRHP Document 68-14 Filed 06/06/25 Page 110 of 235

| NOTICE OF OCCUPANCY RIGHTS UNDER THE VIOLENCE AGAINST WOMEN ACT | U.S. Department of Housing and Urban Development<br>OMB Approval No. 2577-0286<br>Expires 06/30/2017 |
|---|---|

### [Insert Name of Housing Provider[1]]

### Notice of Occupancy Rights under the Violence Against Women Act[2]

## To all Tenants and Applicants

The Violence Against Women Act (VAWA) provides protections for victims of domestic violence, dating violence, sexual assault, or stalking. VAWA protections are not only available to women, but are available equally to all individuals regardless of sex, gender identity, or sexual orientation.[3] The U.S. Department of Housing and Urban Development (HUD) is the Federal agency that oversees that **[insert name of program or rental assistance]** is in compliance with VAWA. This notice explains your rights under VAWA. A HUD-approved certification form is attached to this notice. You can fill out this form to show that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking, and that you wish to use your rights under VAWA."

## Protections for Applicants

If you otherwise qualify for assistance under **[insert name of program or rental assistance],** you cannot be denied admission or denied assistance because you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

## Protections for Tenants

---

[1] The notice uses HP for housing provider but the housing provider should insert its name where HP is used. HUD's program-specific regulations identify the individual or entity responsible for providing the notice of occupancy rights.

[2] Despite the name of this law, VAWA protection is available regardless of sex, gender identity, or sexual orientation.

[3] Housing providers cannot discriminate on the basis of any protected characteristic, including race, color, national origin, religion, sex, familial status, disability, or age. HUD-assisted and HUD-insured housing must be made available to all otherwise eligible individuals regardless of actual or perceived sexual orientation, gender identity, or marital status.

Form HUD-5380
(06/2017)

If you are receiving assistance under [insert name of program or rental assistance], you may not be denied assistance, terminated from participation, or be evicted from your rental housing because you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

Also, if you or an affiliated individual of yours is or has been the victim of domestic violence, dating violence, sexual assault, or stalking by a member of your household or any guest, you may not be denied rental assistance or occupancy rights under [insert name of program or rental assistance] solely on the basis of criminal activity directly relating to that domestic violence, dating violence, sexual assault, or stalking.

Affiliated individual means your spouse, parent, brother, sister, or child, or a person to whom you stand in the place of a parent or guardian (for example, the affiliated individual is in your care, custody, or control); or any individual, tenant, or lawful occupant living in your household.

**Removing the Abuser or Perpetrator from the Household**

HP may divide (bifurcate) your lease in order to evict the individual or terminate the assistance of the individual who has engaged in criminal activity (the abuser or perpetrator) directly relating to domestic violence, dating violence, sexual assault, or stalking.

If HP chooses to remove the abuser or perpetrator, HP may not take away the rights of eligible tenants to the unit or otherwise punish the remaining tenants. If the evicted abuser or perpetrator was the sole tenant to have established eligibility for assistance under the program, HP must allow the tenant who is or has been a victim and other household members to remain in the unit for a period of time, in order to establish eligibility under the program or under another HUD housing program covered by VAWA, or, find alternative housing.

Form HUD-5380
(06/2017)

Case 1:25-cv-02833-GHW-RHP Document 8-14 Filed 06/06/25 Page 120 of 235

RECEIVED NYSCEF: 06/11/2024

In removing the abuser or perpetrator from the household, HP must follow Federal, State, and local eviction procedures. In order to divide a lease, HP may, but is not required to, ask you for documentation or certification of the incidences of domestic violence, dating violence, sexual assault, or stalking.

**Moving to Another Unit**

Upon your request, HP may permit you to move to another unit, subject to the availability of other units, and still keep your assistance. In order to approve a request, HP may ask you to provide documentation that you are requesting to move because of an incidence of domestic violence, dating violence, sexual assault, or stalking. If the request is a request for emergency transfer, the housing provider may ask you to submit a written request or fill out a form where you certify that you meet the criteria for an emergency transfer under VAWA. The criteria are:

(1) **You are a victim of domestic violence, dating violence, sexual assault, or stalking.** If your housing provider does not already have documentation that you are a victim of domestic violence, dating violence, sexual assault, or stalking, your housing provider may ask you for such documentation, as described in the documentation section below.

(2) **You expressly request the emergency transfer.** Your housing provider may choose to require that you submit a form, or may accept another written or oral request.

(3) **You reasonably believe you are threatened with imminent harm from further violence if you remain in your current unit.** This means you have a reason to fear that if you do not receive a transfer you would suffer violence in the very near future.

Form HUD-5380
(06/2017)

OR

You are a victim of sexual assault and the assault occurred on the premises
during the 90-calendar-day period before you request a transfer. If you are a
victim of sexual assault, then in addition to qualifying for an emergency transfer
because you reasonably believe you are threatened with imminent harm from
further violence if you remain in your unit, you may qualify for an emergency
transfer if the sexual assault occurred on the premises of the property from which
you are seeking your transfer, and that assault happened within the 90-calendar-
day period before you expressly request the transfer.

HP will keep confidential requests for emergency transfers by victims of domestic violence,
dating violence, sexual assault, or stalking, and the location of any move by such victims
and their families.

HP's emergency transfer plan provides further information on emergency transfers, and HP must
make a copy of its emergency transfer plan available to you if you ask to see it.

**Documenting You Are or Have Been a Victim of Domestic Violence, Dating
Violence, Sexual Assault or Stalking**

HP can, but is not required to, ask you to provide documentation to "certify" that you are or have
been a victim of domestic violence, dating violence, sexual assault, or stalking. Such request
from HP must be in writing, and HP must give you at least 14 business days (Saturdays,
Sundays, and Federal holidays do not count) from the day you receive the request to provide
the documentation. HP may, but does not have to, extend the deadline for the submission of
documentation upon your request.

Form HUD-5380
(06/2017)

You can provide one of the following to HP as documentation. It is your choice which of the following to submit if HP asks you to provide documentation that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

- A complete HUD-approved certification form given to you by HP with this notice, that documents an incident of domestic violence, dating violence, sexual assault, or stalking. The form will ask for your name, the date, time, and location of the incident of domestic violence, dating violence, sexual assault, or stalking, and a description of the incident. The certification form provides for including the name of the abuser or perpetrator if the name of the abuser or perpetrator is known and is safe to provide.

- A record of a Federal, State, tribal, territorial, or local law enforcement agency, court, or administrative agency that documents the incident of domestic violence, dating violence, sexual assault, or stalking. Examples of such records include police reports, protective orders, and restraining orders, among others.

- A statement, which you must sign, along with the signature of an employee, agent, or volunteer of a victim service provider, an attorney, a medical professional or a mental health professional (collectively, "professional") from whom you sought assistance in addressing domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse, and with the professional selected by you attesting under penalty of perjury that he or she believes that the incident or incidents of domestic violence, dating violence, sexual assault, or stalking are grounds for protection.

- Any other statement or evidence that HP has agreed to accept.

If you fail or refuse to provide one of these documents within the 14 business days, HP does not have to provide you with the protections contained in this notice.

Form HUD-5380
(06/2017)

If HP receives conflicting evidence that an incident of domestic violence, dating violence, sexual assault, or stalking has been committed (such as certification forms from two or more members of a household each claiming to be a victim and naming one or more of the other petitioning household members as the abuser or perpetrator), HP has the right to request that you provide third-party documentation within thirty 30 calendar days in order to resolve the conflict. If you fail or refuse to provide third-party documentation where there is conflicting evidence, HP does not have to provide you with the protections contained in this notice.

Confidentiality

HP must keep confidential any information you provide related to the exercise of your rights under VAWA, including the fact that you are exercising your rights under VAWA.

HP must not allow any individual administering assistance or other services on behalf of HP (for example, employees and contractors) to have access to confidential information unless for reasons that specifically call for these individuals to have access to this information under applicable Federal, State, or local law.

HP must not enter your information into any shared database or disclose your information to any other entity or individual. HP, however, may disclose the information provided if:

- You give written permission to HP to release the information on a time limited basis.
- HP needs to use the information in an eviction or termination proceeding, such as to evict your abuser or perpetrator or terminate your abuser or perpetrator from assistance under this program.
- A law requires HP or your landlord to release the information.

Form HUD-5380
(06/2017)

VAWA does not limit HP's duty to honor court orders about access to or control of the property. This includes orders issued to protect a victim and orders dividing property among household members in cases where a family breaks up.

Reasons a Tenant Eligible for Occupancy Rights under VAWA May Be Evicted or Assistance May Be Terminated

You can be evicted and your assistance can be terminated for serious or repeated lease violations that are not related to domestic violence, dating violence, sexual assault, or stalking committed against you. However, HP cannot hold tenants who have been victims of domestic violence, dating violence, sexual assault, or stalking to a more demanding set of rules than it applies to tenants who have not been victims of domestic violence, dating violence, sexual assault, or stalking.

The protections described in this notice might not apply, and you could be evicted and your assistance terminated, if HP can demonstrate that not evicting you or terminating your assistance would present a real physical danger that:

1) Would occur within an immediate time frame, and

2) Could result in death or serious bodily harm to other tenants or those who work on the property.

If HP can demonstrate the above, HP should only terminate your assistance or evict you if there are no other actions that could be taken to reduce or eliminate the threat.

Other Laws

VAWA does not replace any Federal, State, or local law that provides greater protection for victims of domestic violence, dating violence, sexual assault, or stalking. You may be entitled to

Form HUD-5380
(06/2017)

additional housing protections for victims of domestic violence, dating violence, sexual

assault, or stalking under other Federal laws, as well as under State and local laws.

**Non-Compliance with The Requirements of This Notice**
You may report a covered housing provider's violations of these rights and seek additional

assistance, if needed, by contacting or filing a complaint with **[insert contact information**

**for any intermediary, if applicable]** or **[insert HUD field office]**.

**For Additional Information**

You may view a copy of HUD's final VAWA rule at **[insert Federal Register link]**.

Additionally, HP must make a copy of HUD's VAWA regulations available to you if you ask

to see them.

For questions regarding VAWA, please contact **[insert name of program or rental assistance**

**contact information able to answer questions on VAWA]**.

For help regarding an abusive relationship, you may call the National Domestic Violence

Hotline at 1-800-799-7233 or, for persons with hearing impairments, 1-800-787-3224 (TTY).

You may also contact **[Insert contact information for relevant local organizations]**.

For tenants who are or have been victims of stalking seeking help may visit the National

Center for Victims of Crime's Stalking Resource Center at

https://vvww.victimsofcrime.org/our-programs/stalking-resource-center.

For help regarding sexual assault, you may contact **[Insert contact information for**

**relevant organizations]**

Victims of stalking seeking help may contact **[Insert contact information for relevant**

**organizations]**.

**Attachment:** Certification form HUD-XXXXX **[form approved for this program to be**

**included]**

Form HUD-5380
(06/2017)

**CERTIFICATION OF
DOMESTIC VIOLENCE,
DATING VIOLENCE,
SEXUAL ASSAULT, OR STALKING,
AND ALTERNATE DOCUMENTATION**

**U.S. Department of Housing
and Urban Development**

OMB Approval No. 2577-0286
Exp. 06/30/2017

**Purpose of Form:** The Violence Against Women Act ("VAWA") protects applicants, tenants, and program participants in certain HUD programs from being evicted, denied housing assistance, or terminated from housing assistance based on acts of domestic violence, dating violence, sexual assault, or stalking against them. Despite the name of this law, VAWA protection is available to victims of domestic violence, dating violence, sexual assault, and stalking, regardless of sex, gender identity, or sexual orientation.

**Use of This Optional Form:** If you are seeking VAWA protections from your housing provider, your housing provider may give you a written request that asks you to submit documentation about the incident or incidents of domestic violence, dating violence, sexual assault, or stalking.

In response to this request, you or someone on your behalf may complete this optional form and submit it to your housing provider, or you may submit one of the following types of third-party documentation:

(1) A document signed by you and an employee, agent, or volunteer of a victim service provider, an attorney, or medical professional, or a mental health professional (collectively, "professional") from whom you have sought assistance relating to domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse. The document must specify, under penalty of perjury, that the professional believes the incident or incidents of domestic violence, dating violence, sexual assault, or stalking occurred and meet the definition of "domestic violence," "dating violence," "sexual assault," or "stalking" in HUD's regulations at 24 CFR 5.2003.

(2) A record of a Federal, State, tribal, territorial or local law enforcement agency, court, or administrative agency; or

(3) At the discretion of the housing provider, a statement or other evidence provided by the applicant or tenant.

**Submission of Documentation:** The time period to submit documentation is 14 business days from the date that you receive a written request from your housing provider asking that you provide documentation of the occurrence of domestic violence, dating violence, sexual assault, or stalking. Your housing provider may, but is not required to, extend the time period to submit the documentation, if you request an extension of the time period. If the requested information is not received within 14 business days of when you received the request for the documentation, or any extension of the date provided by your housing provider, your housing provider does not need to grant you any of the VAWA protections. Distribution or issuance of this form does not serve as a written request for certification.

**Confidentiality:** All information provided to your housing provider concerning the incident(s) of domestic violence, dating violence, sexual assault, or stalking shall be kept confidential and such details shall not be entered into any shared database. Employees of your housing provider are not to have access to these details unless to grant or deny VAWA protections to you, and such employees may not disclose this information to any other entity or individual, except to the extent that disclosure is: (i) consented to by you in writing in a time-limited release; (ii) required for use in an eviction proceeding or hearing regarding termination of assistance; or (iii) otherwise required by applicable law.

Form HUD-5382
(12/2016)

## TO BE COMPLETED BY OR ON BEHALF OF THE VICTIM OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR STALKING

1. Date the written request is received by victim: _____

2. Name of victim: _____

3. Your name (if different from victim's): _____

4. Name(s) of other family member(s) listed on the lease: _____

_____

5. Residence of victim: _____

6. Name of the accused perpetrator (if known and can be safely disclosed): _____

_____

7. Relationship of the accused perpetrator to the victim: _____

8. Date(s) and times(s) of incident(s) (if known): _____

10. Location of incident(s): _____

| In your own words, briefly describe the incident(s): |
|---|
| _____ |
| _____ |
| _____ |
| _____ |

This is to certify that the information provided on this form is true and correct to the best of my knowledge and recollection, and that the individual named above in Item 2 is or has been a victim of domestic violence, dating violence, sexual assault, or stalking. I acknowledge that submission of false information could jeopardize program eligibility and could be the basis for denial of admission, termination of assistance, or eviction.

Signature _____ Signed on (Date) _____

**Public Reporting Burden:** The public reporting burden for this collection of information is estimated to average 1 hour per response. This includes the time for collecting, reviewing, and reporting the data. The information provided is to be used by the housing provider to request certification that the applicant or tenant is a victim of domestic violence, dating violence, sexual assault, or stalking. The information is subject to the confidentiality requirements of VAWA. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid Office of Management and Budget control number.

. Form HUD-5382
(12/2016)

## AFFIDAVIT OF CONSPICUOUS SERVICE DELIVERY

**EAST HARLEM MEC PARCEL C, L.P.**

**vs.**

**PERPETUAL ASHARE, "JOHN DOE", "JANE DOE"**

State of New York}

County of Nassau }                                    Client Ref: 444061

I, Allaiddn Alkhandak, being duly sworn, depose and say: That deponent is not a party to this proceeding, is a licensed Process Server over 18 years of age and resides at Richmond County, New York.

Deponent was unable to serve: PERPETUAL ASHARE, "JOHN DOE", "JANE DOE" tenant(s)/occupant(s) therein named by delivering a true copy thereof to said tenant(s)/occupant(s) personally at:

2293 3RD AVENUE, Apt# 806, NEW YORK, NY 10035 on 4/18/2024 at 7:05AM.

At that time deponent affixed a true copy of the THIRTY DAY DEMAND NOTICE for each tenant/occupant upon a conspicuous part, to wit – the entrance door of apartment of aforesaid premises.

Deponent was unable to find tenant(s)/occupant(s) or a person of suitable age and discretion willing to receive the same at this time or during a prior attempt made on 4/17/2024 at 3:39PM. Deponent served true copies of the above mentioned documents on each tenant/occupant at the property sought to be recovered, by depositing true copies of the same enclosed in a wrapper in the Post Office by Certified Mail and Regular First Class Mail within the State of New York on 4/18/2024.

Sworn to before me on April 18, 2024

_____
Melissa Belfer
Notary Public, State of New York
No. 01BE6327330
Qualified in Nassau County
Commission Expires July 06 2027

_____
Allaiddn Alkhandak
License # 2119777
Job # alkhandaka-20240418-618964

Howard Belfer Inc. Lic.# 1406285 One Dupont Street, Suite 207, Plainview NY 11803

RECEIVED NYSCEF: 06/11/2024

NOTICE TO TENANT OF APPLICABILITY OR INAPPLICABILITY
OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW

This notice from your landlord serves to inform you of whether or not your unit/apartment/home is covered by the New York State Good Cause Eviction Law (Article 6-A of the Real Property Law) and, if applicable, the reason permitted under the New York State Good Cause Eviction Law that your landlord is not renewing your lease. Even if your apartment is not protected by Article 6-A, known as the New York State Good Cause Eviction Law, you may have other rights under other local, state, or federal laws and regulations concerning rents and evictions. This notice, which your landlord is required to fill out and give to you, does not constitute legal advice. You may wish to consult a lawyer if you have any questions about your rights under the New York State Good Cause Eviction Law or about this notice.

NOTICE (THIS SHOULD BE FILLED OUT BY YOUR LANDLORD)

UNIT INFORMATION

STREET: 2293 3RD AVENUE
UNIT OR APARTMENT NUMBER: 806
CITY/TOWN/VILLAGE, STATE, ZIP CODE: NEW YORK, NY 10035

1. IS THIS UNIT SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW? (PLEASE MARK APPLICABLE ANSWER)
____: YES
_X_: NO

2. IF THE UNIT IS EXEMPT FROM ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, WHY IS IT EXEMPT FROM THAT LAW? (PLEASE MARK ALL APPLICABLE EXEMPTIONS)

A. Village/Town/City outside of New York City has not adopted good cause eviction under section 213 of the Real Property Law ____;

B. Unit is owned by a "small landlord," as defined in subdivision 3 of section 211 of the Real Property Law, who owns no more than 10 units for small landlords located in New York City or the number of units established as the maximum amount a "small landlord" can own in the state by a local law of a village, town, or city, other than New York City, adopting the provisions of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law, or no more than 10 units, as applicable. In connection with any eviction proceeding in which the landlord claims an exemption from the provisions of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law, on the basis of being a small landlord, the landlord shall provide to the tenant or tenants subject to the proceeding the name of each natural person who owns or is a beneficial owner of, directly or indirectly, in whole or in part, the housing accomodation at issue in the proceeding, the number of units owned, jointly or separately, by each such natural person owner, and the addresses of any such units,

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

excluding each natural person owner's principal residence, If the landlord is an entity, organized under the laws of this state or of any other jurisdiction, then such landlord shall provide to the tenant or tenants subject to the proceeding the name of each natural person with a direct or indirect ownership interest in such entity or any affiliated entity, the number of units owned, jointly or separately, by each such natural person owner, and the addresses of any such units, excluding each natural person owner's principal residence (exemption under subdivision 1 of section 214 of the Real Property Law) ____;

C. Unit is located in an owner-occupied housing accommodation with no more than 10 units (exemption under subdivision 2 of section 214 of the Real Property Law) ____;

D. Unit is subject to regulation of rents or evictions pursuant to local, state, or federal law (exemption under subdivision 5 of section 214 of the Real Property Law) __✓__;

E. Unit must be affordable to tenants at a specific income level pursuant to statute, regulation, restrictive declaration, or pursuant to a regulatory agreement with a local, state, or federal government entity (exemption under subdivision 6 of section 214 of the Real Property Law) __✓__;

F. Unit is on or within a housing accommodation owned as a condominium or cooperative, or unit is on or within a housing accommodation subject to an offering plan submitted to the office of the attorney general (exemption under subdivision 7 of section 214 of the Real Property Law) ____;

G. Unit is in a housing accommodation that was issued a temporary or permanent certificate of occupancy within the past 30 years (only if building received the certificate on or after January 1st, 2009) (exemption under subdivision 8 of section 214 of the Real Property Law) ____;

H. Unit is a seasonal use dwelling unit under subdivisions 4 and 5 of section 7-108 of the General Obligations Law (exemption under subdivision 9 of section 214 of the Real Property Law) ____;

I. Unit is in a hospital as defined in subdivision 1 of section 2801 of the Public Health Law, continuing care retirement community licensed pursuant to Article 46 or 46-A of the Public Health Law, assisted living residence licensed pursuant to Article 46-B of the Public Health Law, adult care facility licensed pursuant to Article 7 of the Social Services Law, senior residential community that has submitted an offering plan to the attorney general, or not-for-profit independent retirement community that offers personal emergency response, housekeeping, transportation and meals to their residents (exemption under subdivision 10 of section 214 of the Real Property Law) ____;

J. Unit is a manufacture home located on or in a manufactured home park as defined in section 233 of the Real Property Law (exemption under subdivision 11 of section 214 of the Real Property Law) ____;

K. Unit is a hotel room or other transient use covered by the definition of a class B multiple dwelling under subdivision 9 of section 4 of the Multiple Dwelling Law (exemption under subdivision 12 of section 214 of the Real Property Law) ____;

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 2

L. Unit is a dormitory owned and operated by an institution of higher education or a school (exemption under subdivision 13 of section 214 of the Real Property Law) _____;

M. Unit is within and for use by a religious facility or institution (exemption under subdivision 14 of section 214 of the Real Property Law) _____;

N. Unit has a monthly rent that is greater than the percent of fair market rent established in a local law of a village, town, or city, other than New York City, adopting the provisions of Article 6-A of the Real Property Law, known as the New York Good Cause Eviction Law, or 245 percent of the fair market rent, as applicable. Fair market rent refers to the figure published by the United States Department of Housing and Urban Development, for the county in which the housing accommodation is located, as shall be published by the Division of Housing and Community Renewal no later than August 1st in any given year. The Division of Housing and Community Renewal shall publish the fair market rent and 245 percent of the fair market rent for each unit type for which such fair market rent is published by the United States Department of Housing and Urban Development for each county in New York State in the annual publication required pursuant to subdivision 7 of section 211 of the Real Property Law) (exemption under subdivision 15 of section 214 of the Real Property Law) _____;

3. IF THIS UNIT IS SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, AND THIS NOTICE SERVES TO INFORM A TENANT THAT THE LANDLORD IS INCREASING THE RENT ABOVE THE THRESHOLD FOR PRESUMPTIVELY UNREASONABLE RENT INCREASES, WHAT IS THE LANDLORD'S JUSTIFICATION FOR INCREASING THE RENT ABOVE THE THRESHOLD FOR PRESUMPTIVELY UNREASONABLE RENT INCREASES? (A rent increase is presumptively unreasonable if the increase from the prior rent is greater than the lower of: (a) 5 percent plus the annual percentage change in the consumer price index for all urban consumers for all items as published by the United States Bureau of Labor Statistics for the region in which the housing accommadation is located, as published not later than August 1st of each year by the Division of Housing and Community Renewal; or (b) 10 percent.)

(PLEASE MARK AND FILL OUT THE APPLICABLE RESPONSE)

A. The rent is not being increased above the threshold for presumptively unreasonable rent increases described above _____;

B. The rent is being increased above the threshold for presumptively unreasonable rent increases described above _____;

B-1: If the rent is being increased above the threshold for presumptively unreasonable rent increases described above, what is the justification for the increase: _____

_____

4. IF THIS UNIT IS SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, AND THIS NOTICE SERVES TO INFORM A TENANT THAT THE LANDLORD IS NOT RENEWING A LEASE, WHAT IS THE GOOD CAUSE FOR NOT RENEWING THE LEASE? (PLEASE MARK ALL APPLICABLE REASONS)

A. This unit is exempt from Article 6-A of the Real Property Law, known as the

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 3

RECEIVED NYSCEF: 06/11/2024

New York State Good Cause Eviction Law, for the reasons stated in response to question 2, above (IF THIS ANSWER IS CHECKED, NO OTHER ANSWERS TO THIS QUESTION SHOULD BE CHECKED) _____;

B. The tenant is receiving this notice in connection with a first lease or a renewal lease, so the landlord does not need to check any of the lawful reasons listed below for not renewing a lease under Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law (IF THIS ANSWER IS CHECKED, NO OTHER ANSWERS TO THIS QUESTION SHOULD BE CHECKED) _____;

C. The landlord is not renewing the lease because the unit is sublet and the sublessor seeks in good faith to recover possession of the unit for their own personal use and occupancy (exemption under subdivision 3 of section 214 of the Real Property Law) _____;

D. The landlord is not renewing the lease because the possession, use or occupancy of the unit is solely incident to employment and the employment is being or has been lawfully terminated (exemption under subdivision 4 of section 214 of the Real Property Law) _____;

E. The landlord is not renewing the lease because the tenant has failed to pay rent due and owing, and the rent due or owing, or any part thereof, did not result from a rent increase which is unreasonable. A rent increase is presumptively unreasonable if the increase from the prior rent is greater than the lower of: (a) 5 percent plus the annual percentage change in the consumer price index for all urban consumers for all items as published by the United States Bureau of Labor Statistics for the region in which the housing accommodation is located, as published not later than August 1st of each year by the Division of Housing and Community Renewal; or (b) 10 percent (good cause for eviction under paragraph a of subdivision 1 of section 216 of the Real Property Law) _____;

F. The landlord is not renewing the lease because the tenant is violating a substantial obligation of their tenancy or breaching any of the landlord's rules and regulations governing the premises, other than the obligation to surrender possession of the premises, and the tenant has failed to cure the violation after written notice that the violation must cease within 10 days of receipt of the written notice. For this good cause to apply, the obligation the tenant violated cannot be an obligation that was imposed for the purpose of circumventing the intent of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law. The landlord's rules or regulations that the tenant has violated also must be reasonable and have been accepted in writing by the tenant or made a part of the lease at the beginning of the lease term (good cause for eviction under paragraph b of subdivision 1 of section 216 of the Real Property Law) _____;

G. The landlord is not renewing the lease because the tenant is either (a) committing or permitting a nuisance on the unit or the premises; (b) maliciously or grossly negligently causing substantial damage to the unit or the premises; (c) interfering with the landlord's, another tenant's, or occupants of the same or an adjacent building or structure's comfort and safety (good cause for eviction under paragraph c of subdivision 1 of section 216 of Real Property Law) _____;

H. The landlord is not renewing the lease because the tenant's occupancy of

the unit violates law and the landlord is subject to civil or criminal penalties for continuing to let the tenant occupy the unit. For this good cause to apply a state or municipal agency having jurisdiction must have issued an order requiring the tenant to vacate the unit. No tenant shall be removed from possession of a unit on this basis unless the court finds that the cure of the violation of law requires the removal of the tenant and that the landlord did not, through neglect or deliberate action or failure to act, create the condition necessitating the vacate order. If the landlord does not try to cure the conditions causing the violation of the law, the tenant has the right to pay or secure payment, in a manner satisfactory to the court, to cure the violation. Any tenant expenditures to cure the violation shall be applied against the rent owed to the landlord. Even if removal of a tenant is absolutely essential to the tenant's health and safety, the tenant shall be entitled to resume possession at such time as the dangerous conditions have been removed. The tenant also retains the right to bring an action for monetary damages against the landlord or to otherwise compel the landlord to comply with all applicable state or municipal housing codes (good cause for eviction under paragraph d of subdivision 1 of section 216 of the Real Property Law) _____;

I. The landlord is not renewing the lease because the tenant is using or permitting the unit or premises to be used for an illegal purpose (good cause for eviction under paragraph e of subdivision 1 of section 216 of the Real Property Law) _____;

J. The landlord is not renewing the lease because the tenant has unreasonably refused the landlord access to the unit for the purposes of making necessary repairs or improvements required by law or for the purposes of showing the premises to a prospective purchaser, mortgagee, or other person with a legitimate interest in the premises (good cause for eviction under paragraph f of subdivision 1 of section 216 of the Real Property Law) _____;

K. The landlord is not renewing the lease because the landlord seeks in good faith to recover possession of the unit for the landlord's personal use and occupancy as the landlord's principal residence, or for the personal use and occupancy as a principal residence by the landlord's spouse, domestic partner, child, stepchild, parent, step-parent, sibling, grandparent, grandchild, parent-in-law, or sibling-in-law. The landlord can only recover the unit for these purposes if there is no other suitable housing accommodation in the building that is available. Under no circumstances can the landlord recover the unit for these purposes if the tenant is (a) 65 years old or older; or (b) a "disabled person" as defined in subdivision 6 of section 211 of the Real Property Law. To establish this good cause in an eviction proceeding, the landlord must establish good faith to recover possession of a housing accommodation for the uses described herein by clear and convincing evidence (good cause for eviction under paragraph g of subdivision 1 of section 216 of the Real Property Law) _____;

L. The landlord is not renewing the lease because the landlord in good faith seeks to demolish the housing accommodation. To establish this good cause in an eviction proceeding, the landlord must establish good faith to demolish the housing accommodation by clear and convincing evidence (good cause for eviction under paragraph h of subdivision 1 of section 216 of the Real Property Law) _____;

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 5

M. The landlord is not renewing the lease because the landlord seeks in good faith to withdraw the unit from the housing rental market. To establish this good cause in an eviction proceeding, the landlord must establish good faith to withdraw the unit from the rental housing market by clear and convincing evidence (good cause for eviction under paragraph i of subdivision 1 of section 216 of the Real Property Law) ____;

N. The landlord is not renewing the lease because the tenant has failed to agree to reasonable changes at lease renewal, including reasonable increases in rent, and the landlord gave written notice of the changes to the lease to the tenant at least 30 days, but no more than 90 days, before the current lease expired. A rent increase is presumptively unreasonable if the increase from the prior rent is greater than the lower of: (a) 5 percent plus the annual percentage change in the consumer price index for all urban consumers for all items as published by the United States Bureau of Labor Statistics for the region in which the housing accommodation is located, as published by August 1st of each year by the Division of Housing and Community Renewal; or (b) 10 percent (good cause for eviction under paragraph j of subdivision 1 of section 216 of the Real Property Law) ____.

END OF NOTICE TO TENANT OF APPLICABILITY OR INAPPLICABILITY OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW

---

PLEASE TAKE NOTICE that, the sending of this Notice TO TENANT OF APPLICABILITY OR INAPPLICABILITY OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW does not vitiate any prior litigation notices or pleading served upon you, nor does the sending of this notice serve to revive or reinstate any previously terminated tenancy. The word "tenant" as recited in the notice is solely for identification purposes and not a statement of legal status. No admissions or concessions of an owner right or remedy may be construed from the text or sending of this notice.

The page is too faded and low-resolution to reliably transcribe the form content.

# RESIDENT NOTICE

SAY GOODBYE TO IN-PERSON PAYMENTS AND
HELLO EASY ONLINE PAYMENTS WITH RENTCAFÉ!

Starting January 1st, 2024, we're moving to fully
online payments and will no longer accept
in-person payments.

For upcoming payments, you have the option
to pay conveniently through your online
RentCafé portal or at one of the reliable nearby
PayNearMe (WIPS) locations.

*Thank you for your cooperation!*



RICHMAN
PROPERTY
SERVICES, INC.
COMMUNITY INSPIRED. PASSION DRIVEN.

COMMUNITY INSPIRED. PASSION DRIVEN.

*Late fees - $1205*

**Receipt**

Functions ▼

| | | |
|---|---|---|
| Property | p00260 | |
| Unit | 1-806 | |
| Payer | t0004823 | |
| Amount | 2,700.00 | |
| Auth Number | 225385689 | |
| Payment Method | Credit Card | |
| Overperson Payer | | |

East Harlem MEC Parcel C_LP
DBA Metro 125

Perpetual Ashare (Current)

| | |
|---|---|
| Display Type | Standard Receipt Display Type |
| Batch | Posted Batch 294258 |
| Ctrl | R-1486177 |
| Date Received | 02/02/2024 |
| Post Month | 02/2024 |
| Cash Acct | 1110-02000 |
| Deposit Number | 551 |
| Deposit Date | 02/02/2024 |
| Deposit Memo | :CC Deposit |

Created by dbo on 02/02/2024 5:00 PM.
Modified by dbo on 02/02/2024 5:00 PM.

[Print] [Help]

**Charges**

| Pay | Charge Code | Account | Charge Date | Charge Amount | Amount Outstanding | Prior Paid | Ref |
|---|---|---|---|---|---|---|---|
| 702.92 | RENT | 5110-00100 | 12/01/2023 | 1,381.34 | 0.00 | 678.42 | :Rent PostTran |
| 25.00 | LATEFEE | 5420-00200 | 11/05/2023 | 25.00 | 0.00 | 0.00 | :late1 |
| 150.00 | LATEFEE | 5420-00200 | 11/30/2023 | 150.00 | 0.00 | 0.00 | :late2 |
| 792.08 | RENT | 5110-00100 | 11/01/2023 | 1,381.34 | 0.00 | 589.26 | :Rent PostTran |
| 25.00 | LATEFEE | 5420-00200 | 10/05/2023 | 25.00 | 0.00 | 0.00 | :late1 |
| 155.00 | LATEFEE | 5420-00200 | 10/31/2023 | 155.00 | 0.00 | 0.00 | :late2 |
| 25.00 | LATEFEE | 5420-00200 | 09/05/2023 | 25.00 | 0.00 | 0.00 | :late1 |
| 150.00 | LATEFEE | 5420-00200 | 09/30/2023 | 150.00 | 0.00 | 0.00 | :late2 |
| 25.00 | LATEFEE | 5420-00200 | 08/05/2023 | 25.00 | 0.00 | 0.00 | :late1 |
| 155.00 | LATEFEE | 5420-00200 | 08/31/2023 | 155.00 | 0.00 | 0.00 | :late2 |
| 25.00 | LATEFEE | 5420-00200 | 07/05/2023 | 25.00 | 0.00 | 0.00 | :late1 |
| 130.00 | LATEFEE | 5420-00200 | 07/31/2023 | 130.00 | 0.00 | 0.00 | :late2 |
| 25.00 | LATEFEE | 5420-00200 | 06/05/2023 | 25.00 | 0.00 | 0.00 | :late1 |
| 150.00 | LATEFEE | 5420-00200 | 06/30/2023 | 150.00 | 0.00 | 0.00 | :late2 |
| 35.00 | LATEFEE | 5420-00200 | 05/05/2023 | 35.00 | 0.00 | 0.00 | :late2 |
| 130.00 | LATEFEE | 5420-00200 | 05/31/2023 | 130.00 | 0.00 | 0.00 | :late2 |
| | | | | 3,967.68 | 0.00 | 1,267.58 | |

Receipt

Functions ▼

| | |
|---|---|
| Property | p00260 |
| Unit | 1-806 |
| Payer | t0004823 |
| Rcpt Amount | 2,700.00 |
| Check Number | 225385699 |
| Payment Method | Credit Card |
| other person Payer | |

East Harlem MEC Parcel C, LP
DBA Metro 125

Perpetual Ashare (Current)

| | |
|---|---|
| Display Type | Standard Receipt Display Type |
| Batch | Posted Batch 294253 |
| Ctrl | R-1486177 |
| Date Received | 02/02/2024 |
| Post Month | 02/2024 |
| Cash Acct | 1110-02000 |
| Deposit Number | 551 |
| Deposit Date | 02/02/2024 |
| Deposit Acct | 1110-02000 :CC Deposit |
| Deposit Memo | :CC Deposit |

Created by dbo on 02/02/2024 5:00 PM.
Modified by dbo on 02/02/2024 5:00 PM.

Print    Help

Charges

| Pay | Charge Code | Account | Charge Date | Charge Amount | Amount Outstanding | Prior Paid | Ref |
|---|---|---|---|---|---|---|---|
| 702.92 | RENT | 5110-00100 | 12/01/2023 | 1,381.34 | 0.00 | 678.42 | :Rent PostTran |
| 25.00 | LATEFEE | 5420-00200 | 11/05/2023 | 25.00 | 0.00 | 0.00 | :Late1 |
| 150.00 | LATEFEE | 5420-00200 | 11/30/2023 | 150.00 | 0.00 | 0.00 | :Late2 |
| 792.08 | RENT | 5110-00100 | 11/01/2023 | 1,381.34 | 0.00 | 589.26 | :Rent PostTran |
| 25.00 | LATEFEE | 5420-00200 | 10/05/2023 | 25.00 | 0.00 | 0.00 | :Late1 |
| 155.00 | LATEFEE | 5420-00200 | 10/31/2023 | 155.00 | 0.00 | 0.00 | :Late2 |
| 25.00 | LATEFEE | 5420-00200 | 09/05/2023 | 25.00 | 0.00 | 0.00 | :Late1 |
| 150.00 | LATEFEE | 5420-00200 | 09/30/2023 | 150.00 | 0.00 | 0.00 | :Late2 |
| 25.00 | LATEFEE | 5420-00200 | 08/05/2023 | 25.00 | 0.00 | 0.00 | :Late1 |
| 155.00 | LATEFEE | 5420-00200 | 08/31/2023 | 155.00 | 0.00 | 0.00 | :Late2 |
| 25.00 | LATEFEE | 5420-00200 | 07/05/2023 | 25.00 | 0.00 | 0.00 | :Late1 |
| 130.00 | LATEFEE | 5420-00200 | 07/31/2023 | 130.00 | 0.00 | 0.00 | :Late2 |
| 25.00 | LATEFEE | 5420-00200 | 06/05/2023 | 25.00 | 0.00 | 0.00 | :Late1 |
| 150.00 | LATEFEE | 5420-00200 | 06/30/2023 | 150.00 | 0.00 | 0.00 | :Late2 |
| 35.00 | LATEFEE | 5420-00200 | 05/05/2023 | 35.00 | 0.00 | 0.00 | :Late1 |
| 130.00 | LATEFEE | 5420-00200 | 05/31/2023 | 130.00 | 0.00 | 0.00 | :Late2 |
| | | | | 3,967.68 | 0.00 | 1,267.68 | |



**Resident Ledger**

Date: 07/26/2024



THE RICHMAN GROUP OF COMPANIES

| Code | 1000423 | Property | p00260 | Lease From | 04/01/2024 |
|------|---------|----------|--------|------------|------------|
| Name | Perpetual Ashare | Unit | 1-806 | Lease To | 03/31/2026 |
| Address | 2293 3rd Ave Apt 806 | Status | Current | Move In | 04/23/2012 |
| | | Rent | 1419.32 | Move Out | |
| City | New York, NY 10035-1774 | Phone (H) | | Phone (W) | |

| Date | Chg Code | Description | Charge | Payment | Balance | Chg/Rec |
|------|----------|-------------|--------|---------|---------|---------|
| 04/23/2012 | DEPRCVD | Security Deposit | 1,176.00 | | 1,176.00 | 27946 |
| 04/23/2012 | DEPRCVD | Security Deposit | | 1,176.00 | 0.00 | 26789 |
| 05/01/2021 | RENT | Rent | 736.94 | | 736.94 | 38038 |
| 05/05/2021 | LATEFEE | Late Charges | 25.00 | | 761.94 | 38049 |
| 05/05/2021 | LATEFEE | Late Charges | 5.00 | | 766.94 | 38053 |
| 05/06/2021 | LATEFEE | Late Charges | 5.00 | | 771.94 | 38057 |
| 05/07/2021 | RENT | Rent (07/2021) | 1,347.65 | | 2,119.59 | 46183 |
| 05/07/2021 | RENT | ch#4 2705309350 Money order 2705309350 | | 1,000.00 | 1,119.59 | 46184 |
| 07/01/2021 | RENT | ch#4 2705309361 Money Order 2705309361 | | 348.00 | 771.59 | 72988 |
| 07/20/2021 | LATEFEE | Late Charges :Reversed by Charge Crt# 78266 | 25.00 | | | 78266 |
| 07/20/2021 | LATEFEE | Late Charges :Reversed by Charge Crt# 78267 | 5.00 | | | 78267 |
| 06/05/2021 | LATEFEE | Late Charges :Reversed by Charge Crt# 78268 | 5.00 | | 2,154.24 | 78268 |
| 06/05/2021 | RENT | Rent (07/2021) | 1,347.65 | | 3,501.89 | 44010 |
| 06/06/2021 | LATEFEE | :Reverse Charge Crt#38129 Late fees reversed due to existing covid19 pandemic & extended eviction moratorium | (5.00) | | 3,471.89 | |
| 06/07/2021 | LATEFEE | :Reverse Charge Crt#38109 Late fees reversed due to existing covid19 pandemic & extended eviction moratorium | (5.00) | | 3,466.89 | |
| 06/07/2021 | LATEFEE | :Reverse Charge Crt#38089 Late fees reversed due to existing covid19 pandemic & extended eviction moratorium | (25.00) | | 3,476.89 | |
| 07/01/2021 | RENT | Rent (08/2021) | 1,347.65 | | 3,501.89 | |
| 07/20/2021 | LATEFEE | Late Charges :Reversed by Charge Crt# 78266 | (5.00) | | | |
| 07/20/2021 | LATEFEE | Late Charges :Reversed by Charge Crt# 78267 | (5.00) | | | |
| 08/01/2021 | RENT | Rent (08/2021) | 1,347.65 | | | |
| 08/05/2021 | LATEFEE | extended eviction moratorium :Reverse Charge Crt#38129 Late fees reversed due to existing covid19 pandemic & | (5.00) | | 3,471.89 | 78267 |
| 08/05/2021 | LATEFEE | extended eviction moratorium :Reverse Charge Crt#38109 Late fees reversed due to existing covid19 pandemic & | (5.00) | | 3,466.89 | 78258 |
| 08/05/2021 | LATEFEE | extended eviction moratorium :Reverse Charge Crt#38089 Late fees reversed due to existing covid19 pandemic & | (25.00) | | 3,476.89 | 78266 |
| 08/05/2021 | LATEFEE | :Reverse Charge Crt#38089 Late fees reversed due to existing covid19 pandemic & | (5.00) | | 3,471.89 | 78267 |
| 08/30/2021 | RENT | ch# 08300534 -CHECKscan Payment - NYS ERAP Chk#08300534 | | 2,084.59 | 1,382.30 | 124004 |
| 09/01/2021 | RENT | Rent (09/2021) | 1,347.65 | | 2,729.95 | 70621 |
| 10/01/2021 | RENT | Rent (10/2021) | 1,347.65 | | 4,077.60 | 88630 |
| 10/05/2021 | RENT | ch#4 2778035934 -CHECKscan Payment | | 1,000.00 | 3,077.60 | 116174 |
| 10/05/2021 | RENT | ch#4 2778035945 -CHECKscan Payment | | 1,000.00 | 2,077.60 | 116175 |
| 10/05/2021 | RENT | ch#4 2778035956 -CHECKscan Payment | | 200.00 | 1,877.60 | 116176 |
| 11/01/2021 | RENT | Rent (11/2021) | 1,347.65 | | 3,225.25 | 182122 |
| 11/23/2021 | RENT | ch#4 2785020T173 -CHECKscan Payment | | 470.00 | 2,755.25 | 180833 |
| 11/23/2021 | RENT | ch#4 2785020T162 -CHECKscan Payment | | 1,000.00 | 1,755.25 | 180834 |
| 12/01/2021 | RENT | Rent (12/2021) | 1,347.65 | | 3,102.90 | 260056 |
| 01/01/2022 | RENT | Rent (01/2022) | 1,347.65 | | 4,450.55 | 235737 |
| 01/04/2022 | RENT | ch#4 2778037155O -CHECKscan Payment | | 1,000.00 | 3,450.55 | 256041 |
| 01/04/2022 | RENT | ch#4 2778037156I -CHECKscan Payment | | 500.00 | 2,950.55 | 256040 |
| 02/01/2022 | RENT | ch#4 2778037154B -CHECKscan Payment | | 1,000.00 | 1,950.55 | 256042 |
| 02/01/2022 | RENT | Rent (02/2022) | 1,347.65 | | 3,298.20 | 405840 |
| 03/01/2022 | RENT | Rent (03/2022) | 1,347.65 | | 4,645.85 | 479506 |
| 03/03/2022 | RENT | ch#4 2812130339S -CHECKscan Payment | | 1,000.00 | 3,645.85 | 341963 |
| 03/03/2022 | RENT | ch#4 2812130338X -CHECKscan Payment | | 1,000.00 | 2,645.85 | 341964 |
| 03/03/2022 | RENT | ch#4 2812130384 -CHECKscan Payment | | | 1,995.85 | 341965 |
| 03/03/2022 | RENT | ch#4 2812130406 -CHECKscan Payment | | 650.00 | 1,995.85 | 341966 |
| 04/01/2022 | RENT | Rent (04/2022) | 1,347.65 | | 3,343.50 | 551460 |
| 04/01/2022 | RENT | Rent (04/2022) | 1,347.65 | | 3,343.50 | |
| 04/25/2022 | DEPRCVD | Addl Deposit for 06/01/2022-05/31/2024 | 205.33 | | 3,548.83 | 556499 |
| 04/25/2022 | RENT | ch#4 2824177845J -CHECKscan Payment | | 1,000.00 | 2,548.83 | 409191 |

| Date | Type | Description | Amount | Payment | Balance | Ref# |
|---|---|---|---|---|---|---|
| 02/05/2023 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1742081 | 35.00 | | 3,124.02 | 1465420 |
| 02/16/2023 | LATEFEE | :Reverse Charge Ctrl#1248874 Late fees removed as a courtesy; rent for Dec & Jan paid in full. | (35.00) | | 3,089.02 | 1872944 |
| 02/16/2023 | LATEFEE | :Reverse Charge Ctrl#1253076 Late fees removed as a courtesy; rent for Dec & Jan paid in full. | (135.00) | | 2,954.02 | 1477945 |
| 02/16/2023 | LATEFEE | :Reverse Charge Ctrl#1365701 Late fees removed as a courtesy; rent for Dec & Jan paid in full. | (130.00) | | 2,824.02 | 1477946 |
| 02/16/2023 | LATEFEE | :Reverse Charge Ctrl#1375135 Late fees removed as a courtesy; rent for Dec & Jan paid in full. | (35.00) | | 2,789.02 | 1477947 |
| 02/16/2023 | RENT | ch# 28675716560 :CHECKscan Payment | | 1,000.00 | 1,789.02 | 393869 |
| 02/28/2023 | RENT | ch# 28675716571 :CHECKscan Payment | | 389.00 | 1,400.02 | 893870 |
| 03/01/2023 | LATEFEE | Late Fee Charges, 23 days @ $55.00/day :Reversed by Charge Ctrl# 1742080 | 115.00 | | 1,515.02 | 1460220 |
| 03/05/2023 | RENT | Rent (03/2023) | 1,381.34 | | 2,896.36 | 1494427 |
| 03/05/2023 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1742083 | 35.00 | | 2,931.36 | 1551028 |
| 03/31/2023 | LATEFEE | Late Fee Charges, 31 days @ $55.00/day :Reversed by Charge Ctrl# 1742082 | 155.00 | | 3,086.36 | 1574936 |
| 03/31/2023 | LATEFEE | :Reverse Charge Ctrl#1547435 Late fees removed as a courtesy. | (35.00) | | | 1574936 |
| 03/31/2023 | LATEFEE | :Reverse Charge Ctrl#1635483 Late fees removed as a courtesy. | (155.00) | | | 1635483 |
| 03/31/2023 | LATEFEE | :Reverse Charge Ctrl#1547435 Late fees removed as a courtesy. | (35.00) | | | 1574936 |
| 04/01/2023 | RENT | Rent (04/2023) | 1,381.34 | | 3,078.70 | 1574462 |
| 04/05/2023 | RENT | ch# 28734350716 :CHECKscan Payment | | 1,000.00 | | 1727912 |
| 04/30/2023 | LATEFEE | Late Fee Charges, 30 days @ $55.00/day :Reversed by Charge Ctrl# 1742084 | 150.00 | | 3,263.70 | 1635483 |
| 05/01/2023 | RENT | Rent (05/2023) | 1,381.34 | | 4,645.04 | 1666957 |
| 05/02/2023 | RENT | ch# 28734350705 :CHECKscan Payment | | 1,000.00 | 1,697.36 | 959227 |
| 05/02/2023 | LATEFEE | ch# 28830387295 :CHECKscan Payment | | 300.00 | 2,345.04 | 952980 |
| 05/05/2023 | LATEFEE | Late Fee Charges | 35.00 | | 2,380.04 | 1739100 |
| 05/17/2023 | LATEFEE | :Reverse Charge Ctrl#1460220 Late fees removed as a courtesy. | (115.00) | | 2,265.04 | 1742080 |
| 05/17/2023 | LATEFEE | :Reverse Charge Ctrl#1465420 Late fees removed as a courtesy. | (35.00) | | 2,230.04 | 1742081 |
| 05/17/2023 | LATEFEE | :Reverse Charge Ctrl#1547435 Late fees removed as a courtesy. | (155.00) | | 2,075.04 | 1742082 |
| 05/17/2023 | LATEFEE | :Reverse Charge Ctrl#1551028 Late fees removed as a courtesy. | (35.00) | | 2,040.04 | 1742083 |
| 05/17/2023 | LATEFEE | :Reverse Charge Ctrl#1635483 Late fees removed as a courtesy. | (150.00) | | 1,890.04 | 1742084 |
| 05/17/2023 | LATEFEE | :Reverse Charge Ctrl#1699331 Late fees removed as a courtesy. | (35.00) | | 1,855.04 | 1742085 |
| 05/17/2023 | LATEFEE | ch# 28830387284 :CHECKscan Payment | | 390.00 | 1,465.04 | 1044604 |
| 07/01/2023 | RENT | Rent (07/2023) | | 1,000.00 | 2,380.04 | 1739100 |
| 07/05/2023 | LATEFEE | Late Fee Charges | 35.00 | | 595.04 | 1721703 |
| 07/11/2023 | LATEFEE | ch# 28919470375 :CHECKscan Payment | | 388.00 | 3,169.72 | 1746278 |
| 07/11/2023 | LATEFEE | ch# 28919470353 :CHECKscan Payment | 1,000.00 | 550.00 | 2,169.72 | 1146279 |
| 07/11/2023 | LATEFEE | ch# 28919470364 :CHECKscan Payment | | 550.00 | 1,619.72 | 1166280 |
| 07/31/2023 | LATEFEE | Late Fee Charges, 26 days @ $55.00/day | 130.00 | | 1,749.72 | 1900209 |
| 08/01/2023 | RENT | Rent (08/2023) | 1,381.34 | | 3,131.06 | 1938169 |
| 08/05/2023 | LATEFEE | Late Fee Charges | 25.00 | | 3,156.06 | 1001230 |
| 08/31/2023 | LATEFEE | Late Fee Charges, 31 days @ $55.00/day | 155.00 | | 3,311.06 | 1894658 |
| 09/01/2023 | RENT | Rent (09/2023) | 1,381.34 | | 4,692.40 | 2059359 |
| 09/05/2023 | LATEFEE | Late Fee Charges | 25.00 | | 4,717.40 | 2093302 |
| 09/07/2023 | RENT | ch# 29038911333 :CHECKscan Payment | 1,000.00 | | 3,717.40 | 1247402 |
| 09/30/2023 | LATEFEE | ch# 29038911344 :CHECKscan Payment | | 600.00 | 3,117.40 | 1247403 |
| 10/01/2023 | RENT | Rent (10/2023) | | 150.00 | 3,267.40 | 2074459 |
| 10/03/2023 | LATEFEE | Late Fee Charges, 30 days @ $55.00/day | 1,381.34 | | 4,648.74 | 2125603 |
| 10/05/2023 | RENT | ch# 29038812591 :CHECKscan Payment | 388.00 | 1,000.00 | 4,260.74 | 1290736 |
| 10/05/2023 | LATEFEE | ch# 29038812581 :CHECKscan Payment | 25.00 | | 3,285.74 | 2184048 |
| 10/31/2023 | LATEFEE | Late Fee Charges, 31 days @ $55.00/day | 155.00 | | 3,440.74 | 2184046 |
| 11/01/2023 | RENT | Rent (11/2023) | 1,381.34 | | 4,822.08 | 2217415 |
| 11/02/2023 | LATEFEE | ch# 29112594445 :CHECKscan Payment | 400.00 | | 4,422.08 | 1338804 |
| 11/02/2023 | LATEFEE | ch# 29112594434 :CHECKscan Payment | | 1,000.00 | 3,422.08 | 1338805 |
| 11/05/2023 | LATEFEE | Late Fee Charges | 25.00 | | 3,447.08 | 2381798 |
| 11/30/2023 | LATEFEE | Late Fee Charges, 30 days @ $55.00/day | 150.00 | | 3,597.08 | 2366791 |

| Date | Type | Description | Amount | Balance | Ref |
|---|---|---|---|---|---|
| 05/01/2022 | RENT | Rent (05/2022) | 1,347.65 | 2,886.48 | 623556 |
| 05/27/2022 | | chk# 28070082720 :CHECKscan Payment | 500.00 | 2,396.48 | 466763 |
| 05/27/2022 | | chk# 28070083718 :CHECKscan Payment | 1,000.00 | 1,396.48 | 466764 |
| 05/27/2022 | | chk# 28070083731 :CHECKscan Payment | 208.00 | 1,188.48 | 466766 |
| 05/27/2022 | RENT | Rent (06/2022) | 1,381.34 | 2,569.82 | 704087 |
| 06/01/2022 | RENT | June 2022 Rent Adj-ERAP | (33.69) | 2,536.13 | 815639 |
| 06/30/2022 | RENT | July 2022 Rent Adj - ERAP | (33.69) | 2,502.44 | 815641 |
| 06/30/2022 | RENT | Rent (07/2022) | 1,381.34 | 3,883.78 | 781659 |
| 07/01/2022 | RENT | Aug 2022 Rent Adj | 35.00 | 3,918.78 | 834760 |
| 07/05/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 846081 | (130.00) | 3,387.96 | 891625 |
| 07/05/2022 | | chk# 28256917500 :CHECKscan Payment | 1,000.00 | 2,387.96 | 539072 |
| 07/06/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 846080 | 800.00 | 2,118.78 | 539164 |
| 07/06/2022 | | chk# 28256917511 :CHECKscan Payment | 543.45 | 1,844.51 | 893080 |
| 07/26/2022 | LATEFEE | Late Fee Charges, 12 days @ $5.00/day :Reversed by Charge Ctrl# 846080 | (120.00) | 1,724.51 | 832386 |
| 07/26/2022 | | chk# 28316445388 :CHECKscan Payment | 330.00 | 1,854.51 | 892071 |
| 07/29/2022 | LATEFEE | Late Fee Charges, 26 days @ $5.00/day :Reversed by Charge Ctrl# 975967 | (60.00) | 1,887.98 | 846081 |
| 07/31/2022 | RENT | Rent (08/2022) 1 day | 45.47 | 1,932.98 | 918387 |
| 08/01/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 975969 | 145.00 | 2,077.98 | 910416 |
| 08/05/2022 | LATEFEE | Late Fee Charges, 29 days @ $5.00/day :Reversed by Charge Ctrl# 975968 | 1,000.00 | 1,077.98 | 605601 |
| 08/29/2022 | | chk# 28378275816 :CHECKscan Payment | 600.00 | 477.98 | 929367 |
| 08/29/2022 | LATEFEE | Late fee waived; ERAP funds rec'd. | (130.00) | 347.98 | 975966 |
| 08/30/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1053812 | 35.00 | 203.98 | 976283 |
| 08/30/2022 | LATEFEE | Late Fee Charges, 29 days @ $5.00/day :Reversed by Charge Ctrl# 1053811 | 145.00 | 167.98 | 975964 |
| 08/30/2022 | LATEFEE | Reverse Charge Ctrl#910416 Late fee waived; ERAP funds rec'd. | (35.00) | 297.98 | 976283 |
| 08/31/2022 | LATEFEE | Late Fee Charges, 26 days @ $5.00/day :Reversed by Charge Ctrl# 976604 | 130.00 | 167.98 | 976604 |
| 08/31/2022 | LATEFEE | Reverse Charge Ctrl#915857 Late fee waived; ERAP funds rec'd. | (130.00) | 1,381.34 | 941950 |
| 03/31/2022 | LATEFEE | Reverse Charge Ctrl#976283 Late fee waived; ERAP funds rec'd for resident. | 1,381.34 | 1,549.32 | 959354 |
| 09/01/2022 | RENT | Rent (09/2022) | 35.00 | 1,584.32 | 989502 |
| 09/05/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1053811 | 145.00 | 1,729.32 | 1053811 |
| 09/29/2022 | LATEFEE | Late Fee Charges, 29 days @ $5.00/day :Reversed by Charge Ctrl# 1156608 | 1,000.00 | 299.32 | 659208 |
| 09/29/2022 | LATEFEE | Reverse Charge Ctrl#910416 Late fee waived; ERAP funds rec'd. | (145.00) | 1,564.32 | 1053811 |
| 09/29/2022 | LATEFEE | Reverse Charge Ctrl#834760 Late fee waived; ERAP funds rec'd for resident. | (35.00) | 1,549.32 | 1051812 |
| 09/30/2022 | LATEFEE | Late Fee Charges, 26 days @ $5.00/day :Reversed by Charge Ctrl# 891825 | 150.00 | 1,699.32 | 1051740 |
| 09/30/2022 | LATEFEE | Reverse Charge Ctrl#976283 Late fee waived; ERAP funds rec'd for resident. | 400.00 | 1,299.32 | 659207 |
| 09/30/2022 | LATEFEE | Late Fee Charges, 30 days @ $5.00/day :Reversed by Charge Ctrl# 1156607 | 1,000.00 | 299.32 | 659208 |
| 10/01/2022 | | chk# 28378298441 :CHECKscan Payment | 35.00 | 1,680.66 | 1021768 |
| 10/01/2022 | RENT | Rent (09/2022) | 155.00 | 1,715.66 | 1075494 |
| 10/05/2022 | | chk# 28378298430 :CHECKscan Payment | 1,381.34 | 1,870.66 | 1064184 |
| 10/05/2022 | RENT | Rent (10/2022) | 1,381.34 | 3,252.00 | 1101637 |
| 11/01/2022 | RENT | Rent (11/2022) | (150.00) | 3,102.00 | 1156607 |
| 11/01/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1156609 | (155.00) | 2,947.00 | 1156608 |
| 11/01/2022 | LATEFEE | Reverse Charge Ctrl#1054740 Late fee waived; ERAP funds rec'd for resident. | (35.00) | 2,912.00 | 1156607 |
| 11/01/2022 | LATEFEE | Reverse Charge Ctrl#1064184 Late fee waived; ERAP funds rec'd for resident. | 500.00 | 2,412.00 | 1075494 |
| 11/01/2022 | LATEFEE | Reverse Charge Ctrl#1075494 Late fee waived; ERAP funds rec'd for resident. | 1,000.00 | 1,412.00 | 710934 |
| 11/30/2022 | | chk# 28458294300 :CHECKscan Payment | 150.00 | 1,562.00 | 1145582 |
| 11/30/2022 | LATEFEE | Late Fee Charges, 30 days @ $5.00/day :Reversed by Charge Ctrl# 1220526 | (150.00) | 1,412.00 | 1226526 |
| 11/30/2022 | LATEFEE | Reverse Charge Ctrl#1145582 Late fee waived; ERAP funds rec'd for resident. | 1,000.00 | 412.00 | 757432 |
| 11/30/2022 | | chk# 28520526050 :CHECKscan Payment | 400.00 | 12.00 | 757434 |
| 11/30/2022 | | chk# 28520526071 :CHECKscan Payment | 12.00 | 0.00 | 757484 |
| 11/30/2022 | | chk# 28520518318 :CHECKscan Payment | 1,381.34 | 1,381.34 | 1190050 |
| 12/01/2022 | RENT | Rent (12/2022) | 35.00 | 1,416.34 | 1248874 |
| 12/05/2022 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1477944 | 135.00 | 1,551.34 | 1553076 |
| 12/31/2022 | LATEFEE | Late Fee Charges, 26 days @ $5.00/day :Reversed by Charge Ctrl# 1477945 | 1,381.34 | 2,932.68 | 1371315 |
| 01/01/2023 | RENT | Rent (01/2023) | 35.00 | 2,967.68 | 1282025 |
| 01/05/2023 | LATEFEE | Late Fee Charges :Reversed by Charge Ctrl# 1477947 | 1,000.00 | 1,967.68 | 845385 |
| 01/20/2023 | | chk# 28613223808 :CHECKscan Payment | 390.00 | 1,577.68 | 845386 |
| 01/20/2023 | | chk# 28613223810 :CHECKscan Payment | 130.00 | 1,707.68 | 1366701 |
| 01/31/2023 | LATEFEE | Late Fee Charges, 26 days @ $5.00/day :Reversed by Charge Ctrl# 1477946 | | | |

| Date | Type | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|---|
| 12/05/2023 | LATEFEE | Late Fee Charges | 25.00 | | 5,003.42 | 2372639 |
| 12/14/2023 | | chk# 2920430793 :CHECKscan Payment | | 1,000.00 | 4,003.42 | 1407296 |
| 12/14/2023 | | chk# 2920430794 :CHECKscan Payment | | 600.00 | 3,403.42 | 1407297 |
| 12/15/2023 | LATEFEE | Late Fee Charges, 31 days @ $5.00/day | 155.00 | | 3,558.42 | 2359435 |
| 01/01/2024 | RENT | Rent (01/2024) | 1,381.34 | | 4,939.76 | 2400651 |
| 01/05/2024 | LATEFEE | Late Fee Charges | 25.00 | | 4,964.76 | 2465781 |
| 01/05/2024 | LATEFEE | Late Fee Charges, 31 days @ $5.00/day | 155.00 | | 5,119.76 | 2460233 |
| 01/31/2024 | RENT | Rent (02/2024) | 1,381.34 | | 6,501.10 | 2492073 |
| 02/02/2024 | | chk# 225285689 Debit Card On-Line Payment ; Mobile App - Resident Services | | 2,700.00 | 3,801.10 | 1486177 |
| 02/05/2024 | LATEFEE | Late Fee Charges | 25.00 | | 3,826.10 | 2556084 |
| 02/29/2024 | LATEFEE | Late Fee Charges, 29 days @ $5.00/day | 145.00 | | 3,971.10 | 2544767 |
| 03/01/2024 | RENT | Rent (03/2024) | 1,381.34 | | 5,352.44 | 2582832 |
| 03/05/2024 | LATEFEE | Late Fee Charges | 25.00 | | 5,377.44 | 2648797 |
| 03/31/2024 | LATEFEE | Late Fee Charges, 31 days @ $5.00/day | 155.00 | | 5,532.44 | 2631122 |
| 04/01/2024 | RENT | Rent (04/2024) | 1,419.32 | | 6,951.76 | 2754758 |
| 04/05/2024 | LATEFEE | Late Fee Charges | 25.00 | | 6,976.76 | 2742606 |
| 04/18/2024 | DEPRCVD | Addl Deposit for 04/01/2024-03/31/2026 | 83.40 | | 7,060.16 | 2754755 |
| 04/18/2024 | | chk# 235925818 Debit Card On-Line Payment ; Mobile Web - Resident Services | | 2,236.10 | 4,824.06 | 1599099 |
| 04/30/2024 | LATEFEE | Late Fee Charges, 30 days @ $5.00/day | 150.00 | | 4,974.06 | 2736978 |
| 05/01/2024 | RENT | Rent (05/2024) | 1,419.32 | | 6,393.38 | 2769084 |
| 05/05/2024 | LATEFEE | Late Fee Charges, 5% of $1419.32, Maximum $50.00 | 50.00 | | 6,443.38 | 2840448 |
| 06/05/2024 | RENT | Rent (06/2024) | 1,419.32 | | 7,862.70 | 2864213 |
| 06/05/2024 | LATEFEE | Late Fee Charges, 5% of $1419.32, Maximum $50.00 | 50.00 | | 7,912.70 | 2929404 |
| 06/05/2024 | | chk# 243542323 Debit Card On-Line Payment ; Mobile App - Resident Services | | 2,800.00 | 5,112.70 | 1688438 |
| 07/01/2024 | RENT | Rent (07/2024) | 1,419.32 | | 6,532.02 | 2951953 |
| 07/05/2024 | LATEFEE | Late Fee Charges, 5% of $1419.32, Maximum $50.00 | 50.00 | | 6,582.02 | 3019051 |
| 08/01/2024 | RENT | Rent (08/2024) | 1,419.32 | | 8,001.34 | 3042910 |

Case 2:25-cv-02833-GW-RHP Document 1-10 Filed 05/25 Page 1 of 235
RECEIVED NYSCEF: 12/17/2024



Page 1 of 2

## *Certificate of Occupancy*

**CO Number:** 121791775T004

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

| | | | | |
|---|---|---|---|---|
| **A.** | **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Temporary |
| | **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 7501 | **Effective Date:** 03/06/2015 |
| | **Building Identification Number (BIN)** 1088865 | | **Expiration Date:** 06/04/2015 |
| | | **Building Type:** Altered | |

This building is subject to this Building Code: **2008 Code**

*For zoning lot metes & bounds, please see BISWeb.*

**B.**
Construction classification: 1-B (2008 Code)

Building Occupancy Group classification: R-2 (2008 Code)

Multiple Dwelling Law Classification: HAEA

No. of stories: 8   Height in feet: 85   No. of dwelling units: 49

**C.** **Fire Protection Equipment:**
Fire alarm system, Sprinkler system, Fire Suppression system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**
There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:** None

Borough Commissioner                    Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

Case 2:25-cv-02833-HWH-WHP Document 61-10 Filed 06/05/25 Page 32 of 235



Page 2 of 2

# *Certificate of Occupancy*

**CO Number:** **121791775T004**

| Permissible Use and Occupancy | | | | | | |
|---|---|---|---|---|---|---|
| All Building Code occupancy group designations below are 2008 designations. | | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| CEL | | OG | F-2 | | 2 | ELECTRICAL ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 199 | 100 | A-2 | | 6 | EATING & DRINKING ESTABLISHMENT |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 40 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| ROF | | | R-2 | | 2 | BULKHEAD |
| **END OF SECTION** | | | | | | |

Borough Commissioner

Commissioner

**END OF DOCUMENT**

121791775/004  3/6/2015 10:22:05 AM



SONTAG & HYMAN, P.C.
Attorneys at Law
165 Roslyn Road, 1st Floor
Roslyn Heights, New York 11577

CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

9589 0710 5270 1494 2452 17

US POSTAGE AND PITNEY BOWES

ZIP 11577
02 7H
0006135752

$ 004.98
JAN 17 2024

FIRST-CLASS

10035-177406

SONTAG & HYMAN P.C.
ATTORNEYS AT LAW
165 ROSLYN RD FL 1
ROSLYN HEIGHTS, NY 11577
516-621-0600

To:  PERPETUAL ASHARE                          Date:   1/18/2024
     2293 3RD AVENUE  Apt 806
     NEW YORK, NY 10035

Re: 2293 3RD AVENUE  Apt 806

    This firm has been retained to collect a debt consisting of rent arrears
totaling $3,369.76
Any information obtained will be used for that purpose.

    The below-named creditor claims that you owe rent arrears as specified.
Unless, within thirty days after receipt of this notice, you dispute the
validity of the debt, or any portion thereof, the debt will be assumed to
be valid by us. If you notify us in writing within the thirty-day period
that the debt, or any portion thereof, is disputed, then we will obtain
verification of the debt and mail such verification to you. Additionally,
upon your written request with the thirty-day period, we will provide you
with the name and address of the original creditor, if different from the
current creditor.

    This opportunity to dispute the debt, or a portion thereof, is separate
from any response that you are required to make or any action you are
required to take with respect to any other legal notices you receive.

PLEASE RESPOND TO ANY LEGAL NOTICES YOU MAY RECEIVE WITHIN THE TIME FRAMES
SET FORTH IN THOSE NOTICES.

Creditor:  EAST HARLEM MEC PARCEL C, L.P.

This notice is being served pursuant to 15 USC 1692(g)(a)(3)

Because of the global COVID-19 pandemic, you may be eligible for temporary
protection from eviction under the laws of your State, territory, locality,
or tribal area, or under Federal law.
Learn the steps you should take now:
- Visit www.cfpb.gov/eviction
- Or call a housing counselor at 800-569-4287

Debido a la pandemia global del COVID-19, bajo las leyes del estado,
territorio, localidad o area tribal donde viva, o bajo la ley federal,
usted puede ser elegible para proteccion temporal contra el desalojo.
Sepa cuales pasos debe tomar ahora:
- Visite www.cfpb.gov/es/desalojo
- O llame a un asesor de vivienda al 800-569-4287

442096
01580/07303
00



SONTAG & HYMAN, P.C.
Attorneys at Law
165 Roslyn Road, 1st Floor
Roslyn Heights, New York 11577

9589 0710 5270 2134 3510 93

GARDEN CITY LAND NY 117

2024 PM

US POSTAGE
ZIP 11577
02 7H
0006135752

$ 005.04°
APR 10 2024

FIRST-CLASS

10035-177406



311 WEST 127TH STREET
NEW YORK, NEW YORK 10027

April 10, 2024

Via Certified Mail

PERPETUAL ASHARE
2293 3RD AVENUE   APT 806
NEW YORK, NY 10035

Dear Tenant:

Please be advised that pursuant to your lease agreement, your rent was due on the 1st of the month. More than five (5) days have passed since your rent was due. The following is due and owing:

FEB24/BAL     $854.76     MAR24     $1,381.34     APR24     $1,381.34

Total:     $3,617.44

Accordingly, you are in default of your lease agreement. This notice is given pursuant to RPL Section 235-e (d).

EAST HARLEM MEC PARCEL C, L.P.

We are attempting to collect a debt and any information obtained will be used for that purpose.

Case 2:25-cv-02834-GW-RHP Document 61-13 Filed 00/05/25 Page 145 of 235

**EAST HARLEM MEC PARCEL C, L.P.**
**311 WEST 127TH STREET**
**NEW YORK, NEW YORK 10027**

April 10, 2024

Via Certified Mail

PERPETUAL ASHARE
2293 3RD AVENUE  APT 806
NEW YORK, NY 10035

Dear Tenant:

Please be advised that pursuant to your lease agreement, your rent was due
on the 1st of the month. More than five (5) days have passed since your
rent was due. The following is due and owing:

| FEB24/BAL | $854.76 | MAR24 | $1,381.34 | APR24 | $1,381.34 |
|-----------|---------|-------|-----------|-------|-----------|

Total:     $3,617.44

Accordingly, you are in default of your lease agreement. This notice is
given pursuant to RPL Section 235-e (d).

EAST HARLEM MEC PARCEL C, L.P.

We are attempting to collect a debt and any information obtained will be
used for that purpose.

9589 0710 5270 2134 3510 93

THIRTY DAY DEMAND NOTICE

April 11, 2024

To: PERPETUAL ASHARE
"JOHN DOE"-OCCUPANT(S)
"JANE DOE"-OCCUPANT(S)
2293 3RD AVENUE            APT 806
NEW YORK, NY              10035

TAKE NOTICE, that you are justly indebted to the undersigned Landlord of
the above described premises in that you owe the sum of       $3,617.44
for the rent of said premises from  **February 1, 2024  TO      April 30, 2024**
Which you are required to pay on or before the expiration of   **THIRTY** days
from the day of service of this Notice, or surrender the possession of said
premises to the undersigned Landlord, in default of which the undersigned
Landlord will commence summary proceedings under the Statute to recover the
possession thereof.

Prior to this demand, a rent default letter was sent by certified mail
pursuant to RPL 235-e(D).

     FEB24/BAL    854.76      MAR24      1,381.34      APR24      1,381.34

                     Landlord: EAST HARLEM MEC PARCEL C, L.P.

This firm has been retained to collect a debt consisting of the above
referenced rent arrears as indicated above. Any information obtained will be
used for that purpose. Although you are requested to pay the said debt or
surrender the possession of the said premises to the undersigned Landlord
within   THIRTY days from the day of service of this notice, you still have
the right to dispute this debt, or any portion thereof, within thirty
days after your receipt of this notice, and to make a written request,
within thirty days after your receipt of this notice, for more information
about the debt.

OUR FILE NO. 444061/07303
     PS 01

Case 1:25-cv-02634-JGK-WKHP Document 81-15 Filed 06/05/25 Page 147 of 235
RECEIVED NYSCEF: 06/11/2024

AFFIDAVIT OF CONSPICUOUS SERVICE DELIVERY

EAST HARLEM MEC PARCEL C, L.P.

vs.

PERPETUAL ASHARE, "JOHN DOE", "JANE DOE"

State of New York}

County of Nassau }                                    Client Ref: 444061

I, Allaiddn Alkhandak, being duly sworn, depose and say: That deponent is not a party to this proceeding, is a licensed Process Server over 18 years of age and resides at Richmond County, New York.

Deponent was unable to serve: PERPETUAL ASHARE, "JOHN DOE", "JANE DOE" tenant(s)/occupant(s) therein named by delivering a true copy thereof to said tenant(s)/occupant(s) personally at:

2293 3RD AVENUE, Apt# 806, NEW YORK, NY 10035 on 4/18/2024 at 7:05AM.

At that time deponent affixed a true copy of the THIRTY DAY DEMAND NOTICE for each tenant/occupant upon a conspicuous part, to wit – the entrance door of apartment of aforesaid premises.

Deponent was unable to find tenant(s)/occupant(s) or a person of suitable age and discretion willing to receive the same at this time or during a prior attempt made on 4/17/2024 at 3:39PM. Deponent served true copies of the above mentioned documents on each tenant/occupant at the property sought to be recovered, by depositing true copies of the same enclosed in a wrapper in the Post Office by Certified Mail and Regular First Class Mail within the State of New York on 4/18/2024.

Sworn to before me on April 18, 2024

_____
Melissa Belfer
Notary Public, State of New York
No. 01BE6327330
Qualified in Nassau County
Commission Expires July 06 2027

_____
Allaiddn Alkhandak
License # 2119777
Job # alkhandaka-20240418-618964

Howard Belfer Inc. Lic.# 1406285 One Dupont Street, Suite 207, Plainview NY 11803

EAST HARLEM MEC PARCEL C, L. P.                    Dated: 07/02/2024
    Petitioner(s)

  -against-                                      **ANSWER IN PERSON**

PERPETUAL ASHARE; "John" "Doe"; "Jane" "Doe"
    Respondent(s)                        Name: **PERPETUAL ASHARE**
                         Property Address: 2293 3RD AVENUE
                                 APT# 806
                                 New York, NY 10035

**X** Respondent / ___ Person claiming possession has appeared and orally answered the Petition as follows:

    **SERVICE**

1 _____ I did not receive the Notice of Petition and Petition.

2 _____ I received the Notice of Petition and Petition, but service was not correct as required by law.

    **PARTIES**

3 _____ ___ My name appears improperly ___ or by the wrong name ___ or does not appear on the Notice of Petition/Petition; ___ the tenant is dead.

4 _____ The Petitioner is not the Landlord, owner of the building or otherwise a proper party.

    **RENT**

5 _____ The Petitioner never asked me or properly asked me for the rent, orally or in writing, before starting this case.

6 _____ I or someone on my behalf tried to pay the rent, but the Petitioner refused to accept it.

7 _____ The monthly rent asked for is not the legal rent or amount on the current lease.

8 _____ ___ The Petitioner owes money to me because of a rent overcharge. ___ I paid for repairs or services.

9 _XXX_ The rent, or a part of the rent, has already been paid to the Petitioner.

    **APARTMENT/HOUSE**

10 _____ There are or were conditions in the apartment and/or the building/house which the Petitioner did not repair and/or services which the Petitioner did not provide.

11 _____ ___ The petition does not properly describe the apartment/house: wrong apt/house number; ___ wrong or missing program(s) and/or laws covering my tenancy.

12 _____ The apartment/house is illegal.

    **OTHER**

13 _____ The Petitioner has harmed me by waiting too long to bring this case (latches).

14 _XXX_ General denial.

15 _____ **New York City Only** - The Petitioner has harassed me

16 _____ I serve in the military or depend on someone in the military.

17 _____ ___ The petition seeks the HUD or Housing Authority Section 8 Part of the rent. ___ The petitioner did not notify HUD or the Housing Authority about this case.
        ___ Other:

18 _____ **COUNTERCLAIM**: I seek a judgment and/or order based upon the above defense(s).

19 _____ Other counterclaim(s):

## Court Date:   July 29, 2024 at 9:30 AM in Part U in Room 844

The clerk **CANNOT** change your court date. You MUST come and bring this form and all of your proof (receipts, photographs, etc.,) with you. Be at the court house **AT LEAST 30 Minutes Prior** to your scheduled appearance time, to allow time to go through the metal detectors. **IF YOU ARE LATE OR DO NOT APPEAR YOU MAY LOSE YOUR CASE AND GET EVICTED**. If you are unable to settle your case, you may have an immediate trial. If you will not be ready for trial, you **MUST** ask the Judge for a new date. The Judge will then decide if you have shown a good reason to postpone the case.

*For assistance visit a Help Center in the courthouse or the Court's website: http://nycourthelp.gov*

Sontag & Hyman, P.C.                                    CIV-LT-91 (Revised Oct.2014)
165 Roslyn Road
1st Floor
Roslyn Heights, NY 11577

NYSCEF DOC. NO. 15

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART U
-----------------------------------------------------------------------X

East Harlem MEC Parcel C, L.P.

                              Petitioner,

              -against-

Perpetual Ashare

                         Respondent-Tenant,

-----------------------------------------------------------------------X

Index No.:
LT-300890-24/HA

**<u>AMENDED ANSWER</u>**

Respondent Perpetual Ashare, through her undersigned counsel, asserts a general denial and denies each and every claim to the forgoing petition unless otherwise specified. Furthermore, Ms. Ashare interposes the following answer and response to each paragraph of the forgoing petition. These statements are made upon information and belief:

1. Respondent denies the allegations in Paragraph 1.

2. Respondent admits to the allegations in Paragraph 2 only to the extent that she is a tenant in possession of the subject unit, but otherwise denies the allegations.

3. Respondent admits to the allegations in Paragraph 3.

4. Respondent admits to the allegations in Paragraph 4 only to the extent that they are located in New York City.

5. Respondent denies the allegations in Paragraph 5.

6. Respondent admits to the allegations in Paragraph 6 to the extent that the unit is subject to Rent Stabilization, but denies the remainder of the allegations in Paragraph 6.

7. Respondent denies the allegations in Paragraph 7.

8. Respondent admits to the allegations in Paragraph 8 only to the extent that she is currently in possession in the unit, but otherwise denies the remainder of the allegations

Case 1:25-cv-02834-GHW-RHP Document 61-17 Filed 06/02/25 Page 52 of 235

in Paragraph 8.

9. Respondent admits to the allegations in Paragraph 9 to the extent that the premises are a

   multiple dwelling, but otherwise denies the remainder of the allegations in Paragraph 9.

10. Petitioner is not entitled to the relief demanded in the "wherefore" clause.

### FIRST DEFENSE

11. The Petition fails to state a cause of action upon which relief can be granted because the

    Petition fails to properly state sufficient facts upon which the proceeding is based as

    required by RPAPL Section 741(4).

12. As such, the matter should be dismissed.

### SECOND DEFENSE and FIRST COUNTERCLAIM: NO VALID CERTIFICATE OF OCCUPANCY

13. A valid and current Certificate of Occupancy is a prerequisite to collecting rent or use

    and occupancy pursuant to N.Y. Mult. Dwell. Law §§ 301, 302.

14. According to the Department of Buildings website, the last Certificate of Occupancy in

    effect was a Temporary Certificate of Occupancy, # 121791775T004, expiring on June 4,

    2015. Upon information and belief, no Certificates of Occupancy have been entered into

    since then. Accordingly, upon information and belief, there is no proper Certificate of

    Occupancy.

15. As such, Petitioner cannot seek rent or use and occupancy, and the Petition must be

    dismissed.

### THIRD DEFENSE and SECOND COUNTERCLAIM: OVERCHARGE

16. Petitioner willfully charged Respondents rent in excess of the legally collectible rent for

    the subject premises.

17. A review of the DHCR rent registration history and lease history details inconsistencies

NYSCEF DOC. NO. 15                                                                    RECEIVED NYSCEF: 12/17/2024

that Petitioner has hidden by providing Respondent a preferential rent.

18. In the registration for an alleged lease commencing April 1, 2020, Petitioner claims a $245 rent increase, raising the legal regulated rent by 18.77 percent, from $1305 to $1550, despite no vacancy and when the RGB guideline only permitted a 1.5% increase to a one-year lease. At this time, a preferential rent is listed at $1214.78. In their following registration, Petitioner registers a legal regulated rent of $1658, a $108 dollar increase (7%), but for the overlapping lease period of the prior registration. In this registration (2021), Petitioner claims an unexplained increase to the preferential rent of $132 (10%) despite the RGB increase allowing for only 1.5% or 2.5% increase that year.

19. Again, in their 2023 registration, Petitioner takes a $335 increase, raising the legal regulated rent by 20.8 percent, from $1610.00 to $1945, despite no vacancy and an RGB allowable increase of only 3.25% or 5.5% depending on the lease.

20. Again, in their 2024 registration, Petitioner claims an increase to the legal regulated rent of $343.00, or 17.64 percent, despite no vacancy and the RGB increase allowing for only a 3% or 2.75% year 1 and 3.2% year 2 increase depending on the lease.

21. Moreover, despite their improper increases to both the legal regulated rents and the preferential rents, upon information and belief, these registrations do not actually reflect the leases that were in fact offered and executed by the Respondent.

22. The totality of the circumstances—including the inexplicable and improperly large increases in the DHCR rent history, the preferential rents that obscure these increases lulling Respondent into inaction, the overlapping lease terms registered, and the inconsistencies between the lease history and the DHCR rent history—demonstrate a fraudulent scheme by Petitioner to overcharge Respondent.

Case 2:25-cv-02833-GW-RHP Document 1-17 Filed 04/02/25 Page 54 of 235
RECEIVED NYSCEF: 12/17/2024

23. Moreover, Petitioner's blatant and defective registrations requires that the rent be frozen at the last properly registered rent under RSL 26-517(e).

24. Accordingly, the Court should determine the proper legal regulated rent and overcharge damages without being bound by the statute of limitations.

25. Given Petitioner's improper increases and registrations, the Petitioner has charged and Respondent has paid rent in excess of that legally collectible under the rent stabilization scheme.

26. Respondent has thus been overcharged since the inception of her tenancy when Petition and/or its predecessor and agents began collecting rent in excess of the legally collectible rent. Upon information and belief, such overcharge was willful.

27. Accordingly, Respondent is entitled to damages equal to the amount of the overcharge. Since, upon information and belief, such overcharge was willful, Respondent is entitled to punitive damages equal to three times the amount of the total overcharge.

**FOURTH DEFENSE: IMPROPER RENT DEMAND**

28. Petitioner's rent demand is fatally defective and thus this proceeding should be dismissed.

29. Pursuant to RPAPL § 711(2) a proper rent demand is a prerequisite to commencement of a non-payment proceeding. Predicate notices in summary eviction proceedings must be in strict compliance with applicable statutory requirements.

30. A rent demand must be a good faith assertion of the rent due at the time of the demand. Failure to provide a good faith approximation in a rent demand renders it defective.

31. Petitioner's rent demand here is not a good faith estimate of the rent owed and hence is defective.

Case 25-623 Document 61-17 Filed 05/05/25 Page 55 of 235

32. Paragraphs ¶16 through ¶28 are incorporated by reference herein.

33. Thus, as Petitioner has improperly increased Respondent's rent, Petitioner seeks an improperly high rent in the rent demand and as such the rent demand is not a good faith assertion of the rent due at the time of the demand.

34. In the instant proceeding, Petitioner filed an improper annual rent registration.

35. Pursuant to Respondent's 2024 lease, Respondent has a legal regulated rent of $2,122.81/$2,132.11 and pays a preferential rent of $1,419.32/$1,464.73. However, in the DHCR annual rent registration, Petitioner inexplicably registered a legal regulated rent of $2,288.00, $165.19 higher than the legal regulated rent as indicated in Respondent's lease.

36. Accordingly, Petitioner's failure to comply with §26-517(e) of the rent stabilization code mandates dismissal since Petitioner seeks rents in excess of what they can lawfully charge.

37. The rent demand is defective and unamendable. Therefore, this matter should be dismissed.

## FIFTH DEFENSE and THIRD COUNTERCLIAM: BREACH OF WARRANTY OF HABITABILITY

38. Pursuant to Real Property Law §235-b, it is an implied covenant in every residential lease that the premises and common arears are fit for human habitation and for purposes reasonably intended and that occupants shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety. N.Y. Real Prop. Law § 235-b.

39. Petitioner has breached the warranty of habitability.

40. The value of the subject premises has been diminished by Petitioner's refusal to make repairs despite Respondent notifying Petitioner of defects in the apartment and that Respondent would be available to grant access.

41. These repairs include:

Case 2:25-cv-02833-JLG-WHRHP Document 31-17 Filed 05/05/25 Page 56 of 235

      a.  Stove does not work.

42. The Petitioner, its managing agents and/or employees knew or should have known of each of the foregoing conditions.

43. Despite such knowledge, Petitioner failed and/or refused to complete many of the repairs listed above and has not maintained these services despite repeated requests by the respondent to do so.

44. Respondent demands an Order to Correct these defects and an abatement no less than one month's rent or such amount as the Court may find just.

## FOURTH COUNTERCLAIM: ORDER TO CORRECT

45. Based upon the conditions set forth above, Respondent is further entitled to an Order from this Court, pursuant to the provisions of N.Y.C. Civil Court Act §110(c), directing petitioner to correct the aforesaid conditions.

46. The court should order Petitioner to correct the conditions set forth above.

## FIFTH COUNTERCLAIM: ATTORNEY'S FEES

47. In the event that legal fees can be awarded, Respondent is entitled to reasonable attorney's fees pursuant to the lease, the provisions of the Rent Stabilization Law and Code, and the provisions of R.P.L. §234.

WHEREFORE, it is respectfully requested that the petition be dismissed but that Respondent be allowed to go forward on the above counterclaims and be granted an order to correct violation and repairs and an order awarding an abatement.

Dated:        November 20, 2024
             New York, NY

                                    Respectfully,

Case 2:25-cv-02835-GW-RHP Document 61-17 Filed 06/05/25 Page 155 of 235

_____

MANHATTAN LEGAL SERVICES
*Attorney for Respondent*
By: Cecília S. MacArthur, Esq.
40 Worth Street, Suite 606
New York, New York 10013
Tel: (646) 442-3167
Email: cmacarthur@lsnyc.org



TO:

Sontag & Hyman, P.C.
*Attorneys for Petitioner*
165 Roslyn Road, 1st Floor
Roslyn Heights, NY 11577
Tel: (516) 621-0600

CLERK OF THE COURT
111 CENTRE STREET
HOUSING PART U
NEW YORK, NY 10013



November 20, 2024

Sontag & Hyman, P.C.
Attn: Michael Giammarusco
165 Roslyn Road, 1st Floor
Roslyn Heights, NY 11577

**Re: *East Harlem MEC Parcel C, L. P. vs. Perpetual Ashare*, LT-300890-24/HA**

To whom it may concern:

I represent Ms. Perpetual Ashare in the above-captioned nonpayment proceeding. On or around June 24, 2024, Ms. Ashare received the Petition commencing the case, which claimed that she owed $1,381.34 for rental arrears for April 2024 "+ Reasonable legal fees". Pursuant to the latest ledger in my possession, provided to me by Sontag & Hyman, P.C. on October 1, 2024, Ms. Ashare owed $6,516.58 through October 2024 (attached).

Ms. Ashare does not owe any of the rental arrears sought in the instant proceeding because there is no current Certificate of Occupancy in effect. According to the NYC Department of Buildings website, the last Certificate of Occupancy in effect was a Temporary Certificate of Occupancy, #121791775T004, which expired on June 4, 2015 (attached). No Certificate of Occupancy has been entered into since. As a landlord cannot seek rent or use and occupancy without a proper Certificate of Occupancy in effect, Ms. Ashare owes no monies whatsoever.

We demand that you discontinue the instant proceeding, LT-300890-24/HA, against Ms. Ashare immediately.

Respectfully,

Cecília S. MacArthur
Staff Attorney
Tel: 646-442-3167
cmacarthur@lsnyc.org



Dear Customer,

The following is the proof-of-delivery for tracking number: 770123603509

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Receptionist/Front Desk |
| Signed for by: | J.EAN | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday | | ROSLYN HEIGHTS, NY, |
| | | Delivery date: | Nov 22, 2024 13:08 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 770123603509 | Ship Date: | Nov 21, 2024 |
| | | Weight: | 0.5 LB/0.23 KG |

| Recipient: | Shipper: |
|---|---|
| ROSLYN HEIGHTS, NY, US, | NEW YORK, NY, US, |

FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment. Please check again later for a signature.

Thank you for choosing FedEx

 Outlook

---

## Re: East Harlem MEC Parcel C, L.P. vs. Perpetual Ashare, LT-300890-24/HA

---

**From** Cecilia MacArthur <cmacarthur@lsnyc.org>
**Date** Tue 12/10/2024 12:07 PM
**To**  Michael Giammarusco <mGiammarusco@sontag-hyman.com>

Hi Michael,

Following up - please advise. If you are unable to discontinue, I will be filing a Motion to Dismiss shortly.

Thanks,
Cecilia

--
**Cecília S. MacArthur** (she/her/ella)
Staff Attorney, Housing Unit
Manhattan Legal Services
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167

 **LEGAL SERVICES STAFF ASSOCIATION**

---

**From:** Cecilia MacArthur <cmacarthur@lsnyc.org>
**Sent:** Monday, December 2, 2024 3:56 PM
**To:** Michael Giammarusco <mGiammarusco@sontag-hyman.com>
**Subject:** Re: East Harlem MEC Parcel C, L.P. vs. Perpetual Ashare, LT-300890-24/HA

Good afternoon,

Following up. Plead advise.

Thanks,
Cecilia
--
**Cecília S. MacArthur** (she/her/ella)
Staff Attorney, Housing Unit
Manhattan Legal Services
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167



# LEGAL SERVICES STAFF ASSOCIATION

---

**From:** Cecilia MacArthur
**Sent:** Tuesday, November 26, 2024 11:04 AM
**To:** Michael Giammarusco <mGiammarusco@sontag-hyman.com>
**Subject:** East Harlem MEC Parcel C, L.P. vs. Perpetual Ashare, LT-300890-24/HA

Good morning,

I am writing about the above-captioned case. I believe that you or your office has received the attached Demand Letter which we sent via FedEx last week.

Are you willing to discontinue this proceeding in advance of our next appearance on December 3? If not, we will be seeking an adjournment to file a motion to dismiss and are hoping to adjourn in advance as well.

Please advise and I can send over either a stipulation of discontinuance or adjournment.

Best,
Cecilia

--
**Cecília S. MacArthur** (she/her/ella)
Staff Attorney, Housing Unit
Manhattan Legal Services
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167

 Outlook

---

**Re: East Harlem MEC Parcel C, L.P. vs. Perpetual Ashare, LT-300890-24/HA**

---

**From** Cecilia MacArthur <cmacarthur@lsnyc.org>

**Date** Tue 12/10/2024 12:07 PM

**To**    Michael Giammarusco <mGiammarusco@sontag-hyman.com>

Hi Michael,

Following up - please advise. If you are unable to discontinue, I will be filing a Motion to Dismiss shortly.

Thanks,
Cecilia

--
**Cecília S. MacArthur** (she/her/ella)
Staff Attorney, Housing Unit
Manhattan Legal Services
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167

 **LEGAL SERVICES STAFF ASSOCIATION**

---

**From:** Cecilia MacArthur <cmacarthur@lsnyc.org>
**Sent:** Monday, December 2, 2024 3:56 PM
**To:** Michael Giammarusco <mGiammarusco@sontag-hyman.com>
**Subject:** Re: East Harlem MEC Parcel C, L.P. vs. Perpetual Ashare, LT-300890-24/HA

Good afternoon,

Following up. Plead advise.

Thanks,
Cecilia
--
**Cecília S. MacArthur** (she/her/ella)
Staff Attorney, Housing Unit
Manhattan Legal Services
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167



## LEGAL SERVICES STAFF ASSOCIATION

**From:** Cecilia MacArthur
**Sent:** Tuesday, November 26, 2024 11:04 AM
**To:** Michael Giammarusco <mGiammarusco@sontag-hyman.com>
**Subject:** East Harlem MEC Parcel C, L.P. vs. Perpetual Ashare, LT-300890-24/HA

Good morning,

I am writing about the above-captioned case. I believe that you or your office has received the attached Demand Letter which we sent via FedEx last week.

Are you willing to discontinue this proceeding in advance of our next appearance on December 3? If not, we will be seeking an adjournment to file a motion to dismiss and are hoping to adjourn in advance as well.

Please advise and I can send over either a stipulation of discontinuance or adjournment.

Best,
Cecilia


--
**Cecília S. MacArthur** (she/her/ella)
Staff Attorney, Housing Unit
Manhattan Legal Services
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167

**CIVIL COURT OF THE CITY OF NEW YORK**

County of New York

Date _____ Part V

Index No. L&T:

Page ___1___ of ___1___

Hon. Ferdinand

East Harlem MEC Parcel C, LP

                    Petitioner(s),

        against

Perpetual Ashare

                    Respondent(s)

#50
2- attorney

**STIPULATION OF SETTLEMENT**

*The parties understand that each party has the right to a trial, the right to see a Judge at any time and the right not to enter into a stipulation of settlement. However, after review of all the issues, the parties agree that they do not want to go to trial and instead agree to the following stipulation in settlement of the issues in this matter.*

| Party (please print) | Added/Amended or Deleted | Appearance | No Appearance | No Answer |
|---|---|---|---|---|
| Petitioner | | AK ✓ | | |
| Respondent 1 | | ✓ | | |
| Respondent 2 | | | | |
| Respondent 3 | | | | |

1. Proceeding adjourned on consent to January 13, 2025 at 9:30 AM for all purposes

MLS for Resp

By: Cecilia MacArthur, Esq.

NYSCEF DOC. NO. 11

RECEIVED NYSCEF: 12/03/2024

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART U

------------------------------------------------------------------------X

East Harlem MEC Parcel C, L.P.

Index No.:
LT-300890-24/HA

Petitioner,

-against-

**NOTICE OF MOTION**

Perpetual Ashare

Respondent-Tenant,

------------------------------------------------------------------------X

**PLEASE TAKE NOTICE**, that upon the annexed affirmation of CECILIA S. MACARTHUR,

dated December 17, 2024, the annexed affirmation of statement of truth of PERPETUAL

ASHARE, dated December 17, 2024, the annexed exhibits, and upon all papers and proceedings

heretofore had herein, the undersigned will move this Court, and pursuant to CPLR 2214(b),

answering affidavits, if any, are required to be served upon the undersigned at least seven days

before the return date of this motion, at Housing Court, Part A, located at the Courthouse, at 111

Centre Street New York County, Room 844, New York, 10013, on January 13, 2025 at 9:30 a.m.

or as soon thereafter as counsel can be heard, for an order:

1. Pursuant to C.P.L.R. 3212(b), granting Respondent summary judgment and dismissing
   the proceeding with prejudice, because the subject building lacks a valid certificate of
   occupancy; and

2. Granting such other and further relief as the Court may deem just and proper.

Dated:     New York, New York
           December 17, 2024

Manhattan Legal Services
*Attorneys for Respondent*

Case 1:25-cv-02834-GWK-RFP Document 08-21 Filed 03/04/25 Page 5 of 625
RECEIVED NYSCEF: 12/17/2024

By: Cecília S. MacArthur, Esq.
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167
E-mail: cmacarthur@lsnyc.org


TO:

Sontag & Hyman, P.C.
165 Roslyn Road, Floor 1
Roslyn Heights, NY 11577,
*Attorney for Petitioner*

CLERK OF THE COURT
111 CENTRE STREET
NEW YORK, NY 10013

Case 1:25-cv-02355-JHR-RFP Document 18-21 Filed 05/30/25 Page 166 of 235

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART U

---------------------------------------------------------------------X

East Harlem MEC Parcel C, L.P.                              Index No.:
                                                           LT-300890-24/HA

                            Petitioner,

                -against-

                                                           **ATTORNEY**
                                                           **AFFIRMATION**

Perpetual Ashare

                            Respondent-Tenant,

---------------------------------------------------------------------X

    CECILIA S. MACARTHUR, an attorney licensed to practice law in the courts of the State of

New York, hereby affirms, under the penalties of perjury under the laws of New York, which

may include a fine or imprisonment, that the foregoing is true, and understands that this

document may be filed in an action or proceeding in a court of law pursuant to CPLR § 2106:

1. I am of counsel to Manhattan Legal Services, the attorney for Respondent PERPETUAL
   ASHARE (hereinafter "Ms. Ashare" or "Respondent), to represent her in the above-
   referenced proceeding. As such, I am familiar with the facts and circumstances herein.

2. I submit this affirmation in support of Respondent's motion for summary judgment
   pursuant to CPLR 3212(b) and Multiple Dwelling Law ("MDL") §§ 301, 302 because the
   subject building lacks a valid certificate of occupancy; and for such other and further
   relief as the Court deems just and proper.

3. The following exhibits are annexed hereto:

   a. **Exhibit A** is a true and correct copy of the Notice of Petition, Petition and Rent
      Demand.

   b. **Exhibit B** is a true and correct copy of the Amended Answer.

   c. **Exhibit C** is a true and correct copy of the Temporary Certificate of Occupancy

dated August 25, 2011. I compared Exhibit C with the Certificate viewed on the

Department of Building's ("DOB") website, and I certify that the annexed

printout is a complete and accurate copy that I downloaded from the DOB

website.

d.  **Exhibit D** is a true and correct copy of the Temporary Certificate of Occupancy

dated November 16, 2011. I compared Exhibit D with the Certificate viewed on

the DOB website and I certify that the annexed printout is a complete and

accurate copy that I downloaded from the DOB website.

e.  **Exhibit E** is a true and correct copy of the Final Certificate of Occupancy dated

December 1, 2011. I compared Exhibit E with the Certificate viewed on the DOB

website and I certify that the annexed printout is a complete and accurate copy

that I downloaded from the DOB website.

f.  **Exhibit F** is a true and correct copy of the DOB Work Permit dated October, 21,

2013. I compared Exhibit F with the Certificate viewed on the DOB website and I

certify that the annexed printout is a complete and accurate copy that I

downloaded from the DOB website.

g.  **Exhibit G** is a true and correct copy of the Temporary Certificate of Occupancy,

dated May 8, 2014. I compared Exhibit G with the Certificate viewed on the DOB

website and I certify that the annexed printout is a complete and accurate copy

that I downloaded from the DOB website.

h.  **Exhibit H** is a true and correct copy of the Temporary Certificate of Occupancy,

dated August 8, 2014. I compared Exhibit H with the Certificate viewed on the

DOB website and I certify that the annexed printout is a complete and accurate

Case 1:25-cv-02834-GHW-RFP Document 3-21 Filed 07/04/25 Page 168 of 235

copy that I downloaded from the DOB website.

i.   **Exhibit I** is a true and correct copy of the Temporary Certificate of Occupancy

dated November 18, 2014. I compared Exhibit I with the Certificate viewed on

the DOB website and I certify that the annexed printout is a complete and

accurate copy that I downloaded from the DOB website.

j.   **Exhibit J** is a true and correct copy of the Temporary Certificate of Occupancy

dated March 6, 2015. I compared Exhibit J with the Certificate viewed on the

DOB website and I certify that the annexed printout is a complete and accurate

copy that I downloaded from the DOB website.

## PRELIMINARY STATEMENT

4.   The Court should grant summary judgment for Ms. Ashare—the long-term tenant of this

rent stabilized unit—as the subject building does not have a valid Certificate of

Occupancy as the last Certificate of Occupancy expired on June 4, 2015 and therefore,

Petitioner is barred for collecting rent.

## PROCEDURAL HISTORY

5.   Ms. Ashare is the rent-stabilized tenant of Apartment 806 at 2293 3rd Avenue, New York,

NY 10035.

6.   Upon information and belief, Petitioner commenced this proceeding on June 11, 2024.

*See* **NYSCEF Doc. #1-2**.

7.   On July 29, 2024, Ms. Ashare appeared in Court, and the proceeding was adjourned for

her to speak with an attorney.

8.   On August 9, 2024, Manhattan Legal Services filed a Notice of Appearance for Ms.

Ashare. *See* **NYSCEF Doc. #8**.

Case 1:25-cv-02354-GHW-RFP Document 68-21 Filed 05/04/25 Page 6 of 235

9. On October 1, 2024, the proceeding was adjourned for Ms. Ashare to file an amended Answer. *See* **NYSCEF Doc. 9.**

10. On November 20, 2024, Ms. Ashare filed an amended Answer which included, *inter alia*, defenses and counterclaims for no valid certificate of occupancy and overcharge. *See* Exhibit B.

11. On December 3, 2024, the parties adjourned the proceeding for all purposes. *See* **NYSCEF Doc. 11**.

12. Now, Ms. Ashare moves for summary judgment pursuant to CPLR §3212(b) as there is no valid certificate of occupancy.

## STATEMENT OF FACTS

13. Ms. Ashare is the rent-stabilized tenant of Apartment 806 (hereinafter, "subject apartment") at 2293 3rd Avenue, New York, NY 10035 (hereinafter "subject building"). *See* Perpetual Ashare Affirmation and Statement of Truth, dated December 17, 2024, hereinafter referred to as "Ashare Aff." Ms. Ashare moved into the subject unit in or around 2012. *Id*. She resides there with her two children, ages 21 and 17. *Id*.

14. Ms. Ashare is a tenant in Petitioner's multiple dwelling premises. *See* NYSCEF Doc. #1.

15. On August 25, 2011, the Department of Buildings (hereinafter "DOB") issued a Temporary Certificate of Occupancy for the subject building, which expired on November 23, 2011. *See* Exhibit C. Before the August 2011 Certificate's expiration, another Temporary Certificate of Occupancy was issued for the subject building, on November 16, 2011, which expired on February 14, 2012. *See* Exhibit D.

16. Later, before the November 2011 Certificate's expiration, a Final Certificate of Occupancy was issued for the subject building on December 1, 2011 with no expiration date. *See* Exhibit E.

17. Following the December 2011 Final Certificate, on October 21, 2013, the DOB issued a work permit to permit "general construction associated with [a] proposed eating and drinking establishment", which was classified as a "Type 1" alteration and changed the use and occupancy of the subject building. *See* Exhibit F.

18. Following the 2013 alteration, the DOB issued a Temporary Certificate of Occupancy for the subject building on May 8, 2014, which expired on August 6, 2014. *See* Exhibit G. Following the May 2014 Certificate's expiration, a subsequent Temporary Certificate of Occupancy was issued on August 8, 2014, which expired on November 16, 2014. *See* Exhibit H. Following the August 2014 Certificate's expiration, another Temporary Certificate of Occupancy was issued on November 18, 2014, which expired on February 16, 2015. *See* Exhibit I.

19. Thereafter, following the November 2014 Certificate's expiration, the last Temporary Certificate of Occupancy was issued on March 6, 2015, which later expired on June 4, 2015. *See* Exhibit J.

20. Since the March 2015 Certificate's expiration in June 2015, based on the DOB's website, no subsequent Certificate of Occupancy has been issued for the subject building. As such, the subject building has lacked a valid Certificate of Occupancy since June 4, 2015.

## **ARGUMENT**

21. The Court should grant Ms. Ashare summary judgment pursuant to CPLR §3212(b) as the record conclusively establishes that the subject apartment lacks a valid Certificate of

Occupancy and therefore Petitioner is barred from collecting rent and commencing a

proceeding for the collection of rent.

22. Summary judgment is appropriate in cases where there are no disputable issues of

material fact. N.Y. C.P.L.R. 3212(b). The purpose of summary judgment is to "expedite

all civil cases by eliminating from the trial calendar claims which can properly be

resolved as a matter of law." *Andre v. Pomeroy*, 35 N.Y. 2d 361 (1974).

23. To obtain summary judgment, the moving party must establish a cause of action or

defense to sufficiently warrant the Court to direct judgment in their favor as a matter of

law. *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324 (1986). Once established, the burden

shifts to the non-moving party to "submit in opposition evidentiary facts or materials, by

affidavit or otherwise, demonstrating the existence of a triable issue of ultimate fact."

*Adam Cutner & Rathkopf*, 238 A.D.2d 234, 240 (1st Dept. 1997).

**I.  THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR RESPONDENT
AS THE RECORD CONCLUSIVELY ESTABLISHES THAT THE SUBJECT
UNIT LACKS A VALID CERTIFICATE OF OCCUPANCY AND THEREFORE
PETITIONER IS BARRED FROM COMMENCING A PROCEEDING FOR THE
COLLECTION OF RENT.**

24. Multiple Dwelling Law (hereinafter, "MDL") § 301(1) states: "[n]o multiple dwelling

shall be occupied in whole or in part until the issuance of a certificate by the department

that said dwelling conforms in all respects to the requirements of this chapter, to the

building code and rules and to all other applicable laws." MDL §301(1).

25. MDL §302 (1) further specifies: "a. if any dwelling or structure be occupied in whole or

in part for human habitation in violation of [MDL 301], during such unlawful occupation

[. . .]. b No rent shall be recovered by the owner of such premises for said period, and no

Case 1:25-cv-02354-GHW-RFP Document 61-21 Filed 06/04/25 Page 172 of 235

action or special proceeding shall be maintained therefor, or for possession of said

premises for nonpayment of such rent [. . .]." MDL § 302.

26. Similarly, the NYC Administrative Code requires buildings to have a valid certificate of

occupancy and prohibits alterations to the building or portions of the building or uses that

are inconsistent with a building's existing certificate of occupancy. *See* NYC Admin.

Code §§ 28-118.3.1; 28-118.3.2. Such alterations include changes, in whole or in part,

from one occupancy group or zoning group to another. *Id*.

27. The First Department has granted summary judgment in favor of tenants where

petitioner-landlords have commenced nonpayment proceedings in the absence of a valid

certificate of occupancy. *See e.g. Barrett Japaning, Inc. v Bialobroda*, 190 A.D.3d 544

(App Div, 1st Dept 2021) (affirming the lower court's granting of summary judgment in

favor of respondent-tenant where there was no certificate of occupancy and thus the

petitioner-landlord could not recover rent); *Matter of 49 Bleecker, Inc v Gatien*, 157

A.D.3d 619 (App Div, 1st Dept 2018) (granting respondent-tenant's motion for summary

judgment as petitioner-landlord "was precluded from charging respondent rents or other

remuneration while the building lacked a certificate of occupancy").

28. Crucially, a March 25, 2025 Appellate Term, First Department decision—**concerning**

**the same landlord and same building as those in the instant proceeding**—affirmed

the dismissal of a nonpayment proceeding against Ms. Ashare's neighbor, finding:

"[b]ecause the building lacks a valid certificate of occupancy, landlord is precluded from

seeking to recover rent from tenant . . .." *E. Harlem MEC Parcel C LP, Smalls,* 82 Misc.

3d 127(A), 2024 NY Slip Op 50317(U) (App Term, 1st Dept Mar 25, 2024) (hereinafter,

"*Smalls*"). It should be noted that, despite the abundantly clear determination by the

Appellate Term, Petitioner commenced this proceeding—with the same attorneys that

represented it in *Smalls*—against Ms. Ashare *several months* after *Smalls* found that

Petitioner was precluded from seeking rents and commencing a nonpayment proceeding

due to the lack of a valid Certificate of Occupancy in the subject building.

29. As this proceeding also concerns 2293 3rd Avenue, New York, NY 10035, the facts here

are identical to those in *Smalls*, which found:

> "The evidentiary submissions conclusive demonstrate, and it is
> essentially undisputed, that after the 2011 certificate of occupancy
> was issued, the subject building had undergone a 'type 1'
> alteration, including the addition of an eating and drinking
> establishment on the first floor; and that temporary certificates of
> occupancy issued between 2013 and 2015 had all expired and no
> new certificate of occupancy had been issued."

> *Id.; see also* Exhibits E; F; G; H; I; and J.

30. According to the documents publicly available on the DOB website, no Certificates of

Occupancy have been issued by DOB since the expiration of the 2015 Certificate of

Occupancy. *See Smalls, supra*.

31. Thus, as there is no valid Certificate of Occupancy, Petitioner "precluded from seeking to

recover rent" and cannot maintain this proceeding. *Smalls, supra*; *see also* MDL §§

301(1), 302(1). Accordingly, this Court should follow the clear directive of the Appellate

Term concerning the subject building and grant summary judgment for Ms. Ashare as

there is no valid Certificate of Occupancy.

WHEREFORE, it is respectfully requested that Respondent's motion be granted in its

entirety and that an order be entered:

1. Pursuant to C.P.L.R. 3212(b), granting Respondent summary judgment and dismissing the proceeding with prejudice, because the subject building lacks a valid Certificate of Occupancy; and

2. Granting such other and further relief as the Court may deem just and proper.

Dated:     New York, New York
        December 17, 2024

Manhattan Legal Services
*Attorneys for Respondent*
By: Cecília S. MacArthur, Esq.
40 Worth Street, Suite 606
New York, NY 10013
Tel: 646-442-3167
E-mail: cmacarthur@lsnyc.org

RECEIVED NYSCEF: 12/17/2024

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART U
-----------------------------------------------------------------------X

East Harlem MEC Parcel C, L.P.                                  Index No.:
                                                               LT-300890-24/HA

                          Petitioner,

                   -against-

                                                               **AFFIRMATION OF**
                                                               **TRUTH OF**
                                                               **STATEMENT OF**
                                                               **PERPETUAL**
                                                               **ASHARE**

Perpetual Ashare

                          Respondent-Tenant,

-----------------------------------------------------------------------X

I, PERPETUAL ASHARE, hereby affirm the following pursuant to CPLR 2106:

1. I am the tenant of record of Apartment 806 at 2293 3rd Avenue, New York, NY 10035. My apartment is rent stabilized.

2. I moved into the unit around 2012, and I live here with my two children, ages 21 and 17.

3. With the assistance of my attorney, I reviewed the Certificate of Occupancy filings on the Department of Buildings website and given that the last temporary Certificate of Occupancy has expired, and no permanent Certificate of Occupancy has been obtained, my landlord is barred from collecting rent from me.

4. Moreover, it has been explained to me that the appellate court decided that one of my neighbors did not have to pay rent to the landlord because of their refusal to obtain an updated temporary or permanent Certificate of Occupancy. I was surprised to find out that even after the appellate court determined in favor on my neighbor, that the landlord is now trying to collect rent from me.

5. For these reasons and the reasons provided by my attorneys, I request that the Court grant

my motion for summary judgment and dismiss the proceeding with prejudice.

I affirm this December 17, 2024, under the penalties of perjury under the laws of New York,

which may include a fine or imprisonment, that the foregoing is true, and I understand that this

document may be filed in an action or proceeding in a court of law.

_____

Perpetual Ashare

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF **NEW YORK** HOUSING PART

----------------------------------------------------------------------X

**EAST HARLEM MEC PARCEL C, L.P.**

                                          Petitioner/Landlord,

               -against-

**PERPETUAL ASHARE**
**"JOHN DOE"-OCCUPANT(S)**
**"JANE DOE"-OCCUPANT(S)**

                         Respondent(s)/Tenant(s),

**2293 3RD AVENUE APT# 806**
**NEW YORK, NY**               **10035**

                    Respondent(s)/ Undertenant(s),

"John Doe" and/or "Jane Doe": *Names of the Undertenants being fictitious and unknown to Petitioner. The persons intended are whoever is in possession of the premises described herein.*

----------------------------------------------------------------------X

**IMPORTANT TO TENANT:**

If you are dependent upon a person in the military service of the United States or the State of New York, advise the Clerk immediately, in order to protect your rights.

Index No. LT-

**Notice of Petition**
**Nonpayment**    **DWELLING**

Petitioner's Business Address:
**EAST HARLEM MEC PARCEL C, L.P.**

**311 WEST 127TH STREET**
**NEW YORK, NEW YORK**
**10027**

Our file No. **444061**

**Your Landlord is suing you for nonpayment of rent.**

1. Your Landlord has started an eviction nonpayment case against you for rent the Landlord claims you owe. The Landlord's reasons are given in the attached Petition.

2. Your Landlord is asking this Court for:
*a possessory and a money judgment for $  **1,381.34** plus interest from **February**    **2024** and reasonable attorney fees for this proceeding.
*permission to evict you from your premises if you do not pay the money judgment.

3. You have a right to a trial, but first you must Answer the Petition by going to the Landlord-Tenant Clerk's Office at: **111 CENTRE STREET 2ND FL**    **NEW YORK, NY 10013**

You must do this within **10** days after the date these papers were given to you or a person who lives or works in your premises or were posted at your premises at:
**2293 3RD AVENUE NEW YORK, NY 10035 APT# 806**

*Warning!* If you don't answer the Petition within **10** days, a judgment may be entered against you. If that happens, the Landlord will have the right to evict you.

4. Your Answer should say the legal reasons that you don't owe all or part of the rent. The legal reasons are called defenses. You can also say any claims you have against the Landlord. You will have to prove your defenses and claims in court. To Answer the Petition you must either:
* Go to the Landlord-Tenant Clerk's Office and tell the Clerk your Answer, or * Give the Landlord-Tenant Clerk your Answer in writing (Form No. Civ-LT-91a).
Information to help you Answer the Petition (Form No. Civ-LT-92) is available at the Landlord-Tenant's clerk's office or online at www.nycourts.gov/housingnyc
*Important!* If you don't tell the Clerk about a defense in your Answer you might not be able to talk about it later in this case or any other case.

----

Chief Clerk, June 11, 2024 01:18 PM  Harlem Community Justice Center - Civil

5. When you Answer the Petition, you will get a date to come back to Court **3** to **8** days later. You have a right to postpone that date for **14** days but you have to come to the courthouse to ask for a postponement. If you pay all the rent due before your court date, the case will be dismissed.

6. If your name is not on this Notice but you live in the premises listed above, you have a right to come to Court and Answer the Petition.

7. Available Resources: **\*** **Legal Help:** Under New York City Law, you may be able to get a free lawyer to represent you in this case. The court does not give you a lawyer. Call (718) 557-1379 or go to nycourts.gov/nyc-freelawyer or LawHelpNY at www.lawhelpny.org for information about getting free legal help. If you have money to hire a lawyer, you can contact the New York City Bar Legal Referral Service at 212-626-7373.

- **Language Help:** If you don't speak English well or are deaf or hard of hearing, you have a right to a free court interpreter. Tell the Court Clerk you need an interpreter, or call 646-386-5670. To read a translation of this Notice in another language visit: www.nycourts.gov/housingnyc For information on evictions:

**646 386-5750:** Informations concernant les expulsions • বেদখলের তথ্য • 迫迁相关信息 迫遷相關資訊 • Информация о выселении • معلومات بشأن حالات الطرد • بے دخلیوں کی معلومات • Enfòmasyon Konsènan Degèpisman • Información sobre desalojos

- **ADA Help:** If you need special accommodations to use the court because of a disability, tell a Court Clerk or ADA contact person listed at: http://www.nycourts.gov/COURTS/nyc/housing/services.shtml#ada or call 646-386-5300 or 711 (TTY).

- **Financial Help:** If you owe the rent and don't have the money, contact HRA's Infoline at (718) 557-1399 for more information about getting help to pay the rent.

- **Help at the Courthouse:** There is a Help Center in the courthouse where you can speak to a Court Attorney or Volunteer Lawyer.

- **Online Help:** Visit the Housing Court's website at: www.nycourts.gov/housingnyc (also available in Spanish and Chinese) or visit LawHelpNY at www.lawhelpny.org

**Postponements and Rent Deposits:** In court, you can ask to postpone your case. You have the right to postpone the case for at least **14** days. If your case is not finished in **60** days or you ask to postpone the case again, the court can order you to deposit money in court or make a rent payment to the landlord. If you don't do this, your case may go to trial right away. RPAPL Sec. 745.
**After Judgment.** If the court orders a judgment against you after a trial, the court may give you time to pay the judgment and not be evicted. After that time is up, you will get a Notice of Eviction from a Marshal giving you at least **14** days to pay all the rent due or move. If you don't pay or move, you will be evicted by the Marshal. RPAPL Sec. 749 (2).

Attorney for Petitioner:
**SONTAG & HYMAN, P.C.**
**165 ROSLYN ROAD FL 1**
**ROSLYN HEIGHTS, NY       11577**
**516-621-0600**
    6/11/24
**courtdate@sontag-hyman.com**

**ALIA RAZZAQ**

Clerk of the Court of the City of New York

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF **NEW YORK** HOUSING PART

Index No. LT-

-----------------------------------------------------------------------------X

**EAST HARLEM MEC PARCEL C, L.P.**

                    Petitioner/Landlord,

                                **Petition Non-Payment**

    -against-

**PERPETUAL ASHARE**
**"JOHN DOE"-OCCUPANT(S)**
**"JANE DOE"-OCCUPANT(S)**

                    Respondent(s)/Tenant(s),

**2293 3RD AVENUE**         Address      Amount Claimed:  **$1,381.34**
**NEW YORK, NY**
**APT# 806**        **10035**

-----------------------------------------------------------------------------X

THE PETITION OF  **EAST HARLEM MEC PARCEL C, L.P.**   respectfully shows that, upon

information and belief:

1.   Petitioner is the Landlord of the subject premises.
     **1A. Notice was sent to tenant(s) pursuant to RPL 235-e(d)**

2.   Respondent(s)/Tenant(s)**PERPETUAL ASHARE**       **"JOHN DOE"-OCCUPANT(S)**
                  **"JANE DOE"-OCCUPANT(S)**

   is/are the Tenant(s) in possession of said premises pursuant to a **WRITTEN** rental agreement
   **MADE HERETOFORE** wherein respondent promised to pay to Landlord as rent
   $ **1,381.34** each month in advance on the 1st day of each month.
   Respondent(s)/Occupant(s) is/are the undertenant(s) of the aforesaid Respondent/Tenant(s).

3.   Respondent(s) is/are now in possession of said premises. Said premises are the
   residence of the Tenant(s) herein.

4.   The premises from which removal is sought were rented for **DWELLING** purposes and
   are described as follows:
   ALL ROOMS, **APT# 806**     in building known as
   **2293 3RD AVENUE NEW YORK, NY 10035**
   situated within the territorial jurisdiction of the Civil Court of the City of New York,
   County of  **NEW YORK**

5.   Pursuant to said agreement there was due from Respondent/Tenant(s), the sum of  **$1,381.34**
   rent and additional rent as follows:
   + Reasonable legal fees     **APR24**     **$1381.34**

6. THE APT. IS SUBJECT TO RENT STABILIZATION LAW, IS REGISTERED WITH DHCR, THE RENT DOES NOT EXCEED THE LEGAL REGULATED RENT, & IS ALSO SUBJECT TO THE FEDERAL LOW INCOME HOUSING TAX CREDIT PROGRAM (26 US 42 & 26 CFR 1.42 -5) & THE HOME INVESTMENTS PARTNERSHIPS PROGRAM CREATED PURSUANT TO TITLE II OF THE CRANSTON-GONZALEZ NATL. AFFORDABLE HOUSING ACT OF 1990 & THE REGULATIONS AT 24 CFR 92. THUS, THE APT. IS EXEMPT FROM THE GOOD CAUSE EVICTION LAW OF RPL 6-A PER RPL 214 (5)&(6). THE RPL 231-C NOTICE IS APPENDED & ITS CONTENTS INCORPORATED HEREIN.

7. Said rent/maintenance has been demanded BY A  THIRTY DAY WRITTEN NOTICE from the tenant(s) since same became due.

8. Respondents have defaulted in the payments thereof and continue in possession of the premises without permission after said default.

9. The premises are  a multiple dwelling and pursuant to the Housing Maintenance Code Article 41 there is a currently effective registration statement on file with the Office of Code Enforcement in which the owner has designated the managing agent named below, a natural person over 21 years of age, to be in control of and responsible for the maintenance and operation of the dwelling. Multiple Dwelling No. **143472**
   Agent:   **NANNEY PENA**

   **2293 THIRD AVENUE NEW YORK, NY 10035**

   WHEREFORE, Petitioner requests a final judgment against Respondent(s) for the rent demanded herein, awarding possession of the premises to the Petitioner/Landlord, and directing the issuance of a Warrant to remove Respondent(s) from possession of the premises together with the costs, disbursements and reasonable legal fees in this proceeding. Dated: **6/11/24**
   **EAST HARLEM MEC PARCEL C, L.P.**


**STATE OF NEW YORK, COUNTY OF NASSAU**
The undersigned affirms under penalty of perjury that he is one of the attorneys for the petitioner; that he has read the foregoing Petition and knows the contents thereof; that the same are true to his own knowledge except as to the matter stated to be upon information and belief; and as to those matters he believes them to be true. The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows: statements and/or records provided by Petitioner, its agents and/or employees and contained in the file in the attorney's office. This verification is made pursuant to the provisions of RPAPL 741.

Attorney for Petitioner:
**SONTAG & HYMAN, P.C.
165 ROSLYN ROAD FL 1
ROSLYN HEIGHTS, NY      11577
516-621-0600
  6/11/24
courtdate@sontag-hyman.com**

**B. SONTAG / M.H.HYMAN**

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 06/06/25 Page 3 of 235

EAST HARLEM MEC PARCEL C, L.P.
311 WEST 127TH STREET
NEW YORK, NEW YORK 10027

April 10, 2024

Via Certified Mail

PERPETUAL ASHARE
2293 3RD AVENUE APT 806
NEW YORK, NY 10035

Dear Tenant:

Please be advised that pursuant to your lease agreement, your rent was due
on the 1st of the month. More than five (5) days have passed since your
rent was due. The following is due and owing:

FEB24/BAD    $854.76    MAR24    $1,181.34    APR24    $1,301.14

Total:    $3,617.64

Accordingly, you are in default of your lease agreement. This notice is
given pursuant to RPL Section 235 e (d).

EAST HARLEM MEC PARCEL C, L.P.

We are attempting to collect a debt and any information obtained will be
used for that purpose

9565 0710 5270 2134 3540 93

April 11, 2024

To: PERPETUAL ASHARE
"JOHN DOE"-OCCUPANT(S)
"JANE DOE"-OCCUPANT(S)
2293 3RD AVENUE                    APT 806
NEW YORK, NY                       10035

TAKE NOTICE, that you are justly indebted to the undersigned Landlord of
the above described premises in that you owe the sum of        $3,617.44
for the rent of said premises from  **February 1, 2024  TO**    **April 30, 2024**
Which you are required to pay on or before the expiration of  **THIRTY** days
from the day of service of this Notice, or surrender the possession of said
premises to the undersigned Landlord, in default of which the undersigned
Landlord will commence summary proceedings under the Statute to recover the
possession thereof.

Prior to this demand, a rent default letter was sent by certified mail
pursuant to RPL 235-e(D).

FEB24/BAL    854.76    MAR24    1,381.34    APR24    1,381.34

Landlord: EAST HARLEM MEC PARCEL C, L.P.

This firm has been retained to collect a debt consisting of the above
referenced rent arrears as indicated above. Any information obtained will be
used for that purpose. Although you are requested to pay the said debt or
surrender the possession of the said premises to the undersigned Landlord
within  THIRTY days from the day of service of this notice, you still have
the right to dispute this debt, or any portion thereof, within thirty
days after your receipt of this notice, and to make a written request,
within thirty days after your receipt of this notice, for more information
about the debt.

OUR FILE NO. 444061/07303
    PS 01

NOTICE OF OCCUPANCY RIGHTS UNDER
THE VIOLENCE AGAINST WOMEN ACT

U.S. Department of Housing and Urban Development
OMB Approval No. 2577-0286
Expires 06/30/2017

### [Insert Name of Housing Provider[1]]

## Notice of Occupancy Rights under the Violence Against Women Act[2]

### To all Tenants and Applicants

The Violence Against Women Act (VAWA) provides protections for victims of domestic violence, dating violence, sexual assault, or stalking. VAWA protections are not only available to women, but are available equally to all individuals regardless of sex, gender identity, or sexual orientation.[3] The U.S. Department of Housing and Urban Development (HUD) is the Federal agency that oversees that [insert name of program or rental assistance] is in compliance with VAWA. This notice explains your rights under VAWA. A HUD-approved certification form is attached to this notice. You can fill out this form to show that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking, and that you wish to use your rights under VAWA."

### Protections for Applicants

If you otherwise qualify for assistance under [insert name of program or rental assistance], you cannot be denied admission or denied assistance because you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

### Protections for Tenants

---

[1] The notice uses HP for housing provider but the housing provider should insert its name where HP is used. HUD's program-specific regulations identify the individual or entity responsible for providing the notice of occupancy rights.

[2] Despite the name of this law, VAWA protection is available regardless of sex, gender identity, or sexual orientation.

[3] Housing providers cannot discriminate on the basis of any protected characteristic, including race, color, national origin, religion, sex, familial status, disability, or age. HUD-assisted and HUD-insured housing must be made available to all otherwise eligible individuals regardless of actual or perceived sexual orientation, gender identity, or marital status.

Form HUD-5380
(06/2017)

Case 1:25-cv-02834-GHW-KHP    Document 68-21    Filed 06/06/25    Page 184 of 235
RECEIVED NYSCEF: 08/17/2024

If you are receiving assistance under [insert name of program or rental assistance], you may not be denied assistance, terminated from participation, or be evicted from your rental housing because you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

Also, if you or an affiliated individual of yours is or has been the victim of domestic violence, dating violence, sexual assault, or stalking by a member of your household or any guest, you may not be denied rental assistance or occupancy rights under [insert name of program or rental assistance] solely on the basis of criminal activity directly relating to that domestic violence, dating violence, sexual assault, or stalking.

Affiliated individual means your spouse, parent, brother, sister, or child, or a person to whom you stand in the place of a parent or guardian (for example, the affiliated individual is in your care, custody, or control); or any individual, tenant, or lawful occupant living in your household.

**Removing the Abuser or Perpetrator from the Household**

HP may divide (bifurcate) your lease in order to evict the individual or terminate the assistance of the individual who has engaged in criminal activity (the abuser or perpetrator) directly relating to domestic violence, dating violence, sexual assault, or stalking.

If HP chooses to remove the abuser or perpetrator, HP may not take away the rights of eligible tenants to the unit or otherwise punish the remaining tenants. If the evicted abuser or perpetrator was the sole tenant to have established eligibility for assistance under the program, HP must allow the tenant who is or has been a victim and other household members to remain in the unit for a period of time, in order to establish eligibility under the program or under another HUD housing program covered by VAWA, or, find alternative housing.

Form HUD-5380
(06/2017)

In removing the abuser or perpetrator from the household, HP must follow Federal, State, and local eviction procedures. In order to divide a lease, HP may, but is not required to, ask you for documentation or certification of the incidences of domestic violence, dating violence, sexual assault, or stalking.

**Moving to Another Unit**

Upon your request, HP may permit you to move to another unit, subject to the availability of other units, and still keep your assistance. In order to approve a request, HP may ask you to provide documentation that you are requesting to move because of an incidence of domestic violence, dating violence, sexual assault, or stalking. If the request is a request for emergency transfer, the housing provider may ask you to submit a written request or fill out a form where you certify that you meet the criteria for an emergency transfer under VAWA. The criteria are:

> **(1) You are a victim of domestic violence, dating violence, sexual assault, or stalking.** If your housing provider does not already have documentation that you are a victim of domestic violence, dating violence, sexual assault, or stalking, your housing provider may ask you for such documentation, as described in the documentation section below.

> **(2) You expressly request the emergency transfer.** Your housing provider may choose to require that you submit a form, or may accept another written or oral request.

> **(3) You reasonably believe you are threatened with imminent harm from further violence if you remain in your current unit.** This means you have a reason to fear that if you do not receive a transfer you would suffer violence in the very near future.

Form HUD-5380
(06/2017)

OR

You are a victim of sexual assault and the assault occurred on the premises during the 90-calendar-day period before you request a transfer. If you are a victim of sexual assault, then in addition to qualifying for an emergency transfer because you reasonably believe you are threatened with imminent harm from further violence if you remain in your unit, you may qualify for an emergency transfer if the sexual assault occurred on the premises of the property from which you are seeking your transfer, and that assault happened within the 90-calendar-day period before you expressly request the transfer.

HP will keep confidential requests for emergency transfers by victims of domestic violence, dating violence, sexual assault, or stalking, and the location of any move by such victims and their families.

HP's emergency transfer plan provides further information on emergency transfers, and HP must make a copy of its emergency transfer plan available to you if you ask to see it.

### Documenting You Are or Have Been a Victim of Domestic Violence, Dating Violence, Sexual Assault or Stalking

HP can, but is not required to, ask you to provide documentation to "certify" that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking. Such request from HP must be in writing, and HP must give you at least 14 business days (Saturdays, Sundays, and Federal holidays do not count) from the day you receive the request to provide the documentation. HP may, but does not have to, extend the deadline for the submission of documentation upon your request.

Form HUD-5380
(06/2017)

You can provide one of the following to HP as documentation. It is your choice which of the following to submit if HP asks you to provide documentation that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

- A complete HUD-approved certification form given to you by HP with this notice, that documents an incident of domestic violence, dating violence, sexual assault, or stalking. The form will ask for your name, the date, time, and location of the incident of domestic violence, dating violence, sexual assault, or stalking, and a description of the incident. The certification form provides for including the name of the abuser or perpetrator if the name of the abuser or perpetrator is known and is safe to provide.

- A record of a Federal, State, tribal, territorial, or local law enforcement agency, court, or administrative agency that documents the incident of domestic violence, dating violence, sexual assault, or stalking. Examples of such records include police reports, protective orders, and restraining orders, among others.

- A statement, which you must sign, along with the signature of an employee, agent, or volunteer of a victim service provider, an attorney, a medical professional or a mental health professional (collectively, "professional") from whom you sought assistance in addressing domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse, and with the professional selected by you attesting under penalty of perjury that he or she believes that the incident or incidents of domestic violence, dating violence, sexual assault, or stalking are grounds for protection.

- Any other statement or evidence that HP has agreed to accept.

If you fail or refuse to provide one of these documents within the 14 business days, HP does not have to provide you with the protections contained in this notice.

Form HUD-5380
(06/2017)

Case 1:25-cv-00834-GHW-KHP Document 64-21 Filed 06/06/25 Page 25 of 235
RECEIVED NYSCEF: 08/17/2024

If HP receives conflicting evidence that an incident of domestic violence, dating violence, sexual assault, or stalking has been committed (such as certification forms from two or more members of a household each claiming to be a victim and naming one or more of the other petitioning household members as the abuser or perpetrator), HP has the right to request that you provide third-party documentation within thirty 30 calendar days in order to resolve the conflict. If you fail or refuse to provide third-party documentation where there is conflicting evidence, HP does not have to provide you with the protections contained in this notice.

Confidentiality

HP must keep confidential any information you provide related to the exercise of your rights under VAWA, including the fact that you are exercising your rights under VAWA.

HP must not allow any individual administering assistance or other services on behalf of HP (for example, employees and contractors) to have access to confidential information unless for reasons that specifically call for these individuals to have access to this information under applicable Federal, State, or local law.

HP must not enter your information into any shared database or disclose your information to any other entity or individual. HP, however, may disclose the information provided if:

- You give written permission to HP to release the information on a time limited basis.
- HP needs to use the information in an eviction or termination proceeding, such as to evict your abuser or perpetrator or terminate your abuser or perpetrator from assistance under this program.
- A law requires HP or your landlord to release the information.

Form HUD-5380
(06/2017)

VAWA does not limit HP's duty to honor court orders about access to or control of the property. This includes orders issued to protect a victim and orders dividing property among household members in cases where a family breaks up.

## Reasons a Tenant Eligible for Occupancy Rights under VAWA May Be Evicted or Assistance May Be Terminated

You can be evicted and your assistance can be terminated for serious or repeated lease violations that are not related to domestic violence, dating violence, sexual assault, or stalking committed against you. However, HP cannot hold tenants who have been victims of domestic violence, dating violence, sexual assault, or stalking to a more demanding set of rules than it applies to tenants who have not been victims of domestic violence, dating violence, sexual assault, or stalking.

The protections described in this notice might not apply, and you could be evicted and your assistance terminated, if HP can demonstrate that not evicting you or terminating your assistance would present a real physical danger that:

1) Would occur within an immediate time frame, and

2) Could result in death or serious bodily harm to other tenants or those who work on the property.

If HP can demonstrate the above, HP should only terminate your assistance or evict you if there are no other actions that could be taken to reduce or eliminate the threat.

## Other Laws

VAWA does not replace any Federal, State, or local law that provides greater protection for victims of domestic violence, dating violence, sexual assault, or stalking. You may be entitled to

Form HUD-5380
(06/2017)

additional housing protections for victims of domestic violence, dating violence, sexual

assault, or stalking under other Federal laws, as well as under State and local laws.

**Non-Compliance with The Requirements of This Notice**
You may report a covered housing provider's violations of these rights and seek additional

assistance, if needed, by contacting or filing a complaint with **[insert contact information**

**for any intermediary, if applicable]** or **[insert HUD field office]**.

**For Additional Information**

You may view a copy of HUD's final VAWA rule at **[insert Federal Register link]**.

Additionally, HP must make a copy of HUD's VAWA regulations available to you if you ask

to see them.

For questions regarding VAWA, please contact **[insert name of program or rental assistance**

**contact information able to answer questions on VAWA]**.

For help regarding an abusive relationship, you may call the National Domestic Violence

Hotline at 1-800-799-7233 or, for persons with hearing impairments, 1-800-787-3224 (ITY).

You may also contact **[Insert contact information for relevant local organizations]**.

For tenants who are or have been victims of stalking seeking help may visit the National

Center for Victims of Crime's Stalking Resource Center at

https://vvww.victimsofcrime.org/our-programs/stalking-resource-center.

For help regarding sexual assault, you may contact **[Insert contact information for**

**relevant organizations]**

Victims of stalking seeking help may contact **[Insert contact information for relevant**

**organizations]**.

**Attachment:** Certification form HUD-XXXXX **[form approved for this program to be**

**included]**

Case 1:25-cv-02884-GHW-KHP   Document 68-21   Filed 06/06/25   Page 22 of 35

| | | |
|---|---|---|
| CERTIFICATION OF<br>DOMESTIC VIOLENCE,<br>DATING VIOLENCE,<br>SEXUAL ASSAULT, OR STALKING,<br>AND ALTERNATE DOCUMENTATION | U.S. Department of Housing<br>and Urban Development | OMB Approval No. 2577-0286<br>Exp. 06/30/2017 |

**Purpose of Form:** The Violence Against Women Act ("VAWA") protects applicants, tenants, and program participants in certain HUD programs from being evicted, denied housing assistance, or terminated from housing assistance based on acts of domestic violence, dating violence, sexual assault, or stalking against them. Despite the name of this law, VAWA protection is available to victims of domestic violence, dating violence, sexual assault, and stalking, regardless of sex, gender identity, or sexual orientation.

**Use of This Optional Form:** If you are seeking VAWA protections from your housing provider, your housing provider may give you a written request that asks you to submit documentation about the incident or incidents of domestic violence, dating violence, sexual assault, or stalking.

In response to this request, you or someone on your behalf may complete this optional form and submit it to your housing provider, or you may submit one of the following types of third-party documentation:

(1) A document signed by you and an employee, agent, or volunteer of a victim service provider, an attorney, or medical professional, or a mental health professional (collectively, "professional") from whom you have sought assistance relating to domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse. The document must specify, under penalty of perjury, that the professional believes the incident or incidents of domestic violence, dating violence, sexual assault, or stalking occurred and meet the definition of "domestic violence," "dating violence," "sexual assault," or "stalking" in HUD's regulations at 24 CFR 5.2003.

(2) A record of a Federal, State, tribal, territorial or local law enforcement agency, court, or administrative agency; or

(3) At the discretion of the housing provider, a statement or other evidence provided by the applicant or tenant.

**Submission of Documentation:** The time period to submit documentation is 14 business days from the date that you receive a written request from your housing provider asking that you provide documentation of the occurrence of domestic violence, dating violence, sexual assault, or stalking. Your housing provider may, but is not required to, extend the time period to submit the documentation, if you request an extension of the time period. If the requested information is not received within 14 business days of when you received the request for the documentation, or any extension of the date provided by your housing provider, your housing provider does not need to grant you any of the VAWA protections. Distribution or issuance of this form does not serve as a written request for certification.

**Confidentiality:** All information provided to your housing provider concerning the incident(s) of domestic violence, dating violence, sexual assault, or stalking shall be kept confidential and such details shall not be entered into any shared database. Employees of your housing provider are not to have access to these details unless to grant or deny VAWA protections to you, and such employees may not disclose this information to any other entity or individual, except to the extent that disclosure is: (i) consented to by you in writing in a time-limited release; (ii) required for use in an eviction proceeding or hearing regarding termination of assistance; or (iii) otherwise required by applicable law.

Form HUD-5382
(12/2016)

## TO BE COMPLETED BY OR ON BEHALF OF THE VICTIM OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR STALKING

1. Date the written request is received by victim: _____

2. Name of victim: _____

3. Your name (if different from victim's): _____

4. Name(s) of other family member(s) listed on the lease: _____

_____

5. Residence of victim: _____

6. Name of the accused perpetrator (if known and can be safely disclosed): _____

_____

7. Relationship of the accused perpetrator to the victim: _____

8. Date(s) and times(s) of incident(s) (if known): _____

10. Location of incident(s): _____

In your own words, briefly describe the incident(s):

_____

_____

_____

_____

This is to certify that the information provided on this form is true and correct to the best of my knowledge and recollection, and that the individual named above in Item 2 is or has been a victim of domestic violence, dating violence, sexual assault, or stalking. I acknowledge that submission of false information could jeopardize program eligibility and could be the basis for denial of admission, termination of assistance, or eviction.

Signature _____ Signed on (Date) _____

**Public Reporting Burden:** The public reporting burden for this collection of information is estimated to average 1 hour per response. This includes the time for collecting, reviewing, and reporting the data. The information provided is to be used by the housing provider to request certification that the applicant or tenant is a victim of domestic violence, dating violence, sexual assault, or stalking. The information is subject to the confidentiality requirements of VAWA. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid Office of Management and Budget control number.

. Form HUD-5382
(12/2016)

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 06/06/25 Page 30 of 35
RECEIVED NYSCEF: 08/17/2024

## AFFIDAVIT OF CONSPICUOUS SERVICE DELIVERY

**EAST HARLEM MEC PARCEL C, L.P.**

vs.

**PERPETUAL ASHARE, "JOHN DOE", "JANE DOE"**

State of New York}

County of Nassau }                                    Client Ref: 444061

I, Allaiddn Alkhandak, being duly sworn, depose and say: That deponent is not a party to this proceeding, is a licensed Process Server over 18 years of age and resides at Richmond County, New York.

Deponent was unable to serve: PERPETUAL ASHARE, "JOHN DOE", "JANE DOE" tenant(s)/occupant(s) therein named by delivering a true copy thereof to said tenant(s)/occupant(s) personally at:

2293 3RD AVENUE, Apt# 806, NEW YORK, NY 10035 on 4/18/2024 at 7:05AM.

At that time deponent affixed a true copy of the THIRTY DAY DEMAND NOTICE for each tenant/occupant upon a conspicuous part, to wit – the entrance door of apartment of aforesaid premises.

Deponent was unable to find tenant(s)/occupant(s) or a person of suitable age and discretion willing to receive the same at this time or during a prior attempt made on 4/17/2024 at 3:39PM. Deponent served true copies of the above mentioned documents on each tenant/occupant at the property sought to be recovered, by depositing true copies of the same enclosed in a wrapper in the Post Office by Certified Mail and Regular First Class Mail within the State of New York on 4/18/2024.

Sworn to before me on April 18, 2024

Melissa Belfer
Notary Public, State of New York
No. 01BE6327330
Qualified in Nassau County
Commission Expires July 06 2027

Allaiddn Alkhandak
License # 2119777
Job # alkhandaka-20240418-618964

Howard Belfer Inc. Lic.# 1406285 One Dupont Street, Suite 207, Plainview NY 11803

Case 1:25-cv-02834-GHW-KHP   Document 68-21   Filed 04/06/25   Page 194 of 235

NOTICE TO TENANT OF APPLICABILITY OR INAPPLICABILITY
OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW

This notice from your landlord serves to inform you of whether or not your unit/apartment/home is covered by the New York State Good Cause Eviction Law (Article 6-A of the Real Property Law) and, if applicable, the reason permitted under the New York State Good Cause Eviction Law that your landlord is not renewing your lease. Even if your apartment is not protected by Article 6-A, known as the New York State Good Cause Eviction Law, you may have other rights under other local, state, or federal laws and regulations concerning rents and evictions. This notice, which your landlord is required to fill out and give to you, does not constitute legal advice. You may wish to consult a lawyer if you have any questions about your rights under the New York State Good Cause Eviction Law or about this notice.

NOTICE (THIS SHOULD BE FILLED OUT BY YOUR LANDLORD)

UNIT INFORMATION

STREET: 2293 3RD AVENUE
UNIT OR APARTMENT NUMBER: 806
CITY/TOWN/VILLAGE, STATE, ZIP CODE: NEW YORK, NY 10035

1. IS THIS UNIT SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW? (PLEASE MARK APPLICABLE ANSWER)
____: YES
_X_: NO

2. IF THE UNIT IS EXEMPT FROM ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, WHY IS IT EXEMPT FROM THAT LAW? (PLEASE MARK ALL APPLICABLE EXEMPTIONS)

A. Village/Town/City outside of New York City has not adopted good cause eviction under section 213 of the Real Property Law ____;

B. Unit is owned by a "small landlord," as defined in subdivision 3 of section 211 of the Real Property Law, who owns no more than 10 units for small landlords located in New York City or the number of units established as the maximum amount a "small landlord" can own in the state by a local law of a village, town, or city, other than New York City, adopting the provisions of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law, or no more than 10 units, as applicable. In connection with any eviction proceeding in which the landlord claims an exemption from the provisions of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law, on the basis of being a small landlord, the landlord shall provide to the tenant or tenants subject to the proceeding the name of each natural person who owns or is a beneficial owner of, directly or indirectly, in whole or in part, the housing accomodation at issue in the proceeding, the number of units owned, jointly or separately, by each such natural person owner, and the addresses of any such units,

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

excluding each natural person owner's principal residence, If the landlord is
an entity, organized under the laws of this state or of any other jurisdiction,
then such landlord shall provide to the tenant or tenants subject to the
proceeding the name of each natural person with a direct or indirect ownership
interest in such entity or any affiliated entity, the number of units owned,
jointly or separately, by each such natural person owner, and the addresses of
any such units, excluding each natural person owner's principal residence
(exemption under subdivision 1 of section 214 of the Real Property
Law) _____;

C. Unit is located in an owner-occupied housing accommodation with no more
than 10 units (exemption under subdivision 2 of section 214 of the Real
Property Law) _____;

D. Unit is subject to regulation of rents or evictions pursuant to local,
state, or federal law (exemption under subdivision 5 of section 214 of the
Real Property Law) ✓ ;

E. Unit must be affordable to tenants at a specific income level pursuant
to statute, regulation, restrictive declaration, or pursuant to a regulatory
agreement with a local, state, or federal government entity (exemption under
subdivision 6 of section 214 of the Real Property Law) ✓ ;

F. Unit is on or within a housing accommodation owned as a condominium or
cooperative, or unit is on or within a housing accommodation subject to an
offering plan submitted to the office of the attorney general (exemption under
subdivision 7 of section 214 of the Real Property Law) _____;

G. Unit is in a housing accommodation that was issued a temporary or permanent
certificate of occupancy within the past 30 years (only if building received
the certificate on or after January 1st, 2009) (exemption under subdivision 8
of section 214 of the Real Property Law) _____;

H. Unit is a seasonal use dwelling unit under subdivisions 4 and 5 of section
7-108 of the General Obligations Law (exemption under subdivision 9 of section
214 of the Real Property Law) _____;

I. Unit is in a hospital as defined in subdivision 1 of section 2801 of the
Public Health Law, continuing care retirement community licensed pursuant to
Article 46 or 46-A of the Public Health Law, assisted living residence licensed
pursuant to Article 46-B of the Public Health Law, adult care facility licensed
pursuant to Article 7 of the Social Services Law, senior residential community
that has submitted an offering plan to the attorney general, or not-for-profit
independent retirement community that offers personal emergency response,
housekeeping, transportation and meals to their residents (exemption under
subdivision 10 of section 214 of the Real Property Law) _____;

J. Unit is a manufacture home located on or in a manufactured home park as
defined in section 233 of the Real Property Law (exemption under subdivision
11 of section 214 of the Real Property Law) _____;

K. Unit is a hotel room or other transient use covered by the definition of a
class B multiple dwelling under subdivision 9 of section 4 of the Multiple
Dwelling Law (exemption under subdivision 12 of section 214 of the Real
Property Law) _____;

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

L. Unit is a dormitory owned and operated by an institution of higher education or a school (exemption under subdivision 13 of section 214 of the Real Property Law) _____;

M. Unit is within and for use by a religious facility or institution (exemption under subdivision 14 of section 214 of the Real Property Law) _____;

N. Unit has a monthly rent that is greater than the percent of fair market rent established in a local law of a village, town, or city, other than New York City, adopting the provisions of Article 6-A of the Real Property Law, known as the New York Good Cause Eviction Law, or 245 percent of the fair market rent, as applicable. Fair market rent refers to the figure published by the United States Department of Housing and Urban Development, for the county in which the housing accommodation is located, as shall be published by the Division of Housing and Community Renewal no later than August 1st in any given year. The Division of Housing and Community Renewal shall publish the fair market rent and 245 percent of the fair market rent for each unit type for which such fair market rent is published by the United States Department of Housing and Urban Development for each county in New York State in the annual publication required pursuant to subdivision 7 of section 211 of the Real Property Law (exemption under subdivision 15 of section 214 of the Real Property Law) _____;

3. IF THIS UNIT IS SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, AND THIS NOTICE SERVES TO INFORM A TENANT THAT THE LANDLORD IS INCREASING THE RENT ABOVE THE THRESHOLD FOR PRESUMPTIVELY UNREASONABLE RENT INCREASES, WHAT IS THE LANDLORD'S JUSTIFICATION FOR INCREASING THE RENT ABOVE THE THRESHOLD FOR PRESUMPTIVELY UNREASONABLE RENT INCREASES? (A rent increase is presumptively unreasonable if the increase from the prior rent is greater than the lower of: (a) 5 percent plus the annual percentage change in the consumer price index for all urban consumers for all items as published by the United States Bureau of Labor Statistics for the region in which the housing accommadation is located, as published not later than August 1st of each year by the Division of Housing and Community Renewal; or (b) 10 percent.)

(PLEASE MARK AND FILL OUT THE APPLICABLE RESPONSE)

A. The rent is not being increased above the threshold for presumptively unreasonable rent increases described above _____;

B. The rent is being increased above the threshold for presumptively unreasonable rent increases described above _____;

B-1: If the rent is being increased above the threshold for presumptively unreasonable rent increases described above, what is the justification for the increase: _____

_____

4. IF THIS UNIT IS SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, AND THIS NOTICE SERVES TO INFORM A TENANT THAT THE LANDLORD IS NOT RENEWING A LEASE, WHAT IS THE GOOD CAUSE FOR NOT RENEWING THE LEASE? (PLEASE MARK ALL APPLICABLE REASONS)

A. This unit is exempt from Article 6-A of the Real Property Law, known as the

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 3

Case 1:25-cv-02834-GHW-KHP   Document 61-21   Filed 06/06/25   Page 34 of 35

New York State Good Cause Eviction Law, for the reasons stated in response to question 2, above (IF THIS ANSWER IS CHECKED, NO OTHER ANSWERS TO THIS QUESTION SHOULD BE CHECKED) ____;

B. The tenant is receiving this notice in connection with a first lease or a renewal lease, so the landlord does not need to check any of the lawful reasons listed below for not renewing a lease under Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law (IF THIS ANSWER IS CHECKED, NO OTHER ANSWERS TO THIS QUESTION SHOULD BE CHECKED) ____;

C. The landlord is not renewing the lease because the unit is sublet and the sublessor seeks in good faith to recover possession of the unit for their own personal use and occupancy (exemption under subdivision 3 of section 214 of the Real Property Law) ____;

D. The landlord is not renewing the lease because the possession, use or occupancy of the unit is solely incident to employment and the employment is being or has been lawfully terminated (exemption under subdivision 4 of section 214 of the Real Property Law) ____;

E. The landlord is not renewing the lease because the tenant has failed to pay rent due and owing, and the rent due or owing, or any part thereof, did not result from a rent increase which is unreasonable. A rent increase is presumptively unreasonable if the increase from the prior rent is greater than the lower of: (a) 5 percent plus the annual percentage change in the consumer price index for all urban consumers for all items as published by the United States Bureau of Labor Statistics for the region in which the housing accommodation is located, as published not later than August 1st of each year by the Division of Housing and Community Renewal; or (b) 10 percent (good cause for eviction under paragraph a of subdivision 1 of section 216 of the Real Property Law) ____;

F. The landlord is not renewing the lease because the tenant is violating a substantial obligation of their tenancy or breaching any of the landlord's rules and regulations governing the premises, other than the obligation to surrender possession of the premises, and the tenant has failed to cure the violation after written notice that the violation must cease within 10 days of receipt of the written notice. For this good cause to apply, the obligation the tenant violated cannot be an obligation that was imposed for the purpose of circumventing the intent of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law. The landlord's rules or regulations that the tenant has violated also must be reasonable and have been accepted in writing by the tenant or made a part of the lease at the beginning of the lease term (good cause for eviction under paragraph b of subdivision 1 of section 216 of the Real Property Law) ____;

G. The landlord is not renewing the lease because the tenant is either (a) committing or permitting a nuisance on the unit or the premises; (b) maliciously or grossly negligently causing substantial damage to the unit or the premises; (c) interfering with the landlord's, another tenant's, or occupants of the same or an adjacent building or structure's comfort and safety (good cause for eviction under paragraph c of subdivision 1 of section 216 of Real Property Law) ____;

H. The landlord is not renewing the lease because the tenant's occupancy of

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 4

Case 1:25-cv-02834-GHW-KHP   Document 68-21   Filed 09/06/25   Page 35 of 35

the unit violates law and the landlord is subject to civil or criminal penalties for continuing to let the tenant occupy the unit. For this good cause to apply a state or municipal agency having jurisdiction must have issued an order requiring the tenant to vacate the unit. No tenant shall be removed from possession of a unit on this basis unless the court finds that the cure of the violation of law requires the removal of the tenant and that the landlord did not, through neglect or deliberate action or failure to act, create the condition necessitating the vacate order. If the landlord does not try to cure the conditions causing the violation of the law, the tenant has the right to pay or secure payment, in a manner satisfactory to the court, to cure the violation. Any tenant expenditures to cure the violation shall be applied against the rent owed to the landlord. Even if removal of a tenant is absolutely essential to the tenant's health and safety, the tenant shall be entitled to resume possession at such time as the dangerous conditions have been removed. The tenant also retains the right to bring an action for monetary damages against the landlord or to otherwise compel the landlord to comply with all applicable state or municipal housing codes (good cause for eviction under paragraph d of subdivision 1 of section 216 of the Real Property Law) ____;

I. The landlord is not renewing the lease because the tenant is using or permitting the unit or premises to be used for an illegal purpose (good cause for eviction under paragraph e of subdivision 1 of section 216 of the Real Property Law) ____;

J. The landlord is not renewing the lease because the tenant has unreasonably refused the landlord access to the unit for the purposes of making necessary repairs or improvements required by law or for the purposes of showing the premises to a prospective purchaser, mortgagee, or other person with a legitimate interest in the premises (good cause for eviction under paragraph f of subdivision 1 of section 216 of the Real Property Law) ____;

K. The landlord is not renewing the lease because the landlord seeks in good faith to recover possession of the unit for the landlord's personal use and occupancy as the landlord's principal residence, or for the personal use and occupancy as a principal residence by the landlord's spouse, domestic partner, child, stepchild, parent, step-parent, sibling, grandparent, grandchild, parent-in-law, or sibling-in-law. The landlord can only recover the unit for these purposes if there is no other suitable housing accommodation in the building that is available. Under no circumstances can the landlord recover the unit for these purposes if the tenant is (a) 65 years old or older; or (b) a "disabled person" as defined in subdivision 6 of section 211 of the Real Property Law. To establish this good cause in an eviction proceeding, the landlord must establish good faith to recover possession of a housing accommodation for the uses described herein by clear and convincing evidence (good cause for eviction under paragraph g of subdivision 1 of section 216 of the Real Property Law) ____;

L. The landlord is not renewing the lease because the landlord in good faith seeks to demolish the housing accommodation. To establish this good cause in an eviction proceeding, the landlord must establish good faith to demolish the housing accommodation by clear and convincing evidence (good cause for eviction under paragraph h of subdivision 1 of section 216 of the Real Property Law) ____;

---

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 5

M. The landlord is not renewing the lease because the landlord seeks in good faith to withdraw the unit from the housing rental market. To establish this good cause in an eviction proceeding, the landlord must establish good faith to withdraw the unit from the rental housing market by clear and convincing evidence (good cause for eviction under paragraph i of subdivision 1 of section 216 of the Real Property Law) _____;

N. The landlord is not renewing the lease because the tenant has failed to agree to reasonable changes at lease renewal, including reasonable increases in rent, and the landlord gave written notice of the changes to the lease to the tenant at least 30 days, but no more than 90 days, before the current lease expired. A rent increase is presumptively unreasonable if the increase from the prior rent is greater than the lower of: (a) 5 percent plus the annual percentage change in the consumer price index for all urban consumers for all items as published by the United States Bureau of Labor Statistics for the region in which the housing accommodation is located, as published by August 1st of each year by the Division of Housing and Community Renewal; or (b) 10 percent (good cause for eviction under paragraph j of subdivision 1 of section 216 of the Real Property Law) _____.

**END OF NOTICE TO TENANT OF APPLICABILITY OR INAPPLICABILITY OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW**

---

PLEASE TAKE NOTICE that, the sending of this Notice TO TENANT OF APPLICABILITY OR INAPPLICABILITY OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW does not vitiate any prior litigation notices or pleading served upon you, nor does the sending of this notice serve to revive or reinstate any previously terminated tenancy. The word "tenant" as recited in the notice is solely for identification purposes and not a statement of legal status. No admissions or concessions of an owner right or remedy may be construed from the text or sending of this notice.

---

EAST HARLEM MEC PARCEL C, L.P./PERPETUAL ASHARE/7303/444061/400

Page 6

Case 1:25-cv-02834-GHW-RWL Document 68-21 Filed 06/06/25 Page 200 of 235

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART U

------------------------------------------------------------------------X

East Harlem MEC Parcel C, L.P.                              Index No.:

                                                           LT-300890-24/HA
                            Petitioner,

              -against-

                                                    **AMENDED ANSWER**

Perpetual Ashare

                            Respondent-Tenant,

------------------------------------------------------------------------X

Respondent Perpetual Ashare, through her undersigned counsel, asserts a general denial and

denies each and every claim to the forgoing petition unless otherwise specified. Furthermore,

Ms. Ashare interposes the following answer and response to each paragraph of the forgoing

petition. These statements are made upon information and belief:

1. Respondent denies the allegations in Paragraph 1.

2. Respondent admits to the allegations in Paragraph 2 only to the extent that she is a tenant
   in possession of the subject unit, but otherwise denies the allegations.

3. Respondent admits to the allegations in Paragraph 3.

4. Respondent admits to the allegations in Paragraph 4 only to the extent that they are
   located in New York City.

5. Respondent denies the allegations in Paragraph 5.

6. Respondent admits to the allegations in Paragraph 6 to the extent that the unit is subject
   to Rent Stabilization, but denies the remainder of the allegations in Paragraph 6.

7. Respondent denies the allegations in Paragraph 7.

8. Respondent admits to the allegations in Paragraph 8 only to the extent that she is
   currently in possession in the unit, but otherwise denies the remainder of the allegations

Case 1:25-cv-02834-GHW-RWL Document 68-21 Filed 06/06/25 Page 68 of 235

in Paragraph 8.

9. Respondent admits to the allegations in Paragraph 9 to the extent that the premises are a
multiple dwelling, but otherwise denies the remainder of the allegations in Paragraph 9.

10. Petitioner is not entitled to the relief demanded in the "wherefore" clause.

### FIRST DEFENSE

11. The Petition fails to state a cause of action upon which relief can be granted because the
Petition fails to properly state sufficient facts upon which the proceeding is based as
required by RPAPL Section 741(4).

12. As such, the matter should be dismissed.

### SECOND DEFENSE and FIRST COUNTERCLAIM: NO VALID CERTIFICATE OF OCCUPANCY

13. A valid and current Certificate of Occupancy is a prerequisite to collecting rent or use
and occupancy pursuant to N.Y. Mult. Dwell. Law §§ 301, 302.

14. According to the Department of Buildings website, the last Certificate of Occupancy in
effect was a Temporary Certificate of Occupancy, # 121791775T004, expiring on June 4,
2015. Upon information and belief, no Certificates of Occupancy have been entered into
since then. Accordingly, upon information and belief, there is no proper Certificate of
Occupancy.

15. As such, Petitioner cannot seek rent or use and occupancy, and the Petition must be
dismissed.

### THIRD DEFENSE and SECOND COUNTERCLAIM: OVERCHARGE

16. Petitioner willfully charged Respondents rent in excess of the legally collectible rent for
the subject premises.

17. A review of the DHCR rent registration history and lease history details inconsistencies

that Petitioner has hidden by providing Respondent a preferential rent.

18. In the registration for an alleged lease commencing April 1, 2020, Petitioner claims a $245 rent increase, raising the legal regulated rent by 18.77 percent, from $1305 to $1550, despite no vacancy and when the RGB guideline only permitted a 1.5% increase to a one-year lease. At this time, a preferential rent is listed at $1214.78. In their following registration, Petitioner registers a legal regulated rent of $1658, a $108 dollar increase (7%), but for the overlapping lease period of the prior registration. In this registration (2021), Petitioner claims an unexplained increase to the preferential rent of $132 (10%) despite the RGB increase allowing for only 1.5% or 2.5% increase that year.

19. Again, in their 2023 registration, Petitioner takes a $335 increase, raising the legal regulated rent by 20.8 percent, from $1610.00 to $1945, despite no vacancy and an RGB allowable increase of only 3.25% or 5.5% depending on the lease.

20. Again, in their 2024 registration, Petitioner claims an increase to the legal regulated rent of $343.00, or 17.64 percent, despite no vacancy and the RGB increase allowing for only a 3% or 2.75% year 1 and 3.2% year 2 increase depending on the lease.

21. Moreover, despite their improper increases to both the legal regulated rents and the preferential rents, upon information and belief, these registrations do not actually reflect the leases that were in fact offered and executed by the Respondent.

22. The totality of the circumstances—including the inexplicable and improperly large increases in the DHCR rent history, the preferential rents that obscure these increases lulling Respondent into inaction, the overlapping lease terms registered, and the inconsistencies between the lease history and the DHCR rent history—demonstrate a fraudulent scheme by Petitioner to overcharge Respondent.

23. Moreover, Petitioner's blatant and defective registrations requires that the rent be frozen at the last properly registered rent under RSL 26-517(e).

24. Accordingly, the Court should determine the proper legal regulated rent and overcharge damages without being bound by the statute of limitations.

25. Given Petitioner's improper increases and registrations, the Petitioner has charged and Respondent has paid rent in excess of that legally collectible under the rent stabilization scheme.

26. Respondent has thus been overcharged since the inception of her tenancy when Petition and/or its predecessor and agents began collecting rent in excess of the legally collectible rent. Upon information and belief, such overcharge was willful.

27. Accordingly, Respondent is entitled to damages equal to the amount of the overcharge. Since, upon information and belief, such overcharge was willful, Respondent is entitled to punitive damages equal to three times the amount of the total overcharge.

### FOURTH DEFENSE: IMPROPER RENT DEMAND

28. Petitioner's rent demand is fatally defective and thus this proceeding should be dismissed.

29. Pursuant to RPAPL § 711(2) a proper rent demand is a prerequisite to commencement of a non-payment proceeding. Predicate notices in summary eviction proceedings must be in strict compliance with applicable statutory requirements.

30. A rent demand must be a good faith assertion of the rent due at the time of the demand. Failure to provide a good faith approximation in a rent demand renders it defective.

31. Petitioner's rent demand here is not a good faith estimate of the rent owed and hence is defective.

32. Paragraphs ¶16 through ¶28 are incorporated by reference herein.

33. Thus, as Petitioner has improperly increased Respondent's rent, Petitioner seeks an improperly high rent in the rent demand and as such the rent demand is not a good faith assertion of the rent due at the time of the demand.

34. In the instant proceeding, Petitioner filed an improper annual rent registration.

35. Pursuant to Respondent's 2024 lease, Respondent has a legal regulated rent of $2,122.81/$2,132.11 and pays a preferential rent of $1,419.32/$1,464.73. However, in the DHCR annual rent registration, Petitioner inexplicably registered a legal regulated rent of $2,288.00, $165.19 higher than the legal regulated rent as indicated in Respondent's lease.

36. Accordingly, Petitioner's failure to comply with §26-517(e) of the rent stabilization code mandates dismissal since Petitioner seeks rents in excess of what they can lawfully charge.

37. The rent demand is defective and unamendable. Therefore, this matter should be dismissed.

### FIFTH DEFENSE and THIRD COUNTERCLAIM: BREACH OF WARRANTY OF HABITABILITY

38. Pursuant to Real Property Law §235-b, it is an implied covenant in every residential lease that the premises and common arears are fit for human habitation and for purposes reasonably intended and that occupants shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety. N.Y. Real Prop. Law § 235-b.

39. Petitioner has breached the warranty of habitability.

40. The value of the subject premises has been diminished by Petitioner's refusal to make repairs despite Respondent notifying Petitioner of defects in the apartment and that Respondent would be available to grant access.

41. These repairs include:

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 06/06/25 Page 205 of 235

a. Stove does not work.

42. The Petitioner, its managing agents and/or employees knew or should have known of each of the foregoing conditions.

43. Despite such knowledge, Petitioner failed and/or refused to complete many of the repairs listed above and has not maintained these services despite repeated requests by the respondent to do so.

44. Respondent demands an Order to Correct these defects and an abatement no less than one month's rent or such amount as the Court may find just.

## FOURTH COUNTERCLAIM: ORDER TO CORRECT

45. Based upon the conditions set forth above, Respondent is further entitled to an Order from this Court, pursuant to the provisions of N.Y.C. Civil Court Act §110(c), directing petitioner to correct the aforesaid conditions.

46. The court should order Petitioner to correct the conditions set forth above.

## FIFTH COUNTERCLAIM: ATTORNEY'S FEES

47. In the event that legal fees can be awarded, Respondent is entitled to reasonable attorney's fees pursuant to the lease, the provisions of the Rent Stabilization Law and Code, and the provisions of R.P.L. §234.

WHEREFORE, it is respectfully requested that the petition be dismissed but that Respondent be allowed to go forward on the above counterclaims and be granted an order to correct violation and repairs and an order awarding an abatement.

Dated:          November 20, 2024
                New York, NY


                                        Respectfully,

Case 1:25-cv-00834-GHW-KHP Document 68-21 Filed 06/06/25 Page 206 of 235
RECEIVED NYSCEF: 12/17/2024

_____

MANHATTAN LEGAL SERVICES
*Attorney for Respondent*
By: Cecília S. MacArthur, Esq.
40 Worth Street, Suite 606
New York, New York 10013
Tel: (646) 442-3167
Email: cmacarthur@lsnyc.org

TO:

Sontag & Hyman, P.C.
*Attorneys for Petitioner*
165 Roslyn Road, 1st Floor
Roslyn Heights, NY 11577
Tel: (516) 621-0600

CLERK OF THE COURT
111 CENTRE STREET
HOUSING PART U
NEW YORK, NY 10013

# *Certificate of Occupancy*

**NYC Buildings**

**CO Number:**　　**120175906T001**

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | |
|---|---|
| **Borough:** Manhattan | |
| **Address:** 2293 THIRD AVENUE | |
| **Building Identification Number (BIN):** 1812029 | |

| | |
|---|---|
| **Block Number:** 01789 | |
| **Lot Number(s):** 46 | |
| **Building Type:** New | |

| | |
|---|---|
| **Certificate Type:** Temporary | |
| **Effective Date:** 08/25/2011 | |
| **Expiration Date:** 11/23/2011 | |

This building is subject to this Building Code: **2008 Code**

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

**Construction classification:** 1-B　　(2008 Code)

**Building Occupancy Group classification:** R-2　　(2008 Code)

**Multiple Dwelling Law Classification:** HAEA

**No. of stories:** 8　　**Height in feet:** 85　　**No. of dwelling units:** 49

**C.** **Fire Protection Equipment:**
Standpipe system, Fire alarm system, Sprinkler system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**

There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:**　　None

Borough Commissioner　　　　　　　　Commissioner

***DOCUMENT CONTINUES ON NEXT PAGE***

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 06/06/25 Page 208 of 235



Page 2 of 2

# *Certificate of Occupancy*

**CO Number:**    120175906T001

| Permissible Use and Occupancy | | | | | | |
|---|---|---|---|---|---|---|
| All Building Code occupancy group designations below are 2008 designations. | | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| CEL | | OG | F-2 | | 2 | ELECTRIC ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM. |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 186 | 100 | M | | 6 | RETAIL STORE |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002  008 | | 60 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| ROF | | | | | 2 | BULKHEAD |
| **END OF SECTION** | | | | | | |

Borough Commissioner

Commissioner

**END OF DOCUMENT**

120175906/001  8/25/2011 12:49:04 PM

Page 1 of 2

# Certificate of Occupancy

**CO Number:** 120175906T002

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Temporary |
| **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 46 | **Effective Date:** 11/16/2011 |
| **Building Identification Number (BIN)** 1812029 | | **Expiration Date:** 02/14/2012 |
| | **Building Type:** New | |

This building is subject to this Building Code: **2008 Code**

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

Construction classification: 1-B (2008 Code)

Building Occupancy Group classification: R-2 (2008 Code)

Multiple Dwelling Law Classification: HAEA

| | | |
|---|---|---|
| **No. of stories:** 8 | **Height in feet:** 85 | **No. of dwelling units:** 49 |

**C.** **Fire Protection Equipment:**
Standpipe system, Fire alarm system, Sprinkler system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**

There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:** None

Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 09/06/25 Page 40 of 235
RECEIVED NYSCEF: 12/17/2024



## Certificate of Occupancy

CO Number:     120175906T002

| Permissible Use and Occupancy | | | | | | |
|---|---|---|---|---|---|---|
| All Building Code occupancy group designations below are 2008 designations. | | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| CEL | | OG | F-2 | | 2 | ELECTRIC ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM. |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 186 | 100 | M | | 6 | RETAIL STORE |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 60 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| ROOF | | | | | 2 | BULKHEAD |
| END OF SECTION | | | | | | |

Borough Commissioner

Commissioner

**END OF DOCUMENT**

120175906/002  11/16/2011 4:26:23 PM

**NYC Buildings**

Page 1 of 2

# *Certificate of Occupancy*

**CO Number:** 120175906F

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Final |
| **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 46 | **Effective Date:** 12/01/2011 |
| **Building Identification Number (BIN):** 1812029 | **Building Type:** New | |

This building is subject to this Building Code: **2008 Code**

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

**Construction classification:** 1-B (2008 Code)

**Building Occupancy Group classification:** R-2 (2008 Code)

**Multiple Dwelling Law Classification:** HAEA

**No. of stories:** 8 **Height in feet:** 85 **No. of dwelling units:** 49

**C.** **Fire Protection Equipment:**
Standpipe system, Fire alarm system, Sprinkler system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Borough Comments:** None

_____
Borough Commissioner

_____
Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*



Page 2 of 2

*Certificate of Occupancy*

**CO Number:** **120175906F**

| | | | | | | |
|---|---|---|---|---|---|---|
|  | | | **Permissible Use and Occupancy** | | | |

**All Building Code occupancy group designations below are 2008 designations.**

| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
|---|---|---|---|---|---|---|
| CEL | | OG | F-2 | | 2 | ELECTRIC ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 186 | 100 | M | | 6 | RETAIL STORE |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 60 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| ROOF | | | | | 2 | BULKHEAD |

**END OF SECTION**

_____
Borough Commissioner

_____
Commissioner

***END OF DOCUMENT***

120175906/000  12/1/2011 4:57:55 PM

Application Details                    https://a810-bisweb.nyc.gov/bisweb/JobsQueryByNumberServlet?reque...

FILED: HARLEM COMMUNITY JUSTICE CENTER - L&T 12/17/2024 12:35 PM
NYSCEF DOC. NO. 19      Case 1:25-cv-00883-GHW-KHP   Document 68-21   Filed 06/06/25   Page 50 of 235      RECEIVED NYSCEF: 12/17/2024





⊠ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**

**Application Details**

---

**The below information does not include work types submitted in DOB NOW; use the [DOB NOW Public Portal](#) to access DOB NOW records.**

---

**JUMP TO:** Doc 1 ▾  Go

**Premises: 2293 3 AVENUE MANHATTAN**                                           **Job No: 121791775**
**BIN:** [1088865](#)   **Block: 1789   Lot: 7501**                             **Document: 01 OF 5**
                                                                 **Job Type: A1 - ALTERATION TYPE 1**

| [Document Overview](#) | [Items Required](#) | [Virtual Job Folder](#) | [All Permits](#) | [Schedule A](#) | [Schedule B](#) |
| [Fees Paid](#) | [Forms Received](#) | | [All Comments](#) | [C/O Summary](#) | [Plumbing Inspections](#) |
| [Crane Information](#) | [Plan Examination](#) | | | [C/O Preview](#) | |
| [After Hours Variance Permits](#) | | | | | |

**This job is not subject to the Department's Development Challenge Process. For any issues, please contact the relevant borough office.**

---

**----------------- \* PROFESSIONALLY CERTIFIED \* --------------------**

**Last Action:** PERMIT ISSUED - ENTIRE JOB/WORK 10/21/2013 (R)

**Application approved on:** 10/08/2013

**Pre-Filed:** 09/25/2013   **Building Type:** Other        **Estimated Total Cost:** $447,500.00
**Date Filed:** 09/25/2013                                  **Electronically Filed:** Yes
**Fee Structure:** STANDARD
**Review is requested under Building Code:** 2008

                                                            [Job Description](#)   [Comments](#)

**1  Location Information (Filed At)**
   **House No(s):** 2293        **Street Name:** THIRD AVENUE
   **Borough:** Manhattan        **Block:** 1789              **Lot:** 7501   **BIN:** [1088865](#)   **CB No:** 111
**Work on Floor(s):** 001                        **Apt/Condo No(s):**                        **Zip Code:** 10035

**2  Applicant of Record Information**
               **Name:** THOMAS O'HARA
       **Business Name:** H.T.O ARCHITECT, PLLC               **Business Phone:** 212-695-3117
   **Business Address:** 370 SEVENTH AVENUE NEW YORK NY 10001   **Business Fax:** 212-695-3118
               **E-Mail:** TOM@HTO-ARCHITECT.COM              **Mobile Telephone:**
                                                              **License Number:** 025215

       **Applicant Type:** ☐ P.E.   ☒ R.A   ☐ Sign Hanger   ☐ R.L.A.   ☐ Other

**Directive 14 Applicant**
Not Applicable

**Previous Applicant of Record**

Not Applicable

**3  Filing Representative**

Name: ORLANDO/SAL/ELE DIAZ/RUSSO/SOSA

Business Name: EAST COAST EXPEDITING & CODE CTG          Business Phone: 646-396-1399

Business Address: 305 BROADWAY 14TH FLOOR NEW YORK NY 10007          Business Fax:

E-Mail: ORLANDO@EASTCOASTEXPEDITING.COM          Mobile Telephone: 917-519-0220

Registration Number:

**4  Filing Status**

Click Here to View

**5  Job Types**

☒ Alteration Type 1

☐ Alteration Type 1, OT "No Work"          ☐ New Building

☐ Alteration Type 2                       ☐ Full Demolition

☐ Alteration Type 3                       ☐ Subdivision: Improved

☐ Sign                                     ☐ Subdivision: Condo

Directive 14 acceptance requested?  ☐ Yes   ☒ No

**6  Work Types**

| | | | |
|---|---|---|---|
| ☐ BL - Boiler | ☐ FA - Fire Alarm | ☐ FB - Fuel Burning | ☐ FS - Fuel Storage |
| ☐ FP - Fire Suppression | ☐ MH - Mechanical | ☐ PL - Plumbing | ☐ SD - Standpipe |
| ☐ SP - Sprinkler | ☐ EQ - Construction Equipment | ☐ CC - Curb Cut | |

☒ OT -  GEN. CONSTR.

**7  Plans/Construction Documents Submitted**

Plans Page Count:  19

**8  Additional Information**

Enlargement proposed?

☒ No   ☐ Yes          ☐ Horizontal  ☐ Vertical

**9  Additional Considerations, Limitations or Restrictions**

| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| ☐ | ☐ | Alt. required to meet New Building req's (28-101.4.5) | ☐ | ☐ | Alteration is a major change to exits |
| | | | ☐ | ☐ | Change in number of dwelling units |
| | | | ☒ | ☐ | Change in Occupancy / Use |
| | | | ☐ | ☐ | Change is inconsistent with current certificate of occupancy |
| | | | ☐ | ☐ | Change in number of stories |

| | | | | | |
|---|---|---|---|---|---|
| ☐ | ☐ | Facade Alteration | ☐ | ☒ | Infill Zoning |
| ☐ | ☒ | Adult Establishment | ☐ | ☒ | Loft Board |
| ☐ | ☒ | Compensated Development (Inclusionary Housing) | ☐ | ☒ | Quality Housing |
| ☐ | ☒ | Low Income Housing (Inclusionary Housing) | ☐ | ☒ | Site Safety Job / Project |
| ☐ | ☒ | Single Room Occupancy (SRO) Multiple Dwelling | ☐ | ☒ | Included in LMCCC |
| ☐ | ☒ | Filing includes Lot Merger / Reapportionment | | | Work Includes: |
| | | | ☐ | ☐ | Prefab wood I-joists |
| | | | ☐ | ☐ | Structural cold-formed steel |
| | | | ☐ | ☐ | Open-web steel joists |

| | | |
|---|---|---|
| ☐ | ☒ | Landmark |
| ☐ | ☒ | Environmental Restrictions (Little E or RD) |

- ☐ **N** Unmapped/CCO Street
- ☐ **N** Legalization
- ☐ **N** Other, Specify:
- ☐ **N** Filed to Comply with Local Law
- ☐ **N** Restrictive Declaration / Easement
- ☐ **N** Zoning Exhibit Record (I,II,III,etc)
- ☐ **N** Filed to Address Violation(s)

- **Y** ☐ Work includes lighting fixture and/or controls, installation or replacement. [ECC §404 and §505]
- ☐ **N** Work includes modular construction under New York State jurisdiction
- ☐ **N** Work includes modular construction under New York City jurisdiction
- ☐ **N** Structural peer review required per BC §1627      Peer Reviewer License No.(P.E.):
- ☐ **N** Work includes permanent removal of standpipe, sprinkler or fire suppression related systems
- ☐ **N** Work includes partial demolition as defined in AC §28-101.5, or the raising/moving of a building
- ☐ **N** Structural Stability affected by proposed work

**BSA Calendar No.(s):**

**CPC Calendar No.(s):**

**10  NYCECC Compliance** *New York City Energy Conservation Code* **(Applicant Statement)**

**X** To the best of my knowledge, belief and professional judgment, this application is in compliance with the NYCECC.

- ☐ Energy analysis is on another job number:

**Yes  No**
- ☐ **N** This application is, or is part of, a project that utilizes trade-offs among different major systems
- ☐ **N** This application utilizes trade-offs within a single major system

**11  Job Description**

GENERAL CONSTRUCTION ASSOCIATED WITH PROPOSED EATING & DRINKING ESTABLISHMENT.

**Related BIS Job Numbers:**

**Primary application Job Number:**

**12  Zoning Characteristics**

**District(s):**  C6-3 - GENERAL CENTRAL COMMERCIAL DISTRICT    C4-4D - GENERAL COMMERCIAL DISTRICT

**Overlay(s):**

**Special District(s):**

**Map No.:**  6b    **Street legal width (ft.):**  100    **Street status:** **X** Public  ☐ Private

**Zoning lot includes the following tax lots:**  Not Provided

| Proposed: Use | Zoning Area (sq.ft.) | District | FAR |
|---|---|---|---|
| RESIDENTIAL | 48,349 | C6-3 | 4.97 |
| COMMERCIAL | 5,664 | C6-3 | 0.55 |
| **Proposed Totals:** | 56,953 | -- | 5.52 |
| **Existing Total:** | 56,953 | -- | -- |

**Proposed Lot Details:**    **Lot Type:** **X** Corner  ☐ Interior  ☐ Through

**Lot Coverage (%):** 78    **Lot Area (sq.ft.):** 10,366    **Lot Width (ft.):** 100

**Proposed Yard Details:**    ☐ No Yards  **Or**

**Front Yard (ft.):** 0    **Rear Yard (ft.):** 30    **Rear Yard Equivalent (ft.):** 0

**Side Yard 1 (ft.):** 0    **Side Yard 2 (ft.):** 0

**Proposed Other Details:**    **Perimeter Wall Height (ft.):** 85

**Enclosed Parking?** ☐ Yes  **X** No    **No. of parking spaces:**

**13  Building Characteristics**

|  | 2022/2014/2008 Code Designations? |
|---|---|
| **Occupancy Classification: Existing:**  R-2 - RESIDENTIAL: APARTMENT HOUSES | **X** Yes ☐ No |

| | | | |
|---|---|---|---|
| **Proposed:** | R-2 - RESIDENTIAL: APARTMENT HOUSES | ☒ Yes | ☐ No |
| **Construction Classification: Existing:** | I-B: 2 HOUR PROTECTED - NON-COMBUST | ☒ Yes | ☐ No |
| **Proposed:** | I-B: 2 HOUR PROTECTED - NON-COMBUSTI | ☒ Yes | ☐ No |
| **Multiple Dwelling Classification: Existing:** | HAEA | | |
| **Proposed:** | HAEA | | |
| **Building Height (ft.): Existing:** | 85 | | |
| **Proposed:** | 85 | | |
| **Building Stories: Existing:** | 8 | | |
| **Proposed:** | 8 | | |
| **Dwelling Units: Existing:** | 49 | | |
| **Proposed:** | 49 | | |

**Building was originally erected pursuant to which Building Code:** ☐ 2022 ☐ 2014 ☒ 2008 ☐ 1968 ☐ Prior to 1968

**The earliest Code with which this building or any part of it is required to comply:** ☐ 2022 ☐ 2014 ☒ 2008 ☐ 1968 ☐ Prior to 1968

**Mixed use building?** ☒ Yes ☐ No

**14 Fill**

☒ **Not Applicable**    ☐ **Off-Site**    ☐ **On-Site**    ☐ **Under 300 cubic yards**

**15 Construction Equipment**

Not Applicable

**16 Curb Cut Description**

Not Applicable

**17 Tax Lot Characteristics**

Not Provided

**18 Fire Protection Equipment**

| | Existing | | Proposed | | | Existing | | Proposed | |
|---|---|---|---|---|---|---|---|---|---|
| | Yes | No | Yes | No | | Yes | No | Yes | No |
| **Fire Alarm** | ☒ | ☐ | ☒ | ☐ | **Sprinkler** | ☒ | ☐ | ☒ | ☐ |
| **Fire Suppression** | ☐ | ☒ | ☒ | ☐ | **Standpipe** | ☒ | ☐ | ☐ | ☒ |

**19 Open Spaces**

Not Provided

**20 Site Characteristics**

| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| ☐ | ☒ | **Tidal Wetlands** | ☐ | ☒ | **Freshwater Wetlands** |
| ☐ | ☐ | **Coastal Erosion Hazard Area** | ☐ | ☒ | **Urban Renewal** |
| ☒ | ☐ | **Fire District** | ☐ | ☒ | **Flood Hazard Area** |

**Flood Hazard Area Information:**

| Yes | No | |
|---|---|---|
| ☐ | ☐ | **Substantial improvement?** |
| ☐ | ☐ | **Substantially damaged?** |
| ☐ | ☐ | **Floodshields part of proposed work?** |

**21 Demolition Details**

Not Applicable

**22 Asbestos Abatement Compliance**

☒ **The scope of work is exempt from the asbestos requirement as defined in the regulations promulgated by the NYC DEP (15 RCNY 1-23(b)) or is an alteration to a building constructed pursuant to plans submitted for approval on or after April 1,1987, in accordance with §28-106.1.**

**23 Signs**

Application Details ... https://a810-biswebprd.nyc.gov/bisweb/JobsQueryByNumberServlet?reque...

FILED: HARLEM COMMUNITY JUSTICE CENTER - L&T 12/17/2024 12:55 PM
NYSCEF DOC. NO. 19    Case 1:25-cv-02834-GHW-KHP    Document 68-21    Filed 06/06/25    Page 54 of 235    RECEIVED NYSCEF: 12/17/2024

Not Applicable

**24  Comments**

**25  Applicant's Statements and Signatures     ( See paper form or check <u>Forms Received</u> )**

**Yes No**

☐  **N**  **For New Building and Alteration 1 applications filed under the 2008 or 2014 NYC Building Code only: does this building qualify for high-rise designation?**

☐  ☐  **Directive 14 applications only: I certify that the construction documents submitted and all construction documents related to this application do not require a new or amended Certificate of Occupancy as there is no change in use, exits, or occupancy.**

**26  Owner's Information**

**Name:** JUAN BARAHONA

**Relationship to Owner:** VICE PRESIDENT

**Business Name:** PARCEL C GP, LLC          **Business Phone:**

**Business Address:**                              **Business Fax:**

**E-Mail:**                                   **Owner Type:** OTHER

**Non Profit:** ☐ Yes  **X**  No

**Yes No**

☐  **N**  **Owner's Certification Regarding Occupied Housing (Remain Occupied)**

☐  **N**  **Owner's Certification Regarding Occupied Housing (Rent Control / Stabilization)**

☐  ☐  **Owner DHCR Notification**

☐  **N**  **Owner's Certification for Adult Establishment**

☐  ☐  **Owner's Certification for Directive 14 (if applicable)**

**Metes and Bounds**

To view metes and bounds, see the Plot Diagram (form PD-1). A scanned image may be available <u>here</u>.

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

Case 1:25-cv-02834-GHW-KHP    Document 63-21    Filed 00/06/235    Page 55 of 035

RECEIVED NYSCEF: 12/17/2024

NYC Buildings

*Certificate of Occupancy*

**CO Number:**     **121791775T001**

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Temporary |
| **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 7501 | **Effective Date:** 05/08/2014 |
| **Building Identification Number (BIN):** 1088865 | | **Expiration Date:** 08/06/2014 |
| | **Building Type:** Altered | |

This building is subject to this Building Code: 2008 Code

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

| | | |
|---|---|---|
| **Construction classification:** | 1-B | (2008 Code) |
| **Building Occupancy Group classification:** | R-2 | (2008 Code) |
| **Multiple Dwelling Law Classification:** | HAEA | |

| | | |
|---|---|---|
| **No. of stories:** 8 | **Height in feet:** 85 | **No. of dwelling units:** 49 |

**C.** **Fire Protection Equipment:**
Fire alarm system, Sprinkler system, Fire Suppression system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**

There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:** None

Borough Commissioner

Acting Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 06/06/25 Page 50 of 85
RECEIVED NYSCEF: 12/17/2024



Page 2 of 2

## *Certificate of Occupancy*

**CO Number:** 121791775T001

| | | | | | | |
|---|---|---|---|---|---|---|
| **Permissible Use and Occupancy** | | | | | | |
| **All Building Code occupancy group designations below are 2008 designations.** | | | | | | |
| **Floor From To** | **Maximum persons permitted** | **Live load lbs per sq. ft.** | **Building Code occupancy group** | **Dwelling or Rooming Units** | **Zoning use group** | **Description of use** |
| CEL | | OG | F-2 | | 2 | ELECTRICAL ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 199 | 100 | A-2 | | 6 | EATING & DRINKING ESTABLISHMENT |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 40 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| ROF | | | R-2 | | 2 | BULKHEAD |
| **END OF SECTION** | | | | | | |

Borough Commissioner

Acting

Commissioner

***END OF DOCUMENT***

121791775/001  5/8/2014 9:57:45 AM

**NYC Buildings**

Page 1 of 2

## *Certificate of Occupancy*

**CO Number:** 121791775T002

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Temporary |
| **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 7501 | **Effective Date:** 08/08/2014 |
| **Building Identification Number (BIN):** 1088865 | | **Expiration Date:** 11/06/2014 |
| | **Building Type:** Altered | |

This building is subject to this Building Code: 2008 Code

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

Construction classification: 1-B (2008 Code)

Building Occupancy Group classification: R-2 (2008 Code)

Multiple Dwelling Law Classification: HAEA

No. of stories: 8    Height in feet: 85    No. of dwelling units: 49

**C.** **Fire Protection Equipment:**
Fire alarm system, Sprinkler system, Fire Suppression system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**

There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:** None

Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

Case 1:25-cv-02834-GHW-KHP Document 68-21 Filed 06/06/25 Page 38 of 235



Page 2 of 2

## *Certificate of Occupancy*

**CO Number:** **121791775T002**

| | | | **Permissible Use and Occupancy** | | | |
|---|---|---|---|---|---|---|
| | | | **All Building Code occupancy group designations below are 2008 designations.** | | | |
| **Floor From To** | **Maximum persons permitted** | **Live load lbs per sq. ft.** | **Building Code occupancy group** | **Dwelling or Rooming Units** | **Zoning use group** | **Description of use** |
| CEL | | OG | F-2 | | 2 | ELECTRICAL ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 199 | 100 | A-2 | | 6 | EATING & DRINKING ESTABLISHMENT |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 40 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| ROF | | | R-2 | | 2 | BULKHEAD |
| | | | **END OF SECTION** | | | |

Borough Commissioner

Commissioner

***END OF DOCUMENT***

121791775/002  8/8/2014 9:54:11 AM

Page 1 of 2

**NYC Buildings**

# *Certificate of Occupancy*

**CO Number:**     **121791775T003**

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Temporary |
| **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 7501 | **Effective Date:** 11/18/2014 |
| **Building Identification Number (BIN):** 1088865 | | **Expiration Date:** 02/16/2015 |
| | **Building Type:** Altered | |

This building is subject to this Building Code: **2008 Code**

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

| | | |
|---|---|---|
| **Construction classification:** | 1-B | (2008 Code) |
| **Building Occupancy Group classification:** | R-2 | (2008 Code) |
| **Multiple Dwelling Law Classification:** | HAEA | |

**No. of stories:** 8     **Height in feet:** 85     **No. of dwelling units:** 49

**C.** **Fire Protection Equipment:**
Fire alarm system, Sprinkler system, Fire Suppression system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**

There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:**    None

Borough Commissioner                Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*



# Certificate of Occupancy

**CO Number:** 121791775T003

| | | | | | | |
|---|---|---|---|---|---|---|
| **Permissible Use and Occupancy** | | | | | | |
| **All Building Code occupancy group designations below are 2008 designations.** | | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| CEL | | OG | F-2 | | 2 | ELECTRICAL ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 199 | 100 | A-2 | | 6 | EATING & DRINKING ESTABLISHMENT |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 40 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| RO F | | | R-2 | | 2 | BULKHEAD |
| **END OF SECTION** | | | | | | |

Borough Commissioner

Commissioner

**END OF DOCUMENT**

121791775/003   11/18/2014 2:46:16 PM

FILED: HARLEM COMMUNITY JUSTICE CENTER - L&T 12/17/2024 12:53 PM INDEX NO. LT-002834-24/HA
NYSCEF DOC. NO. 23    Case 1:25-cv-02834-GHW-KHP    Document 68-21    Filed 00/06/25    Page 224 of 235    RECEIVED NYSCEF: 12/17/2024

# NYC Buildings

## *Certificate of Occupancy*

**CO Number:** **121791775T004**

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01789 | **Certificate Type:** Temporary |
| **Address:** 2293 THIRD AVENUE | **Lot Number(s):** 7501 | **Effective Date:** 03/06/2015 |
| **Building Identification Number (BIN):** 1088865 | | **Expiration Date:** 06/04/2015 |
| | **Building Type:** Altered | |

This building is subject to this Building Code: **2008 Code**

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

**Construction classification:** 1-B (2008 Code)

**Building Occupancy Group classification:** R-2 (2008 Code)

**Multiple Dwelling Law Classification:** HAEA

**No. of stories:** 8          **Height in feet:** 85          **No. of dwelling units:** 49

**C.** **Fire Protection Equipment:**
Fire alarm system, Sprinkler system, Fire Suppression system

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**
There are 14 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:** None

Borough Commissioner                    Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

Case 1:25-cv-02834-GHW-KHP   Document 68-21   Filed 09/06/25   Page 225 of 235



Page 2 of 2

# *Certificate of Occupancy*

**CO Number:** 121791775T004

| | Permissible Use and Occupancy | | | | | |
|---|---|---|---|---|---|---|
| | All Building Code occupancy group designations below are 2008 designations. | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| CEL | | OG | F-2 | | 2 | ELECTRICAL ROOM, GAS METER ROOM, WATER/SEWER AND PUMP ROOM, BOILER ROOM, LAUNDRY ROOM, TELEPHONE ROOM, REFUSE/RECYCLE ROOM |
| CEL | | OG | S-2 | | 2 | ACCESSORY TENANT STORAGE ROOM, BICYCLE STORAGE |
| CEL | | OG | R-2 | | 2 | COMMUNITY ROOM |
| 001 | 199 | 100 | A-2 | | 6 | EATING & DRINKING ESTABLISHMENT |
| 001 | | 60 | R-2 | | 2 | RESIDENTIAL LOBBY |
| 002 008 | | 40 | R-2 | 7 | 2 | SEVEN (7) APARTMENTS PER FLOOR |
| RO F | | | R-2 | | 2 | BULKHEAD |
| | **END OF SECTION** | | | | | |

Borough Commissioner                    Commissioner

**END OF DOCUMENT**                    121791775/004  3/6/2015 10:22:05 AM

**CIVIL COURT OF THE CITY OF NEW YORK**

Index No. L&T: _____

County of N Y

Page __1__ of __1__

Date 1/13/25    Part Y    Hon. Febres

Eas. Harlem MeC

_Petitioner(s),_

against

Perpetual A shame

_Respondent(s)_

**STIPULATION OF SETTLEMENT**

_The parties understand that each party has the right to a trial, the right to see a Judge at any time and the right not to enter into a stipulation of settlement. However, after review of all the issues, the parties agree that they do not want to go to trial and instead agree to the following stipulation in settlement of the issues in this matter._

| Party (please print) | Added/Amended or Deleted | Appearance | No Appearance | No Answer |
|---|---|---|---|---|
| Petitioner _____ | _____ | ✓ | _____ | _____ |
| Respondent 1 by counsel, MLS | _____ | ✓ SO ORDERED | _____ | _____ |
| Respondent 2 _____ | _____ | | _____ | _____ |
| Respondent 3 _____ | _____ | | _____ | _____ |

1. De,2's Mtn To Vacoreal without prejudice.

2. Case discontinued w/at prejudice Parties

3. Both parties reserve all claims + defenses.

Not atty

CIV-LT-30 page 1(Revised 4/07)

1 of 1

02/26/2025

PerpetualAshare
Unit # Bldg: 1
Apt:806
2293 3rd Avenue #806
New York, NY 10035

Re: **Initial Recertification Notice**

Dear Perpetual Ashare:

It will soon be time for your annual recertification. Internal Revenue Code Section 42 requires us to review your income, assets, and family composition every year to determine if you are still eligible for the Tax Credit program.

To help us complete your recertification, you must meet with Metro 125 Team at the Management Office. Metro 125 Team will be available for recertification interviews from March 3, 2025, to March 31, 2025. Please call Metro 125 Team at (212) 283-1847 to schedule your interview as soon as possible.

When we meet, you should have the names, addresses and phone and fax numbers for all sources of income and assets with you. Please bring the most recent statements you have received.

Some examples of income are employment wages or salary, self-employment income, social security, SSI, disability, alimony, child support, pensions, annuities, unemployment benefits, and support from family or other sources.

Assets include checking and savings accounts, money market funds, certificates of deposit (CD's), stocks, savings bonds, mutual funds, IRA's, 401K's, rental property, trusts and whole life insurance.

It is very important that we start the annual recertification in order to complete the required verifications as soon as possible. Please call if you have any questions.

Thank you for your cooperation.

Sincerely,

The Metro 125 Team

# METRO 125

Date: 02-06-25

Tenant Name: Perpetual Ashare

Unit #: 806

Attached is your Annual Recertification Questionnaire. Please complete and return to the management office.

6  Bank Statements: _Checking Account For Both_

6  Paystubs: _____

____ Employment Verification

____ Unemployment affidavit

____ Social Security/SSI award letter

____ Pension award letter

____ Child support letter

____ Student status verification and/or school letter

✓ W2's  Tax Returns 2024

____ Other: Recertification Questionnaire.

Please come to the management office by 9/21/2018 to provide the completed Annual Recertification Questionnaire.

Sincerely, Management

# ATTACHMENT L

## NYC HOUSING DEVELOPMENT CORPORATION
### TENANT INCOME CERTIFICATION

Housing Connect Log #: _____

☐ Initial Certification  ☑ Recertification  ☐ Other: _____

Effective Date: __04/01/2025__  *(if applicable)*
MM / DD / YYYY

Next Recert Date: __04/01/2026__
MM / DD / YYYY

### PART I - DEVELOPMENT DATA

Property Name: East Harlem MEC Parcel C LP

Address: 2993 3rd Avenue, New York, NY 10035-1738

Building ID # (BIN): 1010110

Unit #: 1-806

Move-In Date: 04/23/2012
MM / DD / YYYY

# Bedrooms: __3__

### PART II - HOUSEHOLD COMPOSITION

| HH Mbr # | Last Name | First Name | Middle Initial | Relationship to Head of Household | Race | Ethnicity | Disabled? | Date of Birth (MM/DD/YY) | LHTC ONLY: F/T Student (Y or N) | Last 4 Digits of Social Security # or Alien Reg # or Ind. Taxpayer ID # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 (Head) | ASHARE | PERPETUAL | | Self | 8 | 3 | 2 | | 2 | |
| 2 | OPPONG | MICHAEL | | 0 | 8 | 3 | 2 | | 1 | |
| 3 | OPPONG | GLORIA | | 0 | 8 | 3 | 2 | | 1 | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |

### PART III - GROSS ANNUAL INCOME (USE ANNUAL AMOUNTS)

| HH Mbr # | (A) Employment or Wages | (B) Soc. Security/Pensions | (C) Public Assistance | (D) Other Income |
|---|---|---|---|---|
| 1 | | | | |
| | | | | |
| | | | | |

TOTALS  $ _____  $ _____  $ _____  $ _____

Add totals from (A) through (D), above = TOTAL INCOME (E):  $ _____

### PART IV - INCOME FROM ASSETS

| HH | (F) Type of Asset | (G) C or I | (H) Cash Value of Asset | (I) Annual Income from Asset |
|---|---|---|---|---|
| Head | Checking Account | C | | |
| 3 | Checking Account | C | | |
| | | | | |

TOTALS  $ _____  $ _____

Enter Column (H) Total, if over $ 5000

Column (H) Total, if over $ 5000  $ _____  X  0.06%  =  Passbook Rate  =  IMPUTED INCOME FROM ASSETS (K):  $ _____

Enter the greater of totals from (I) or (J) = TOTAL INCOME FROM ASSETS (K)  $ _____

### PART V - DETERMINATION OF INCOME ELIGIBILITY

(L) TOTAL ANNUAL HOUSEHOLD INCOME FROM ALL SOURCES (Add (E) + (K))  $ _____

**I. TOTAL ANNUAL HOUSEHOLD INCOME FROM ALL SOURCES:** FROM ITEM (L)  $ _____

Current Income Limit Per Family Size $ _____

Household Income at Move-In  $ _____

Household Size at Move-In  4

**II. RECERTIFICATION - LIHTC PROJECTS ONLY**

Current Limit X 140% or (170%) $ _____
*Note: 170% applies to Deep Rent Skewed projects only.*

Household Income exceeds 140% OR (170%) at Recertification  ☐ Yes  ☑ No

Tenant Income Certification (Jan 2022) page 1 of 2


NYC Department of Housing Preservation & Development


NYC HDC Low-Income Program





**Department of Housing Preservation & Development**

## PART VI - RENT

| | | |
|---|---|---|
| Tenant Paid Rent: | $ | 1,464.73 |
| Utility Allowances: | + $ | 178.00 |
| | = $ | |

Rental Assistance: $ _____ $ 0.00

Other Non-optional Charges: $ _____ $ 0.00

**GROSS RENT FOR UNIT**
(Tenant paid rent plus Utility Allowances and other non-optional charges)

$ 1,642.73

Identify Other Charges: _____

Rent Level:
(in AMI)
- ☐ 30%    ☐ 80%    ☐ Other: _____ %
- ☐ 40%    ☐ 90%
- ☐ 50%    ☐ 100%
- ☒ 60%    ☐ 130%

Maximum Gross Rent Limit for this unit:    $ 2,422.00

## PART VII - STUDENT STATUS (LHTC ONLY)

ARE ALL OCCUPANTS FULL TIME STUDENTS?

☐ Yes    ☒ No

If yes, enter student explanation*
(also attach documentation)

Enter (1-5): _____

\* Student Explanation:
1. TANF assistance
2. Job training program
3. Single parent/dependent child
4. Married/joint return
5. Previous foster care

## PART VIII - PROGRAM TYPE

Mark the program(s) listed below (A. through E.) for which this household's unit will be counted toward the property's occupancy requirements. Under each program marked, indicate the household's income status as established by this certification/recertification.

| A. Tax Credit ☒ | B. HOME ☐ | C. Tax Exempt ☐ | D. Middle-Income ☐ | E. Name of other program ☐ |
|---|---|---|---|---|
| Income Status | Income Status | Income Status | Income Status | Income Status |
| ☐ 20%  ☒ 80% | ☐ 50% | ☐ 40% ☐ 80% | ☐ 80%  ☐ 130% | ☐ |
| ☐ 30%  ☐ 70%* | ☐ 60% | ☐ 50% ☐ OI** | ☐ 100%  ☐ 165% | ☐ |
| ☐ 40%  ☐ 80%* | ☐ OI** | ☐ 60% | ☐ 110%  ☐ Other %: _____ | ☐ OI** |
| ☐ 50%  ☐ OI** | | | ☐ 120% | |

\* these income levels apply for income-averaging tax credit developments only

\*\* Upon recertification, household was determined over-income (OI) according to eligibility requirements of the program(s) marked above.

## HOUSEHOLD CERTIFICATION & SIGNATURES

The information on this form will be used to determine maximum income eligibility. I/we consent to the disclosure of all of the above information to the issuer of such bonds, to the holders of such bonds and the trustee acting on their behalf, of the New York City Department of Housing Preservation and Development, to any lender providing financing for the apartment building and to the agents and employees of such entities. I/we have provided for each person(s) set forth in Part II acceptable verification of current anticipated annual income. I/we agree to notify the landlord immediately upon any member moving out of the unit or any new member moving in. I/we agree to notify the landlord immediately upon any member becoming a full time student. I/we understand and agree that the unit indicated on this form must be my primary residence, and I will not simultaneously maintain another residential lease in my name or otherwise maintain another residence.

I DECLARE THAT THE STATEMENTS CONTAINED IN THIS DOCUMENT ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I have not withheld, falsified or otherwise misrepresented any information. I fully understand that any and all information I provide during this application process is subject to review by the New York City Department of Investigation (DOI), a fully empowered law enforcement agency which investigates potential fraud in City-sponsored programs. I understand that the consequences for providing false or knowingly incomplete information in an attempt to qualify for this program may include the disqualification of my application, the termination of my lease (if discovery is made after the fact), and referral to the appropriate authorities for potential criminal prosecution.

| Signature | Date | Signature | Date |
|---|---|---|---|
| Signature | Date | Signature | Date |
| Signature | Date | Signature | Date |

## SIGNATURE OF OWNER/REPRESENTATIVE

Based on the representations herein and upon the proof and documentation required to be submitted, the individual(s) named in Part II of this Tenant Income Certification is/are eligible to live in the applicable unit under, as applicable, the provisions of Section 42 of the Internal Revenue Code (as amended), the Regulatory Agreement and/or the HOME Written Agreement governing the above Property.

Signature of Owner/Representative    Date

# ATTACHMENT L

NYC HOUSING DEVELOPMENT CORPORATION

TENANT INCOME CERTIFICATION

☐ Initial Certification ☑ Recertification ☐ Other: _____

| | | Housing Connect Log #: _____ |
|---|---|---|
| Effective Date: 04/01/2025 | | (if applicable) |
| MM / DD / YYYY | | |
| Next Recert Date: 04/01/2026 | | Move-in Date: 04/23/2012 |
| MM / DD / YYYY | | MM / DD / YYYY |

## PART I - DEVELOPMENT DATA

Property Name: East Harlem MEC Parcel C LP      Building ID # (BIN): 1010110

Address: 2093 3rd Avenue, New York, NY 10035-1738      Unit #: 1-806

# Bedrooms: 3

## PART II - HOUSEHOLD COMPOSITION

| HH Mbr # | Last Name | First Name | Middle Initial | Relationship to Head of Household | Race | Ethnicity | Disabled? | Date of Birth (MM/DD/YY) (Y or N) | LHTC ONLY: FTT Student | Last 4 Digits of Social Security # or Alien Reg. # or Ind. Taxpayer ID # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 (Head) | ASHARE | PERPETUAL | | Self | 8 | 8 | 3 | 2 | 2 | |
| 2 | OPPONG | MICHAEL | | O | 8 | 3 | 2 | 1 | | |
| 3 | OPPONG | GLORIA | | O | 8 | 3 | 2 | 1 | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |

## PART III - GROSS ANNUAL INCOME (USE ANNUAL AMOUNTS)

| HH Mbr # | (A) Employment or Wages | (B) Soc. Security/Pensions | (C) Public Assistance | (D) Other Income |
|---|---|---|---|---|
| 1 | | | | |
| HH | | | | |
| TOTALS $ | $ | $ | $ | $ |

Add totals from (A) through (D), above = TOTAL INCOME (E): $

## PART IV - INCOME FROM ASSETS

| Hshld Mbr # | (F) Type of Asset | (G) C/I | (H) Cash Value of Asset | (I) Annual Income from Asset |
|---|---|---|---|---|
| Head | Checking Account | C | | |
| 3 | Checking Account | C | | |
| | | | | 0.00 |
| TOTALS $ | | | $ | $ |

Enter Column (H) Total, if over $ 5,000 $ _____ X 0.00% = IMPUTED INCOME (J): $

Passbook Rate

Enter the greater of totals from (I) or (J) = TOTAL INCOME FROM ASSETS (K): $

## PART V - DETERMINATION OF INCOME ELIGIBILITY

| L. TOTAL ANNUAL HOUSEHOLD INCOME FROM ALL SOURCES: FROM ITEM (L) | $ | II. RECERTIFICATION - LHTC PROJECTS ONLY |
|---|---|---|
| | | Current Limit X 140% or (170%) $ _____ |
| Current Income Limit Per Family Size $ | | Note: 170% applies to Deep Rent Skewed projects only |
| Household Income at Move-in $ | | Household Income exceeds 140% OR (170%) at |
| Household Size at Move-in | 4 | Recertification ☐ Yes ☑ No |

(L) TOTAL ANNUAL HOUSEHOLD INCOME
FROM ALL SOURCES  [Add (E) + (K)]  $



**Department of Housing Preservation & Development**

## PART VI - RENT

| | | | | |
|---|---|---|---|---|
| Tenant Paid Rent: | $ _____ 1,464.73 | Rental Assistance: | $ _____ | 0.00 |
| Utility Allowances: | + $ _____ 178.00 | Other Non-optional Charges: | $ _____ | 0.00 |
| | = | | | |

GROSS RENT FOR UNIT
(Tenant paid rent plus Utility
Allowances and other non-
optional charges)

$ _____ 1,642.73

Identify Other Charges: _____

Maximum Gross Rent Limit for this unit: $ _____ 2,422.00

Rent Level: (in AMI)
☐ 30%  ☐ 80%  ☐ Other: _____ %
☐ 40%  ☐ 90%
☑ 50%  ☐ 100%
☐ 60%  ☐ 130%

## PART VII - STUDENT STATUS (LIHTC ONLY)

ARE ALL OCCUPANTS FULL TIME STUDENTS?

☐ Yes  ☑ No

If yes, enter student explanation*
(also attach documentation)

Enter (1-5): [ ]

* Student Explanation:
1 TANF assistance
2 Job training program
3 Single parent/dependent child
4 Married/joint return
5 Previous foster care

## PART VIII - PROGRAM TYPE

Mark the program(s) listed below (A. through E.) for which this household's unit will be counted toward the property's occupancy requirements. Under each program marked, indicate the household's income status as established by this certification/recertification.

| A. Tax Credit ☑ | B. HOME ☐ | C. Tax Exempt ☐ | D. Middle-Income ☐ | E. Name of other program [ ] ☐ |
|---|---|---|---|---|
| Income Status | Income Status | Income Status | Income Status | Income Status |
| ☐ 20%  ☑ 60% | ☐ 50% | ☐ 40%  ☐ 80% | ☐ 30% | |
| ☐ 30%  ☐ 70%* | ☐ 60% | ☐ 50%  ☐ O1** | ☐ 80% | |
| ☐ 40%  ☐ 80%* | | ☐ 60% | ☐ 100% | |
| ☐ 50%  ☐ O1** | | | ☐ 110% | ☐ 130% |
| | | | ☐ 120% | ☐ 165% |
| | | | | ☐ Other %:  ☐ O1** |

* these income levels apply for income-averaging tax credit developments only

** Upon recertification, household was determined over-income (OI) according to eligibility requirements of the program(s) marked above.

## HOUSEHOLD CERTIFICATION & SIGNATURES

The information on this form will be used to determine maximum income eligibility. I/we consent to the disclosure of all of the above information to the issuer of such bonds, to the holders of such bonds and the trustee acting on their behalf, of the New York City Department of Housing Preservation and Development, to any lender providing financing for the apartment building and to the agents and employees of such entities. I/we have provided for each person(s) set forth in Part II acceptable verification of current anticipated annual income. I/we agree to notify the landlord immediately upon any member moving out of the unit or any new member moving in. I/we agree to notify the landlord immediately upon any member becoming a full time student. I/we understand and agree that the unit indicated on this form must be my primary residence, and I will not simultaneously maintain another residential lease in my name or otherwise maintain another residence.

I DECLARE THAT THE STATEMENTS CONTAINED IN THIS DOCUMENT ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I have not withheld, falsified or otherwise misrepresented any information. I fully understand that any and all information I provide during this application process is subject to review by the New York City Department of Investigation (DOI), a fully empowered law enforcement agency which investigates potential fraud in City-sponsored programs. I understand that the consequences for providing false or knowingly incomplete information in an attempt to qualify for this program may include the disqualification of my application, the termination of my lease of discovery is made after the fact), and referral to the appropriate authorities for potential criminal prosecution.

| Signature | Date | Signature | Date |
|---|---|---|---|
| Signature | Date | Signature | Date |
| Signature | Date | Signature | Date |

## SIGNATURE OF OWNER/REPRESENTATIVE

Based on the representations herein and upon the proof and documentation required to be submitted, the individual(s) named in Part II of this Tenant Income Certification is/are eligible to live in the applicable unit under, as applicable, the provisions of Section 42 of the Internal Revenue Code (as amended), the Regulatory Agreement and/or the HOME Written Agreement governing the above Property.

Signature of Owner/Representative _____  Date _____

Tenant Income Certification (Jan 2022) page 2 of 2




NYC HDC
Low-Income Program

**From:** "Sherrill, Gregory" <SherrillG@richmanmgt.com>
**Date:** April 1, 2025 at 10:55:39 AM EDT
**To:** Perpetual Ashare <perpasha51@gmail.com>
**Cc:** gloriaoppong48@gmail.com, ashare.perpetual@icloud.com
**Subject: Recertification Documents**


Hello,

Please see attached document to be signed by everyone and emailed back to me as soon as possible. Thanks!



**Gregory Sherril · Asst. Property Manager**
The Balton, Metro 125, Douglass Park, St. Nicholas Park
311 West 127th Street · New York, NY 10027
Phone: (212) 864.6511
Email: sherrillg@richmanmgt.com
www.RichmanPropertyServices.com

# ATTACHMENT L

## NYC HOUSING DEVELOPMENT CORPORATION
## TENANT INCOME CERTIFICATION

☐ Initial Certification ☑ Recertification ☐ Other: _____    Housing Connect Log #: _____
*(if applicable)*

Effective Date: 04/01/2025
   MM / DD / YYYY

Next Recert Date: 04/01/2026
   MM / DD / YYYY

### PART I - DEVELOPMENT DATA

Property Name: East Harlem MEC Parcel C LP    Building ID # (BIN): 1010110

Address: 2993 3rd Avenue, New York, NY 10035-1738    Unit #: L-806

# Bedrooms: 3    Move-in Date: 04/23/2012    MM / DD / YYYY

### PART II - HOUSEHOLD COMPOSITION

| HH Mbr # | Last Name | First Name | Middle Initial | Relationship to Head of Household | Race | Ethnicity | Disabled? | Date of Birth (MM/DD/YY) | LIHTC ONLY: F/T Student (Y or N) | Last 4 Digits of Social Security or Alien Reg. # or Ind. Taxpayer ID # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 (Head) | ASHARE | PERPETUAL | | Self | 8 | 3 | 2 | | 2 | |
| 2 | OPPONG | MICHAEL | | O | 8 | 3 | 2 | | 1 | |
| 3 | OPPONG | GLORIA | | O | 8 | 3 | 2 | | 1 | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |

### PART III - GROSS ANNUAL INCOME (USE ANNUAL AMOUNTS)

| HH Mbr # | (A) Employment or Wages | (B) Soc. Security/Pensions | (C) Public Assistance | (D) Other Income |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| TOTALS | $ | $ | $ | $ |

Add totals from (A) through (D) above = TOTAL INCOME (E): $

### PART IV - INCOME FROM ASSETS

| HH Mbr # | (F) Type of Asset | (G) C/I | (H) Cash Value of Asset | (I) Annual Income from Asset |
|---|---|---|---|---|
| Head | Checking Account | C | | |
| 3 | Checking Account | C | | |
| | | | | |
| | | | | |
| | TOTALS | $ | $ | $ |

Enter Column (H) Total if over $5000   $ _____ X 0.06% = IMPUTED INCOME (J): $

Enter the greater of totals from (I) or (J) = TOTAL INCOME FROM ASSETS (K): $

### PART V - DETERMINATION OF INCOME ELIGIBILITY

**I. TOTAL ANNUAL HOUSEHOLD INCOME FROM ALL SOURCES:**
FROM ITEM (L): $

TOTAL ANNUAL HOUSEHOLD INCOME FROM ALL SOURCES (Add (E) + (K)) $

Current Income Limit Per Family Size $

Household Income at Move-In $ _____ Household Size at Move-In _____

**II. RECERTIFICATION - LIHTC PROJECTS ONLY**
Current Limit X 140% or (170%): $ _____
*Note: 170% applies to Deep Rent Skewed projects only*

Household Income exceeds 140% OR (170%) at Recertification? ☐ Yes ☑ No


Low-Income Program

Tenant Income Certification (Jan 2022) page 1 of 2

## PART VI - RENT

| | | |
|---|---|---|
| Tenant Paid Rent: | $ _____ 1,464.73 | Rental Assistance: $ _____ 0.00 |
| | + | Other Non-optional Charges: $ _____ 0.00 |
| Utility Allowances: | $ _____ 178.00 | |
| | = | |

GROSS RENT FOR UNIT
(Tenant paid rent plus Utility
Allowances and other non-
optional charges)  $ _____ 1,642.73

Identify Other Charges: _____

Maximum Gross Rent Limit for this unit:  $ _____ 2,422.00

## PART VII - STUDENT STATUS (LIHTC ONLY)

ARE ALL OCCUPANTS FULL TIME STUDENTS?

☐ Yes    ☒ No

If yes, enter student explanation*
(also attach documentation)

Enter (1-5): _____

* Student Explanation:
1  TANF assistance
2  Job training program
3  Single parent/dependent child
4  Married/joint return
5  Previous foster care

## PART VIII - PROGRAM TYPE

Mark the program(s) listed below (A. through E.) for which this household's unit will be counted toward the property's occupancy requirements. Under each program marked, indicate the household's income status as established by this certification/recertification.

| A. Tax Credit ☒ | B. HOME ☐ | C. Tax Exempt ☐ | D. Middle-Income ☐ | E. _____ ☐ |
|---|---|---|---|---|
| Income Status | Income Status | Income Status | Income Status | Name of other program |
| ☐ 20%    ☒ 60% | ☐ 50% | ☐ 40%   ☐ 80% | ☐ 90% | Income Status |
| ☐ 30%    ☐ 70%* | ☐ 60% | ☐ 50%   ☐ OI** | ☐ 100% | ☐ |
| ☐ 40%    ☐ 80%* | | ☐ 60% | ☐ 110% | ☐ |
| ☐ 50%    ☐ OI** | | | ☐ 120% | ☐ 165% ☐ |
| | | | | ☐ Other %: |
| | | | | ☐ OI** |

| Rent Level (in AMI) | |
|---|---|
| ☐ 30%   ☐ 80% | |
| ☐ 40%   ☐ 90% | |
| ☐ 50%   ☐ 100% | |
| ☒ 60%   ☐ 130% | |
| ☐ Other _____ % | |

* these income levels apply for income-averaging tax credit developments only
** Upon recertification, household was determined over-income (OI) according to eligibility requirements of the program(s) marked above.

## HOUSEHOLD CERTIFICATION & SIGNATURES

The information on this form will be used to determine maximum income eligibility. I/we consent to the disclosure of all of the above information to the issuer of such bonds, to the holders of such bonds and the trustee acting on their behalf, of the New York City Department of Housing Preservation and Development, to any lender providing financing for the apartment building and to the agents and employees of such entities. I/we have provided for each person(s) set forth in Part II acceptable verification of current anticipated annual income. I/we agree to notify the landlord immediately upon any member moving out of the unit or any new member moving in. I/we agree to notify the landlord immediately upon any member becoming a full time student. I/we understand and agree that the unit indicated on this form must be my primary residence, and I will not simultaneously maintain another residential lease in my name or otherwise maintain another residence.

I DECLARE THAT THE STATEMENTS CONTAINED IN THIS DOCUMENT ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I have not withheld, falsified or otherwise misrepresented any information. I fully understand that any and all information I provide during this application process is subject to review by the New York City Department of Investigation (DOI), a fully empowered law enforcement agency which investigates potential fraud in City-sponsored programs. I understand that the consequences for providing false or knowingly incomplete information in an attempt to qualify for this program may include the disqualification of my application, the termination of my lease (if discovery is made after the fact), and referral to the appropriate authorities for potential criminal prosecution.

| Signature | Date | Signature | Date |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Signature | Date | Signature | Date |
| _____ | _____ | _____ | _____ |
| Signature | Date | Signature | Date |
| _____ | _____ | _____ | _____ |

## SIGNATURE OF OWNER/REPRESENTATIVE

Based on the representations herein and upon the proof and documentation required to be submitted, the individual(s) named in Part II of this Tenant Income Certification is/are eligible to live in the applicable unit under, as applicable, the provisions of Section 42 of the Internal Revenue Code (as amended), the Regulatory Agreement and/or the HOME Written Agreement governing the above Property.

_____
Signature of Owner/Representative

_____
Date

Tenant Income Certification (Jan 2022) page 2 of 2


NYC HDC
Low-Income Program