Page 89

```
 1              M. HYMAN
 2   a nonpayment petition steps, as follows, and
 3   tell me if you agree with it or not.
 4        And her testimony would be whatever
 5   it is.
 6        She says that there is the property
 7   management company e-mails information about
 8   tenants who they want to begin nonpayment
 9   proceedings with -- against.
10        Does that sound right?
11        MR. FLANAGAN:  Objection to the form
12     of question.
13        Over objection, you can answer.
14   A.   My response would be that the client
15   sends it over, depending on who the building is
16   and whatever.
17   Q.   Okay, fine.
18        MR. FLANAGAN:  That was her
19     testimony too, I believe.
20        MR. KESHAVARZ:  Let's call it the
21     client.
22   BY MR. KESHAVARZ:
23   Q.   The client e-mails -- strike that.
24        So I'm trying to go through -- and
25   tell me if this is correct -- the steps between
```

Page 90

```
 1              M. HYMAN
 2   when the client try -- contacts your firm to
 3   begin a nonpayment petition and when your firm
 4   brings the nonpayment petition.  So let me go
 5   through those steps.
 6        Are you looking at your phone, sir?
 7   A.   No, I'm playing with a piece of
 8   paper in my hand.
 9   Q.   I do the same thing, but with a --
10        MR. FLANAGAN:  Just ask the
11     questions.  Let's go.
12   BY MR. KESHAVARZ:
13   Q.   All right.
14        So there is an intake form that this
15   firm gets from the owner of the building as one
16   of the first steps.
17        Is that correct?
18   A.   The client will send over to our
19   office a rent ledger and an intake form for us
20   to commence a case.  They would ask us to
21   commence a case.
22   Q.   So that -- okay.
23        That's a good summary about how
24   cases come from the owner to the filing of the
25   nonpetition.
```

Page 91

```
 1              M. HYMAN
 2        That's how it works?
 3   A.   To commence a case.
 4   Q.   Yeah.
 5        A non--
 6   A.   A nonpayment of rent case.
 7   Q.   Okay.
 8        And the form and the information
 9   that the owner would send would be things like
10   the lease; that would be one thing, right?
11   A.   They would give us information on
12   their tenant's name, address, apartment, rent
13   owed, if there's a subsidy, that there's a tax
14   credit tied to the unit, Section 8 tied to the
15   unit, other adults that are in the apartment;
16   that type of thing.
17   Q.   In the ordinary course of -- that's
18   the information that the owner would send to
19   begin?
20   A.   We would need that, correct.
21   Q.   And that's what they send over?
22   A.   Correct.
23   Q.   Is there any, in your ordinary
24   course of business, are there any other types
25   of information that you ask from the owner?
```

Page 92

```
 1              M. HYMAN
 2   A.   I'm not sure I understand what that
 3   means.  Whatever is on the intake is what we
 4   need to fill them out.
 5   Q.   Okay.
 6        What's on the intake sheet?
 7   A.   Basically, things I've just said to
 8   you.
 9   Q.   Anything else on the intake sheet
10   other than what we just discussed?
11   A.   I would have to look at one to see
12   what I have left out, but...
13   Q.   That's all you recall?
14   A.   I think I had most of everything, I
15   believe so.
16        MR. KESHAVARZ:  I call for the
17     production of the intake sheet.  Instead of
18     just asking you what the intake says, let's
19     just take a look at the sheet.
20        MR. FLANAGAN:  Taken under
21     advisement.
22   BY MR. KESHAVARZ:
23   Q.   Do you have a -- do you ask the
24   landlord if there's a certificate of occupancy
25   in the building prior to filing a nonpayment
```



Page 93

```
 1                M. HYMAN
 2   action?
 3      A.   No, that's usually assumed.
 4      Q.   And the --
 5      A.   I shouldn't say that.  If it's a
 6   two-family type of a house, we do.
 7      Q.   But other than that situation?
 8      A.   No.
 9      Q.   You don't have to ask -- you don't
10   ask anything --
11      A.   It's usually assumed that they have
12   it.
13      Q.   You have to wait until I finish the
14   question.
15      A.   I thought you finished.
16      Q.   Other than the two family situation,
17   you wouldn't -- your firm doesn't ask the
18   landlord about the certificate of occupancy?
19      A.   Correct.
20      Q.   Before filing a nonpayment petition?
21      A.   Correct.
22      Q.   And in the ordinary course of
23   litigating a nonpayment petition, you wouldn't
24   ask for certificate of occupancy information?
25      A.   Sorry, say that again?
```

Page 94

```
 1                M. HYMAN
 2      Q.   We talked about everything up in
 3   until to the date of the filing.  I just want
 4   to make sure during the normal course of
 5   litigating, to the degree there is litigation
 6   in a rental arrears case, you don't ask for the
 7   certificate of occupancy from the beginning of
 8   the case to the resolution of the case?
 9      A.   We wouldn't need to.
10      Q.   So the answer is no?
11      A.   Correct.
12      Q.   Okay.  All right.
13           If there's no certificate of
14   occupancy in a building, do you believe you
15   could lawfully file suit to collect rent in
16   that billing?
17           MR. FLANAGAN:  Objection to form and
18      calls for legal conclusion.
19           Over objection, you can answer.
20      A.   If the building -- if a building is
21   constructed and doesn't have a certificate of
22   occupancy, is a landlord allowed to collect
23   rent?  I would say no.
24      Q.   Okay.
25           Well, how do you know whether the
```

Page 95

```
 1                M. HYMAN
 2   nonpayment petitions that you file are for a
 3   building that does not have a certificate of
 4   occupancy?
 5      A.   I think I said earlier, we assume
 6   that these multiple dwellings have certificate
 7   of occupancies.  Clients wouldn't waste their
 8   time and money to pay us to sue tenants if they
 9   don't have what they need.
10      Q.   Okay.
11           THE WITNESS:  I'll have somebody
12      order lunch for you.
13           MR. FLANAGAN:  I have lunch.
14   BY MR. KESHAVARZ:
15      Q.   Are you familiar with the Court of
16   Appeals case in Chazon?
17           (Reporter clarification.)
18      A.   Chazon, I'm familiar with the case,
19   I just don't know if it was the First Appellate
20   Division or if it was the Court of Appeals --
21      Q.   It's the Court of Appeals.  But
22   whatever it is, is it your understanding that
23   if there's a no valid certificate of occupancy,
24   a landlord can't legally file suit to collect
25   rent?
```

Page 96

```
 1                M. HYMAN
 2           MR. FLANAGAN:  Objection to form.
 3      Objection, calls for legal conclusion.
 4           Over objection, you can answer.
 5      A.   If I recall correctly, Chazon was
 6   dealing with loft laws, loft tenants.  And
 7   there was an agency -- there was a
 8   determination that that loft landlord has to
 9   obtain a certificate of occupancy by a certain
10   date; and if he didn't, that was that.  And
11   they didn't have it in that case.  And I think
12   that's very distinguishable.
13      Q.   You could lawfully file a case
14   seeking to collect rent if there's no
15   certificate of occupancy, correct?
16           MR. FLANAGAN:  Objection to form.
17      Objection for legal conclusion.
18           Over objection, you can answer.
19      A.   I don't think I understand the
20   question.  Can you rephrase it?
21      Q.   Sure.
22           I think you answered the question.
23           But I was asking before:  Can the
24   landlord lawfully collect rent from a tenant if
25   there's no certificate of occupancy?
```

